**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CITY OF COLUMBUS
90 W. Broad St.
Columbus, OH  43215;

MAYOR AND CITY COUNCIL OF
    BALTIMORE
100 N. Holliday St., Suite 101
Baltimore, MD  21202;

CITY OF CINCINNATI
City Hall, Room 214
801 Plum St.
Cincinnati, OH  45202;

CITY OF CHICAGO
121 N. Lasalle St., Room 600
Chicago, IL  60602

STEPHEN VONDRA
c/o Democracy Forward Foundation
1333 H St. NW
Washington, DC  20005; and

BONNIE MORGAN
c/o Democracy Forward Foundation
1333 H St. NW
Washington, DC  20005;

        *Plaintiffs*,

    vs.

DONALD J. TRUMP, in his official capacity
    as President of the United States of
    America,
1600 Pennsylvania Ave. NW
Washington, DC  20500;

Case No. 18-cv-2364

ALEX M. AZAR, II, in his official capacity
   as Secretary of the United States
   Department of Health and Human
   Services,
200 Independence Ave. SW
Washington, DC  20201;

UNITED STATES DEPARTMENT OF
   HEALTH AND HUMAN SERVICES
200 Independence Ave. SW
Washington, DC  20201;

SEEMA VERMA, in her official capacity as
   Administrator of the Centers for Medicare
   and Medicaid Services,
7500 Security Blvd.
Baltimore, MD  21244; and the

CENTERS FOR MEDICARE AND
   MEDICAID SERVICES
7500 Security Blvd.
Baltimore, MD  21244,

      *Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

NATURE OF THE ACTION .................................................................... 4

JURISDICTION AND VENUE ............................................................... 7

PARTIES .............................................................................................. 7

FACTS .................................................................................................. 9

    I.    The Individual Health Insurance Markets and the Affordable Care Act ............... 9

    II.    The Administration's Intent to Repeal the ACA, With or Without Congress ...... 17

DEFENDANTS' EXECUTIVE ACTIONS  TO SABOTAGE THE
AFFORDABLE CARE ACT ................................................................. 28

    I.    The 2019 Rule ................................................................. 29

        A.    Eliminating Protections that the ACA Guarantees ................... 29

            1.    Permitting Exchanges to Strip Individuals of Eligibility for
Tax Credits Without Providing Direct Notification..................... 29

            2.    Outsourcing to States the Compliance Review of Insurance
Plans to be Offered on Federal Exchanges ................................ 32

            3.    Reducing Oversight of Insurance Brokers Participating in
Direct Enrollment.................................................................. 35

        B.    Deterring Americans from Enrolling in Quality Health Insurance
Plans ........................................................................................ 37

            1.    Making It Harder to Compare Insurance Plans........................... 37

            2.    Undermining the Navigator Program.......................................... 39

            3.    Making Small Business Exchanges Less User-Friendly ............. 42

            4.    Imposing Unnecessary Income Verification Requirements ........ 43

        C.    Driving Up Costs ...................................................................... 46

            1.    Exacerbating Risk Selection ....................................................... 46

            2.    Curtailing Review of Insurance Rate Increases........................... 49

            3.    Reducing Rebates for Poor Insurer Performance......................... 52

    II.    Additional Executive Actions Demonstrating Defendants' Violation of
Their Constitutional Duty to Faithfully Execute the ACA .................... 55

        A.    Directing Agencies to Sabotage the Act ..................................... 55

        B.    Attempting to Destabilize the Exchanges .................................. 57

            1.    Promoting Bare-Bones Plans to Try to Weaken
ACA Exchanges....................................................................... 61

            2.    Undermining the Individual Mandate .......................................... 65

|     |     | 3. | Refusing to Grant State Waiver Requests that Would Further the ACA's Goals | 68 |
|     |     | 4. | Attempting to Weaken Public Confidence in ACA Exchanges | 70 |
|     | C. | Working to Decrease Enrollment | | 73 |
|     |     | 1. | Shortening Open Enrollment | 74 |
|     |     | 2. | Cutting Funding for Advertising and Refusing to Publicize Open Enrollment | 77 |
|     |     | 3. | Cutting Funding for Navigators and Encouraging Them to Undermine the Act | 82 |
|     |     | 4. | Refusing to Participate in Enrollment Events and Other Outreach | 88 |
|     | D. | Refusing to Defend the Act | | 89 |

DEFENDANTS' UNLAWFUL ACTIONS ARE HARMING PLAINTIFFS ............................ 91

I.      Defendants' Unlawful Actions Are Causing Premiums to Rise and the Rate of the Uninsured to Increase ............................ 91

II.     Defendants' Unlawful Actions Harm the City Plaintiffs by Forcing Them to Spend More on Uncompensated Care ...................... 96

        A.      Columbus, Ohio ......................................... 102

        B.      Baltimore, Maryland ..................................... 106

        C.      Cincinnati, Ohio ........................................ 111

        D.      Chicago, Illinois ........................................ 114

III.    Defendants' Unlawful Actions Harm the Individual Plaintiffs by Making Insurance Coverage Harder and More Expensive to Procure ......... 118

CLAIMS FOR RELIEF ................................................. 124

        Count One (Violation of the Administrative Procedure Act) ........ 124

        Count Two (Violation of the Take Care Clause) ................... 126

PRAYER FOR RELIEF ................................................ 126

Plaintiffs the City of Columbus, Ohio, the Mayor and City Council of Baltimore, Maryland, the City of Cincinnati, Ohio, the City of Chicago, Illinois, Stephen Vondra, and Bonnie Morgan hereby sue Defendants Donald J. Trump, in his official capacity as President of the United States of America, Alex M. Azar, II, in his official capacity as Secretary of the United States Department of Health and Human Services, the United States Department of Health and Human Services, Seema Verma, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services, and the Centers for Medicare and Medicaid Services, and allege as follows:

1.     Having failed to persuade Congress to repeal the Affordable Care Act, President Trump and his Administration are waging a relentless campaign to sabotage and, ultimately, to nullify the law. President Trump has repeatedly admitted as much: because Congress rejected his demand to have "Obamacare repealed," he has said, he decided "to go a different route" and "end[] Obamacare" through his own actions. To that end, President Trump and his Administration are deliberately trying to make the Act fail. They are discouraging Americans from enrolling in comprehensive plans that protect them against debilitating medical expenses. They are working to raise prices and reduce choices for Americans seeking insurance in the Act's exchanges. And they are misappropriating funds Congress allocated to support the Act, instead using those funds to attack it. The Trump Administration's strategy: to deceptively shift the blame from their own actions to the Act itself. Their objective: to pressure Congress to repeal the Act or, if that fails, to achieve de facto repeal through executive action alone. The Administration's actions are unlawful.

2.     The scope of this Complaint is testament to the breadth and persistence of the Trump Administration's efforts to undermine the Affordable Care Act ("ACA"). As Plaintiffs—

individuals and cities representing almost 4.5 million Americans—allege in detail below, the

Administration has tried to prevent families from obtaining health insurance through the ACA's

exchanges by, for example:

- promoting insurance that does not comply with the ACA's requirements, including insurance that does not cover preexisting conditions;

- slashing funding for outreach strategies that have been proven to encourage individuals, and healthy individuals in particular, to sign up for coverage;

- misusing federal funds for advertising campaigns aimed at smearing the ACA and its exchanges, and spinning false narratives about the efficacy and success of the Act;

- providing individuals and families with less time to choose a plan that is appropriate for them; and

- imposing unnecessary and onerous documentation requirements, making enrollment even harder.

In addition, the Administration has worked to increase premiums for ACA-compliant insurance

by, for example, shirking oversight of insurance rate increases and reducing rebates owed to

consumers when insurers underperform. Finally, the Administration has attempted to make

affordable, high-quality health insurance unavailable by sowing uncertainty in insurance

markets, causing insurers to raise rates or exit markets altogether.

   3. President Trump and his Administration have been remarkably transparent about

their intent and their approach. "If we don't get it done" in Congress, President Trump has said,

"we are going to watch Obamacare go down the tubes, and we'll blame the Democrats . . . [a]nd

at some point, they are going to come and say, 'You've got to help us.'" "[W]e are getting rid of

Obamacare," President Trump has boasted, "essentially, we have gotten rid of it," "[i]t's dead[,]

[i]t's essentially dead," "there is no Obamacare, it's dead." Of course, as a matter of

constitutional law, the Affordable Care Act has not been repealed; as a matter of fact, it is not

dead, and indeed it has proven more resilient than the Administration might have hoped. But the

Administration's death-by-a-thousand-cuts campaign to undermine the Act via executive action alone has taken a toll.

4.      All Americans are, quite literally, paying the price. The Trump Administration's actions are driving insurers out of ACA exchanges, raising premiums, and increasing the population of underinsured and uninsured individuals. Defendants' actions are therefore imposing significant costs on families and governments nationwide, including Plaintiffs in this case. Specifically, the Trump Administration's actions force the cities of Columbus, Ohio, Baltimore, Maryland, Cincinnati, Ohio, and Chicago, Illinois, to spend more on uncompensated care for their residents. The Trump Administration's actions force Steve Vondra and Bonnie Morgan to pay more for the quality health insurance coverage they need—insurance that, for example, covers Steve's preexisting condition. That is the precise opposite of what Congress intended the ACA to achieve. Congress passed the ACA to make comprehensive health insurance more affordable and to reduce the costs of uncompensated care. The ACA was achieving those aims before the Trump Administration came to power.

5.      The Trump Administration's actions are also an affront to the rule of law: to our constitutional system, under which Congress enacts laws and the President faithfully implements them. The Administration's actions raise questions that go to the heart of our structure of government: whether the executive branch must "take care that the laws be faithfully executed," U.S. Const. art. II, § 3, and whether the Constitution therefore prohibits the President and his appointees from wielding executive power to destroy a duly-enacted law. The Administration's actions violate the Take Care Clause and the Administrative Procedure Act. They should be declared unlawful and set aside.

## NATURE OF THE ACTION

6.      In 2010, the 111th Congress passed, and President Barack Obama signed into law, the Patient Protection and Affordable Care Act.[1] In so doing, Congress and the President enacted the ACA into law pursuant to the "single, finely wrought and exhaustively considered[] procedure" set forth in the Constitution. *INS v. Chadha*, 462 U.S. 919, 951 (1983) (citing U.S. Const. art. I, §§ 1, 7). Under the Constitution, the ACA remains law unless Congress and the President revise or repeal it by that same procedure. Until then, President Trump and his Administration must "take care that the law[] be faithfully executed." U.S. Const. art. II, § 3.

7.      Defendants have not only neglected this obligation: they have defied it. Having campaigned on a promise to secure the ACA's repeal but having failed to convince Congress to take that step, President Trump has turned to executive action alone to try to sabotage the law. Whereas the ACA is "designed to *expand* coverage in the individual health insurance market," *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015) (emphasis added), Defendants—by regulation, executive order, and otherwise—are obstructing individuals' access to that market, purposefully attempting to destabilize it, laboring to increase insurance premiums and decrease enrollment, and using resources that Congress has provided to support the law in their blatant attempts to undermine it.

8.      The executive actions challenged here have been undertaken to thwart the ACA's goals and try to make the law fail. They are therefore "incompatible with the expressed . . . will of Congress," such that the Executive's "power is at its lowest ebb" and judicial scrutiny is at its

---

[1]    *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), *as amended*, Health Care Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010). The Affordable Care Act is also known as "Obamacare."

most strict, "for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring). President Trump may well believe, as he has repeatedly stated, that "[t]he best thing politically is to let [the ACA] explode."[2] But in acting on that intention—by neglecting to faithfully implement the ACA and affirmatively taking numerous executive actions to sabotage it— President Trump and his Administration have violated the Administrative Procedure Act, 5 U.S.C. § 706, and the Take Care Clause, U.S. Const. art. II, § 3.

9. At issue here are a final rule and a long list, ever-growing, of other executive actions, all undertaken by the Trump Administration to undermine the ACA.

10. The final rule is the Centers for Medicare & Medicaid Service's Notice of Benefit and Payment Parameters for 2019, 83 Fed. Reg. 16,930 (April 17, 2018), referenced here as the "2019 Rule" as it governs many aspects of ACA insurance markets for the 2019 plan year. The 2019 Rule implements a number of changes, detailed below, that increase the cost of health coverage and impose other barriers to enrollment. These changes lack adequate justification and, in some instances, violate the Affordable Care Act's text; they are therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and must be "[held] unlawful and set aside," *id.* § 706(2).

11. The 2019 Rule's unlawful changes are also evidence of Defendants' failure to comply with their duty under the Constitution to "take care that the [Affordable Care Act] be faithfully executed." U.S. Const. art. II, § 3.

---

[2] Amy Goldstein & Juliet Eilperin, *Affordable Care Act Remains 'Law of the Land,' but Trump Vows to Explode It*, Washington Post, Mar. 24, 2017, https://www.washingtonpost.com/national/health-science/affordable-care-act-remains-law-of-the-land-but-trump-vows-to-explode-it/2017/03/24/4b7a2530-10c3-11e7-ab07-07d9f521f6b5_story.html.

12.     The 2019 Rule does not stand alone. A slew of executive actions, starting with the very first executive order President Trump issued on the day of his inauguration and continuing through the present, further confirms Defendants' failure to heed the obligations that the Take Care Clause imposes. Unquestionably, "[t]he Constitution does not confer upon [the President] any power to enact laws or to suspend or repeal such as the Congress enacts." *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915). Rather, "[u]nder our system of government, Congress makes laws and the President, acting at times through agencies . . . 'faithfully execute[s]' them." *Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 134 S. Ct. 2427, 2446 (2014) (quoting U.S. Const. art. II, § 3) (final alteration in original).[3] That principle, embodied in the Take Care Clause, is as fundamental as it is longstanding. Just as courts "cannot interpret federal statutes to negate their own stated purposes," *King*, 135 S. Ct. at 2493, the President cannot "implement" a federal statute in ways designed to destroy it. This is precisely what President Trump and his Administration are doing. By actively and avowedly wielding executive authority to sabotage the ACA, Defendants are not acting in good faith; instead, they have usurped Congress's lawmaking function, and they are violating the Constitution.

13.     This Court must intervene. For the reasons set forth below, this Court should declare that Defendants have violated the Administrative Procedure Act and failed to fulfill their constitutional duty to faithfully execute the Affordable Care Act, enjoin Defendants' attempts to

---

[3] *See* Brief for the Cato Institute, Professor Randy E. Barnett, and Professor Jeremy Rabkin as *Amici Curiae* Supporting Respondents at 10, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), https://object.cato.org/sites/cato.org/files/pubs/pdf/texas-v-us-sup-ct-final-2.pdf ("It bears emphasis how strong the language of the Take Care Clause is. It is pitched at the highest register of constitutional obligation. The president *shall*—not may. He shall *take care*—not merely attempt. He shall take care that the laws be *executed*—not merely obeyed. And he shall take care that they are executed *faithfully*. No other constitutional provision mandates that any branch execute a power in a specific manner. Yet the Constitution mandates that the president execute the laws in a specific way: *faithfully*.").

undermine the ACA, and order them to implement the Act so as to expand, rather than limit, access to quality health insurance.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs' claim challenging the 2019 Rule is reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, 706. As to Plaintiffs' claim under the Take Care Clause, this Court has authority to issue "equitable relief . . . '[to] prevent[] entities from acting unconstitutionally.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)).

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) because Defendants are agencies and officers of the United States and Defendant the Centers for Medicare and Medicaid Services is headquartered in Baltimore, Maryland.

## PARTIES

16.     Plaintiff the City of Columbus, Ohio, is a municipal corporation organized under Ohio law. *See* Ohio Const. art. XVIII. Columbus has all the powers of local self-government and home rule under the constitution and laws of the state of Ohio, which are exercised in the manner prescribed by the Charter of the City of Columbus.[4]

17.     Columbus, located in Franklin County, is the capital of Ohio. It is the largest city in the state and the fourteenth largest city in the United States, with a population of over 860,000, according to 2016 Census estimates. Columbus provides a wide range of services on behalf of its residents, including health services for families and children, public health, public assistance, and emergency medical care.

---

[4]     *See City Code and Charter*, City of Columbus, https://www.columbus.gov/council/Helpful-Links/City-Code-and-Charter; O.R.C. § 715.01.

18.     Plaintiff the Mayor and City Council of Baltimore ("Baltimore") is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, and entrusted with all of the powers of local self-government and home rule afforded by those articles.

19.     Baltimore is the largest city in Maryland and the thirtieth largest city in the United States, with a population of over 600,000, according to 2016 Census estimates. The Baltimore City Department of Health is a city agency that has wide-ranging responsibilities for providing health services to residents of the city.[5]

20.     Plaintiff the City of Cincinnati, Ohio, is a municipal corporation organized under Ohio law. *See* Ohio Const. art. XVIII. Cincinnati has all the powers of local self-government and home rule under the constitution and laws of the state of Ohio, which are exercised in the manner prescribed by the Charter of the City of Cincinnati.[6]

21.     Cincinnati, located in Hamilton County, is the third largest city in Ohio and the sixty-fifth largest city in the United States, with a population of around 300,000, according to 2017 Census estimates. Like Columbus, Cincinnati provides a wide range of services on behalf of its residents, including health services for city residents, public health, public assistance, and emergency medical care.

22.     Plaintiff the City of Chicago, Illinois, is a municipal corporation and home-rule unit organized and existing under the constitution and laws of the State of Illinois. *See* Illinois Const. art. VII.

---

[5]     *See* Baltimore City Charter art. VII, §§ 54-56, http://ca.baltimorecity.gov/codes/01%20-%20Charter.pdf.

[6]     *See Municipal Code*, City of Cincinnati, https://www.cincinnati-oh.gov/council/references-resources/municipal-code/; O.R.C. § 715.01.

23.     Chicago, located in Cook County, is the largest city in Illinois and the third largest city in the United States, with a population of over 2.7 million, according to 2016 Census estimates. Chicago provides a wide range of services on behalf of its residents, including health services, public assistance, and emergency medical care.

24.     Plaintiffs Steve Vondra and Bonnie Madison are a married couple who reside in Charlottesville, Virginia, and who purchase their health insurance on Virginia's ACA exchange.

25.     Defendant Donald J. Trump is sued in his official capacity as President of the United States of America.

26.     Defendant Alex M. Azar, II, is sued in his official capacity as Secretary of the United States Department of Health and Human Services.

27.     Defendant the United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C., at 200 Independence Ave. SW, Washington, DC, 20201.

28.     Defendant Seema Verma is sued in her official capacity as Administrator of the Centers for Medicare and Medicaid Services.

29.     Defendant the Centers for Medicare and Medicaid Services ("CMS") is a component of Defendant HHS and is headquartered in Baltimore, Maryland, at 7500 Security Boulevard, Baltimore, MD, 21244.

## FACTS

## I.    The Individual Health Insurance Markets and the Affordable Care Act

30.     Individual health insurance is insurance that individuals purchase themselves, in contrast to, for example, joining employer-sponsored group health plans. Prior to the enactment of the ACA, individual health insurance markets were dysfunctional:

One reason was that premiums for these policies were increasing more than 10% a year, on average, while the policies themselves had major deficiencies. They often excluded pre-existing conditions, charged higher premiums for people with health risks and for young women, placed limits on annual and lifetime benefits, or refused to renew policies for individuals who became sick. Many people who tried to buy plans were turned down. In 2010, an estimated 9 million adults who had tried to buy a plan in the individual market over the prior three years reported that they were turned down, charged a higher price, or had a condition excluded from their plan because of their health. Faced with unsubsidized premiums and flawed products, the majority of consumers who tried to buy a plan remained uninsured. Only healthy people could get policies, and only those with good incomes could afford the premiums.[7]

31.     As the Supreme Court has explained, many state efforts to reform the individual health insurance market in the 1990s were unsuccessful. *King*, 135 S. Ct. at 2485-86. The ACA "grew out of [this] long history of failed health insurance reform," *id.* at 2485, and aims to achieve systemic improvements in the individual health insurance market by means of certain key reforms, including:

a.     *Nondiscrimination on the basis of health status and health history*. The ACA requires "each health insurance issuer that offers health insurance coverage in the individual . . . market in a State [to] accept every . . . individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), and bars insurers from charging higher premiums on the basis of a person's health, *id.* § 300gg. ACA-compliant health insurance therefore covers preexisting conditions; it does not discriminate on the basis of an individual's health status and health history. *See id.* § 300gg-4.

---

[7]     David Blumenthal & Sara Collins, *Where Both the ACA and AHCA Fall Short, and What the Health Insurance Market Really Needs*, Harvard Business Review, Mar. 21, 2017, https://hbr.org/2017/03/where-both-the-aca-and-ahca-fall-short-and-what-the-health-insurance-market-really-needs [hereinafter Blumenthal & Collins].

b.    *Essential health benefits*. Insurance for individuals and families sold on ACA exchanges must cover "essential health benefits," *id*. § 300gg-6(a), including hospitalization, prescription drugs, emergency services, ambulatory patient services, maternity and newborn care, mental health and substance use disorder services, preventive and wellness services, and pediatric services including oral and vision care, *see id.* § 18022(b)(1). In addition, to protect patients from being confronted with devastating costs when a medical condition exhausts their health coverage, the ACA limits so-called "cost-sharing"—for example, deductibles and copayments—for essential health benefits coverage, and prohibits plans from imposing annual or lifetime limits on such coverage. *See id.* §§ 300gg-6(b), 18022(a)(2), (c).

c.    *Subsidized coverage*. The ACA "seeks to make insurance more affordable by giving refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line." *King*, 135 S. Ct. at 2487 (citing 26 U.S.C. § 36B; 42 U.S.C. §§ 18081, 18082). Financial assistance comes through income-related, premium-based tax credits—known as advance premium tax credits, or "APTCs"—for qualified individuals. The Act also requires health insurance issuers to reduce certain individuals' cost-sharing expenditures and directs HHS to reimburse issuers for such cost-sharing reductions ("CSRs"). *See* 18 U.S.C. § 18071.

32.     In addition, as enacted, the ACA required individuals to maintain health insurance coverage or make a shared responsibility payment to the Internal Revenue Service. 26 U.S.C. § 5000A. As a result of congressional action in 2017, the shared responsibility payment will be reduced to $0 after December 31, 2018.[8] Although it was initially believed that the shared responsibility payment was essential for maintaining the stability of health insurance markets, experience from the ACA's implementation has indicated that the elimination of the payment will increase premiums for unsubsidized enrollees by 10 percent for 2019 but will not destabilize markets.[9]

33.     To facilitate individuals' ability to learn about and enroll in the health insurance options that are available to them, the ACA "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 135 S. Ct. at 2487 (quoting 42 U.S.C. § 18031(b)(1)). These exchanges, also known as health insurance marketplaces, enable people not eligible for Medicare or Medicaid to obtain adequate, affordable private insurance independent of their jobs. The exchanges remedy a problem that had long bedeviled individual health insurance markets: individuals' inability to intelligently compare different plans in terms of price and quality. For ease of comparison, the ACA differentiates plans along four standard metallic tiers—bronze, silver, gold, and platinum, from least to most generous—according to

---

[8]     Budget Fiscal Year, 2018, Pub. L. No. 115-97, § 11081, 131 Stat. 2054, 2092 (2017) (codified at 26 U.S.C. §§ 5000A, 5000A note).

[9]     Congressional Budget Office, *Repealing the Individual Health Insurance Mandate: An Updated Estimate* 1 (Nov. 2017), https://www.cbo.gov/system/files?file=115th-congress-2017-2018/reports/53300-individualmandate.pdf; Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2018 to 2028* at 2 (May 2018), https://www.cbo.gov/system/files?file=2018-06/53826-healthinsurancecoverage.pdf [hereinafter *May 2018 CBO Report*].

how they apportion costs between individuals and issuers. 42 U.S.C. § 18022(d).[10] Thus, as the

Supreme Court has summarized, an exchange in each state serves as "a marketplace that allows

people to compare and purchase" ACA-compliant insurance plans, *King*, 135 S. Ct. at 2485,

known as "qualified health plans" or "QHPs" under the Act, 42 U.S.C. § 18031(b)(1); *see id.*

§ 18021(a).

34.     Individuals may enroll in qualified health plans on an exchange during a specified

annual open enrollment period or, if they qualify on the basis of certain life events—such as

getting married, having a baby, or losing other health coverage—they may enroll during a special

enrollment period. *Id*. § 18031(c)(6).[11]

35.     ACA exchanges also help consumers make smart health insurance choices by

running call centers and providing in-person assistance. For example, the ACA requires that

exchanges award grants to healthcare "Navigators" to "carry out . . . duties" that are specified by

statute, *id*. § 18031(i)(1); *see id.* § 18031(i)(3), and in HHS implementing regulations, *see* 45

C.F.R. §§ 155.210, 155.215. By law, Navigators' essential responsibilities include maintaining a

current understanding of available health insurance options, conducting public education and

awareness campaigns, helping consumers understand their choices, facilitating consumer health

insurance decisions, and ensuring access to consumer protections.

36.     An exchange may be established by the state in which it operates or, in states that

elect not to establish exchanges, by the federal government. *See King*, 135 S. Ct. at 2487 (citing

---

[10]   *See Health Plan Categories*, HealthCare.gov, https://www.healthcare.gov/glossary/health-plan-categories/.

[11]   *See Open Enrollment Period*, HealthCare.gov, https://www.HealthCare.gov/glossary/open-enrollment-period/. The exchanges also offer small businesses a way to find qualified health plans on a platform called the Small Business Health Options Program or "SHOP." *See* 42 U.S.C. § 18031(b)(1)(B).

42 U.S.C. §§ 18031(b)(1), 18041(c)(1)); 45 C.F.R. § 155.105(f)). In 2018, twelve states operate

their "state-based exchanges" or "SBEs" (operating their own websites rather than using the

federally-run HealthCare.gov), twenty-eight states rely entirely on the federal government to run

their "federally-facilitated exchanges" or "FFEs" using HealthCare.gov, and eleven states have

hybrid exchanges that assume some, but not all, exchange functions.[12] As relevant here, the

exchange in Ohio is an FFE, the exchange in Maryland is an SBE, and the exchange in Illinois is

a hybrid exchange.

37.     The ACA requires that exchanges offer only quality health insurance: insurance

that covers preexisting conditions, for example, and that does not impose annual or lifetime

dollar limits on core coverage. Such coverage has been found to improve access to care and

overall health, and to reduce financial burdens for both individuals and institutions that cover the

costs of uncompensated care. But increasing enrollment in quality health insurance coverage is

not only the ACA's immediate goal; it is also key to the Act's long-term success. "Achieving

insurance market stability over time . . . requires robust enrollment."[13] Specifically, "[a]t the

overall market level, enrollment must be high enough to reduce random fluctuations in claims

from year to year."[14] In addition, "[b]ecause the ACA prohibits health plans from denying

coverage or charging higher premiums based on preexisting health conditions, having affordable

---

[12]   *State Health Insurance Marketplace Types, 2018*, Kaiser Family Foundation,
https://www.kff.org/health-reform/state-indicator/state-health-insurance-marketplace-types/; *see*
HHS, *Cooperative Agreement to Support Navigators in Federally-facilitated Exchanges: Notice
of Funding Opportunity* 89 (July 10, 2018),
https://www.grantsolutions.gov/gs/preaward/previewPublicAnnouncement.do?id=62537 (click
"View PDF") (listing states that will have an FFE for plan year 2019).

[13]   Blumenthal & Collins, *supra* n.7.

[14]   American Academy of Actuaries, *An Evaluation of the Individual Health Insurance Market
and Implications of Potential Changes* 5 (Jan. 2017),
https://www.actuary.org/files/publications/Acad_eval_indiv_mkt_011817.pdf.

premiums depends on enrolling enough healthy individuals over which the costs of the less-healthy individuals can be spread. Enrollment of only individuals with high health care needs . . . can produce unsustainable upward premium spirals."[15]

38.     Limiting the cost of health insurance is, in turn, essential to promoting increased enrollment. The Centers for Medicare and Medicaid Services has found that "cost is the top reason cited" for individuals ending their coverage.[16] To that end, the ACA and its implementing regulations aim to drive costs down specifically for coverage available on the exchanges, spurring further enrollment and ensuring that health insurance markets function smoothly.

39.     When faithfully implemented, the ACA's reforms successfully met Congress's goal of enabling more individuals—specifically, 20 million more individuals[17]—to enroll in health insurance coverage. Indeed, the number of uninsured nonelderly Americans had decreased from 44 million in 2013 (the year before the ACA's major coverage provisions went into effect) to around 28 million by the end of 2016.[18] The uninsured rate had dropped across all demographic groups; individuals with low and moderate incomes, young people, and those who live in rural areas have experienced particularly dramatic coverage gains.[19] In addition, the

---

[15]   *Id.*

[16]   Press Release, CMS, *High Costs, Lack of Affordability Most Common Factors that Lead Consumers to Cancel Health Insurance Coverage* (June 12, 2017), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2017-Press-releases-items/2017-06-12.html.

[17]   Namrata Uberio et al., *Health Insurance Coverage and the Affordable Care Act, 2010-2016* at 8, HHS (March 3, 2016), https://aspe.hhs.gov/system/files/pdf/187551/ACA2010-2016.pdf.

[18]   *See Key Facts About the Uninsured Population*, Kaiser Family Foundation (Nov. 29, 2017), https://www.kff.org/uninsured/fact-sheet/key-facts-about-the-uninsured-population/ [hereinafter *KFF Key Facts*]; Robin A. Cohen et al., *Health Insurance Coverage: Early Release of Estimates from the National Health Interview Survey, 2016* at 2, National Center for Health Statistics (May 2017), https://www.cdc.gov/nchs/data/nhis/earlyrelease/insur201705.pdf.

[19]   *See* Bowen Garret & Anuj Gangopadhyaya, *Who Gained Health Insurance Coverage Under the ACA, and Where Do They Live?*, Urban Institute (Dec. 2016),

Congressional Budget Office has concluded that under the ACA—assuming it is implemented faithfully—the market for individual health insurance "would probably be stable in most areas."[20]

40.     Several aspects of the ACA contributed to the 57 percent increase in the number of people covered in the individual market (on and off exchanges) between 2013 and 2016.[21] Overall, an estimated 40 percent of the coverage gain attributable to the ACA resulted from the exchanges' policies.[22] In addition, the ACA set up the exchanges to encourage competition among insurers, both to keep premiums low and to improve customer service. To that end, it significantly standardized benefits and cost-sharing to facilitate shopping on price, required that the exchanges create tools to allow consumers to compare plans, and established a permanent risk-adjustment program to prevent insurers from profiting by disproportionately enrolling people with lower-than-average health care costs.

41.     The results were clear: the unsubsidized cost of coverage in the exchanges, before the start of the Trump Administration, was 10 percent lower than the average employer-

---

https://www.urban.org/sites/default/files/publication/86761/2001041-who-gained-health-insurance-coverage-under-the-aca-and-where-do-they-live.pdf; Sara R. Collins et al., *How the Affordable Care Act Has Improved Americans' Ability to Buy Health Insurance on Their Own*, Commonwealth Fund (Feb. 1, 2017), http://www.commonwealthfund.org/publications/issue-briefs/2017/feb/how-the-aca-has-improved-ability-to-buy-insurance; Kevin Quealy & Margot Sanger-Katz, *Obama's Health Law: Who Was Helped Most*, New York Times, Oct. 29, 2014, https://www.nytimes.com/interactive/2014/10/29/upshot/obamacare-who-was-helped-most.html.

[20]   Congressional Budget Office, *Congressional Budget Office Cost Estimate: American Health Care Act* (Mar. 13, 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/americanhealthcareact.pdf.

[21]   *Health Insurance Coverage of Nonelderly 0-64, 2013 and 2016*, Kaiser Family Foundation, https://www.kff.org/other/state-indicator/nonelderly-0-64/.

[22]   *See* Molly Frean et al., *Premium Subsidies, the Mandate, and Medicaid Expansion: Coverage Effects of the Affordable Care Act*, 53 J. of Health Economics 72 (2016), http://www.nber.org/papers/w22213.

sponsored insurance premium.[23] In the early years after the exchanges opened, some insurers set prices so low that they lost money in order to gain market share; others did not fully understand the risks of their new customers. In 2017, they raised premiums to correct those mistakes. After the 2017 price corrections, expert analyses indicated that premiums would have grown in single digits for 2018 but for Defendants' policies, including those challenged here.[24]

## II.     The Administration's Intent to Repeal the ACA, With or Without Congress

42.     Notwithstanding the ACA's demonstrated successes, President Trump has repeatedly vowed to ensure that the Act is repealed. For example, on June 15, 2015, in announcing his candidacy for the presidency, he stated, "So, just to sum up, I would do various things very quickly. I would repeal and replace the big lie, Obamacare."[25] On October 8, 2015, then-candidate Trump stated, "We're gonna repeal Obamacare."[26] Then, on July 21, 2016, in accepting the Republican nomination for the presidency, Trump stated, "We will repeal and replace disastrous Obamacare."[27]

---

[23]   Linda J. Blumberg et al., *Are Nongroup Marketplace Premiums Really High? Not in Comparison with Employer Insurance*, Urban Institute (Sept. 2016), https://www.urban.org/research/publication/are-nongroup-marketplace-premiums-really-high-not-comparison-employer-insurance.

[24]   Matthew Fiedler, *Taking Stock of Insurer Financial Performance in the Individual Health Insurance Market Through 2017*, Brookings (Oct. 2017), https://www.brookings.edu/research/taking-stock-of-insurer-financial-performance-in-the-individual-health-insurance-market-through-2017/; Mark A. Hall & Michael J. Cue, *Health Insurance Markets Perform Better in States That Run Their Own Marketplaces*, To the Point (March 7, 2018), https://www.commonwealthfund.org/blog/2018/health-insurance-markets-perform-better-states-run-their-own-marketplaces.

[25]   *Here's Donald Trump's Presidential Announcement Speech*, Time (June 16, 2015) http://time.com/3923128/donald-trump-announcement-speech/.

[26]   *Presidential Candidate Donald Trump Rally in Las Vegas*, C-SPAN (Oct. 8, 2015) https://www.c-span.org/video/?328645-1/presidential-candidate-donald-trump-rally-las-vegas.

[27]   Donald J. Trump, Republican Nomination Acceptance Speech (July 21, 2016), https://assets.donaldjtrump.com/DJT_Acceptance_Speech.pdf.

43.     Despite these promises by the President—and many, many more not catalogued here—and despite repeated attempts, Congress has declined to pass a bill repealing the Affordable Care Act.

44.     President Trump has repeatedly admitted that three key elements of his strategy to convince Congress to repeal the ACA are asserting—falsely—that the law is failing, undermining the ACA by neglect, and sabotaging the ACA with affirmative executive actions:

    a.     On January 11, 2017, President-elect Trump stated, "[T]he easiest thing would be to let [the ACA] implode in '17 and believe me, we'd get pretty much whatever we wanted, but it would take a long time."[28]

    b.     On January 25, 2017, President Trump stated, "[T]he best thing we could do is nothing for two years, let [the ACA] explode. And then we'll go in and we'll do a new plan and—and the Democrats will vote for it. Believe me . . . . So let it all come [due] because that's what's happening. It's all coming [due] in '17. We're gonna have an explosion. And to do it right, sit back, let it explode and let the Democrats come begging us to help them because it's on them."[29]

    c.     On January 26, 2017, President Trump stated, "If we waited two years, [the ACA is] going to explode like you've never seen an explosion.

---

[28] *Donald Trump's News Conference: Full Transcript and Video*, New York Times (Jan. 11, 2017), https://www.nytimes.com/2017/01/11/us/politics/trump-press-conference-transcript.html.

[29] *Transcript: ABC News Anchor David Muir Interviews President Trump*, ABC News (Jan. 25, 2017), http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-president/story?id=45047602.

Nobody's going to be able to afford it. It's a disaster. And that's politically

what we should do . . . ."[30]

d.    On January 26, 2017, President Trump stated, "[The ACA] actually

explodes in '17. And I told the Republicans. I said, look, if you really want

to do something, just let it explode, and then they'll come begging us to

fix it, OK? Begging."[31]

e.    On March 24, 2017, President Trump stated, "As you know, I've been

saying for years that the best thing is to let Obamacare explode and then

go make a deal with the Democrats and have one unified deal. And they

will come to us, we won't have to come to them. After Obamacare

explodes . . . . Time will tell. Obamacare is in for some rough days. You

understand that. It's in for some rough, rough days. I'll fix it as it

explodes. They're going to come to ask for help. They're going to have to.

Here's the good news: Health care is now totally the property of the

Democrats."[32]

---

[30]   *Transcripts: Trump Addresses GOP Leadership at Retreat in Philadelphia*, CNN (Jan. 26, 2017), http://transcripts.cnn.com/TRANSCRIPTS/1701/26/wolf.02.html.

[31]   *Cable Exclusive: Trump Sits Down with Sean Hannity at White House*, Fox News (Jan. 26, 2017), http://www.foxnews.com/transcript/2017/01/26/cable-exclusive-president-trump-sits-down-with-sean-hannity-at-white-house.html.

[32]   Robert Costa, *'Hello, Bob': President Trump Called My Cellphone to Say That the Health-care Bill Was Dead*, Washington Post, Mar. 24, 2017, https://www.washingtonpost.com/powerpost/president-trump-called-my-cellphone-to-say-that-the-health-care-bill-was-dead/2017/03/24/8282c3f6-10ce-11e7-9b0d-d27c98455440_story.html.

f.     On March 25, 2017, President Trump tweeted, "ObamaCare will explode and we will all get together and piece together a great healthcare plan for THE PEOPLE. Do not worry!"[33]

g.     On April 12, 2017, President Trump tied his Administration's potential elimination of CSR payments, addressed below,[34] to his overall sabotage agenda, stating, "Even now, as I came in here, they're saying payments have to be made that weren't scheduled to be made on ObamaCare. If you don't make them, it fails. I mean, you know, it's just a mess. ObamaCare is a total mess."[35]

h.     Again referencing the possibility that his Administration would eliminate CSR payments, on April 12, 2017, President Trump stated, "that would mean that Obamacare doesn't have enough money so it dies immediately as opposed to over a period of time. Even if it got that money, it dies, but it dies over a period of time."[36] That same day, President Trump

---

[33]  @realDonaldTrump, Twitter (March 25, 2017, 10:37 AM), https://twitter.com/realDonaldTrump/status/845645916732358656.

[34]  *See infra* ¶¶ 111-15; Reed Abelson & Margot Sanger-Katz, *Explaining the Health Payments That Trump Has Called 'Ransom Money'*, New York Times, Apr. 14, 2017, https://www.nytimes.com/2017/04/14/upshot/explaining-the-health-payments-that-trump-is-threatening-to-end.html.

[35]  Aaron Blake, *President Trump's Thoroughly Confusing Fox Business Interview, Annotated*, Washington Post, Apr. 12, 2017, https://www.washingtonpost.com/news/the-fix/wp/2017/04/12/president-trumps-throughly-confusing-fox-business-interview-annotated/?utm_term=.64c0efc03f6a.

[36]  *WSJ Trump Interview Excerpts: China, North Korea, Ex-Im Bank, Obamacare, Bannon, More*, Wall Street Journal (Apr. 12, 2017),  https://blogs.wsj.com/washwire/2017/04/12/wsj-trump-interview-excerpts-china-north-korea-ex-im-bank-obamacare-bannon/; https://www.wsj.com/articles/trump-threatens-to-withhold-payments-to-insurers-to-press-democrats-on-health-bill-1492029844.

elaborated on the theme: "Obamacare is dead next month if it doesn't get that money . . . . What I think should happen and will happen is the Democrats will start calling me and negotiating."[37]

i.   Similarly, on April 23, 2017, President Trump tweeted, "ObamaCare is in serious trouble. The Dems need big money to keep it going - otherwise it dies far sooner than anyone would have thought."[38]

j.   On May 1, 2017, President Trump stated, "And I've said from day one, the best thing I could do is let ObamaCare die and then come in with a plan."[39]

k.   On May 4, 2017, President Trump stated, "I predicted it a long time ago. I said, [the ACA is] failing. And now, it's obvious that it's failing. It's dead. It's essentially dead. If we don't pay lots of ransom money over to the insurance companies it would die immediately."[40]

l.   On May 4, 2017, President Trump also pronounced that he was presiding over the ACA's "dea[th]."[41]

---

[37]   Michael C. Bender et al., *Trump Threatens to Withhold Payments to Insurers to Press Democrats on Health Bill*, Wall Street Journal, Apr. 12, 2017, https://www.wsj.com/articles/trump-threatens-to-withhold-payments-to-insurers-to-press-democrats-on-health-bill-1492029844.

[38]   @realDonaldTrump, Twitter (Apr. 23, 2017, 7:20 AM), https://twitter.com/realDonaldTrump/status/856150719656755200.

[39]   *Trump on North Korea: 'Nobody's Safe'*, Fox News, May 1, 2017, http://www.foxnews.com/politics/2017/05/01/trump-on-north-korea-nobodys-safe.html.

[40]   *Id.*

[41]   *Remarks by President Trump on Healthcare Vote in the House of Representatives*, The White House (May 4, 2017), *available at* https://web.archive.org/web/20170504233618/https://www.whitehouse.gov/the-press-office/2017/05/04/remarks-president-trump-healthcare-vote-house-representatives.

m.  Likewise, on May 11, 2017, President Trump stated, "You know when people say, 'Oh, Obamacare is so wonderful,' there is no Obamacare, it's dead. Plus we're subsidising it and we don't have to subsidise it. You know if I ever stop wanting to pay the subsidies, which I will."[42]

n.  On June 12, 2017, according to the press, President Trump "stressed the need to 'starve the beast' of Obamacare in order to garner more public support for [a] Republican-backed [repeal] bill."[43]

o.  On June 28, 2017, President Trump stated, "Obamacare is dying. It's essentially dead. If you don't give it the subsidy, it would die within 24 hours. It's been a headache for everybody. It's been a nightmare for many."[44]

p.  On July 18, 2017, President Trump tweeted, "As I have always said, let ObamaCare fail and then come together and do a great healthcare plan."[45]

q.  On July 18, 2017, President Trump stated, "[L]et Obamacare fail, it will be a lot easier. And I think we're probably in that position where we'll let Obamacare fail. We're not going to own it. I'm not going to own it. I can

---

[42]  *Transcript: Interview with Donald Trump*, Economist (May 11, 2017) https://www.economist.com/united-states/2017/05/11/transcript-interview-with-donald-trump.

[43]  Jake Lahut, *Trump: Dems Wouldn't Pass Healthcare Bill Even if It Was the Best in the World*, Politico, June 12, 2017, http://www.politico.com/story/2017/06/12/trump-obamacare-repeal-bill-democrats-239428.

[44]  *Remarks by President Trump and Secretary of Energy Rick Perry at Tribal, State, and Local Energy Roundtable*, The White House (June 28, 2017), https://www.whitehouse.gov/the-press-office/2017/06/28/remarks-president-trump-and-secretary-energy-rick-perry-tribal-state-and.

[45]  @realDonaldTrump, Twitter (July 18, 2017, 4:58 AM), https://twitter.com/realDonaldTrump/status/887280380423938048.

tell you the Republicans are not going to own it. We'll let Obamacare fail

and then the Democrats are going to come to us."[46]

    r.    On July 19, 2017, President Trump stated, "If we don't get it done, we are

going to watch Obamacare go down the tubes, and we'll blame the

Democrats. And at some point, they are going to come and say, 'You've

got to help us.'"[47]

45.    One effort to repeal the ACA failed in the Senate in the early hours of July 28,

2017, with Sen. John McCain marking his decisive vote against repeal by a thumbs-down

gesture.[48] Thereafter, President Trump continued to push the false narrative that the ACA was

failing. He also placed greater emphasis on the affirmative steps that he and his Administration

were taking to sabotage the Act in order to provoke Congress to repeal it, or to achieve its de

facto destruction:

    a.    On July 28, 2017, shortly after the failed vote, President Trump tweeted,

"3 Republicans and 48 Democrats let the American people down. As I

said from the beginning, let ObamaCare implode, then deal. Watch!"[49]

---

[46]  Matthew Yglesias, *Trump: 'Let Obamacare Fail… I'm Not Going to Own It'*, Vox, July 18, 2017, https://www.vox.com/2017/7/18/15990986/trump-let-obamacare-fail.

[47]  *Excerpts from the Times's Interview with Trump*, New York Times, July 19, 2017, https://www.nytimes.com/2017/07/19/us/politics/trump-interview-transcript.html?_r=0.

[48]  Robert Pear and Thomas Kaplan, *Senate Rejects Slimmed-Down Obamacare Repeal as McCain Votes No*, New York Times, July 28, 2017, https://www.nytimes.com/2017/07/27/us/politics/obamacare-partial-repeal-senate-republicans-revolt.html.

[49]  @realDonaldTrump, Twitter (July 27, 2017, 11:25 PM), https://twitter.com/realDonaldTrump/status/890820505330212864.

b.      On July 28, 2017, President Trump stated, "You know, I said from the beginning, let Obamacare implode, and then do it. And I turned out to be right. Let Obamacare implode."[50]

c.      On October 10, 2017, in advance of issuing Executive Order No. 13,813, which directed his Administration to expand access to non-ACA compliant plans and thereby siphon consumers, especially healthy consumers, away from ACA exchanges, *see infra* ¶¶ 116-22, President Trump tweeted, "[s]ince Congress can't get its act together on HealthCare, I will be using the power of the pen."[51]

d.      On October 13, 2017, after announcing the end of cost-sharing reduction payments, *see infra* ¶¶ 111-15, President Trump stated, "You saw what we did yesterday with respect to health care. . . . We're taking a little different route than we had hoped, because getting Congress—they forgot what their pledges were. . . . So we're going a little different route. But you know what? In the end, it's going to be just as effective, and maybe it'll even be better."[52]

---

[50]   Jordan Fabian, *Trump: Let ObamaCare Implode*, The Hill, July 28, 2017, http://thehill.com/homenews/administration/344365-trump-let-obamacare-implode.

[51]   @realDonaldTrump, Twitter (Oct. 10, 2017, 3:30 AM), https://twitter.com/realDonaldTrump/status/917698839846576130.

[52]   *President Trump Addresses Values Voter Summit*, CNN (Oct. 13, 2017), http://www.cnn.com/TRANSCRIPTS/1710/13/cnr.04.html.

e.      On that same day, President Trump tweeted, "The Democrats [sic] ObamaCare is imploding. Massive subsidy payments to their pet insurance companies has stopped. Dems should call me to fix!"[53]

f.      Also on October 13, 2017, President Trump tweeted, "ObamaCare is a broken mess. Piece by piece we will now begin the process of giving America the great HealthCare it deserves!"[54]

g.      On October 14, 2017, a few months after he left the White House, Steve Bannon, one of President Trump's key advisors, boasted that the Administration was undertaking executive action to "blow [the Act] up," reiterating its intent to "blow those [insurance] exchanges up."[55]

h.      On October 16, 2017, President Trump stated, "Obamacare is finished. It's dead. It's gone. It's no longer—you shouldn't even mention [it]. It's gone. There is no such thing as Obamacare anymore."[56]

i.      On October 17, 2017, President Trump stated, "Obamacare is virtually dead. At best, you could say it's in its final legs. The premiums are going through the roof. The deductibles are so high that people don't get to use

---

[53]   @realDonaldTrump, Twitter (Oct. 13, 2017, 2:36 AM), https://twitter.com/realDonaldTrump/status/918772522983874561.

[54]   @realDonaldTrump, Twitter (Oct. 13, 2017, 4:14 AM), https://twitter.com/realDonaldTrump/status/918797009133465600.

[55]   Martin Pengelly, *Bannon Says Trump Will 'Blow Up' Obamacare as Subsidies Cut Stokes Fires*, The Guardian, Oct. 15, 2017, https://www.theguardian.com/us-news/2017/oct/15/bannon-indicates-trumps-aca-strategy-blow-that-thing-up (second alteration in original).

[56]   *Remarks by President Trump in Cabinet Meeting*, The White House (Oct. 16, 2017), *available at* https://web.archive.org/web/20171016180503/https://www.whitehouse.gov/the-press-office/2017/10/16/remarks-president-trump-cabinet-meeting.

it. Obamacare is a disgrace to our nation, and we are solving the problem of Obamacare."[57]

j.     In late April 2018, at a rally in Michigan, President Trump bragged, "Essentially, we are getting rid of Obamacare . . . . Some people would say, essentially, we have gotten rid of it."[58]

k.     In signing a bill unrelated to the ACA on May 30, 2018, President Trump stated: "For the most part, we will have gotten rid of a majority of Obamacare."[59] He went on to confirm that his Administration's objective is to achieve by executive action alone what Congress has refused to do: "Could have had it done a little bit easier, but somebody decided not to vote for it, so it's one of those things."[60]

l.     Likewise, on June 4, 2018, President Trump tweeted: "We had Repeal & Replace done (and the saving to our country of one trillion dollars) except for one person"—presumably, Sen. John McCain—"but it is getting done anyway."[61] Referencing the tax bill's reduction of the shared responsibility

---

[57]   *Remarks by President Trump and Prime Minister Tsipras of Greece Before Bilateral Meeting*, The White House (Oct. 17, 2017), *available at* https://web.archive.org/web/20171030160901/https://www.whitehouse.gov/the-press-office/2017/10/17/remarks-president-trump-and-prime-minister-tsipras-greece-bilateral.

[58]   Alan Rappeport, *Trump Says He Got Rid of Obamacare. The I.R.S. Doesn't Agree*, New York Times, May 6, 2018, https://www.nytimes.com/2018/05/06/business/trump-obamacare-irs.html.

[59]   *Remarks by President Trump at S.204 "Right to Try" Bill Signing*, The White House (May 30, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-s-204-right-try-bill-signing/.

[60]   *Id.*

[61]   @realDonaldTrump, Twitter (June 4, 2018, 5:18 AM), https://twitter.com/realDonaldTrump/status/1003611857272360960.

payment to $0, President Trump continued, "Individual Mandate is gone

and great, less expensive plans will be announced this month."[62]

m.    At a rally on June 23, 2018, according to an observer, President Trump

"mock[ed] John McCain's 'thumbs down' on the Obamacare repeal" and

told audience members that "'it doesn't matter. We gutted it anyway.'"[63]

n.    In that same vein, in a speech on July 23, 2018, according to an observer,

President Trump stated that "Obamacare's very rapidly fading away" and

once again singled out Sen. McCain.[64]

o.    Finally—at least as of this filing—on August 1, 2018, President Trump

returned to the same theme, stating:

*We had Obamacare repealed and replaced, and a man—I won't mention his name. But a man at 2 o'clock in the morning went thumbs down . . . We had the chance. . . . But still, I have just about ended Obamacare.* We have great health care. We have a lot of great things happening right now. New programs are coming out. We got rid of the individual mandate. But that was very disappointing to me that night—and he did it because of me, probably. *But that was very disappointing.* That was a horrible thing he did to our country. And, frankly, it cost $1 trillion because we would have saved $1 trillion, on top of which we would have had good health care. *But we're doing it a different way. We have to go a different route.*[65]

---

[62]    *Id.*

[63]    @LauraLitvan, Twitter (June 23, 2018, 1:04 PM),
https://twitter.com/LauraLitvan/status/1010614472946352128; *see also* Jake Sherman et al.,
*Overheard at the DSCC Retreat on Martha's Vineyard*, Politico, June 24, 2018,
https://www.politico.com/newsletters/playbook/2018/06/24/overheard-at-the-dscc-retreat-on-marthas-vineyard-281247.

[64]    @ddale8, Twitter (July 23, 2018, 3:40 PM),
https://twitter.com/ddale8/status/1021480066029694978.

[65]    *President Trump Calls the Show!*, The Rush Limbaugh Show (Aug. 1, 2018),
https://www.rushlimbaugh.com/daily/2018/08/01/president-trump-calls-the-show/amp/
(emphasis added).

46.     Statements disparaging the Affordable Care Act have also been made by other prominent members of President Trump's Administration, including when announcing some of the very executive actions at issue here. For example, in announcing that open enrollment for the 2018 plan year would be cut in half from previous years, CMS's press release touted, in bullet form, "[r]ecent statistics related to the Affordable Care Act" that were deliberately selected to paint a false picture of the Act as failing.[66] On information and belief, CMS Administrator Seema Verma edited these bullets herself. And on a media call to explain the 2019 Rule, Ms. Verma said, "It's clear that Obamacare continues to have negative effects on many Americans."[67] That view—mistaken, and more importantly, contrary to Congress's judgment— permeates and drives the Administration's campaign to undermine the ACA.

## DEFENDANTS' EXECUTIVE ACTIONS
## TO SABOTAGE THE AFFORDABLE CARE ACT

47.     President Trump and his Administration have attempted to deliver on their repeated promises to sabotage the Affordable Care Act. The Administration knows what executive actions would faithfully implement the Act and further the Act's objective of expanding affordable health insurance to every American.[68] Yet the Administration has repeatedly refused to pursue such actions and has instead adopted policies affirmatively designed to undermine the Act. As detailed below, multiple provisions of the 2019 Rule, and many other

---

[66]   Press Release, CMS, CMS Issues Final Rule to Increase Choices and Encourage Stability in Health Insurance Market for 2018 (Apr. 13, 2017), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2017-Press-releases-items/2017-04-13-2.html.

[67]   Allison Inserro, *CMS Creates New ACA Penalty Mandate Exemptions, Including Opposition to Abortion*, AJMC, Apr. 10, 2018, https://www.ajmc.com/newsroom/cms-creates-new-aca-penalty-mandate-exemptions-including-opposition-to-abortion.

[68]   *See, e.g.*, Letter from Andrew M. Slavitt to CMS Administrator Verma (Nov. 27, 2017), *available at* https://www.regulations.gov/contentStreamer?documentId=CMS-2017-0141-0240&attachmentNumber=1&contentType=pdf (commenting on the 2019 Rule as proposed).

executive actions, have the aim and effect of weakening ACA exchanges, driving up premiums, and driving out issuers, ultimately increasing the rate of the uninsured and underinsured.

## I.    The 2019 Rule

48.    In April 2018, the Centers for Medicare and Medicaid Services promulgated a final rule that undermines many of the Act's safeguards and requirements. *See* Notice of Benefit and Payment Parameters for 2019, 83 Fed. Reg. 16,930 (April 17, 2018). Specifically, many provisions of the 2019 Rule roll back protections that the Act guarantees, make it more difficult to enroll in ACA-compliant plans, and drive up the cost of ACA-compliant plans. For the reasons explained below, the enumerated provisions of the 2019 Rule violate the Administrative Procedure Act and must be set aside.

### A.    Eliminating Protections that the ACA Guarantees

49.    Numerous provisions of the 2019 Rule weaken or eliminate ACA protections necessary to ensure that individuals have access to quality, affordable health insurance coverage.

> *1.    Permitting Exchanges to Strip Individuals of Eligibility for Tax Credits Without Providing Direct Notification*

50.    As noted above, many individuals who purchase health insurance through the exchanges are eligible for premium subsidies known as advance premium tax credits. The Affordable Care Act required HHS to promulgate regulations further defining APTC eligibility. 42 U.S.C. §§ 18081, 18082. Among other things, HHS regulations direct exchanges to deny APTCs to an individual if the Internal Revenue Service notifies the exchange that the individual or a member of her household did not reconcile the amount of advance premium tax credits she received with the amount of the actual premium tax credit she should have been allowed on her prior year's tax return. *See* 45 C.F.R. § 155.305(f)(4) (describing process for filing a federal income tax return). This provision, known as the failure to reconcile provision, was amended in

2016 to specify that an exchange may not deny APTC under this provision "unless *direct notification* is first sent to the tax filer . . . that his or her eligibility will be discontinued as a result of the tax filer's failure to comply with the requirement." 45 C.F.R. § 155.305(f)(4)(ii) (2016) (effective Jan. 17, 2017 to June 17, 2018).

51.     The 2019 Rule continues to require that exchanges deny APTCs to individuals who fail to reconcile APTCs received in a prior year on their tax return but, crucially, removes the requirement that exchanges first provide such individuals with direct notification that their eligibility will be discontinued as a result of their failure to comply with this requirement. 83 Fed. Reg. at 16,982. The 2019 Rule's failure to reconcile provision is contrary to law and arbitrary and capricious, and therefore must be set aside.

52.     The failure to reconcile provision conflicts with express statutory language requiring that any eligible individual be allowed to claim APTC. Under 26 U.S.C. § 36B, "[i]n the case of an applicable taxpayer, there shall be allowed as a credit against the tax imposed . . . for any taxable year an amount equal to the premium assistance credit amount of the taxpayer for the taxable year." The statute's plain terms thus require that any applicable taxpayer be allowed to claim an APTC. The term "applicable taxpayer" means, "with respect to any taxable year, a taxpayer whose household income for the taxable year equals or exceeds 100 percent but does not exceed 400 percent of an amount equal to the poverty line for a family of the size involved." 26 U.S.C. § 36B(c)(1)(A). Whether an individual has reconciled her APTC has no bearing on whether she is an "applicable taxpayer" under the statute. Therefore, depriving an "applicable taxpayer" of the credit that the statute says "shall be allowed" based on a failure to reconcile his or her taxes violates the plain language of the statute.

53.     In addition, CMS's decision to remove the direct notification requirement is arbitrary and capricious. CMS attempted to justify its decision to remove the direct notification requirement by asserting that state exchanges are not equipped to send direct notices and in light of the agency's belief that "ensuring consumers are not receiving APTC improperly is necessary for program integrity." 83 Fed. Reg. at 16,984. This purported justification fails, and the 2019 Rule's failure to reconcile provision is arbitrary and capricious, for at least two reasons. First, CMS offered no evidence that consumers are in fact "receiving APTC improperly." *Id*. Second, the 2019 Rule indicates that FFEs will continue to provide direct notification, demonstrating that CMS recognizes the utility and importance of such notifications. *See id*. at 16,983. Indeed, the direct notice requirement was added to the failure to reconcile provision in 2016 in response to concerns that denying APTCs without direct notice would violate due process.[69] CMS thus knows about the problem that direct notification was designed to solve, and yet is now eliminating the solution without setting forth any evidence that the problem has gone away.

54.     The 2019 Rule will cause eligible individuals to lose the subsidies that the ACA guarantees, and will do so without providing any advance, direct notification. In 2017, annual premium tax credits averaged $4,458.[70] The unexpected loss of this assistance would likely cause many if not most individuals to drop coverage entirely, especially since they will not know why they lost it or how to remedy their loss. Individuals might lose subsidies for any number of reasons that would ultimately prove unfounded; direct notification facilitated individuals' efforts to determine why they had lost eligibility and how to fix the problem. Former Administration

---

[69]   HHS, Notice of Benefit and Payment Parameters for 2018; Amendments to Special Enrollment Periods, 81 Fed. Reg. 94,058, 94,124 (Dec. 22, 2016).

[70]   *See* CMS, *2017 Effectuated Enrollment Snapshot* 5 (June 12, 2017), https://downloads.cms.gov/files/effectuated-enrollment-snapshot-report-06-12-17.pdf.

officials who worked to implement the ACA's advance premium tax credit program estimate that this Administration's decision could deprive up to 800,000 eligible individuals of their APTCs, leading to a significant rise in the number of uninsured Americans—directly contrary to the purpose of the Act.

> 2. *Outsourcing to States the Compliance Review of Insurance Plans to be Offered on Federal Exchanges*

55.     According to the text of the ACA, the Secretary of Health and Human Services "shall, by regulation, establish criteria for the certification of health plans as qualified health plans," 42 U.S.C. § 18031(c)(1), including criteria that "ensure a sufficient choice of providers," *id*. § 18031(c)(1)(B)—*i.e.*, criteria that ensure network adequacy. Pursuant to those criteria, "[a]n Exchange shall, at a minimum[,] implement procedures for the certification, recertification, and decertification . . . of health plans as qualified health plans." 42 U.S.C. § 18031(d)(4)(A).

56.     Consistent with these statutory requirements, CMS, acting as the exchange in states with federally-facilitated exchanges, used to review network adequacy and accreditation status plans that insurers proposed to offer on those exchanges.

57.     The 2019 Rule instead extends a policy first adopted in the 2018 Market Stabilization Rule, 82 Fed. Reg. 18,346, 18,371-72 (April 18, 2017), under which CMS will "rely on the [s]tates' reviews" of network adequacy and other critical requirements in certain federally-facilitated exchanges, *see* 83 Fed. Reg. at 17,024-26. In defending its decision, CMS explained that it "is committed to recognizing States' role as the primary regulator of their insurance markets," and that it sought "to limit duplicative oversight over issuers." *Id.* at 17,024. CMS's decision is both contrary to law and arbitrary and capricious under the APA, and must be set aside.

58.     First, CMS's decision conflicts with express statutory language, quoted above, that requires the federal government, as the administrator of federally-facilitated exchanges, to certify plans proffered by insurers as qualified health plans under the applicable statutory and regulatory criteria. Under the ACA, the Secretary of Health and Human Services "*shall*, by regulation, establish criteria for the certification of health plans as qualified health plans," including criteria that "ensure a sufficient choice of providers." 42 U.S.C. § 18031(c)(1) (emphasis added). Pursuant to those criteria, "[a]n *Exchange shall, at a minimum*[,] implement procedures for the certification, recertification, and decertification . . . of health plans as qualified health plans." 42 U.S.C. § 18031(d)(4)(A) (emphasis added). The statute's repeated use of the term "shall" makes plain that these are mandatory duties. Moreover, the statutory requirement to certify health plans is a "minimum" requirement, 42 U.S.C. § 18031(d)(4)(A), below which an exchange cannot fall. Simply deferring to states to conduct plan reviews does not constitute "implement[ing] procedures" for the exchange's review.

59.     Interpreting the statute to prohibit CMS's decision to rubber-stamp states' review of network adequacy for federally-facilitated exchanges is also consistent with the Act's purpose. Among other things, "[t]he Act aims to increase the number of Americans covered by health insurance" adequate to meet their health needs. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). But health insurance cannot meet a consumer's needs if the provider's network is inadequate—that is, if it lacks facilities close to the consumer's home or that are equipped to handle the consumer's specific medical conditions. Thus, permitting CMS, as the administrator of federally-facilitated exchanges, to approve a state's assessment of network adequacy powerfully undermines this central feature of, and conflicts with, the ACA.

60.     Second, even if the ACA permitted the choice CMS made, the explanation CMS offered for outsourcing its duties to states is insufficient, confirming that its choice was arbitrary and capricious. CMS offered virtually no response to commenters' views that "[s]tates' and accrediting entities' review processes do not do enough to ensure enrollees have adequate access to necessary care," simply asserting that its decision would "reduc[e] regulatory burden on issuers, while also preserving adequate access to care." 83 Fed. Reg. at 17,025. In particular, CMS failed to provide evidence to buttress its assertion that state review procedures are sufficient to guarantee network adequacy, including, for example, an analysis of the rigor of state procedures or assessments of plans certified by state regulators. That notwithstanding that "[a]long with lacking quantitative standards to ensure broad coverage, most states lack an adequate process to protect consumers forced to seek out-of-network treatment in particular cases."[71] Similarly, CMS neglected to consider how an exchange operator may be uniquely positioned to assess plan adequacy. Because CMS did not sufficiently justify its decision, failed to adequately respond to comments, and failed to consider important aspects of the problem, its decision in the 2019 Rule to outsource plan review on federally-facilitated exchanges to states was arbitrary and capricious.

61.     Outsourcing federal plan review to states will permit insurers to market plans with overly restrictive networks of providers—networks that could thereby limit patient access to care. Even before the 2019 Rule, only 41 percent of qualified health plans in FFE states had

---

[71]   Mark Hall & Caitlin Brandt, *Network Adequacy Under the Trump Administration*, Health Affairs Blog, Sept. 14, 2017, https://www.healthaffairs.org/do/10.1377/hblog20170914.061958/full/.

networks that included National Cancer Institute-designated cancer centers.[72] Similarly, one study estimated that 15 percent of FFE plans lacked in-network physicians for at least one specialty.[73] These numbers will continue to fall now that the federal government has shirked its plan review responsibilities. More consumers will end up purchasing inadequate plans, either through necessity or confusion—meaning that a greater share of the population will obtain insurance coverage that is insufficient to meet their health care needs. The rate of the underinsured will therefore increase.

### 3. Reducing Oversight of Insurance Brokers Participating in Direct Enrollment

62.     By reducing federal oversight of insurance brokers that assist consumers in signing up for insurance on ACA exchanges via direct enrollment, *see id.* at 16,981-82, the 2019 Rule will enable brokers to provide consumers with incorrect information and permit brokers to deny consumers the assistance that they need, and that the ACA requires, so that they can identify and purchase the health insurance that best meets their situation.

63.     Direct enrollment is a process under which a consumer enrolls in an ACA-compliant health insurance plan through a third-party website instead of through the governmental platform (HealthCare.gov for FFEs). Direct enrollment entities are "agents, brokers, and issuers that participate in direct enrollment and use their own internet website for [qualified health plan] selection or to complete the Exchange eligibility application." *Id.* at 16,981. Given evidence that direct enrollment entities were committing fraud, signing up

---

[72]   Kenneth L. Kehl et al., *Access to Accredited Cancer Hospitals Within Federal Exchange Plans Under the Affordable Care Act*, 35 J. Clinical Oncology 645, 647 (2017).

[73]   Stephen C. Dorner et al., *Adequacy of Outpatient Specialty Care Access in Marketplace Plans Under the Affordable Care Act*, JAMA Network (2015), https://jamanetwork.com/journals/jama/fullarticle/2466113.

individuals without their knowledge or consent, and using inaccurate calculators for APTC eligibility, prior rules provided a strong oversight structure and required such entities to be audited by third parties that HHS approved.

64.     The 2019 Rule eliminates this protection and permits agents, brokers, and issuers participating in direct enrollment to "select their own third-party entities for conducting audits, rather than requiring HHS to initially review and approve these entities"—*i.e.*, to select an auditor that has not been approved by HHS to determine whether the agent, broker, or issuer is ready to handle direct enrollment in compliance with relevant requirements. *Id.*

65.     CMS's decision to weaken oversight over direct enrollment entities is arbitrary and capricious and must be set aside. First, CMS failed to grapple with evidence, well known to the agency, that direct enrollment entities have in the past produced poor information for consumers, facilitating consumers' poor enrollment choices. That evidence is what necessitated CMS oversight of direct enrollment entities' auditors in the first place. Second, and relatedly, CMS failed to adequately respond to comments expressing "concern[] that enrollment through a non-governmental site would occur without proper oversight and controls." *Id.* at 16,982. Indeed, CMS offers no meaningful response, and instead asserts, without evidence, that it "believe[s]" that its decision "will ensure that quality operational readiness reviews are conducted." *Id.*

66.     Scaling back oversight of agents, brokers, and issuers that participate in direct enrollment will increase the likelihood that consumers receive inaccurate information, thus decreasing overall enrollment and leading to a rise in the rate of the uninsured. CMS's decision to shirk its responsibilities will also lead to a rise in the rate of the underinsured, as confusion around APTC eligibility facilitated by CMS's withdrawal will lead individuals to choose plans that are not appropriate to their needs.

**B.      Deterring Americans from Enrolling in Quality Health Insurance Plans**

67.      Other provisions of the 2019 Rule make it more difficult for consumers to enroll

in ACA-compliant health insurance coverage.

*1.      Making It Harder to Compare Insurance Plans*

68.      A key function of the exchanges is to "allow[] people to compare and purchase"

qualified health plans. *King*, 135 S. Ct. at 2485. In order to carry out this obligation—"to

simplify the consumer shopping experience and to allow consumers to more easily compare

plans across issuers"—prior rules supported "standardized options," which are qualified health

plans at different levels of coverage with a cost-sharing structure specified by HHS, including

fixed deductibles, fixed annual limitations on cost-sharing, and fixed copayments or coinsurance

for certain specified benefits.[74]

69.      HHS supported standardized options given its recognition that "[a]n excessive

number of health plan options makes consumers less likely to make any plan selection, more

likely to make a selection that does not match their health needs, and more likely to make a

selection that leaves them less satisfied."[75] HHS further stated that its experience during prior

"open enrollment periods suggests that many consumers, particularly those with a high number

of health plan options, find the large variety of cost-sharing structures available on the

Exchanges difficult to navigate." 80 Fed. Reg. at 75,542. HHS determined that "standardized

options will provide these consumers the opportunity to make simpler comparisons of plans

offered by different issuers within a metal level," and to "focus their decision making on the

---

[74]   *See* CMS, Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment
Parameters for 2017, 81 Fed. Reg. 12,204, 12,205, 12,289-293 (Mar. 8, 2016) (final rule).

[75]   *See* HHS Notice of Benefit and Payment Parameters for 2017, 80 Fed. Reg. 75,488, 75,542
(Dec. 2, 2015) (proposed rule); *see id.* at 75,542 & nn.31-32 (citing data).

providers in the plan networks, premiums, benefits, and quality," and prevent consumers from having "to make complex tradeoffs among cost-sharing differences among a large number of plans." *Id.* "For the 2017 and 2018 benefit years, HHS specified standardized options in rulemaking, encouraged issuers to offer such plans, and provided differential display of these plans on HealthCare.gov." 83 Fed. Reg. at 16,974.

70.     Notwithstanding the agency's own understanding of their effectiveness, the 2019 Rule discontinues support for standardized options. *See id.* at 16,974-75. CMS's decision to do so is arbitrary and capricious. CMS claims that standardized options stymied innovation, "removing incentives for issuers to offer coverage with innovative plan designs." *Id.* at 16,974. Yet CMS has cited no data to support that contention. Furthermore, CMS offered no reasonable response to commenters who pointed out that standardized options "are a useful consumer-support tool that aids in plan comparisons and selection," that their presence in fact "*encourages* issuers to innovate on other plan features and *encourages* issuers to compete on networks and formularies," and that their withdrawal "could create confusion for consumers, especially those with low health literacy or certain health conditions." *Id.* at 16,975 (emphasis added). CMS has not adequately explained its decision to make comparison shopping more difficult.

71.     By eliminating support for standardized options on federal exchanges, the 2019 Rule makes it more difficult for consumers to select appropriate health coverage, and also increases the risk that they will go without coverage entirely. These effects will, in turn, increase the size of the underinsured and uninsured populations. Indeed, CMS itself cited commenters who pointed out "that removing the standardized option designation could make plan selection more difficult resulting in fewer people enrolling in QHPs." *Id.*

72.     Moreover, eliminating support for standardized options will limit the degree to which health plans will compete on price; instead, some plans will choose to compete on benefit design in a gambit to discourage high-risk enrollees. Research found that after Massachusetts standardized its plans, consumers placed additional weight on cost-sharing features of their plan selections.[76] Covered California, which runs California's ACA exchange, attributes some of its success in offering affordable choices to its use of standardized plans.[77] Without standardized options, it will be harder for individuals to select coverage, prices will rise, and the rate of the uninsured and underinsured will increase.

## 2.     Undermining the Navigator Program

73.     As explained above, the ACA requires exchanges to award grants to healthcare "Navigators" that are responsible for helping individuals enroll in qualified health plans. 42 U.S.C. § 18031(i). Under HHS's prior rules, each exchange was required to have two Navigators, one of those Navigators was required to be a community- and consumer-focused nonprofit, and Navigators were required to have physical presences in the areas they served.[78] CMS decided to eliminate these requirements in the 2019 Rule. *See* 83 Fed. Reg. at 16,979-80. Its decision violates the APA in multiple ways.

74.     First, CMS's decision to eliminate these requirements is contrary to law because it permits entities to qualify as Navigators that cannot satisfy the relevant statutory criteria. Among other things, Navigators must "conduct public education activities to raise awareness of the

---

[76]   Keith M. Marzilli Ericson, & Amanda Starc, *How Product Standardization Affects Choice: Evidence from the Massachusetts Health Insurance Exchange*, 50 J. Health Econ. 71 (2016).

[77]   Shelby Livingston, *How California Made Obamacare Work*, Modern Healthcare, June 13, 2017, http://www.modernhealthcare.com/article/20170613/NEWS/170619961.

[78]   *See* 45 C.F.R. §§ 155.210(c)(2), 155.210(e)(7), 155.215(h) (effective May 9, 2016 to June 17, 2018).

availability of qualified health plans," 42 U.S.C. § 18031(i)(3)(A); "distribute fair and impartial information concerning enrollment in qualified health plans, and the availability of premium tax credits . . . and cost-sharing reductions," *id.* § 18031(i)(3)(B); "facilitate enrollment in qualified health plans," *id.* § 18031(i)(3)(C); provide enrollees with grievances, complaints, or questions about their health plans with referrals to specified entities, *id.* § 18031(i)(3)(D); and "provide information in a manner that is culturally and linguistically appropriate to the needs of the population being served by the Exchange or Exchanges," *id.* § 18031(i)(3)(E). But Navigators without a physical presence in an exchange service area cannot, in the terms CMS itself used in proposing the physical presence requirement, "provide[]" "face-to-face assistance . . . to applicants and enrollees"[79]—they therefore cannot adequately carry out the statutory duties summarized above.

75.    The statute also requires Navigators to "demonstrate to the Exchange involved that [they have] existing relationships, or could readily establish relationships, with employers and employees, consumers (including uninsured and underinsured consumers), or self-employed individuals likely to be qualified to enroll in a qualified health plan." 42 U.S.C. § 18031(i)(2)(A). The prior requirement that exchanges award grants to at least two Navigators, and that one be a community- and consumer-focused nonprofit, faithfully implemented this statutory mandate; the 2019 Rule's elimination of these requirements violates it. Current Navigators will potentially be replaced by organizations with conflicts of interest because commissions prompt them to steer enrollees to particular insurers. New Navigators may also have an incentive to discourage enrollment of high-cost enrollees.

---

[79]    CMS, Patient Protection and Affordable Care Act; Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 15,808, 15,832 (Mar. 21, 2014).

76.     Second, the 2019 Rule's elimination of the physical presence requirement is arbitrary and capricious. As noted above, in proposing the requirement CMS understandably recognized that face-to-face assistance is necessary for Navigators to carry out their statutorily required duties. 79 Fed. Reg. at 15,832. In response to CMS's proposal to eliminate the requirement, "many commenters [stated] that entities not physically present in an Exchange service area may not be able to provide a full spectrum of local outreach, education, and assistance to support enrollment and post-enrollment activities"; "[m]any commenters" also stated "that removing this requirement would negatively affect hard-to-reach populations, as the in-person assistance provided by Navigator entities is often the only known resource and form of support for some low-income and other at-risk populations"; and "some commenters [stated] that web or phone-based assistance is a poor substitute for in-person assistance delivered by a known and trusted community-based organization, and that this is particularly true for those living with significant health needs for whom remote assistance may prove inadequate and frustrating." 83 Fed. Reg. at 16,980. On top of that, CMS acknowledged—twice—"that entities with a physical presence and strong relationships in their [exchange] service areas tend to deliver the most effective outreach and enrollment results." *Id.*; *see id.* at 16,979-80 (similar). Yet HHS eliminated the requirement. That is arbitrary and capricious.

77.     The Administration's actions will decrease individuals' and families' in-person access to complete, impartial information. In so doing, they will dampen overall enrollment, especially among vulnerable populations, and thereby increase the rate of the uninsured. People who receive in-person assistance are nearly 40 percent more likely to enroll in coverage than

people who are forced to go it alone.[80] In-person assistance is particularly important for young people and minority populations, especially Latinos. A study conducted during the ACA's first open enrollment period found that two out of every five young people who successfully enrolled in coverage received help from a Navigator.[81] Another study found that nearly 50 percent of Latinos who successfully enrolled received in-person assistance.[82] Decreased in-person access to Navigators makes it more difficult for individuals to shop for appropriate health insurance, and will lead to a rise in the uninsured and underinsured.

### 3.    Making Small Business Exchanges Less User-Friendly

78.    The ACA requires exchanges to "provide[]for the establishment of a Small Business Health Options Program"—a "'SHOP Exchange'[] that is designed to assist" certain "small employers in facilitating the enrollment of their employees in qualified health plans offered in the small group market." 42 U.S.C. § 18031(b)(1)(B).[83] The ACA further requires SHOP exchanges to "make available qualified health plans to . . . qualified employers," *id.* § 18031(d)(2)(A); to protect employers' and employees' choice among certain qualified health

---

[80]    Sara R. Collins et al., *Following the ACA Repeal-and-Replace Effort, Where Does the U.S. Stand on Insurance Coverage?*, Commonwealth Fund (Sept. 7, 2017), http://www.commonwealthfund.org/Publications/Issue-Briefs/2017/Sep/Post-ACA-Repeal-and-Replace-Health-Insurance-Coverage.

[81]    Deloitte, *Young Adults and Health Insurance: Not Invincible--but Perhaps Convincible Findings from the Deloitte 2014 Survey of Young Adults and Health Insurance* 6 (2014), https://www2.deloitte.com/content/dam/Deloitte/us/Documents/life-sciences-health-care/us-chs-young-adults-and-health-insurance.pdf.

[82]    Adrian Garcia Mosqueira & Benjamin D. Sommers, *Better Outreach Critical to ACA Enrollment, Particularly for Latinos*, To the Point, Jan. 14, 2016, http://www.commonwealthfund.org/publications/blog/2016/jan/better-outreach-critical-to-aca-enrollment-particularly-for-latinos.

[83]    *See* 42 U.S.C. § 18024(b)(2) (defining "small employer"). *See generally Small Business Health Options Program (SHOP)*, CMS, https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces/SHOP.html.

plans, *see id.* § 18032(a)(2); and to protect employees' ability to enroll even after their employer

no longer qualifies as a small employer under the Act, *see id.* § 18024(b)(4)(D).

79.     Under prior rules, CMS interpreted the ACA as "requir[ing] that all SHOPs

provide for employer eligibility, employee eligibility, and certain enrollment functions, including

premium aggregation functions." 83 Fed. Reg. at 16,996. Provisions of the 2019 Rule purport to

reinterpret the ACA and remove these requirements. *See id.* at 16,996-17,006. In so doing, these

provisions are contrary to law and arbitrary and capricious. First, the removal of these

requirements permits SHOPs that cannot fulfill their statutory duties, described above, which

violates the ACA's text. Second, although CMS purported to justify its decision by reference to

declining enrollment in SHOPs, *see, e.g.*, *id.* at 16,996, making SHOPs even less functional and

less user friendly will exacerbate the very problem CMS cited. Because CMS's interpretation

violates the statute and has not been well-reasoned, these provisions of the 2019 Rule violate the

APA.

80.     By eliminating the requirement that SHOP exchanges allow employers to

determine employee eligibility, aggregate premiums, and enroll employees online, the 2019 Rule

makes it more difficult for small businesses to offer workers and their dependents affordable

coverage, and thereby will increase the size of the uninsured population. These changes will also

push small businesses to use a broker or buy directly from an insurance company, limiting their

ability to make plan comparisons and shop by price for appropriate coverage, potentially raising

their premiums.

### 4.     *Imposing Unnecessary Income Verification Requirements*

81.     In general, the ACA makes advance premium tax credits available to individuals

purchasing insurance on an exchange whose income is between 100-400 percent of the federal

poverty line ("FPL"). *See* 26 U.S.C. § 36B; 42 U.S.C. §§ 18081, 18082. Out of purported

concern that individuals inflate their income above the FPL to gain APTCs, resulting in the

payment of APTCs to those not entitled to receive them, provisions of the 2019 Rule impose

income verification requirements "where electronic data sources reflect income under 100

percent FPL and a consumer attests to income between 100 percent FPL and 400 percent FPL."

83 Fed. Reg. at 16,985; *see id.* at 16,985-87.

82.     These provisions are arbitrary and capricious. Even though individuals have been

seeking and receiving APTCs for years, in the 2019 Rule CMS "acknowledge[d] that it does not

have firm data on the number of applicants that might be inflating their income to gain APTC."

*Id*. at 16,986. Furthermore, CMS admitted that its new rules will disadvantage "households with

lower income." *Id*. CMS has no sufficient answer to the "many commenters" who "expressed

concern that low-income consumers have difficulty in providing documentation to resolve their

annual income data matching issues and that [CMS's new rules] would exacerbate that problem."

*Id.* Moreover, because APTC is reconciled with actual income from tax data for the year in

question, the concern about program integrity is overstated. Overall, it is more than ironic that in

the same rule that CMS repeatedly expresses a desire to cut red tape and reduce unnecessary

regulation, it nonetheless *increases* bureaucratic hurdles for the most vulnerable Americans. That

disparity renders these new requirements irrational. Because the Administration has not

adequately explained why burdensome income verification measures are needed, the provisions

of the 2019 Rule that impose them are arbitrary and capricious.

83.     By making it harder for consumers to obtain insurance tax credits, these

provisions of the 2019 Rule will likely mean that more consumers will choose to go without

coverage entirely—*i.e.*, that the rate of the uninsured will increase. The deterrent effects of

paperwork burdens are well-documented as a general matter.[84] Moreover, in this specific context, paperwork burdens have historically deterred enrollment of people with relatively low need for health care; those with high health care needs will work harder to get coverage.[85] For example, a verification pilot study found that only 55 percent of young adults submitted required documents compared to 73 percent of older applicants.[86] As such, extending verification to additional groups will worsen the risk pool and raise premiums, causing coverage to become less affordable.

84.     This challenge will be even greater among the lower-income enrollees targeted by this policy since they are more likely to have fluctuating income, part-year or part-time employment, and multiple employers, and to have difficulty accessing and supplying necessary documentation. One analysis estimates that 50 percent of adults with income below 200 percent of the poverty level experience income changes that make them move between eligibility for Medicaid and the exchanges.[87]

---

[84]   *See, e.g.*, Tricia Brooks, *Why is NH Proposing to Replace Proven Electronic Citizenship Verification with Burdensome Medicaid Paperwork Requirements?*, Georgetown University Health Policy Institute, Center for Children and Families (June 28, 2018), https://ccf.georgetown.edu/2018/06/28/why-is-nh-proposing-to-replace-proven-electronic-citizenship-verification-with-burdensome-medicaid-paperwork-requirements/.

[85]   Stan Dorn, *Helping Special Enrollment Periods Work Under the Affordable Care Act* 5-6, Urban Institute (June 2016), https://www.urban.org/sites/default/files/publication/81806/2000834-Helping-Special-Enrollment-Periods-Work-Under-the-Affordable-Care-Act.pdf.

[86]   *Pre-Enrollment Verification for Special Enrollment Periods*, CMS, https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/Pre-Enrollment-SEP-fact-sheet-FINAL.PDF.

[87]   Benjamin D. Sommers & Sara Rosenbaum, *Issues in Health Reform: How Changes in Eligibility May Move Millions Back and Forth Between Medicaid and Insurance Exchanges*, Health Affairs (Feb. 2011), https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2010.1000.

### C.     Driving Up Costs

85.     Lastly, other provisions of the 2019 Rule make health insurance coverage more expensive for consumers.

#### 1.     Exacerbating Risk Selection

86.     The 2019 Rule allows states to petition CMS to reduce by half so-called "risk adjustment" transfer payments—payments by insurers with healthier enrollees to insurers with sicker enrollees. *See* 83 Fed. Reg. at 16,955-60. In so doing, the Rule provides insurers a dramatically increased incentive to sign up healthy individuals and families and deter enrollment by individuals and families with preexisting conditions or other high medical costs.

87.     Adverse selection is a major concern in health insurance markets.[88] One form of adverse selection, called risk selection, arises when "health plans manipulate their offerings to deter the sick and attract the healthy."[89] For a variety of reasons, "[t]he premiums that insurers are paid may not fully reflect their population mix, say because premiums are set in advance or because employers do not fully assess the mix of enrollees before bargaining with a plan over the premium."[90] "In such circumstances, insurers have incentives to attract healthy insureds and repel sick insureds" by manipulating their plans and outreach.[91]

88.     To provide a partial solution to the problem of risk selection, the ACA requires each state to "assess a charge on health plans and health insurance issuers . . . if the actuarial risk of the enrollees of such plans or coverage for a year is *less*" than other issuers. 42 U.S.C. § 18063(a)(1) (emphasis added). By the same token, it requires each state to "provide a

---

[88]   David M. Cutler & Richard J. Zeckhauser, *Adverse Selection in Health Insurance*, *in* 1 Frontiers in Health Policy Research 1, 1 (Alan M. Garber, ed. 1998).

[89]   *Id.* at 2.

[90]   *Id.* at 10.

[91]   *Id.* at 12.

payment" to insurers if the average actuarial risk of their plans is *greater* than other issuers. *Id.* § 18063(a)(2). In other words, the ACA's risk adjustment scheme aims to defray the costs of signing up sicker enrollees, while limiting the financial benefit to pursuing largely healthy enrollees, thereby discouraging risk selection. Indeed, as CMS noted in the 2019 Rule, "[r]isk adjustment is widely used in health insurance markets, and is recognized as a critical measure in mitigating the effects of adverse selection." 83 Fed. Reg. at 16,955.

89.     The 2019 Rule, however, allows states to petition CMS to cut these payments in half. Specifically, the 2019 Rule permits states to ask to reduce risk adjustment transfer payments by up to 50 percent by "identifying the State-specific rules or market dynamics that warrant an adjustment and demonstrating the actuarial risk differences in plans in the applicable State market are attributable to factors other than systematic risk selection." 83 Fed. Reg. at 16,957. In CMS's view, the fact that "States are the primary regulators of their insurance markets," *id.* at 16,956, justified this unwarranted reduction in payments needed to ensure that health insurance markets remain stable. That change is arbitrary and capricious.

90.     Most importantly, CMS did not seriously grapple with the arguments presented by commenters—and corroborated by multiple studies—that substantial reductions in risk adjustment transfer payments would encourage risk selection by insurers, undermining the very purpose of the risk adjustment program specifically and the ACA generally. Instead, CMS simply parroted its assertion that "unique State rules or other relevant factors could support a reduction," 83 Fed. Reg. at 16,958, elevating state flexibility over the statutory mandate for an effective risk adjustment program. In doing so, CMS also failed to respond to multiple comments pointing out, among other things, that the risk adjustment transfer methodology already accounts for state-specific factors, and that states can obtain additional flexibility simply by operating their

own risk adjustment programs, *see* 45 C.F.R. § 153.330, which no state currently does, 83 Fed. Reg. at 16,958.

91.     Moreover, CMS provided insufficient explanation for why it decided to expand the proposed reductions to insurers in individual markets. To the contrary, CMS acknowledged that "adverse selection in the individual market is not mitigated by group enrollment or minimum participation requirements as is the selection in the small group market," 83 Fed. Reg. at 16,956; that "those enrolled in the individual or merged markets typically have higher actuarial risk, risk selection, and risk segmentation in plan selection than those enrolled in the small group market," *id.* at 16,958; and that "risk adjustment transfers are particularly required in these markets to mitigate issuers' risk of adverse selection and incentives to avoid risk," *id*. Despite these meaningful differences between individual and small group insurance markets, CMS allowed states to request the same 50 percent reduction for individual markets as well (while not soliciting comments on this amount for this market). In other words, CMS entirely failed to consider an important aspect of the problem.

92.     Finally, if CMS truly wished to provide states with additional flexibility, then it would have similarly allowed states to *increase* risk adjustment transfers based on "unique State rules or other relevant factors" as well. In rejecting that proposal, CMS made arguments flatly contrary to the reasons underlying its proposed reductions: that "State regulators under their own State authority could take actions outside of this flexibility," and "can also elect to establish and operate the [ACA] risk adjustment program." 83 Fed. Reg. at 16,959. Ultimately, CMS failed to explain why it decided to make the risk adjustment system a one-way ratchet. Because CMS's decision is therefore internally inconsistent and inadequately explained, it is likewise arbitrary and capricious.

93.     For these reasons, the 2019 Rule arbitrarily—and unlawfully—allows insurers with healthier enrollees to pay less, thereby decreasing the payments that insurers with sicker enrollees will receive. Experience with other systems suggests that insurers will respond by skimping on the quality of care or altering benefit design to try to lower cost for or avoid sicker enrollees altogether.[92] It will also cause insurers to raise premiums now on account of the added uncertainty of state action in the future, as well as the inadequacy of compensation once a state does act. This would discourage enrollment of healthy enrollees while disincentivizing employers from enrolling less healthy enrollees—those more likely to need health coverage in the first place—thereby increasing the number of underinsured or uninsured.

2.     *Curtailing Review of Insurance Rate Increases*

94.     The 2019 Rule also decreases the federal government's role in reviewing insurance rates, giving insurers greater flexibility to increase premiums without any justification. Under the ACA, "[t]he Secretary, in conjunction with States, shall establish a process for the annual review . . . of unreasonable increases in premiums for health insurance coverage." 42 U.S.C. § 300gg-94(a)(1). Pursuant to this statutory duty, CMS has promulgated regulations that require insurers to justify annual rate increases above a given threshold. *See* 45 C.F.R. §§ 154.101 *et seq*.

95.     The 2019 Rule, however, changes this scheme—and thereby flouts CMS's statutory duties—in two respects. First, the 2019 Rule exempts student health plans from rate review beginning July 1, 2018. 83 Fed. Reg. at 16,972. Second, the 2019 Rule raises the threshold for rate review to rate increases of 15 percent rather than the current 10 percent. *Id.* at

---

[92]    Wynand P.M.M. van de Ven et al., *Risk Selection Threatens Quality of Care for Certain Patients: Lessons from Europe's Health Insurance Exchanges*, Health Affairs (Oct. 2015), https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2014.1456.

16,972-73. Both of these changes limit the federal government's review of unwarranted rate increases and are unlawful.

96.     To start, the 2019 Rule's carve-out for student health plans is contrary to the text of the ACA. As explained above, the ACA requires review of "unreasonable increases in premiums for health insurance coverage," 42 U.S.C. § 300gg-94(a)(1), which are defined as "benefits consisting of medical care," *id.* § 300gg-91(b)(1)—a term that encompasses student health plans, which plainly provide medical care benefits like any other health insurance plan. Currently, the only exceptions to rate review are for "excepted benefits" and "grandfathered health plan" coverage, both of which are mandated by statute, *see* 42 U.S.C. §§ 300gg-91(c), 18011, and for large group plan rates, which are negotiated on a group-by-group basis and therefore cannot be effectively reviewed. By its plain terms, therefore, the ACA requires rate review of student health plans.

97.     Moreover, the 2019 Rule's student health plan exception is arbitrary and capricious. As CMS admitted, "[s]tudent health insurance coverage is considered by HHS to be a type of individual market coverage and is generally subject to . . . individual market requirements." 83 Fed. Reg. at 16,972. CMS provided an insufficient explanation for its decision to change course and treat student health plans like large group plans rather than individual plans. CMS also failed to meaningfully address comments that explained how exempting such plans "would result in minimal oversight and decreased affordability." *Id*. Instead, CMS argued that states can step in by engaging in rate review themselves. *Id.* Acknowledging that some states lack "an Effective Rate Review Program," however, CMS claimed that it would continue to monitor rates "based on complaints and as part of targeted market conduct examinations," *id.*—

50

ignoring the need for automatic, systemic review of increased rates that underlies the rate review program.

98.     The 2019 Rule's increased threshold for rate review is also arbitrary and capricious. CMS raised the threshold "in recognition of significant rate increases," 83 Fed. Reg. at 16,972—but larger rate increases are a reason for more, rather than less, review. CMS also gave short shrift to the "many" commenters concerned about increasing rates, arguing that the increased threshold would have implicated only one rate filing later found to be unreasonable. *Id.* at 16,973. In doing so, CMS ignored the fact that one of the core functions of rate review is to deter unreasonable increases from being submitted in the first place. CMS again invoked state rate review procedures as a stopgap measure, *see id.*—meaning that its explanation is again deficient for the reasons stated above. All told, CMS failed to consider important aspects of the problem, rendering its decision arbitrary and capricious.

99.     Overall, the 2019 Rule's unlawful changes to rate review will make it easier for insurers to increase rates without adequate justification; the purpose of rate review is for insurance commissioners and the public to examine the proposed reasons for health insurance premium increases in the individual and small-group market and adjust them as appropriate to improve affordability for consumers. In 2011, one in five proposed premium increases was reduced through rate review, with rates that went into effect approximately one-fifth lower than those initially requested by the insurer.[93] In 2015, rate review lowered premiums in the individual and small group markets by $1.5 billion.[94] And if prices are permitted to increase

---

[93]   Kaiser Family Foundation, *Quantifying the Effects of Health Insurance Rate Review* 3 (Oct. 2012), https://kaiserfamilyfoundation.files.wordpress.com/2013/01/8376.pdf.

[94]   HHS, *Rate Review Annual Report* 5 (Dec. 2015), https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/Rate-Review-Annual-Report_508.pdf.

without the significant check provided by rate review, individuals will increasingly decide to go without appropriate coverage or any coverage at all—driving up the rate of uninsured and underinsured individuals.

### 3.    Reducing Rebates for Poor Insurer Performance

100.    Lastly, the 2019 Rule makes it easier for insurers to avoid paying rebates to consumers if they provide subpar coverage. Under the ACA, insurers must pay rebates if the percentage of each premium that they spend on paying claims and improving their services—the "medical loss ratio" or "MLR"—drops below 85 percent (for large group insurance plans) or 80 percent (for small group and individual insurance plans). 42 U.S.C. § 300gg-18(b)(1)(A). "These minimum MLR standards are intended to help ensure that individuals covered under private health insurance plans (enrollees) receive adequate value for their premiums and to create incentives for insurers to become more efficient in their operations."[95]

101.    The 2019 Rule, however, alters the method by which rebates are awarded in two ways. First, the 2019 Rule allows insurers to claim a flat 0.8 percent of premium credit for quality improvement activities ("QIA")—*i.e.*, "activities that improve health care quality," 42 U.S.C. § 300gg-18(a)(2)—when calculating medical loss ratio, rather than a percent based on the amount actually spent on such activities, *see* 83 Fed. Reg. at 17,032-33. In other words, the 2019 Rule allows insurers to take credit for improving their services whether or not they actually did so. Second, the 2019 Rule makes it easier for states to request reduced medical loss ratio thresholds in multiple respects: among other things, the Secretary may lower the threshold if doing so would somehow "help stabilize the individual market in that [s]tate," *id.* at 17,034; the

---

[95]   *GAO-14-580, Private Health Insurance: Early Effects of Medical Loss Ratio Requirements and Rebates on Insurers and Enrollees* 1, U.S. Government Accountability Office (July 2014), https://www.gao.gov/assets/670/664719.pdf.

state need not provide information about its MLR standard formula for assessing compliance, *id.*; and the state need not comply with several other data collection requirements, *id.* at 17,033-34. All of these changes are unlawful.

102.    To start, allowing insurers to claim a flat credit for quality improvement activities is contrary to the text of the ACA. The ACA requires an issuer to report "the percentage of total premium revenue . . . that such coverage expends" for, among other things, "activities that improve health care quality." 42 U.S.C. § 300gg-18(a)(2). The statute's language requires insurers to report the amount *actually* spent on QIA—much like insurers are obligated to report how much they *actually* spent on reimbursing claims. *Id.* § 300gg-18(a)(1). The statute does not permit CMS to instead throw up its hands and give every insurer the same credit, whether or not the funds are actually expended. To the contrary, that approach undermines the statute's clear purpose: to encourage insurers to improve the quality of their services, lest they be forced to pay a rebate.[96]

103.    CMS's decision is also arbitrary and capricious. CMS decided to allow insurers to claim a flat credit because of what it saw as "issuers' relatively low and consistent reported expenditures on QIA and the significant burden associated with identifying, tracking, and reporting these expenditures." 83 Fed. Reg. at 17,032. But CMS failed to corroborate its assertions of substantial burden, or to meaningfully address comments pointing out that "allowing issuers who spend nothing on QIA to take a standardized credit for QIA would disincentivize issuers from making such investments." *Id.* Recognizing the validity of those concerns, CMS did modify its proposal to specify that insurers "that elect the standardized QIA reporting option must apply it consistently across all of their [s]tates and markets." *Id.* at 17,033.

---

[96]    *Id.*

That is an inadequate bandaid; nothing would stop an insurer from consistently failing to engage in quality improvement and simply claiming the newly invented flat-rate credit for all their plans. CMS added that insurers have other incentives to improve quality, but Congress explicitly created the MLR scheme because it believed that additional incentives are necessary.

104.    CMS's attempts to make it easier for states to request reduced MLR thresholds constitute another impermissible effort to lift burdens on insurers at the expense of consumers. In doing so, CMS recognized that "the adjustments to the individual market MLR standard should not undermine consumer protections and that the integrity of the adjustment review process should not be compromised." 83 Fed. Reg. at 17,036. But CMS simply asserted that states should be permitted to "develop strategies involving an adjusted MLR standard" without complying with what it deemed "duplicative, burdensome requirements" or "up-front restrictions on how much or what direction of an adjustment a State may seek." *Id.* CMS therefore failed to weigh the importance of a robust MLR system, and the importance of each individual requirement, against the purported administrative hurdles those requirements impose. That failure, too, is arbitrary and capricious.

105.    These changes will increase the rate of the uninsured and underinsured. Since the ACA's medical loss ratio policy began in 2011, enrollees in the individual market have received nearly $1.2 billion in rebates.[97] Preliminary data for 2017 suggest that rebates will be much higher than the previous year, with the average MLR dropping from 96 to 82 percent in the

---

[97]    CMS, *Summary of 2016 Medical Loss Ratio Results*, https://www.cms.gov/CCIIO/Resources/Data-Resources/Downloads/Medical_Loss_Ratio_2016_Annual_Report.pdf.

individual market.[98] By allowing insurers to increasingly avoid paying these rebates, the 2019

Rule will effectively cause consumers to pay more for worse insurance, leading to an increase in

the number of consumers that lack appropriate coverage.

## II.     Additional Executive Actions Demonstrating Defendants' Violation of Their Constitutional Duty to Faithfully Execute the ACA

106.    As detailed above, the 2019 Rule includes at least nine separate provisions that

illustrate how Defendants are violating their obligation to faithfully implement the Affordable

Care Act. In addition, President Trump and his Administration have taken many other actions

with the intent and effect of sabotaging the Act generally and its private insurance reforms and

exchanges in particular. Taken together, all of these actions—those described above and those

detailed below—establish Defendants' pattern and practice of taking executive action to

undermine the Act, and they demonstrate Defendants' violation of the Take Care Clause.

### A.     Directing Agencies to Sabotage the Act

107.    Hours after he was sworn in, President Trump signed Executive Order No.

13,765, "Minimizing the Economic Burden of the Patient Protection and Affordable Care Act

Pending Repeal," 82 Fed. Reg. 8,351 (Jan. 20, 2017). The Order turned what had been candidate

Trump's promises to repeal the ACA into President Trump's official policy. *Id.* § 1 ("It is the

policy of my Administration to seek the prompt repeal of the Patient Protection and Affordable

Care Act . . . ."). "[P]ending such repeal," the Order directs Administration officials to "take all

actions consistent with law to minimize the unwarranted economic and regulatory burdens of the

Act." *Id.*; *see id.* §§ 2-4. Yet President Trump's estimation of whether or not the Act's reforms

are "warranted" does not, and must not, affect his obligation to take care that the Act is faithfully

---

[98]   Cynthia Cox et al., *Individual Insurance Market Performance in 2017* at 2, Kaiser Family
Foundation (May 2018), http://files.kff.org/attachment/Issue-Brief-Individual-Insurance-Market-
Performance-in-2017.

executed, and actions his Administration has characterized as "consistent with law" have flown in the face of that constitutional obligation.

108.    Executive Order No. 13,765 is not merely a statement of policy. Rather, its issuance marked the start of the Trump Administration's usurpation of Congress's authority in its unilateral effort to repeal the ACA. The Order authorizes agencies to "waive, defer, grant exemptions from, or delay the implementation of any" ACA provision or requirement that, in the Administration's estimation, would impose fiscal or regulatory burdens. *Id.* § 2. As the press reported at the time, the Order "essentially allow[ed] the dismantling of the law to begin even before Congress move[d] to repeal it."[99] Indeed, five days after signing the Executive Order, President Trump affirmed his agenda to "let [the ACA] explode" so as to be better positioned to "go in and . . . do a new plan." "We're gonna have an explosion," he promised,[100] and Executive Order No. 13,765 delivered.

109.    Joshua Peck, who served as Chief Marketing Officer for the federal government's ACA exchange (HealthCare.gov) until 2016, estimated that by signaling that the Administration might not enforce the ACA's individual mandate, Executive Order No. 13,765 resulted in 130,000 fewer individuals enrolling in health insurance during the open enrollment period for 2017 plan year insurance that was ongoing at the time.[101] And as projected, within a month of its

---

[99]    Julie Hirschfield Davis & Robert Pear, *Trump Issues Executive Order Scaling Back Parts of Obamacare*, New York Times, Jan. 20, 2017, https://www.nytimes.com/2017/01/20/us/politics/trump-executive-order-obamacare.html.

[100]   *Transcript: ABC News Anchor David Muir Interviews President Trump*, ABC News (Jan. 25, 2017), http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-president/story?id=45047602.

[101]   Joshua Peck, *Trump Blocked Nearly 500,000 People From Getting Coverage*, Medium, Feb. 2, 2017, https://medium.com/get-america-covered/trumped-blocked-nearly-500-000-people-from-getting-coverage-70317eedaaa4.

being issued, the Executive Order indeed resulted in reduced enforcement of the individual mandate,[102] as further detailed below.

110.    By issuing and implementing Executive Order No. 13,765, President Trump and his Administration have violated their constitutional obligation to take care that the ACA is faithfully executed. Rather, they have purposefully undermined the Act—the aim of which is to expand access to quality coverage—in at least two ways. First, the Order has limited and will likely continue to reduce progress in decreasing the number of uninsured Americans, directly undermining the Act's aim. And second, by shrinking the risk pool, the Order will make health insurance less affordable, a result counter to the Affordable Care Act's central goal—a goal so critical that it is featured in the Act's title.

### B.    Attempting to Destabilize the Exchanges

111.    As described above, Congress constructed the ACA to both support, and be supported by, robust enrollment in ACA-compliant plans on ACA exchanges. Key to strong enrollment numbers are competitive exchanges with low premiums that attract a broad range of consumers, not just those with high medical expenses, and a broad range of insurers, to foster competition. If one were setting out to weaken the exchanges, therefore, one could hardly do better than to sow uncertainty about the rules that govern them and the government support for them. Insurance companies strive to minimize risk and uncertainty. When risk and uncertainty increase, issuers raise premiums to compensate, or even exit insurance markets entirely. Sowing uncertainty in insurance markets is precisely what the Trump Administration has done from day

---

[102]  Michael Hiltzik, *Trump's IRS Stages a Stealth Attack on Obamacare*, Los Angeles Times, Feb. 15, 2017, http://www.latimes.com/business/hiltzik/la-fi-hiltzik-irs-obamacare-20170215-story.html.

one, including by issuing Executive Order No. 13,765, described above, and by taking the discrete executive actions detailed below.

112.    Exemplifying the Trump Administration's strategy is the way in which the Administration, over the course of the summer and the fall in 2017, repeatedly threatened to discontinue reimbursing insurers for cost-sharing reductions—to stop paying insurers back for the reductions in copayments, coinsurance, and so on, that the Act requires them to provide to consumers.[103] At the time, pending litigation raised questions concerning those payments, but the merits of those questions are not what is at issue here; rather, the Administration's actions, aimed toward provoking a legislative repeal, were deliberately designed to introduce uncertainty into the exchanges through *threats* that the CSR payments would cease. As the President himself asserted, in one of his many intentionally intimidating statements, "If you don't make them, [the ACA exchange] fails."[104]

113.    The threats served their purpose. Throughout the country, some insurers that had previously sold health insurance through the exchanges for the 2017 plan year exited them entirely, refusing to offer coverage for the 2018 plan year because of the Administration's refusal

---

[103]  *See, e.g.*, Chad Terhune & Julie Appleby, *Uncertainty Over Obamacare Leaves Next Year's Rates in Limbo*, NPR, July 19, 2017, https://www.npr.org/sections/health-shots/2017/07/19/538099050/uncertainty-over-obamacare-leaves-next-years-rates-in-limbo; Robert Pear & Thomas Kaplan, *Trump Threat to Obamacare Would Send Premiums and Deficits Higher*, New York Times, Aug. 15, 2017, https://www.nytimes.com/2017/08/15/us/politics/cbo-obamacare-cost-sharing-reduction-trump.html.
[104]  Aaron Blake, *President Trump's Thoroughly Confusing Fox Business Interview, Annotated*, Washington Post, Apr. 12, 2017, https://www.washingtonpost.com/news/the-fix/wp/2017/04/12/president-trumps-throughly-confusing-fox-business-interview-annotated/?utm_term=.0b4ab6f8b1a6.

to guarantee that CSR payments would continue.[105] That left some counties with decreased competition among issuers, which (again) drives up prices and decreases overall enrollment. Indeed, at the time, the Congressional Budget Office warned that terminating CSR payments could increase the percentage of people living in areas not served by a single insurer between 2018 and 2020.[106] Other insurers raised premiums by as much as 23 percent for 2018 to guard against the risk that they would not receive the payments. And (again)—as the Administration knew—rising premiums and decreased enrollment threaten the long-term success of the ACA by increasing adverse selection and weakening the market, leading to yet lower enrollment and higher premiums.

114. Tellingly, the Trump Administration ultimately stopped making CSR payments on October 12, 2017, shortly after the reconciliation instruction for legislation to repeal and replace the ACA expired.[107] Confirming his aim all along, days later President Trump declared that the Act was "dead" and "gone," and that "[t]here is no such thing as Obamacare anymore."[108] Some insurers and insurance commissioners adjusted to the Administration's action by raising premiums rather than pulling out of the exchanges entirely. The Congressional Budget Office estimated that 2018 silver plan premiums were 10 percent higher because of the

---

[105] Rachel Roubein, *No Certainty on Cost-sharing Payments to Insurers*, The Hill, June 8, 2017, http://thehill.com/policy/healthcare/336974-no-certainty-on-cost-sharing-payments-to-insurers (citing the exit of Anthem in Ohio in particular).

[106] Congressional Budget Office, *The Effects of Terminating Payments for Cost-Sharing Reductions* (Aug. 15, 2017), https://www.cbo.gov/publication/53009.

[107] Dan Mangan, *Obamacare Bombshell: Trump Kills Key Payments to Health Insurers*, CNBC, Oct. 12, 2017, https://www.cnbc.com/2017/10/12/obamacare-bombshell-trump-kills-key-payments-to-health-insurers.html.

[108] Rebecca Savransky, *Trump: There Is No Such Thing as ObamaCare Anymore*, The Hill, Oct. 16, 2017, http://thehill.com/policy/healthcare/355658-trump-there-is-no-such-thing-as-obamacare-anymore.

Administration's actions, and will be 20 percent higher by 2021.[109] While few enrollees actually paid this sticker price in light of the ACA's premium tax credits, this likely contributed to a reduction in enrollment among people not eligible for premium tax credits.[110] And the cost to the federal government of those premium tax credits—and, therefore, to federal taxpayers—ballooned.

115.    The Administration's approach to CSR payments—create uncertainty at every turn—weakened insurance markets, particularly given the Administration's timing. One recent study explains:

> Several subjects amplified that the Trump [A]dministration's decision to cancel cost-sharing reduction payments for the final quarter of 2017, well after it was too late for insurers to adjust their 2017 rates, and just a few days before their deadline to decide on 2018 participation, "had a concussive quality" and was the "straw that broke the camel's back" because it "sent a clear signal" to insurers that they "cannot rely on the federal government to keep its [funding] commitments" in the future . . . .[111]

These views emphasize that "[a]lthough actuarial uncertainty is always present, what has especially bedeviled ACA insurers is the political uncertainty over adverse change in rules."[112] Over time, as further detailed below, Defendants have recognized and deliberately exploited their ability to generate such uncertainty, and experts have found—as the Trump Administration has known—that many of the actions discussed below will

---

[109]  *May 2018 CBO Report*, *supra* n.9, at 7, 9.

[110]  Jeanne Lambrew, *No "ObamaCare Implosion" from Trump Payment Freeze*, The Century Foundation, Apr. 19, 2018, https://tcf.org/content/commentary/no-obamacare-implosion-trump-payment-freeze/.

[111]  Mark Hall, *Stabilizing and Strengthening the Individual Health Insurance Market: A View from Ten States* 20, USC-Brookings Schaeffer Initiative for Health Policy (July 2018), https://www.brookings.edu/wp-content/uploads/2018/07/Stabilizing-and-Strenghtening-the-Individual-Health-Insurance-Market2.pdf (alteration in original).

[112]  *Id.* at 19.

lead to increased premiums on ACA exchanges.[113] If these actions are allowed to stand,

they will contribute to the Administration's stated goal of undermining the Act.

        1.     *Promoting Bare-Bones Plans to Try to Weaken ACA Exchanges*

    116.    On October 12, 2017, President Trump signed Executive Order No. 13,813,

entitled "Promoting Healthcare Choice and Competition Across the United States," 82 Fed. Reg.

48,385 (Oct. 12, 2017). Alleging that the ACA "has severely limited the choice of healthcare

options available to many Americans and has produced large premium increases in many State

individual markets for health insurance," *id.* § 1(a), the Order directs the Administration to

"prioritize three areas for improvement in the near term: association health plans (AHPs), short-

term, limited-duration insurance (STLDI), and health reimbursement arrangements (HRAs)," *id.*

§ 1(b). All three—AHPs, STLDI, and HRAs—provide coverage, often bare-bones coverage, that

does not need to comply with the ACA's requirements.[114] For example, short-term, limited-

duration insurance can refuse to offer coverage at all, or exclude coverage, for preexisting

conditions; charge a higher rate based on an individual's health history and health status; exclude

benefits such as prescription drugs, maternity care, mental health services, and substance use

---

[113] *See* American Academy of Actuaries, *Drivers of 2019 Health Insurance Premium Changes* 2, 4, http://www.actuary.org/files/publications/Premium_Drivers_2019_061318.pdf (addressing the effect of the elimination of cost-sharing reduction payments, and of expanded access to STLDI and AHPs, on premiums).

[114] Association health plans purport to group small businesses, including self-employed workers, together to obtain coverage as though they were a single large employer. Short-term, limited-duration insurance, in keeping with its name, has historically been used to provide stop-gap coverage, for example when an individual transitions from one type of major medical coverage to another. Health reimbursement arrangements, also known as health reimbursement accounts, are funds set aside by employers to reimburse employees for qualified medical expenses. *See generally* Bernadette Fernandez et al., *Background Information on Health Coverage Options Addressed in Executive Order 13813* at i-ii, Congressional Research Service, https://fas.org/sgp/crs/misc/R45216.pdf.

disorder services; can include a dollar cap on services and stop paying medical bills after that cap is reached; and are not required to limit consumer out-of-pocket costs.

117.    By directing his Administration to expand access to bare-bones plans like AHPs, STLDI, and HRAs, Executive Order No. 13,813 will "open doors for young and healthy people to flee [the] ACA-compliant market," *i.e.*, the exchanges, "and find lower premiums" off of the exchanges.[115] Because on-exchange purchasers will as a group be older and sicker than they have been in prior years, premiums for on-exchange purchasers will increase. This will lead to decreased enrollments in ACA-compliant plans, particularly among the young and healthy. The Order will thereby increase costs and decrease coverage, phenomena that the ACA was designed to prevent.

118.    Specifically, the Urban Institute estimated that expanded access to short-term, limited duration policies would cause 2.6 million people to lose coverage in 2019.[116] The Office of the Actuary at CMS projected that such enhanced access would increase premiums for ACA-

---

[115]  Timothy Jost, *Trump Executive Order Expands Opportunities For Healthier People To Exit ACA*, Health Affairs Blog, Oct. 12, 2017, http://www.healthaffairs.org/do/10.1377/hblog20171022.762005/full/; *see* Mark A. Hall & Michael J. McCue, *How Do Noncompliant Health Plans Affect the Market?*, To the Point, Nov. 15, 2017, http://www.commonwealthfund.org/blog/2017/how-do-noncompliant-health-plans-affect-market ("Actuaries and other analysts have expressed concern that allowing compliant and noncompliant health plans to be sold side by side in the same market could destabilize the market for the compliant plans. If people who benefit the least from the standard requirements are allowed to opt for cheaper noncompliant plans, then the risk pool for the compliant plans will worsen, driving their prices higher, and possibly to an unsustainable level.").

[116]  *See* Linda J. Blumberg et al., *Updated: The Potential Impact of Short-Term Limited-Duration Policies on Insurance Coverage, Premiums, and Federal Spending* 6, Urban Institute (Mar. 2018), https://www.urban.org/sites/default/files/publication/96781/2001727_updated_finalized.pdf [hereinafter *March 2018 Urban Institute Study*].

compliant plans by 3 to 6 percent.[117] And one analysis estimated that increased access to association health plans would increase premiums for ACA-compliant individual market plans by 1.4 to 4.4 percent.[118] Overall, the Congressional Budget Office estimated that the combined effect of additional access to short-term, limited duration insurance and association health plans would increase premiums for ACA-compliant plans by 2 to 3 percent, with 6 million people enrolling in these STLID and AHPs—plans with far fewer consumer protections.[119]

119.    Given this, it is no surprise that one analysis found that more than 98 percent of healthcare groups that commented on the Administration's proposed STLDI regulation expressed serious concerns or opposed it outright; the figure was 95 percent for the AHP regulation. "Among the groups were virtually every leading patient advocate in the country, including the American Lung Assn., the American Heart Assn., the Cystic Fibrosis Foundation, the March of Dimes, the National Multiple Sclerosis Society, Susan G. Komen, AARP and the advocacy arm of the American Cancer Society. Not a single group representing patients, physicians, nurses or hospitals voiced support in the public comments for the two Trump [A]dministration proposals."[120]

---

[117]   Paul Spitalnic, *Estimated Financial Effects of the Short-Term, Limited-Duration Policy Proposed Rule* 2, CMS (Apr. 6, 2018), https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/STLD20180406.pdf.

[118]   Sabrina Corlette et al., *New Rules to Expand Association Health Plans*, The Actuary (May 2018), http://www.theactuarymagazine.org/new-rules-to-expand-association-health-plans/.

[119]   *May 2018 CBO Report*, *supra* n.9, at 10.

[120]   Noam N. Levey, *Trump's New Insurance Rules Are Panned by Nearly Every Healthcare Group That Submitted Formal Comments*, Los Angeles Times, May 30, 2018, http://www.latimes.com/politics/la-na-pol-trump-insurance-opposition-20180530-story.html.

120.     In signing Executive Order No. 13,813, President Trump confirmed its intent, saying, "I just keep hearing repeal-replace, repeal replace. Well, we're starting that process."[121] And thus, by using Executive Order No. 13,813 to begin unilateral executive efforts to repeal the ACA, the Administration directly usurped Congress's lawmaking function. At least one member of Congress, Sen. Rand Paul, claimed to have worked directly with President Trump to craft the Order, in order to achieve the reforms that Congress itself had failed to advance.[122] And a comparison of the Order with Sen. Paul's proposed Obamacare Replacement Act, S. Bill No. 222, 115th Congress (2017-18),[123] reveals multiple similarities.

121.     In keeping with Executive Order No. 13,813's directive, as of the date of this filing the Administration has finalized rules expanding access to association health plans[124] and short-term limited duration insurance.[125]

122.     By issuing and implementing Executive Order No. 13,813, Defendants have violated their constitutional obligation to take care that the ACA is faithfully executed. Rather, they have purposefully undermined the Act—the aim of which is to expand access to quality

---

[121]   Margot Sanger-Katz, *What We Know About Trump's Twin Blows to Obamacare*, New York Times, Oct. 12, 2017, https://www.nytimes.com/2017/10/12/upshot/what-did-trumps-health-care-executive-order-do.html.

[122]   *See* Max Greenwood, *Rand Paul: I've Been Working with Trump for Months on Health Care Order*, The Hill, Oct. 10, 2017, http://thehill.com/policy/healthcare/354663-rand-paul-ive-been-working-with-trump-for-months-on-health-care-order.

[123]   *Available at* https://www.congress.gov/bill/115th-congress/senate-bill/222/text.

[124]   *See* Department of Labor, Definition of "Employer" Under Section 3(5) of ERISA—Association Health Plans, 83 Fed. Reg. 28,912 (June 21, 2018); *see also New York v. U.S. Dep't of Labor*, No. 18-cv-1747 (D.D.C. filed July 26, 2018) (challenging the Administration's AHP rule under the Administrative Procedure Act).

[125]   *See* Department of the Treasury, Final Rule, Short-Term, Limited-Duration Insurance, -- Fed. Reg. -- (Aug. 1, 2018), https://www.cms.gov/CCIIO/Resources/Files/Downloads/dwnlds/CMS-9924-F-STLDI-Final-Rule.pdf; *see also* Department of the Treasury, Short-Term, Limited-Duration Insurance, 83 Fed. Reg. 7,437 (Feb. 21, 2018) (proposed rule).

coverage—in at least two ways. First, the Order will result in fewer individuals receiving ACA-compliant health insurance coverage, directly undermining the Act's goal. And second, by decreasing enrollments in ACA-compliant plans, the Order will increase premiums for quality plans, ultimately resulting in even fewer individuals being able to access affordable health care coverage.

### 2.   *Undermining the Individual Mandate*

123.    As noted above, when Congress enacted the ACA it imposed an individual mandate that now, in light of congressional amendments in 2017, requires those without insurance to make a shared responsibility payment through December 31, 2018. *See* 26 U.S.C. §§ 5000A, 5000A note. On February 14, 2017, citing President Trump's Executive Order No. 13,765, the Internal Revenue Service announced that it was scrapping a new policy that had been designed to strengthen the individual mandate by automatically rejecting tax returns of those who fail to answer whether they had health insurance.[126] The press reported that this change signaled that the Administration was "loosening up on enforcement of . . . [the] individual mandate."[127] Indeed, the IRS confirmed that at the direction of Executive Order No. 13,765, its decision aimed "to reduce potential burden"—i.e., to lessen enforcement—of the ACA.[128]

124.    Although the IRS subsequently reversed course, it waited until October 2017 to do so.[129] This was after insurers indicated, in summer 2017, that they would either raise

---

[126] *See* Peter Sullivan, *IRS Loosening Enforcement of ObamaCare Mandate*, The Hill, Feb. 15, 2017, http://thehill.com/policy/healthcare/319672-irs-takes-step-against-obamacare-mandate.

[127] *Id.*

[128] *Id.*

[129] Michael Cohn, *IRS Won't Accept Tax Returns Next Year Without Health Coverage*, Accounting Today, Oct. 17, 2017, https://www.accountingtoday.com/news/irs-wont-accept-tax-returns-next-year-without-health-coverage.

premiums or withdraw from the market if they did not have clarity on enforcement prior to the September 5, 2017 rate filing deadline.[130] The months-long threat of underenforcement of the individual mandate created uncertainty, thereby weakening markets and causing insurers to increase prices.

125.   On November 1, 2017, the first day of open enrollment, President Trump suggested that Congress repeal the individual mandate as part of a tax reform package.[131] He did not, like his predecessor, encourage people to review their health insurance options and sign up for coverage.[132] Then, on November 6, 2017, the press reported that in the face of Congress's unwillingness to pass a bill repealing the individual mandate, President Trump was readying an executive order to attempt the same, by unilateral executive action.[133]

126.   Even after the 2017 tax bill reduced the shared responsibility payment to $0 for the months starting after December 31, 2018, the Administration has endeavored to further weaken the individual mandate while the payment remains in effect. For example, when it issued the 2019 Rule, CMS also issued guidance providing expanded access to so-called "hardship exemptions" from the mandate.[134]

---

[130]   Rabah Kamal et al., *An Early Look at 2018 Premium Changes and Insurer Participation on ACA Exchanges,* Kaiser Family Foundation (Aug. 10, 2017), https://www.kff.org/health-reform/issue-brief/an-early-look-at-2018-premium-changes-and-insurer-participation-on-aca-exchanges/.

[131]   @realDonaldTrump, Twitter (Nov. 1, 2017, 7:59 AM), https://twitter.com/realDonaldTrump/status/925739132579729420.

[132]   Sarah Kliff, *Trump Won't Advertise Obamacare, So Obama is Stepping In,* Vox, Nov. 1, 2017, https://www.vox.com/health-care/2017/11/1/16592274/obama-obamacare-video.

[133]   Kimberly Leonard, *Trump Readies Executive Order to Unravel Obamacare's Individual Mandate*, Washington Examiner, Nov. 6, 2017, http://www.washingtonexaminer.com/trump-readies-executive-order-to-unravel-obamacares-individual-mandate/article/2639728.

[134]   CMS, *Guidance on Hardship Exemptions from the Individual Shared Responsibility Provision for Persons Experiencing Limited Issuer Options or Other Circumstances* (Apr. 9, 2018), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2018-

127.    There is no question that the ACA's individual mandate has had an effect on

individuals' decisions to purchase insurance. For instance, the uninsured rate among high-

income young adults, who faced increases in premiums due to the ACA insurance reforms,

sharply decreased between 2013 and later years, suggesting that the mandate affected their

insurance decisions.[135] Moreover, multiple studies show that uninsured people who signed up

due to the mandate have health costs significantly below other enrollees.[136]

128.    Congress acted to reduce the shared responsibility payment associated with the

mandate to $0 knowing that it would increase premiums by 10 percent in 2019. But prior to that,

the Trump Administration's *threats* not to enforce the mandate drove up 2018 premiums all by

themselves. Preliminary analyses estimate that the deliberate uncertainty around the mandate's

enforcement that the Administration introduced accounted for up to a 20 percent increase in 2018

individual market premiums.[137] The Congressional Budget Office also attributed higher

premiums for 2018 and insurer withdrawals from the exchanges to uncertainty about the

---

Hardship-Exemption-Guidance.pdf; *see also* Dan Diamond, *Seema Verma Previews Medicare Agenda*, Politico, Mar. 23, 2018, https://www.politico.com/newsletters/politico-pulse/2018/03/23/seema-verma-previews-medicare-agenda-148797 (reporting that Defendant Verma was "weighing more exemptions to the ACA individual mandate").

[135]  Matthew Fiedler, *How Did the ACA's Individual Mandate Affect Insurance Coverage?*, USC-Brookings Schaeffer Initiative for Health Policy (May 2018), https://www.brookings.edu/wp-content/uploads/2018/05/coverageeffectsofmandate2018.pdf

[136]  *See, e.g.*, Martin B. Hackmann et al., *Adverse Selection and An Individual Mandate: When Theory Meets Practice*, 105 American Economic Review 1030 (2015); Amy Finkelstein et al., *Subsidizing Health Insurance for Low-Income Adults: Evidence from Massachusetts* (National Bureau of Economic Research, Working Paper No. 23668, 2017), *available at* https://scholar.harvard.edu/files/mshepard/files/finkelstein_hendren_shepard_SubsidizingInsurance.pdf.

[137]  Rabah Kamal et al., *An Early Look at 2018 Premium Changes and Insurer Participation on ACA Exchanges*, Kaiser Family Foundation (Aug. 10, 2017), https://www.kff.org/health-reform/issue-brief/an-early-look-at-2018-premium-changes-and-insurer-participation-on-aca-exchanges/.

enforcement of the individual mandate.[138] Those premium increases, in turn, made it more difficult for other segments of the population to obtain coverage, eroding coverage overall.

129.    By threatening underenforcement of the individual mandate, Defendants have violated their constitutional obligation to take care that the ACA is faithfully executed. Rather, they have purposefully undermined the Act—the aim of which is to expand access to quality coverage—in at least two ways. First, threatening underenforcement of the individual mandate will result in fewer individuals receiving ACA-compliant health insurance coverage overall, directly undermining the Act's goal. And second, by decreasing health insurance enrollments, threatening underenforcement of the individual mandate will weaken health insurance markets and increase premiums, ultimately resulting in even fewer individuals being able to access affordable health care coverage.

### 3.    *Refusing to Grant State Waiver Requests that Would Further the ACA's Goals*

130.    The ACA permits states to apply for waivers of some of the law's requirements in order to promote innovative policies that—and this is key—"provide coverage that is at least as comprehensive as" ACA-compliant coverage. 42 U.S.C. § 18052(b)(1)(A).

131.    Although the Trump Administration has encouraged states to apply for waivers,[139] it has either denied or not responded to many of the requests for waivers that it has received,[140]

---

[138]  *May 2018 CBO Report*, *supra* n.9, at 2-3.

[139]  *See, e.g.*, Letter from Thomas E. Price, former HHS Secretary, to state governors (Mar. 13, 2017), https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Downloads/March-13-2017-letter_508.pdf ("We welcome the opportunity to work with states on Section 1332 State Innovation Waivers….").

[140]  *See* Alison Kodak, *Administration Sends Mixed Signals On State Health Insurance Waivers*, NPR (Oct. 19, 2017), http://www.npr.org/sections/health-shots/2017/10/19/558310690/administration-sends-mixed-signals-on-state-health-insurance-waivers. *See generally* Section 1332: State Innovation Waivers, CMS,

especially when it believes that granting the waivers would faithfully implement the Act by expanding access to coverage. (By contrast, the Administration has eagerly processed state waivers that are designed to reduce access to quality health insurance.[141]) Indeed, the Administration has dragged its feet even though some states' waiver requests are designed to lower premiums and stabilize insurance markets. For example, the press reported that, upon learning about Iowa's waiver request and claims that the state's plan would improve its exchange, President Trump personally called Defendant Seema Verma, whose agency—CMS— is responsible for processing waiver requests, and instructed her to deny Iowa's application.[142]

132.    The Administration's actions have frustrated states' efforts to support the ACA and its reforms and to expand access to affordable, quality health insurance. For example, in withdrawing its waiver request owing to the Administration's delay, Oklahoma Secretary of Health and Human Services Terry Cline stated that CMS's failure to approve the waiver would "prevent thousands of Oklahomans from realizing the benefits of significantly lower insurance premiums in 2018."[143]

---

https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Section_1332_State_Innovation_Waivers-.html (listing pending, approved, and denied waiver requests).

[141] *See* Bruce Jaspen, *Trump's Medicaid Work Rules Hit States With Costs And Bureaucracy*, Forbes, July 22, 2018, https://www.forbes.com/sites/brucejapsen/2018/07/22/trumps-medicaid-work-rules-hit-states-with-costs-and-bureaucracy/#745af26066f5; *see also Stewart v. Azar*, -- F. Supp. 3d --, No. 18-cv-152, 2018 WL 3203384 (D.D.C. June 29, 2018).

[142] *See* Juliet Eilperin, *As ACA Enrollment Nears, Administration Keeps Cutting Federal Support of the Law*, Washington Post, Oct. 5, 2017, https://www.washingtonpost.com/politics/as-aca-enrollment-nears-administration-keeps-cutting-federal-support-of-the-law/2017/10/05/cc5995a2-a50e-11e7-b14f-f41773cd5a14_story.html?utm_term=.4c73ed0cbe7d.

[143] Letter from Terry Cline, former Oklahoma Health Commissioner, to Steve Mnuchin, Secretary, United States Department of the Treasury, and Thomas E. Price, former HHS Secretary (Sept. 29, 2017), https://www.ok.gov/health2/documents/Oklahoma%201332%20Waiver%20Withdrawal%209.29.17.pdf.

133.     By delaying and denying waiver requests, Defendants have violated their

constitutional obligation to take care that the ACA is faithfully executed. Rather, they have

purposefully undermined the Act—the aim of which is to expand access to quality coverage—in

at least two ways. First, delaying and denying waiver requests will result in fewer individuals

receiving ACA-compliant health insurance coverage overall, directly undermining the Act's

goal. And second, delaying and denying waiver requests will weaken health insurance markets

and increase premiums, ultimately resulting in even fewer individuals being able to access

affordable health care coverage.

### 4.  Attempting to Weaken Public Confidence in ACA Exchanges

134.     Statements by President Trump and others in his Administration confirm that the

driving force behind all of the Administration's actions described here is to sabotage the

Affordable Care Act. As exemplified by the statements catalogued above, *see supra* ¶¶ 42-46,

the Trump Administration has been relentless in its efforts to paint a false picture of the Act as

failing—or even, in President Trump's words at a meeting of his Cabinet, as already "dead. It's

gone. It's no longer—you shouldn't even mention [it]. It's gone. There is no such thing as

Obamacare anymore."[144] The number of times that President Trump and others in his

Administration have called "Obamacare . . . a disaster" can barely be counted.[145] The President

---

[144] *Remarks by President Trump in Cabinet Meeting*, The White House (Oct. 16, 2017), *available at* https://web.archive.org/web/20171016180503/https://www.whitehouse.gov/the-press-office/2017/10/16/remarks-president-trump-cabinet-meeting.

[145] *See, e.g.*, Jacqueline Thomsen, *Trump Vows to Repeal and Replace ObamaCare 'Disaster'*, The Hill, Nov. 23, 2017, http://thehill.com/homenews/administration/361693-trump-vows-to-repeal-and-replace-obamacare-disaster; Jay Willis, *President Trump Couldn't Repeal the Affordable Care Act, So He's Trying to Sabotage It Instead*, GQ, Sept. 1, 2017, https://www.gq.com/story/trump-sabotage-obamacare-marketing (collecting examples).

has even gone so far as to assert that "ObamaCare is torturing the American People."[146] Vice President Mike Pence has called Obamacare a "nightmare."[147]

135.     It would be one thing if the Administration's only goal were to build public opposition to the Act, but that is not the case. Rather, the Administration's communications strategy is aimed at creating a false public impression about the ACA and reducing public confidence in the law and its exchanges, thereby discouraging individuals from enrolling in ACA-compliant insurance and weakening the exchanges. In March 2017, for example, HHS launched an official website alleging "skyrocketing premiums and narrowing choices" in ACA exchanges and asserting that the ACA "has done damage to" the market for individual insurance and "created great burdens for many Americans."[148] An official WhiteHouse.gov page likewise proclaims that "Obamacare is hurting American families, farmers, and small businesses with skyrocketing health insurance costs."[149] And HHS press officials have labored to paint a picture of the ACA as "continu[ing] to collapse" and as having "been in a death spiral for years."[150]

---

[146] @realDonaldTrump, Twitter (July 25, 2017, 6:38 AM), https://twitter.com/realdonaldtrump/status/889796918615920640.

[147] Juliet Eilperin et al., White House's Decision to Atop ACA Cost-sharing Subsidies Triggers Strong Opposition, Washington Post, Oct. 13, 2017, https://www.washingtonpost.com/politics/white-house-tells-court-it-is-immediately-stopping-aca-cost-sharing-subsidies/2017/10/13/4c404234-b01d-11e7-be94-fabb0f1e9ffb_story.html?noredirect=on&undefined=&utm_term=.2cc7c1747873&wpisrc=nl_most&wpmm=1.

[148] Providing Relief Right Now for Patients, HHS, https://www.hhs.gov/healthcare/empowering-patients/providing-relief-right-now-for-patients/index.html.

[149] Healthcare, The White House, https://www.whitehouse.gov/issues/healthcare/.

[150] Dan Mangan, *Trump's Health Chief Pushes 'Waivers' for States from Obamacare Rules, as HHS Says Program in 'Death Spiral'*, CNBC, May 16, 2017, https://www.cnbc.com/2017/05/16/trumps-health-chief-pushes-waivers-for-states-from-obamacare-rules.html.

136.    Less visibly, recent reports from the Sunlight Foundation have documented how HHS has systematically removed information about the ACA from its websites.[151] Worse, Senators Schatz, Booker, and Murphy, "concerned that the use of appropriated funds to promote legislation pending before Congress" to repeal the ACA "violate both HHS's constitutional responsibility to implement existing law, and legal prohibitions against using taxpayer dollars to lobby in favor of pending legislation," have collected numerous examples where HHS social media accounts published "anti-ACA propaganda."[152] For example, then-Secretary of HHS Tom Price tweeted videos that his agency produced to discredit the Act, *see infra* ¶ 156, with an explicit admonition discouraging enrollment, commenting that "[u]nder Obamacare, coverage ≠ care."[153] Sec. Price also adorned social media posts featuring anti-ACA infographics with official government logos.[154] Such activities constitute impermissible uses of government funds; they

---

[151]  *See* Rachael Bergman, *Affordable Care Act Page Quietly Removed from Medicare Website, Sunlight Foundation*, May 17, 2018, https://sunlightfoundation.com/2018/05/17/affordable-care-act-page-quietly-removed-from-medicare-site/; Rachel Bergman, *Removal of the Affordable Care Act Website from within Medicaid.gov*, Sunlight Foundation (July 2018), http://sunlightfoundation.com/wp-content/uploads/2018/07/AAR-7-CMS-Medicaid-ACA-180710.pdf; *see also* Dan Diamond, *Trump Policy Shop Filters Facts to Fit His Message, Politico*, July 28, 2018, https://www.politico.com/story/2018/07/28/trump-facts-policy-shop-administration-research-714353.

[152]  Letter from Sen. Brian Schatz et al. to Thomas E. Price, former HHS Secretary, at 1 (July 21, 2017), https://www.schatz.senate.gov/imo/media/doc/7.21.17%20Schatz-Booker-Murphy%20Letter%20to%20Sec.%20Price.pdf.

[153]  *Id.* at 5 (reproducing @SecPriceMD, Twitter (June 7, 2017, 4:42 PM), https://twitter.com/secpricemd/status/872554390506360833); *see id.* at 6-8 (reproducing additional examples).

[154]  *Id.* at 1, 9. *See generally* Audrey Carlsen & Haeyoun Park, *The Same Agency That Runs Obamacare Is Using Taxpayer Money to Undermine It*, New York Times, Sept. 4, 2017, https://www.nytimes.com/interactive/2017/09/04/us/hhs-anti-obamacare-campaign.html (collecting and displaying examples of anti-ACA videos, Twitter posts, infographics, and press releases publicized by Defendants, and citing instances where Defendants deleted materials from government websites that provided information about the Act).

also exemplify how, rather than faithfully implement the ACA, the Trump Administration has endeavored to undermine it.

137.    By working to weaken public confidence in the ACA and its exchanges, Defendants have violated their constitutional obligation to take care that the ACA is faithfully executed. Rather, they have purposefully undermined the Act—the aim of which is to expand access to quality coverage—in at least two ways. First, declining public confidence in the ACA's insurance markets will result in fewer individuals receiving ACA-compliant health insurance coverage overall, directly undermining the Act's goal. And second, declining public confidence will weaken health insurance markets and increase premiums, ultimately resulting in even fewer individuals being able to access affordable health care coverage.

### C.    Working to Decrease Enrollment

138.    Under the ACA, exchanges must "facilitate[] the purchase of qualified health plans." 42 U.S.C. § 18031(b)(1)(a). Defendants, however, have shirked this duty in multiple ways, as detailed below, including by slashing funding for advertising and outreach and cutting in half the length of time during which federally-facilitated exchanges are open for enrollment.

139.    As further discussed below, the Administration's efforts to discourage enrollment are having effects. One study has found that two of the decisions at issue here—shortening open enrollment and reducing outreach—may result in as much as a 9 percent increase in premiums.[155]

---

[155] Covered California, *Individual Markets Nationally Face High Premium Increases in Coming Years Absent Federal or State Action, With Wide Variation Among States* 3 (Mar. 8, 2018), http://hbex.coveredca.com/data-research/library/CoveredCA_High_Premium_Increases_3-8-18.pdf [hereinafter *March 2018 Covered California Study*].

*1.     Shortening Open Enrollment*

140.    As described above, the ACA requires HHS to establish "annual open enrollment

periods" during which individuals, via the exchanges, can enroll in new or different health

insurance coverage for the coming year. 42 U.S.C. § 18031(c)(6)(B). Outside of open

enrollment, individuals may enroll in coverage through an exchange only if they qualify for a

special enrollment period, *see id.* § 18031(c)(6)(C), based on certain life events like getting

married, having a baby, or losing other health coverage. The opportunity to buy insurance

through the exchange is generally limited to established open enrollment periods in order to

minimize adverse selection. If consumers could buy health insurance through an exchange at any

time throughout the year, they could wait until they got sick to purchase insurance and drop it

once they recover.

141.    The 2016 open enrollment period ran from November 1, 2015 through January

31, 2016.[156] Likewise, the 2017 open enrollment period ran from November 1, 2016 through

January 31, 2017.[157]

142.    In April 2017, however, the Trump Administration announced that it was cutting

Open Enrollment for 2018 in half from prior years, setting it to run from November 1, 2017

---

[156] *2016 Marketplace Open Enrollment Period Public Use Files*, CMS,
https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-
Reports/Marketplace-Products/2016_Open_Enrollment.html.
[157] CMS, *Health Insurance Marketplaces 2017 Open Enrollment Period Final Enrollment
Report: November 1, 2016 - January 31, 2017* (Mar. 15, 2017),
https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2017-Fact-Sheet-
items/2017-03-15.html.

through December 15, 2017.[158] Shortly thereafter, President Trump tweeted that "ObamaCare is in serious trouble" and that "it dies far sooner than anyone would have thought."[159]

143.    In addition, HHS told community groups that the federal health insurance exchange, HealthCare.gov, would be subject to "[p]lanned" "[d]owntime" during the upcoming open enrollment period for an "[o]vernight outage on Wednesday, November 1, 2017"; and on "Sundays [from] 12am-12pm ET, except on December 10, 2017"[160]—a significant increase in downtime from prior years. While the actual downtime proved less than what had been announced, that fact was not communicated, which may have been discouraged enrollment during the times slated for outages.

144.    HHS has claimed that reducing the open enrollment period will reduce adverse selection. 82 Fed. Reg. at 18,353-54. However, HHS has not cited any evidence to show that prior open enrollment periods enabled adverse selection, or that shortening the period will reduce it. Indeed, experts have found weekly enrollment data inconclusive as to "whether longer enrollment windows increase risk for health insurers through adverse selection or decrease risk by providing greater opportunities for enrollment by so-called 'healthy procrastinators.'"[161] Still, these experts concluded that "reducing the length of the open enrollment period in 2018 may

---

[158]  CMS, Patient Protection and Affordable Care Act; Market Stabilization, 82 Fed. Reg. 18,346, 18,353-54 (Apr. 18, 2017); *see* 45 C.F.R. § 155.410(e).

[159]  @realDonaldTrump, Twitter (Apr. 23, 2017, 7:20 AM), https://twitter.com/realDonaldTrump/status/856150719656755200.

[160]  @philgalewitz, Twitter (Sept. 22, 2017, 12:06 PM), https://twitter.com/philgalewitz/status/911305725154140163/photo/1?ref_src=twsrc%5Etfw&; *see* Phil Galewitz, *Sunday Hours: Obamacare Website To Be Shut Down For Portion of Most Weekends*, Kaiser Health News (Sept. 22, 2017), https://khn.org/news/hhs-to-close-insurance-exchange-for-12-hours-on-sundays-during-enrollment/.

[161]  Paul Shafer & Stacie Dusetzina, *Looking Ahead To 2018: Will A Shorter Open Enrollment Period Reduce Adverse Selection In Exchange Plans?*, Health Affairs Blog, Apr. 14, 2017, http://www.healthaffairs.org/do/10.1377/hblog20170414.059663/full/.

cause as much or more harm for consumers (*e.g.*, reduced plan switching among re-enrollees, lower enrollment among those eligible but previously uninsured) than any potential reduction in adverse selection for insurers." *Id.* And there is broad consensus that later enrollees are, generally speaking, younger and healthier than earlier enrollees.[162]

145.     There can be no doubt that the Administration's decision to shorten the 2018 enrollment period for FFEs made it more difficult for people to obtain health insurance. Unlike the federal government, nine state-based exchanges opted to maintain a longer 2018 open enrollment period than the Administration set for HealthCare.gov. Providing extra time for people to sign up for coverage is but one example of actions SBEs have taken that have resulted in increased enrollment and lower premiums there as compared to in FFEs.[163]

146.     By cutting open enrollment in half, Defendants have violated their constitutional obligation to take care that the ACA is faithfully executed. Rather, they have purposefully undermined the Act—the aim of which is to expand access to quality coverage—in at least two

---

[162]  *See id.*; Express Scripts, *Exchange Pulse: Public Health Exchange and Off-Exchange Report* 2 (Oct. 2014), http://lab.express-scripts.com/lab/insights/government-programs/~/media/68c6ed3d98db484bbb9ac557acafa9de.ashx (finding that those who enroll later during open enrollment periods are, "on average, 4 years younger than early enrollees," and that they "also have a lower prevalence of chronic conditions, such as heart disease, depression, high cholesterol and diabetes, and a lower prevalence of specialty conditions, such as cancer and multiple sclerosis"); *see also* Virgil Dickson, *Market Stabilization Rule Could Collapse the ACA Exchanges*, Modern Healthcare, Apr. 14, 2017, http://www.modernhealthcare.com/article/20170414/NEWS/170419910 (surveying experts and concluding that shortening open enrollment will disproportionately affect low-income individuals and limit participation in exchange plans).

[163]  Mark A. Hall & Michael J. McCue, *Health Insurance Markets Perform Better in States That Run Their Own Marketplaces*, To the Point, Mar. 7, 2018, https://www.commonwealthfund.org/blog/2018/health-insurance-markets-perform-better-states-run-their-own-marketplaces; *see* Mark Hall, *Stabilizing and Strengthening the Individual Health Insurance Market: A View from Ten States* 4, 9, USC-Brookings Schaeffer Initiative for Health Policy (July 2018), https://www.brookings.edu/wp-content/uploads/2018/07/Stabilizing-and-Strenghtening-the-Individual-Health-Insurance-Market2.pdf.

ways. First, cutting open enrollment will result in fewer individuals receiving ACA-compliant health insurance coverage overall, directly undermining the Act's goal. And second, by decreasing health insurance enrollments, and in particular by decreasing enrollments among younger and healthier populations, cutting open enrollment will weaken health insurance markets and increase premiums, ultimately resulting in even fewer individuals being able to access affordable health care coverage.

> 2.   *Cutting Funding for Advertising and Refusing to Publicize Open Enrollment*

147.    In keeping with the exchanges' duty to facilitate enrollment, HHS regulations specify that they "must conduct outreach and education activities . . . to educate consumers about the Exchange and insurance affordability programs to encourage participation." 45 C.F.R. § 155.205(e).

148.    In order to comply with this obligation for federally-facilitated exchanges, HHS has, in the past, funded advertising campaigns. In 2016, for example, HHS spent $100 million on advertising to educate consumers about, and promote their enrollment in, health insurance.[164]

149.    So far, President Trump and his Administration have drastically reduced funding for such advertising—twice.

150.    First, on January 26, 2017—in the waning days of that year's open enrollment period—the Administration overruled the objections of career staff and "pull[ed] the plug on all Obamacare outreach and advertising in the crucial final days of the 2017 enrollment season,"

---

[164]  Timothy Jost, *CMS Cuts ACA Advertising by 90 Percent Amid Other Cuts to Enrollment Outreach*, Health Affairs Blog, Aug. 31, 2017, http://www.healthaffairs.org/do/10.1377/hblog20170901.061790/full/.

cutting funding by $5 million.[165] Individuals could still sign up through the January 31, 2017

deadline, but the Administration decided not to "advertis[e] that fact any longer."[166]

Subsequently, the Office of the Inspector General at HHS determined that the Administration's

actions resulted in $1.1 million in unrecoupable costs.[167] More importantly, the advertising cuts

resulted in fewer enrollments—to the tune of 350,000.[168] Fewer enrollments mean higher

premiums. Indeed, the same day his Administration cut ACA advertising by $5 million,

President Trump again promised an ACA "explosion" and that "[n]obody's going to be able to

afford" healthcare under the law.[169]

151.    Second, on August 31, 2017, CMS announced that for the open enrollment period

that was slated to commence on November 1, 2017, it planned to spend only $10 million on

advertising, a 90 percent cut from the prior year.[170] CMS further specified that it would "target

---

[165]  Paul Demko, *Trump White House Abruptly Halts Obamacare Ads*, Politico, Jan. 26, 2017, http://www.politico.com/story/2017/01/trump-white-house-obamacare-ads-234245.

[166]  *Id.*

[167]  HHS, Office of the Inspector General, *Review of The Department of Health and Human Services Cancellation of Marketplace Enrollment Outreach Efforts, OEI-12-17-00290* at 5, https://oig.hhs.gov/oei/reports/oei-12-17-00290.pdf.

[168]  *See* Joshua Peck, *Trump Blocked Nearly 500,000 People From Getting Coverage*, Medium, Feb. 2, 2017, https://medium.com/get-america-covered/trumped-blocked-nearly-500-000-people-from-getting-coverage-70317eedaaa4; Charles Gaba, *UPDATED: Want Evidence Trump Killing HC.gov Ads Hurt Enrollment? Check This Out.*, Feb. 3, 2017, http://acasignups.net/17/03/16/updated-want-evidence-trump-killing-hcgov-ads-hurt-enrollment-check-out.

[169]  *Transcripts: Trump Addresses GOP Leadership at Retreat in Philadelphia*, CNN (Jan. 26, 2017), http://transcripts.cnn.com/TRANSCRIPTS/1701/26/wolf.02.html.

[170]  CMS, *Policies Related to the Navigator Program and Enrollment Education for the Upcoming Enrollment Period* 1 (Aug. 31, 2017), https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces/Downloads/Policies-Related-Navigator-Program-Enrollment-Education-8-31-2017.pdf [hereinafter "HHS Aug. 31, 2017 Announcement"]; *see* Timothy Jost, *CMS Cuts ACA Advertising by 90 Percent Amid Other Cuts to Enrollment Outreach*, Health Affairs Blog, Aug. 31, 2017, http://www.healthaffairs.org/do/10.1377/hblog20170901.061790/full/.

its advertising and outreach activities . . . through digital media, email, and text messages," at the expense of television advertising.[171] Shortly after they were announced, Joshua Peck, who previously had led such outreach efforts, estimated that CMS's cuts to advertising would result in at least 1.1 million fewer enrollments.[172]

152.    In justifying its drastic cuts to advertising, Administration officials "pointed to the fact that for 2017, even as spending on ads rose, enrollment ended up lower."[173] But as press reports pointed out, and as described above, "The Trump [A]dministration . . . withdrew about $5 million of ads at the end of the 2017 sign-up period, which likely contributed to the enrollment decline."[174]

153.    The Administration has slashed advertising funding and emphasized digital over television-based marketing notwithstanding that—or because—evidence known to HHS demonstrates that robust advertising, and television advertising in particular, is critical to fulfilling the ACA's goal of increasing enrollments in health insurance coverage.[175] Indeed, starting in 2015, CMS undertook randomized control trials and econometric modeling to measure the effectiveness of paid promotional activities and by 2017 concluded that paid

---

[171]   HHS Aug. 31 2017 Announcement, *supra* n.170, at 1.

[172]   Joshua Peck, *Trump's Ad Cuts Will Cost a Minimum of 1.1 Million Obamacare Enrollments*, Medium, Oct. 23, 2017, https://medium.com/get-america-covered/trumps-ad-cuts-will-cost-a-minimum-of-1-1-million-obamacare-enrollments-9334f35c1626.

[173]   Zachary Tracer & Anna Edney, *Trump Guts Budget for Obamacare Ads*, Bloomberg, Aug. 31, 2017, https://www.bloomberg.com/news/articles/2017-08-31/trump-health-department-is-said-to-slash-obamacare-ad-budget.

[174]   *Id.*

[175]   *See id.*

outreach was responsible for 40 percent of all enrollments.[176] The agency further found that television ads were "the number one driver of enrollment."[177]

154.    That finding aligns with a study of the effectiveness of advertising in promoting enrollment on Kentucky's Exchange, which found that cuts in advertising during the 2016 open enrollment period led to "450,000 fewer page views . . . and 20,000 fewer unique visitors *per week*" to Kentucky's state-based marketplace.[178]

155.    Studies also found that the increased volume of television advertisement during the 2014 open enrollment period contributed to increased enrollment and a substantial reduction in the uninsured rate.[179] States and exchanges that have engaged in their own marketing efforts similarly report higher enrollment and more stable insurance markets: Covered California reports that its marketing investment has yielded a healthier risk pool, premiums that are 6 to 8 percent lower, and greater insurer participation.[180]

---

[176]  Lori Lodes, *I Ran ACA Outreach Under Obama. Trump's Funding Cuts Could Ruin the Health Care Law*, Vox,  Sept. 15, 2017, https://www.vox.com/the-big-idea/2017/9/12/16294784/aca-outreach-advertising-sabotage-funding.

[177]  *Id.*

[178]  Paul Shafer et al., *Advertising Cutbacks Reduce Marketplace Information-seeking Behavior: Lessons From Kentucky for 2018*, Incidental Economist, Sept. 2, 2017, http://theincidentaleconomist.com/wordpress/advertising-cutbacks-reduce-marketplace-information-seeking-behavior-lessons-from-kentucky-for-2018/.

[179]  Pinar Karaca-Mandic et al., *The Volume of TV Advertisements During the ACA's First Enrollment Period Was Associated with Increased Insurance Coverage*, Health Affairs (Apr. 2017), https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2016.1440?journalCode=hlthaff; Sarah E. Gollust et al., *TV Advertising Volumes Were Associated With Insurance Marketplace Shopping And Enrollment In 2014*, Health Affairs (June 2018), https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2017.1507.

[180]  Peter V. Lee et al., *Marketing Matters: Lessons from California to Promote Stability and Lower Costs in National and State Individual Insurance Markets*, Covered California (Sept. 2017), http://hbex.coveredca.com/data-research/library/CoveredCA_Marketing_Matters_9-17.pdf.

156.     President Trump and his Administration have not only dramatically reduced overall funding for advertising under the Affordable Care Act, but also have gone so far as to produce ads that impugn the law and its reforms. In June 2017, HHS produced and posted 23 video testimonials "from people who said they had been 'burdened by Obamacare,' including families, health care professionals and small business owners."[181] "While it's not certain where the money for the videos came from, several former health officials who worked in the Obama Administration said that they suspect it came from the budget meant to promote the Affordable Care Act."[182] And when an individual featured in one of the videos "sat down for a recording at the HHS studio he said it 'felt like they were pushing for a harder line against Obamacare' than he was delivering."[183]

157.     Finally, when open enrollment for plan year 2018 began on November 1, 2017, neither HHS nor CMS even issued a press release, and the Twitter feeds of the agencies and of their leadership were silent, in stark contrast to the prior year's intense push. Such silence is part of a pattern: as described above, through multiple changes to its own websites, HHS has endeavored to reduce access to information about the ACA.[184] And Administration officials have indicated that they do not want to promote ACA-compliant plans.

---

[181]  Audrey Carlsen & Haeyoun Park, *The Same Agency That Runs Obamacare Is Using Taxpayer Money to Undermine It*, New York Times, Sept. 4, 2017, https://www.nytimes.com/interactive/2017/09/04/us/hhs-anti-obamacare-campaign.html?_r=0.
[182]  *Id.*
[183]  Sam Stein, *Team Trump Used Obamacare Money to Run PR Effort Against It*, Daily Beast, July 20, 2017, https://www.thedailybeast.com/team-trump-used-obamacare-money-to-run-ads-against-it.
[184]  *See* Charles S. Clark, *Report: How HHS Buried Information About the Affordable Care Act*, Government Executive (May 17, 2018), https://m.govexec.com/oversight/2018/05/report-how-hhs-buried-information-about-affordable-care-act/148283/.

158.     These actions do not simply represent a choice to spend resources in other ways; the Administration's own statements show that they were acting to frustrate the goals of the ACA. Underscoring this is the fact that in the very year that the Administration shortened open enrollment, it decreased outreach. By slashing spending on ACA advertising, producing ads designed to criticize the law, and refusing to publicize open enrollment, Defendants have violated their constitutional obligation to take care that the law is faithfully executed. Rather, they have purposefully undermined the Act—the aim of which is to expand access to quality coverage—in at least three ways. First, the Administration's advertising choices contradict the requirements of the Act and of its implementing regulations concerning education and outreach. 42 U.S.C. § 18031(b)(1)(a); 45 C.F.R. § 155.205(e). Second, the Administration's advertising choices are resulting in fewer individuals receiving health insurance coverage, directly undermining the Act's goal.[185] And third, by decreasing health insurance enrollments—particularly among healthier people—the Administration's advertising choices have weakened health insurance markets, which ultimately will lead to even fewer individuals being able to access affordable health care coverage.

> 3.     *Cutting Funding for Navigators and Encouraging Them to Undermine the Act*

159.     Twice—in 2017 and 2018—the Trump Administration has drastically cut funding for Navigators working in federally-facilitated exchanges. With its latest round of funding cuts, the Administration has gone even further, commandeering Navigators in its sabotage agenda by requiring them to compete for funding according to how enthusiastically they plan to advertise

---

[185] Ashley Semanskee et al., *Individual Insurance Market Performance in Early 2018, Kaiser Family Foundation* (June 26, 2018), https://www.kff.org/private-insurance/issue-brief/individual-insurance-market-performance-in-early-2018/ (finding that these "recent policy changes," among others, "have the potential to destabilize the individual market generally").

the availability of *non*-ACA compliant coverage—*i.e.*, according to their willingness to assist the Administration in siphoning consumers away from the exchanges and convincing them to purchase inferior coverage. These decisions exemplify the Administration's failure to take care to faithfully execute the ACA.

160.    As explained above, the ACA requires exchanges to award grants to Navigators, 42 U.S.C. § 18031(i), who must maintain a current understanding of available health insurance options, conduct public education and awareness campaigns, help consumers understand their choices, facilitate consumers' health insurance decisions, and ensure their access to consumer protections, *see id.* § 18031(i)(3); 45 C.F.R. §§ 155.210, 155.215. To ensure that exchanges run by the federal government comply with the requirement that all exchanges establish Navigator programs, *see, e.g.*, 42 U.S.C. §§ 18031(d)(4)(K), 18031(i)(1); 45 C.F.R. §§ 155.205(d)(1), 155.210(a), HHS enters into cooperative agreements with Navigators.[186]

161.    In the ACA, Congress recognized the importance of expert assistance, both to individuals and for the functioning of the exchanges. Navigators play vitally important roles at every step, from helping consumers make informed health insurance decisions to facilitating their applications and enrollment, thereby contributing to the success of the exchanges—and of the Act itself—overall. For example, one study concluded that "[t]he strongest overall predictor of completing the [insurance] application process was receiving assistance from a [N]avigator or

---

[186] *See, e.g.*, HHS, *Cooperative Agreement to Support Navigators in Federally-facilitated and State Partnership Marketplaces*, Funding Opportunity No. CA-NAV-15-001 (Apr. 15, 2015) https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces/Downloads/Navigator_2015_FOA_FINAL_04_15_2015.pdf [hereinafter 2015 FOA]; *see generally In-Person Assistance in the Health Insurance Marketplaces*, CMS, https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces/assistance.html (describing the "FFE Navigator program").

social worker."[187] Additional research has documented that Hispanic and low-income individuals

disproportionately rely on direct assistance from Navigators and other entities when making

health insurance coverage decisions.[188] Other experts have established the importance of the

broad range of Navigators' duties for consumers and for exchanges.[189]

162.     When issuing the 2015 Funding Opportunity Announcement, HHS estimated that

it "expect[ed] to award up to $201,000,000 over the three-year project period and up to

$67,000,000 during the first 12-month budget period." 2015 FOA, *supra* n.186, at 11. Indeed, in

2015, HHS reported awarding $67 million in grants under the FFE Navigator program.[190] And in

2016, HHS reported issuing continuation awards totaling "over $62.5 million" under the

program.[191]

---

[187]  Benjamin D. Sommers et al., *The Impact of State Policies on ACA Applications and Enrollment Among Low-Income Adults in Arkansas, Kentucky, and Texas*, 34 Health Affairs 1010 (July 2018), https://dash.harvard.edu/handle/1/25156070.

[188]  *See* Fredric Blavin et al., *Obtaining Information on Marketplace Health Plans: Websites Dominate but Key Groups Also Use Other Sources*, Urban Institute Health Policy Center (June 9, 2014), http://hrms.urban.org/briefs/obtaining-information-on-marketplace.html.

[189]  *See* Tricia Brooks & Jessica Kendall, *Designing Navigator Programs to Meet the Needs of Consumers: Duties and Competencies*, Georgetown University Health Policy Institute (Sept. 2012), http://files.www.cmhnetwork.org/news/navigator-grants/Navigator-Programs-Duties-and-Competencies.pdf.

[190]  Press Release, CMS, CMS Awards $67 Million in Affordable Care Act Funding to Help Consumers Sign-up for Affordable Health Insurance Marketplace Coverage in 2016 (Sept. 2, 2015), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2015-Press-releases-items/2015-09-02.html.

[191]  Randy Pate, Director, Center for Consumer Information and Insurance Oversight ("CCIO"), Policies Related to the Navigator Program and Enrollment Education for the Upcoming Enrollment Period (Aug. 31, 2017), https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces/Downloads/Policies-Related-Navigator-Program-Enrollment-Education-8-31-2017.pdf.

163.    Until late summer 2017, final preparations were underway to fund the HHS

Navigator program at a similar level for the 2018 open enrollment—$60 million.[192]

164.    Final preparations were also underway until late summer 2017 to allocate funding

for the 2018 open enrollment according to the process and criteria described in the 2015 FOA. In

a memo signed on August 23, 2017, agency staff explained that individual grantees' continuation

award amounts for 2017 had been calculated "based on performance evaluations conducted by

[CMS project officers] and [CMS regional office liaisons]," which were based on the

"performance factors outlined in the 2015 FOA" and grantees' "progress toward the goals

outlined in their 2016 Non-Competing Continuation Application."[193]

165.    But at the direction of political appointees at the agency, HHS abruptly changed

course. In an August 31, 2017 announcement, HHS announced an entirely "new funding

formula"—nowhere to be found in the operative 2015 FOA, nor in the relevant statutes or

regulations—whereby "Navigator grantees will receive funding based" solely "on their ability to

meet their enrollment goals during the previous year." HHS Aug. 31, 2017 Announcement, *supra*

n.170, at 1. "For example, a grantee that achieved 100 percent of its enrollment goal for plan

year 2017 will receive the same level of funding as last year, while a grantee that enrolled only

---

[192]  *See* Memorandum from Randy Pate, Director, CCIIO, to Janet Loftus, Director, Division of
Accounting Operations, CMS, regarding Patient Protection and Affordable Care Act—
Cooperative Agreement Funds (dated Aug. 24, 2017; stamped Aug. 31, 2017),
http://acasignups.net/17/09/04/exclusive-i-believe-whats-called-scoop (confirming that $60
million was appropriated on August 31, 2017); Memorandum from Gian Johnson, Acting
Director, Division of Assister Programs, Consumer Support Group, CCIIO, to Jennifer Beeson,
Director, Consumer Support Group, CCIIO, regarding Funding and Decision Memo- Request for
Approval to Award Year 3 Funding for Cooperative Agreement to Support Navigators in
Federally-facilitated and State Partnership Exchanges 2 (signed Aug. 23, 2017),
http://acasignups.net/17/09/04/exclusive-i-believe-whats-called-scoop [hereinafter Aug. 23, 2017
Memo] ("The Navigator program received $60 million for grant awards in FY 2017….").
[193]  Aug. 23, 2017 Memo, *supra* n.192, at 2.

70 percent of its enrollment goal would receive 70 percent of its previous year funding level, a reduction of 30 percent." *Id.*

166.    Although HHS announced its new funding formula one day before the then-current budget period expired, on September 1, 2017, the agency waited almost two weeks, until September 13, 2017, to issue notices of awards to grantees under its new funding formula. Accordingly, because "[e]ntities and individuals cannot serve as federally certified Navigators without receiving federal grant funding to perform Navigator duties," 2015 FOA, *supra* n.186, at 7, by delaying issuance of notices of award until September 13, 2017, HHS eliminated Navigator programs in FFEs from September 2-12, 2017, further violating the ACA's requirements.

167.    HHS's 2017 funding formula resulted in a nearly 40 percent decrease in overall funding for the FFE Navigator program, to about $36 million.[194] Some individual Navigators saw cuts as high as 92 percent.[195]

168.    But HHS's 2017 cuts to Navigator funding pale in comparison to those the agency announced in 2018. On July 10, 2018, HHS released a new funding opportunity announcement for the FFE Navigator program and stated that it "expects to award up to $10 million"[196]—

---

[194] *See* Robert King, *Trump Cuts Obamacare Ad Budget By 90 Percent*, Washington Examiner, Aug. 31, 2017, http://www.washingtonexaminer.com/trump-cuts-obamacare-ad-budget-by-90-percent/article/2633128; Press Release, CMS, CMS Announces New Funding Opportunity Announcement for the Federally-Facilitated Exchange Navigator Program (July 10, 2018), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2018-Press-releases-items/2018-07-10-2.html.

[195] *See* Juliet Eilperin & Amy Goldstein, *HHS Slashes Funding to Groups Helping ACA Consumers Enroll by up to 92 Percent*, Washington Post, Sept. 14, 2017, https://www.washingtonpost.com/national/health-science/hhs-slashes-funding-to-some-aca-navigator-groups-by-more-than-60-percent/2017/09/14/729c394c-9957-11e7-b569-3360011663b4_story.html?utm_term=.f7910e0bc711.

[196] CMS, Press Release, CMS Announces New Funding Opportunity Announcement for the Federally-Facilitated Exchange Navigator Program (July 10, 2018),

merely one-fourth the amount of funding provided for the prior year, and one-sixth the amount of funding provided for the year before that. Notwithstanding Navigators' important place in the ACA's statutory scheme and their vital role in facilitating enrollment, HHS has unlawfully arrogated to itself the authority to decide that their services are no longer important.[197]

169.    Yet drastically reducing Navigator funding in FFEs was not enough. HHS also instructed applicants to compete for the limited funding available by "demonstrat[ing] how they provide information to people who may be unaware of the range of available coverage options in addition to qualified health plans . . . such as association health plans, short-term, limited-duration insurance, and health reimbursement arrangements."[198] This means that Navigators will now use funds that Congress designated to support the ACA for the opposite purpose—to undermine it. The Act is clear: Navigators must "conduct public education activities to raise awareness of the availability *of qualified health plans*," "distribute fair and impartial information concerning enrollment *in qualified health plans*," and "facilitate enrollment *in qualified health plans*." 42 U.S.C. § 18031(i)(3) (emphasis added). HHS's decision to incentivize Navigators to push plans designed to siphon consumers away from ACA exchanges, thus weakening them does not faithfully implement the ACA but rather undermines it.

170.    By slashing funding for Navigators and encouraging them to advertise non-ACA compliant plans, Defendants have violated their constitutional obligation to take care that the ACA is faithfully executed. Rather, they have purposefully undermined the Act—the aim of which is to expand access to quality coverage—in at least two ways. First, reducing funding for

---

https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2018-Press-releases-items/2018-07-10-2.html.

[197]   *See id.*

[198]   *Id.*

Navigators will result in fewer individuals receiving ACA-compliant health insurance coverage overall, directly undermining the Act's goal. And second, by decreasing health insurance enrollments, reducing funding for Navigators will weaken health insurance markets and increase premiums, ultimately resulting in even fewer individuals being able to access affordable health care coverage.

        *4.     Refusing to Participate in Enrollment Events and Other Outreach*

      171.    To effectuate the ACA's education and outreach mandates, *see, e.g.*, 42 U.S.C. § 18031(b)(1)(a); *see also* 45 C.F.R. § 155.205(e), in prior years HHS officials participated in enrollment events around the country.[199] That changed dramatically in 2017. During that summer, the Trump Administration ended contracts that provided outreach, and that brought enrollment assistance to libraries, businesses, and urban neighborhoods, in 18 cities.[200] The Administration stopped coordinating enrollment efforts with the Latino Affordable Care Act Coalition, a group of local and national organizations that assisted with every previous open enrollment period,[201] and a number of other organizations as well.[202] The Administration stopped sending staff to regional enrollment events.[203] After being informed that HHS would no longer

---

[199]  Kate Nocera & Paul McLeod, *The Trump Administration Is Pulling Out Of Obamacare Enrollment Events*, Buzzfeed, Sept. 27, 2017, https://www.buzzfeed.com/katenocera/the-trump-administration-wont-support-state-obamacare.

[200]  Carla K. Johnson, Trump Administration Ends Affordable Care Act Assistance Contracts in 18 Cities, PBS NewsHour, July 20, 2017, https://www.pbs.org/newshour/health/trump-administration-ends-affordable-care-act-assistance-contracts-18-cities.

[201]  Alice Ollstein, *Trump Admin Abandons Latino Outreach For Obamacare Sign-Ups*, Talking Points Memo, Aug. 10, 2017, https://talkingpointsmemo.com/dc/trump-hhs-abandons-latino-outreach-on-obamacare.

[202]  Allice Ollstein, *Trump HHS Severs Key Partnerships For Obamacare Outreach*, Talking Points Memo, Aug. 14, 2017, https://talkingpointsmemo.com/dc/trump-hhs-obamacare-partnerships-promotion-sabotage.

[203]  Dylan Scott, *Trump Administration Abruptly Drops out of Obamacare Events in Mississippi*, Vox, Sept. 27, 2017, https://www.vox.com/policy-and-politics/2017/9/27/16374158/obamacare-

participate in such events, at least one group that had previously sponsored such events, and that had planned to hold such events, decided to cancel them.[204] Once again, the Administration's actions fit a pattern of reducing support for enrollment initiatives."[205]

172.    By cutting back on enrollment events and other outreach, Defendants have violated their constitutional obligation to take care that the ACA is faithfully executed. Rather, they have purposefully undermined the Act—the aim of which is to expand access to quality coverage—in at least two ways. First, cutting back on enrollment events and outreach will result in fewer individuals receiving ACA-compliant health insurance coverage overall, directly undermining the Act's goal. And second, by decreasing health insurance enrollments, cutting back on enrollment events and outreach will weaken health insurance markets and increase premiums, ultimately resulting in even fewer individuals being able to access affordable health care coverage.

**D.    Refusing to Defend the Act**

173.    Finally, Defendants have abdicated their constitutional duty to defend the ACA in court. "[T]he question of the executive's obligation to enforce and defend implicates Article II's

---

mississippi-hhs-events; *see* Kate Nocera & Paul McLeod, *The Trump Administration Is Pulling Out Of Obamacare Enrollment Events*, Buzzfeed, Sept. 27, 2017, https://www.buzzfeed.com/katenocera/the-trump-administration-wont-support-state-obamacare (further reporting about an HHS official's email to an event sponsor stating that he would not be permitted to participate).

[204]  *See id.*

[205]  *Id.*; *see, e.g.*, Carla K. Johnson, *Trump Administration Ends Affordable Care Act Assistance Contracts in 18 Cities*, PBS NewsHour, July 20, 2017, https://www.pbs.org/newshour/health/trump-administration-ends-affordable-care-act-assistance-contracts-18-cities; Leslie Small, *Wide Array of Groups Say HHS Has Stopped Working with Them on ACA Outreach*, Fierce Healthcare, Aug. 15, 2017, http://www.fiercehealthcare.com/aca/wide-array-groups-say-hhs-has-stopped-working-them-aca-outreach; Amanda Michelle Gomez, *Obamacare State Officials Are Being Left in the Dark This Open Enrollment Period*, ThinkProgress, Aug. 24, 2017, https://thinkprogress.org/trump-admin-obamacare-enrollment-state-marketplace-d8064210e501/.

requirement that the president 'take Care that the Laws be faithfully executed.'" Daniel J.

Meltzer, *Executive Defense of Congressional Acts*, 61 Duke L.J. 1183, 1192 (2012). Indeed,

> a range of considerations, including the distinctive capacities of the executive branch, the nature of relations between career lawyers and political appointees in the government, the virtues of institutional continuity within the executive branch, and the relationship between the executive branch and Congress, reinforce the wisdom of the conventional practice of providing a defense even of statutes that the incumbent administration views as offensive and possibly invalid.

*Id.* at 1186-87.

174.    On June 7, 2018, Attorney General Jeff Sessions notified Congress that the

Department of Justice would "not defend the constitutionality" of the ACA's individual mandate

provision, and would "argue that certain provisions of the [ACA] are inseverable from that

provision," namely the guaranteed-issue and community-rating provisions, in a pending case in

federal district court in Texas.[206] He did so despite acknowledging that "the Executive Branch

has a longstanding tradition of defending the constitutionality of duly enacted statutes if

reasonable arguments can be made in their defense."[207] The Attorney General's decision

constituted "a dramatic break from the executive branch's tradition of arguing to uphold existing

statutes and a land mine for health insurance changes the ACA brought about."[208]

175.    The Attorney General's decision deprives the courts of the federal government's

considerable expertise and experience regarding the ACA, and inhibits the proper functioning of

our adversary system, which is essential to ensuring that courts receive a robust presentation of

---

[206]  Letter from Jefferson B. Sessions, U.S. Attorney General, to Speaker, House of Representatives, Paul Ryan 1 (June 7, 2018), https://www.justice.gov/file/1069806/download.

[207]  *Id.* at 2.

[208]  Amy Goldstein, *Trump Administration Won't Defend ACA in Case Brought by GOP States*, Washington Post, June 7, 2018, https://www.washingtonpost.com/national/health-science/trump-administration-wont-defend-aca-in-cases-brought-by-gop-states/2018/06/07/92f56e86-6a9c-11e8-9e38-24e693b38637_story.html.

competing views. More troublingly, it is a dramatic example of how Defendants are eager to invalidate, rather than to implement, core ACA provisions. Because of Defendants' decision, consumers and other stakeholders cannot fully rely on the ACA's guaranteed-issue and community-rating provisions, which are essential to ensuring that individuals with preexisting conditions can obtain necessary insurance coverage.

## DEFENDANTS' UNLAWFUL ACTIONS ARE HARMING PLAINTIFFS

176.    Although the ACA has proven more resilient than Defendants might have hoped, Defendants' actions are taking a toll. Through all the mechanisms described above, Defendants' actions are aimed at weakening insurance markets; they are making it harder and more expensive for consumers and small businesses to procure health insurance coverage; and they are driving up the size of the uninsured and underinsured populations. Local governments and individuals nationwide, including Plaintiffs in this case, are paying the price.

I.    **Defendants' Unlawful Actions Are Causing Premiums to Rise and the Rate of the Uninsured to Increase**

177.    The myriad ways in which Defendants' actions cause premiums to rise, enrollment in ACA exchanges to drop, and the rate of the uninsured to increase, are described above, action by action. As detailed below, the overall consequences are being felt now and, without intervention, will worsen.

178.    The executive actions at issue here are making it harder for Americans to afford and purchase quality health insurance, in part by increasing premiums for plans on the ACA exchanges. According to one analysis, "absent" various "policy changes," including the actions challenged here, "it is likely that insurers would generally have required only modest premium

increases" from 2017 to 2018, and from 2018 to 2019 "as well."[209] But as a result of Defendants' actions and other factors, premiums are increasing substantially. The Congressional Budget Office has estimated that the average premium for a benchmark ACA plan for 2018 is about 37 percent higher than it was in 2017.[210] One analysis concluded that "a substantial portion" of such rate increases was "due to political and regulatory factors that arose in 2017"—including the Trump Administration decisions at issue here.[211] Insurers have agreed: the press reported that in May 2017, "[h]ealth insurers across the country [were] making plans to dramatically raise Obamacare premiums or exit marketplaces amid growing exasperation with the Trump [A]dministration's erratic management of the program and its conflicting signals about the fate of aid for low-income consumers and other key issues."[212]

179.     Looking ahead, according to an assessment by Covered California, in 2019, statewide average premium increases for ACA plans could range from 12 to 32 percent, with additional increases of 10 to 21 percent expected in both 2020 and 2021.[213] "Cumulatively, these premium increases would average 50 percent over the three-year period, with a projected range

---

[209]  Cynthia Cox et al., *Individual Insurance Market Performance in 2017*, Kaiser Family Foundation (May 17, 2018), https://www.kff.org/private-insurance/issue-brief/individual-insurance-market-performance-in-2017/.

[210]  *May 2018 CBO Report*, *supra* n.9, at 2.

[211]  Mark Hall, *Stabilizing and Strengthening the Individual Health Insurance Market: A View from Ten States* 4, USC-Brookings Schaeffer Initiative for Health Policy (July 2018), https://www.brookings.edu/wp-content/uploads/2018/07/Stabilizing-and-Strenghtening-the-Individual-Health-Insurance-Market2.pdf; *see also May 2018 CBO Report*, *supra* n.9, at 2.

[212]  *See, e.g.*, Noam N. Levey, *Health Insurers Plan Big Obamacare Rate Hikes—and They Blame Trump*, Los Angeles Times, May 22, 2017, http://www.latimes.com/politics/la-na-pol-obamacare-trump-mismanagement-20170518-story.html.

[213]  *March 2018 Covered California Study*, *supra* n.155, at 2.

of 36 percent to 94 percent."[214] Once again, the actions by Defendants challenged here are in part

to blame. The Urban Institute has calculated that some of Defendants' actions will contribute to

an increase of over 18 percent in premiums for ACA-compliant plans in most states.[215] The

Kaiser Family Foundation, in reviewing proposed premiums for 2019, also found evidence that

they are substantially higher than they would otherwise have been because of Defendants'

actions.[216] Indeed, a review of proposed premiums found insurers citing "[t]he increase in the

overall sickness of the risk pool," which they attribute "to ACA-related policy changes that lead

to the loss of young and healthy enrollees," as driving recent increases.[217] These increases reflect

the concern in insurance markets that the executive actions under review here have caused. Such

concern has also resulted in insurers exiting ACA exchanges entirely.[218] For example, in

discussing whether to stay in ACA exchanges, the CEO of CareFirst Blue Cross Blue Shield, the

---

[214] *Id*. The Congressional Budget Office has estimated that the average premium for a benchmark ACA plan for 2019 will increase by 15 percent, and will further increase by an average of about 7 percent per year between 2019 and 2028. *May 2018 CBO Report*, *supra* n.9, at 2-3.

[215] *March 2018 Urban Institute Study*, *supra* n.116, at 2.

[216] Rabah Kamal et al., *Tracking 2019 Premium Changes on ACA Exchanges,* Kaiser Family Foundation (updated July 24, 2018), https://www.kff.org/private-insurance/issue-brief/tracking-2019-premium-changes-on-aca-exchanges/ [hereinafter *KFF Tracking 2019 Premium Changes*]; *see also National Analysis Projects 2019 Premium Hikes of 30 Percent in Some States and Cumulative Increases of 90 Percent or More in the Next Three Years*, Covered California (Mar. 8, 2018), https://coveredcanews.blogspot.com/2018/03/national-analysis-projects-2019-premium.html [hereinafter *March 2018 Covered California Post*] (finding that as a result of "ongoing federal uncertainty, premium increases for every state could range from 12 to 32 percent in 2019").

[217] Sabrina Corlette, *The Effects of Federal Policy: What Early Premium Rate Filings Can Tell Us About the Future of the Affordable Care Act*, CHIRblog, May 21, 2018, http://chirblog.org/what-early-rate-filings-tell-us-about-future-of-aca/.

[218] *See* Sabrina Corlette et al., *Insurers Remaining in Affordable Care Act Markets Prepare for Continued Uncertainty in 2018, 2019*, Urban Institute (Mar. 2018), https://www.rwjf.org/content/dam/farm/reports/issue_briefs/2018/rwjf444308.

largest insurer in the mid-Atlantic (covering Maryland, Washington, D.C., and parts of Virginia),

said that "[c]ontinuing actions on the part of the [A]dministration to systematically undermine

the market . . . make it almost impossible to carry out the mission."[219]

180.    Increased premiums lead to an increase in the rate of the uninsured and

underinsured.[220] So just as the rate of the uninsured fell as a result of the Affordable Care Act's

faithful implementation in its initial years, that rate appears to be on the rise again, thanks in part

to Defendants' actions. The Congressional Budget Office has estimated that the number of

uninsured Americans under age 65 has risen by 2 million between 2016 and 2018.[221] The overall

decline in enrollment in ACA-compliant plans from its 2016 peak, particularly among those not

eligible for subsidies, is contributing to this trend.[222]

---

[219]  Paige Winfield Cunningham, *The Health 202: Leading Obamacare Insurer Says Things Are 'Materially Worse' Under Trump Administration*, Washington Post, May 1, 2018 https://www.washingtonpost.com/news/powerpost/paloma/the-health-202/2018/05/01/the-health-202-leading-obamacare-insurer-says-things-are-materially-worse-under-trump-administration/5ae76f2230fb04371192693b/?utm_term=.d54f46a7a0a1.

[220] It has long been understood that among the most important reasons why the uninsured lack coverage is the unaffordability of coverage. *See, e.g.*, *supra* ¶ 38 (citing CMS's statement); *KFF Key Facts*, *supra* n.18 ("Even under the ACA, many uninsured people cite the high cost of insurance as the main reason they lack coverage. In 2016, 45% of uninsured adults said that they remained uninsured because the cost of coverage was too high."); M. Susan Marquis et al., Consumer Decision Making In The Individual Health Insurance Market, Health Affairs (May/June 2006), https://www.healthaffairs.org/doi/full/10.1377/hlthaff.25.w226 ("Affordability of insurance is believed to be the most important reason that the uninsured lack coverage . . . .").

[221]  *See* Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2016 to 2026* at 2 (March 2016), https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51385-healthinsurancebaselineonecol.pdf; *May 2018 CBO Report*, *supra* n.9, at 1, 5.

[222]  Press Release, CMS, Centers for Medicare and Medicaid Services Releases Reports on the Performance of the Exchanges and Individual Health Insurance Market (July 2, 2018), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2018-Press-releases-items/2018-07-02.html; *see also May 2018 CBO Report*, *supra* n.9, at 1, 5 (reporting that for 2018, a monthly average of about 9 million people under age 65 will be insured through nongroup plans purchased on ACA exchanges, a decline from 2017, when the estimated monthly average was 10 million); Ashley Semanskee et al., *Data Note: Changes in Enrollment in the*

181.    Specifically, "[a]fter peaking in 2016 at 12.7 million, there was an approximately

3.9 [percent] decline in ACA marketplace insurance enrollment in 2017" nationwide,[223] and from

2017 to 2018, enrollment dropped by an additional 3.7 percent overall, and by 5.3 percent in

states with federally-facilitated exchanges.[224] And while the primary government survey found

no change in the overall rate of the uninsured through the end of 2017,[225] preliminary

information for 2018 suggests it is climbing. For example, one survey found that the uninsured

rate among working-age people had risen to 15.5 percent by March 2018, up from 12.7 percent

as of April 2016—meaning that about 4 million working-age people lost insurance coverage.[226]

Among the likely causes? For all the reasons described above, some of the very actions at issue

*Individual Health Insurance Market* 3, Kaiser Family Foundation (July 2018), http://files.kff.org/attachment/Data-Note-Changes-in-Enrollment-in-the-Individual-Health-Insurance-Market (reporting that enrollment in ACA-compliant plans peaked at 11.1 million in 2016 and dropped to 10.6 million in the first quarter of 2018).

[223]   Dan Witters, Uninsured Rate Rises in 17 States in 2017, Gallup, May 9, 2018, https://news.gallup.com/poll/233597/uninsured-rate-rises-states-2017.aspx (citing data from CMS).

[224]   Press Release, Kaiser Family Foundation, National ACA Marketplace Signups Dipped a Modest 3.7 Percent This Year (Feb. 7, 2018), https://www.kff.org/health-reform/press-release/national-aca-marketplace-signups-dipped-a-modest-3-7-percent-this-year/?utm_source=link_newsv9&utm_campaign=item_233597&utm_medium=copy.

[225]   Robin A. Cohen et al., *Health Insurance Coverage: Early Release of Estimates From the National Health Interview Survey, 2017*, National Center for Health Statistics (May 2018), https://www.cdc.gov/nchs/data/nhis/earlyrelease/insur201805.pdf. An analysis by Gallup and Sharecare, however, found that the rate of the uninsured rose by 1.3 percent from the last quarter of 2016 to the last quarter of 2017—the "largest single-year increase Gallup and Sharecare have measured since beginning to track the rate in 2008, including the period before the [ACA] went into effect." Zac Auter, *U.S. Uninsured Rate Steady at 12.2% in Fourth Quarter of 2017*, Gallup, Jan. 16, 2018, https://news.gallup.com/poll/225383/uninsured-rate-steady-fourth-quarter-2017.aspx.

[226]   Sara R. Collins et al., *First Look at Health Insurance Coverage in 2018 Finds ACA Gains Beginning to Reverse*, To the Point, May 1, 2018, https://www.commonwealthfund.org/blog/2018/first-look-health-insurance-coverage-2018-finds-aca-gains-beginning-reverse.

here: the Trump "[A]dministration's deep cuts in advertising and outreach during the marketplace open-enrollment periods, a shorter open enrollment period, and other actions that collectively may have left people with a general sense of confusion about the status of the law" or dissuaded enrollment.[227]

182.    These problems will only grow if the Trump Administration's sabotage efforts are not stopped. The Congressional Budget Office has projected that, between 2018 and 2019, the number of people enrolled in health insurance through the nongroup market—including plans purchased on ACA exchanges and otherwise—will decrease by 3 million, in part because "premiums faced by people who are ineligible for subsidies in the nongroup market will be higher."[228]

## II.    **Defendants' Unlawful Actions Harm the City Plaintiffs by Forcing Them to Spend More on Uncompensated Care**

183.    The City Plaintiffs—and, for that matter, many other cities and counties nationwide—are being harmed by Defendants' unlawful attempts to undermine the ACA, and they will continue to be harmed as long as Defendants' unlawful actions stand. By driving up the rate of uninsured or underinsured individuals within the City Plaintiffs' jurisdictions, Defendants' actions force the City Plaintiffs to devote additional funding, personnel, and other resources to subsidizing and providing uncompensated care for their residents. Defendants' actions thereby hit the City Plaintiffs' budgets, including the budgets for their public health departments, free or reduced-cost clinics, and ambulance services.

184.    Fulfilling their responsibility to care for their residents, local governments often provide a variety of health services to those who, lacking adequate health insurance, cannot

---

[227] *Id.*

[228] *May 2018 CBO Report, supra* n.9, at 5, 14.

otherwise pay for medical treatment. For that reason, "local governments (municipalities,

counties, and special-purpose health or hospital districts) bear a large share of the direct

financing of public hospital and clinic services."[229] In 2013, state and local governments spent

$19.8 billion to cover the costs of uncompensated care.[230] As a result, an increase in "the number

of uninsured and the amount of uncompensated care . . . will translate into increased pressure on

state and local government to finance the growing cost of the uninsured."[231]

185.    Moreover, "compared to the insured population, the uninsured are more likely to

skip or postpone needed care due to cost, miss preventative care, and be diagnosed with cancer at

later stages resulting in earlier death."[232] Then, "when uninsured persons do use services, they

are likely to need more costly health services because of delays in seeking care."[233] There is,

therefore, a direct relationship between increases in the uninsured population and increased costs

for government, including local government.[234]

---

[229]  Institute of Medicine, A Shared Destiny: Community Effects of Uninsurance 128 (2003), https://www.ncbi.nlm.nih.gov/books/NBK221329/ [hereinafter IOM Shared Destiny].

[230]  Patrick Kaiser & Eric Cochling, *Increasing Access to Quality Healthcare for Low-Income Uninsured Georgians Policy Recommendations for the State of Georgia* 12, Georgia Center for Opportunity (June 2014), https://georgiaopportunity.org/assets/2014/06/Charity-Care-Report.pdf.

[231]  John Holahan & Bowen Garnett, *The Cost of Uncompensated Care With and Without Health Reform* 4, Urban Institute (Mar. 2010), https://www.urban.org/sites/default/files/publication/28431/412045-The-Cost-of-Uncompensated-Care-with-and-without-Health-Reform.PDF; *see also* Erin F. Taylor et al., *Community Approaches to Providing Care for the Uninsured*, 25 Health Affairs 173, 173 (2006), https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.25.w173 ("[i]ncreases in the number of uninsured people often strain local safety nets and health systems").

[232]  James Benedict, *Chronic Disease Management of the Uninsured Patient at Ohio Free Clinics* 5, Walden University (2016), https://scholarworks.waldenu.edu/cgi/viewcontent.cgi?article=3816&context=dissertations.

[233]  IOM Shared Destiny, *supra* n.229, at 125.

[234]  *Cf.* Jessica Schubel & Matt Broaddus, *Uncompensated Care Costs Fell in Nearly Every State as ACA's Major Coverage Provisions Took Effect*, Center on Budget and Policy Priorities (May

186.     Costs like these—costs institutions bear as a result of providing uncompensated care—motivated the passage of the ACA. In the Act itself, Congress observed the astronomical costs "of providing uncompensated care to the uninsured": "$43,000,000,000 in 2008." 42 U.S.C. § 18091(2)(F). Congress also noted that individuals who choose "to forego health insurance coverage and attempt to self-insure . . . increase[] financial risks to households and medical providers." *Id.* § 18091(2)(A). Indeed, during the debates over the Act, members of Congress frequently referred to the need to reduce the costs that providers face because of uncompensated care.[235] And in explaining his Administration's health care reform agenda in a speech to the U.S. Conference of Mayors in 2009, President Obama highlighted the need for action because, among other things, "spiraling health care costs" were "straining budgets across government."[236] In sum, there is no doubt that reducing the financial burden upon entities that provide health services, including cities, was one of the core aims of the ACA.

---

23, 2018), https://www.cbpp.org/research/health/uncompensated-care-costs-fell-in-nearly-every-state-as-acas-major-coverage.

[235] *See, e.g.*, 155 Cong. Rec. S13800 (daily ed. Dec. 23, 2009) (statement of Sen. Kaufman) ("Rising medical costs, skyrocketing premiums, increasing numbers of the uninsured and the strain on both business and providers have brought the critical need for health reform back to the Senate this year. Make no mistake, we need health care reform now."); 155 Cong. Rec. S14126 (daily ed. Dec. 24, 2009) (statement of Sen. Akaka) ("Our health care providers are struggling to meet the increasing burdens imposed on them by greater numbers of uninsured patients and rising costs."); 156 Cong. Rec. H1880 (daily ed. Mar. 21, 2010) (statement of Rep. Jackson Lee) (claiming that in her district, the ACA would "[r]educe the cost of uncompensated care for hospitals and other health care providers by $27 million annually"); 156 Cong. Rec. H1871 (daily ed. Mar. 21, 2010) (statement of Rep. Ellison) ("When insurance coverage for 358,000 Fifth District residents is improved—and when the cost of uncompensated care for hospitals and other health care providers is reduced by $101 million—that is positive change.").

[236] President Barack Obama, Remarks to the United States Conference of Mayors 127, Feb. 20, 2009, https://www.gpo.gov/fdsys/pkg/PPP-2009-book1/pdf/PPP-2009-book1-doc-pg126.pdf; *see also* Sen. Nancy Pelosi, Remarks at the 2010 Legislative Conference for National Association of Counties, March 9, 2010, https://www.democraticleader.gov/newsroom/pelosi-remarks-2010-legislative-conference-national-association-counties/.

187.    The City Plaintiffs operate or subsidize free or reduced-cost health care centers

and clinics, which "have patients who are primarily uninsured, rely on volunteers and resources

of the community, and face persistent financial struggles."[237] "The primary reason for using a

free clinic is lack of insurance."[238] For example, one study found that nearly 50 percent of the

individuals who use publicly funded sexually transmitted infection clinics are uninsured.[239]

Similarly, uninsured individuals primarily rely on free or reduced-cost immunization clinics to

obtain necessary vaccinations.[240]

188.    The City Plaintiffs will have to bear greater costs to maintain their health care

centers and clinics if the number of uninsured or underinsured individuals increases. There is a

direct relationship between the uninsured rate in a given state and the rate of uninsured visits for

which the clinic does not receive full compensation. In states that expanded Medicaid, for

example, "[t]here was a substantial decrease in uninsured community health center visits and a

---

[237]  David O. Barbe, Council on Medical Services, *Free Clinics and the Uninsured* 1, American
Medical Association (2009), https://www.ama-assn.org/sites/default/files/media-
browser/public/about-ama/councils/Council%20Reports/council-on-medical-service/a09-cms-
free-clinics.pdf.

[238]  Akiko Kamimura et al., *Uninsured Free Clinic Patients' Experiences and Perceptions of
Healthcare Services, Community Resources, and the Patient Protection and Affordable Care Act*,
3 Patient Experience J. 12, 12 (2016),
http://pxjournal.org/cgi/viewcontent.cgi?article=1100&context=journal.

[239]  Karen W. Hoover et al., *Continuing Need for Sexually Transmitted Disease Clinics After the
Affordable Care Act*, American Journal of Public Health (Nov. 2015),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4627523/.

[240]  Association of State & Territorial Health Officials, *Identifying and Vaccinating Uninsured
Adults: Strategies and Practices* 12 (Sept. 2016),
http://www.astho.org/Programs/Immunization/Documents/ASTHO-Identifying-and-Vaccinating-
Uninsured-Adults-(FINAL-5_19_17)/.

significant increase in Medicaid-covered visits" relative to states that did not.[241] But "[d]espite the uninsured rate dipping to 9.1 percent in 2015, a record low in the U.S., there has been a slow trend upward" as a result of Defendants' unlawful actions "that has many clinic leaders worried—and fighting for funding."[242]

189.    The City Plaintiffs also operate or subsidize ambulance services, which answer emergency calls regardless of whether the individual needing care has health insurance. Studies have shown that "the uninsured . . . disproportionately rely on ambulance service for transport to the [emergency department]."[243] As the number of uninsured or underinsured individuals increases, ambulance services will have to respond to a larger number of calls for which they cannot seek reimbursement from insurers. Thus, the ambulance service and, by extension, the city that runs or subsidizes the service, is left to absorb the increased costs.

190.    The City Plaintiffs must address these budgetary shortfalls, and must do so in ways that impose still greater costs on cities and their residents. "Public subsidy of uncompensated care delivered to uninsured persons requires that additional public revenues be raised, resulting in a higher tax burden at the local level, the receipt of monies from federal

---

[241]  Heather Angier et al., *An Early Look at Rates of Uninsured Safety Net Clinic Visits After the Affordable Care Act*, 13 Annals of Family Med. 10, 10 (Jan.-Feb. 2015), https://www.annemergmed.com/article/S0196-0644(10)00384-7/fulltext.

[242]  Joseph Jaafari, *The Demand for Volunteer Physicians Is Rising. The Number of Uninsured Is Too.*, Nation Swell, Oct. 27, 2017, http://nationswell.com/demand-volunteer-physicians-free-health-clinics/.

[243]  Benjamin T. Squire et al., *At-Risk Populations and the Critically Ill Rely Disproportionately on Ambulance Transport to Emergency Departments*, 20 Annals of Emergency Med. 1, 6 (2010), https://www.ncbi.nlm.nih.gov/pubmed/20554351; *see also* Zachary F. Meisel et al., *Variations in Ambulance Use in the United States: The Role of Health Insurance*, Academy Emergency Medicine (Oct. 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3196627/pdf/nihms314403.pdf ("EMS use is higher among those who historically have had difficulty accessing routine medical care, specifically poor and uninsured patients.")

coffers, or the diversion of resources from other public purposes."[244] An unexpected increase in the rate of uninsured or underinsured individuals therefore translates to additional strain on already overburdened city budgets and overtaxed city residents.

191.    Aside from the direct impact on their public safety and health departments, the City Plaintiffs will have to confront the many downstream effects of a population that is necessarily sicker, less productive, and less able to participate in the community and civic life. Multiple studies have shown that "in areas with many uninsured people, the quality of care was lower, as well," in part because "it is difficult for health providers to maintain services in areas with large numbers of patients who cannot pay for care."[245] More broadly, "[f]or the communities in which uninsured individuals and families live, the lack or loss of health insurance coverage by some may undermine the shared economic and social foundations of the entire community."[246]

192.    The effects will be felt throughout the City Plaintiffs' budgets. As one mayor has put it, "if people don't get the medical care they need, it's going to be city fire departments and police departments responding to preventable emergencies."[247] Public school teachers will have

---

[244]  IOM Shared Destiny, *supra* n.229, at 123.

[245]  Julie Rovner, *Millions More Uninsured Could Impact Health of Those With Insurance, Too*, Kaiser Health News, July 14, 2018, https://khn.org/news/millions-more-uninsured-could-impact-health-of-those-with-insurance-too/.

[246]   IOM Shared Destiny, *supra* n.229, at 120.

[247]  Sara Durr, *The Nation's Mayors Stress Impact of Affordable Care Act Repeal*, U.S. Conference of Mayors (Jan. 25, 2017), https://www.usmayors.org/2017/01/25/the-nations-mayors-stress-impact-of-affordable-care-act-repeal/ (statement of Mesa, Ariz., Mayor John Giles).

to deal with students that either miss school or come to school and spread illnesses to other students.[248] And other social services departments will face increased demand for public benefits.

193.    The City Plaintiffs' economies will suffer too: "An increasing or high uninsured rate, and the attendant high public costs, may discourage employers from locating or continuing to make their home in a community."[249] Moreover, "the uneven availability of workplace health benefits keeps workers 'locked in' to their jobs if they already have coverage through their employer," inhibiting growth and dynamism in the City Plaintiffs' economies.[250] For example, employees may be unwilling to move to a new job or start a new business, and thereby forego employer-provided health insurance, if doing so forces them to purchase costly insurance on the individual market.

194.    All of these costs—budgetary, economic, political, and social—are being borne by each of the City Plaintiffs in this case.

**A.    Columbus, Ohio**

195.    The City of Columbus will be harmed in at least three ways by the rise in the rates of the uninsured and underinsured caused by Defendants' unlawful actions: it will be forced to pay more to support community health centers that serve its uninsured residents, its ambulance system will face greater unrecouped costs from calls by uninsured and underinsured individuals,

---

[248]   Press Release, U.S. Department of Education, *Obama Administration Encourages Schools and Districts to Enroll Students in Health Care Coverage Through School Registration* (Aug. 31, 2016), https://www.ed.gov/news/press-releases/obama-administration-encourages-schools-and-districts-enroll-students-health-care-coverage-through-school-registration ("Research shows that children who have access to health coverage are more likely to graduate from high school and college than uninsured children.").

[249]   IOM Shared Destiny, *supra* n.229, at 130.

[250]   *Id.*

and it will suffer all of the downstream costs of a population that is necessarily sicker and less productive.

196.    To start, Columbus has a public health department, Columbus Public Health, which "is charged with assuring conditions in which people can be healthy." Columbus Public Health "is made up of a range of programs providing clinical, environmental, health promotion, and population-based services,"[251] and has an annual budget of approximately $56 million and is staffed by 490 full- and part-time employees.

197.    Columbus Public Health subsidizes a number of community health centers that, as described above, will face greater demand from uninsured or underinsured individuals who cannot obtain health care elsewhere. In 2017, these community health centers saw a total of 45,616 patients. In total, these centers have an annual budget of approximately $38 million.

198.    Most importantly, Columbus Public Health financially supports PrimaryOne Health, which is a collection of ten Columbus neighborhood health centers in medically underserved areas.[252] PrimaryOne is designed to be a "system of health center sites throughout Columbus and Franklin County to serve the health care needs of vulnerable, un/under and insured residents within the community."[253]

199.    In 2017, Columbus subsidized PrimaryOne with $4,367,145 in public funds. That same year, the centers served over 45,000 patients. This included more than 15,000 uninsured patients, an increase of almost 3,000 more uninsured patients than the year before. In contrast,

---

[251] *About Columbus Public Health*, City of Columbus, https://www.columbus.gov/publichealth/About-Columbus-Public-Health/.
[252] *The History of PrimaryOne Health*, PrimaryOne, http://www.primaryonehealth.org/about/.
[253] *Id.*

the number of uninsured patients dropped from 17,752 in 2013 to 14,272 in 2014, after the individual mandate took effect.

200.     If the rate of uninsured or underinsured individuals increases, then the PrimaryOne Health centers will necessarily see even more patients, and Columbus will either have to provide them with additional funding or let them decrease the range of services they are able to provide. *See supra* ¶ 188.

201.     Columbus Public Health also operates a number of specialty clinics for alcohol and drug abuse prevention, dental services, family planning, immunizations, sexual health, tuberculosis control, women, infants, and children nutrition, and women's health and wellness.[254] Each of these clinics operates on a free or reduced-fee scale and principally serves the uninsured and underinsured populations.[255] As with PrimaryOne Health, growth in the uninsured and underinsured population will translate to additional costs for Columbus.

202.     Columbus also maintains "one of the best Emergency Medical Services (EMS) in the United States," operated by the Columbus Division of Fire.[256] That system dispatches ambulances to meet urgent health needs, regardless of whether the call comes from an individual who has health insurance or is otherwise able to pay for the call. In 2017, the Columbus Division of Fire answered over 132,000 emergency medic calls and had a budget of over $240 million.

---

[254] *About Columbus Public Health*, City of Columbus, https://www.columbus.gov/publichealth/About-Columbus-Public-Health/.

[255] *See, e.g.*, *Dental Clinic*, City of Columbus, https://www.columbus.gov/publichealth/programs/Dental-Clinic/.

[256] *Division of Fire*, City of Columbus, https://www.columbus.gov/public-safety/fire/reports/EMS-Reports/.

203.    If possible, "[r]eimbursement for the expense of emergency ambulance transport is sought from a patient's Medicare, Medicaid, or commercial health insurance coverage."[257] If an individual "live[s] in the City of Columbus and do[es] not have health insurance coverage, [they] will not receive a bill for transport"; thus, "no Columbus resident will pay anything 'out of pocket' as the result of being transported to a hospital by The Columbus Division of Fire."[258] Indeed, while Columbus recoups from 40 to 80 percent of its costs for transports for individuals with private insurance, Columbus only recoups less than 4 percent of its costs for uninsured individuals. For that reason, reimbursements "in no way cover all the costs incurred for treatment and transport."[259]

204.    As explained above, an increase in the number of uninsured or underinsured individuals will result in more transports for which Columbus does not receive reimbursement and thus must make up for the shortfall in its budget. *See supra* ¶ 189. Indeed, Columbus's data shows that this concern is far from speculative: In 2014, after the individual mandate took effect, the number of uninsured transports dropped from 11,123 to 7,943—a decrease of 29 percent. Since then, uninsured transports have remained flat. As the uninsured rate goes up again, however, Columbus can expect to provide additional unreimbursed transports, which will be paid for out of Columbus's own coffers.

205.    Aside from these budgetary impacts, Columbus—a city of nearly 900,000 people, with an economy of $132 billion—is harmed by the need to care for a population that becomes increasingly uninsured and less healthy. As explained above, an increase in the rate of uninsured

---

[257] *Id.*

[258] *Id.*

[259] *Id.*

and underinsured individuals will impose additional drains on the city's budget and its personnel, and will make the city a less attractive place to live and work.

206.    Each of these harms is traceable to Defendants' unlawful actions. As explained above, Defendants' actions increase the rate of the uninsured and underinsured, which in turn affects Columbus's budget and diminishes Columbus's economic prospects. Indeed, the Urban Institute projects that Defendants' sabotage efforts, among other factors, will cause enrollment in ACA-compliant plans to decrease in Ohio by 31.6 percent for 2019—45.6 percent if expanded access to short-term policies is factored in[260]—thus increasing the rate of the uninsured and the underinsured. That is unsurprising, given that one study estimates that Ohio has a "catastrophic risk" of a potential 90 percent premium increase.[261] Moreover, Columbus, and surrounding Franklin County, tend to have a higher rate of uninsured individuals than Ohio overall.[262] Columbus is therefore particularly vulnerable to Defendants' attempts to sabotage the ACA and the resulting increase in the rate of uninsured. By the same token, each of these harms will be redressed by countermanding the challenged provisions of the 2019 Rule specifically and Defendants' sabotage of the ACA more generally.

### B.    Baltimore, Maryland

207.    The City of Baltimore, Maryland, will be harmed in many of the same ways as Columbus. By increasing the rate of uninsured and underinsured individuals, Defendants' actions will make it costlier for Baltimore to support its health clinics and other programs; they will

---

[260] *March 2018 Urban Institute Study*, *supra* n.116, at 11.

[261] *March 2018 Covered California Post*, *supra* n.155.

[262]   *See 2017 Community Health Assessment* 2-5, Columbus, Worthington, Franklin County (Sept. 2017), https://www.columbus.gov/WorkArea/DownloadAsset.aspx?id=2147499258; *Selected Characteristics of Health Insurance Coverage in the United States*, U.S. Census Bureau (2016), https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (select table and enter "Ohio" and "Columbus city, Ohio").

likewise force Baltimore to spend more to cover unrecouped costs from city ambulance calls; and Baltimore, too, will suffer the many harms associated with a population that is necessarily less healthy.

208.    "The Baltimore City Health Department is the oldest continuously-operating health department in the United States, formed in 1793." It is charged with "working to improve the health and well-being of Baltimore residents"—and thereby "make Baltimore a city where all residents realize their full health potential." To that end, the department "has a wide-ranging area of responsibility," including matters like acute communicable diseases, chronic disease prevention, HIV/STD, maternal-child health, school health, and senior services. It is staffed by approximately 800 employees and has an annual budget of approximately $126 million.[263]

209.    In particular, the Baltimore City Health Department operates a number of specialty clinics out of two principal facilities. These include clinics for reproductive health, sexually transmitted diseases, dental and oral health care, and immunizations.[264] The department also subsidizes a Men's Health Center, which operates out of space provided at one of the department's own facilities.[265] Each of these clinics provides services on a free or reduced-fee scale and therefore serves as an essential resource for the uninsured and underinsured populations.[266] Consequently, any growth in the uninsured and underinsured population will mean additional costs for the city.

---

[263]  *About the Baltimore City Health Department*, Baltimore City Health Department, https://health.baltimorecity.gov/about.

[264]  *Health Clinics & Services*, Baltimore City Health Department, https://health.baltimorecity.gov/programs/health-clinics-services.

[265]  *Men's Health Center*, Baltimore City Health Department, https://health.baltimorecity.gov/health-clinics-services/mens-health-center.

[266]  *See, e.g.*, *Family Planning & Reproductive Health Clinic*, Baltimore City Health Department, https://health.baltimorecity.gov/health-clinics-services/family-planning-reproductive-health.

210.    The Baltimore City Health Department also provides or subsidizes a number of

other services for Baltimore's uninsured and underinsured residents. In particular, the

Department funds a visiting-nurse program that makes house calls for individuals who tend to

use ambulance services frequently, including those with chronic health conditions like diabetes,

hypertension, asthma, and mental health disorders. The Department also funds a number of other

programs focused on specific health conditions, including a Community Asthma Program, a

Tuberculosis Control Program, a Childhood Lead Poisoning Prevention Program, and programs

for substance abuse.[267] And the Department subsidizes a number of other entities that provide

services to Baltimore residents, including the Baltimore Family League and Health Care Access

Maryland. An increase in the uninsured rate will similarly impose additional burdens on each of

these programs, and therefore require more funding from the city.

211.    Like Columbus, the Baltimore City Fire Department also maintains an ambulance

system that answers calls whether or not they come from individuals with health insurance or

who are otherwise able to pay.[268] In 2017, the Baltimore City Fire Department answered over

100,000 emergency medic calls (with 17,000 from uninsured residents) and had a budget of over

$42 million for emergency medical services.

212.    The Baltimore City Fire Department attempts to recoup its costs for ambulance

services by seeking reimbursement from a patient's Medicare, Medicaid, or commercial health

---

[267]  *See, e.g.*, *Asthma*, Baltimore City Health Department,
https://health.baltimorecity.gov/node/454; *Health Clinics & Services*, Baltimore City Health
Department, https://health.baltimorecity.gov/programs/health-clinics-services; *Lead Poisoning*,
Baltimore City Health Department, https://health.baltimorecity.gov/lead/lead-poisoning;
*Substance Use and Misuse*, Baltimore City Health Department,
https://health.baltimorecity.gov/programs/substance-abuse; *Tuberculosis*, Baltimore City Health
Department, https://health.baltimorecity.gov/node/164.
[268]  *See Welcome to the Baltimore City Fire Department*, Baltimore City Fire Department,
https://fire.baltimorecity.gov/.

insurance coverage. If a patient lacks insurance, the department will seek reimbursement from the patient personally, making several attempts to collect on the debt. However, the Department is rarely successful; while, on average, the department recoups 90 percent or more of its costs for ambulance calls from individuals with private insurance, it only recoups less than 7 percent of its costs for uninsured individuals. Thus, as with Columbus, more uninsured and underinsured individuals means more ambulance calls for which Baltimore does not receive reimbursement and thus must make up for the shortfall in its budget. *See supra* ¶ 189.

213.    Indeed, Baltimore's ambulance system will be hit especially hard; in its recent strategic plan, the Baltimore City Fire Department identified "[r]esources allocation for EMS: allotment of resources with increasing EMS call volume; staffing; too many calls for amount of personnel we have; potential closings" as the community's chief area of concern.[269] Baltimore has adopted multiple programs to try to deal with this problem, including the visiting nurse program described above, and a High Utilizer Task Force "focused on strategies to support the most vulnerable patients, whose unmet social, complex medical, behavioral health, or environmental needs contribute to repetitive, avoidable use of acute health services."[270] An increase in the uninsured rate will only further strain a system which is already overstretched.

214.    Finally, Baltimore—a city of over 600,000 people, with a $187.4 billion economy—is similarly harmed by the burdens imposed by a sicker population. As with Columbus, an increase in the uninsured rate will drain Baltimore's budget and resources across the board, and will make the city a less attractive place to live and work.

---

[269] *Strategic Plan 2016-2021* at 9, Baltimore City Fire Department (2016), http://fire.baltimorecity.gov/sites/default/files/Baltimore%20Strategic%20Plan%202016-2021%20FINAL%2016%2010%2016%20corrected.pdf.

[270] *High Utilizer Task Force*, Baltimore City Health Department, https://health.baltimorecity.gov/high-utilizer-task-force.

215.     These harms, again, can be traced directly to Defendants' unlawful actions.

Defendants' actions are contributing to stark premium increases in Maryland. The two insurers

on the state's ACA exchange "requested average rate increases for 2019 that ranged from 18.5

percent to 91.4 percent, depending on the type of plan."[271] Maryland has been cleared by state

legislators to petition CMS to "establish a reinsurance program that would create a pot of money

for insurers to cover the most expensive claims," but a health economist "said he would be

shocked if the Trump [A]dministration approved such a request, given its efforts to weaken

Obamacare": "It just seems very unlikely to me that Trump would approve this . . . . Maryland is

easily saying we want to help prop up Obamacare, which the Trump administration doesn't want

to have anything to do with."[272]

216.     Beyond 2019, one study describes Maryland as having a "high risk" of

experiencing premium increases of up to 50 percent.[273] Another predicts premium increases

averaging 30 percent.[274]

217.     Higher premiums mean more uninsured families and individuals. Sharply rising

premiums have already had an effect on Maryland, with enrollees on Maryland's ACA exchange

dropping 13 percent from 2017 to 2018.[275] Looking ahead, the Urban Institute estimates a further

---

[271]  Andrea K. McDaniels, *CareFirst and Kaiser Ask Again for Large Rate Increases on Insurance Sold on State Exchange*, Baltimore Sun, May 7, 2018, http://www.baltimoresun.com/health/bs-hs-insurance-rate-requests-20180507-story.html.

[272]  *Id.*

[273]  *See March 2018 Covered California Post, supra* n.155.

[274]  *KFF Tracking 2019 Premium Changes, supra* n.216.

[275]  Andrea K. McDaniels, *CareFirst and Kaiser Ask Again for Large Rate Increases on Insurance Sold on State Exchange*, Baltimore Sun, May 7, 2018, http://www.baltimoresun.com/health/bs-hs-insurance-rate-requests-20180507-story.html.

20.1 percent decrease in 2019.[276] Like Columbus, Baltimore has a higher uninsured rate than the rest of its state, meaning that Baltimore is also particularly vulnerable to an increase in the uninsured rate caused by Defendants' sabotage efforts.[277] And again like Columbus, Baltimore's harms will be redressed by countermanding the challenged provisions of the 2019 Rule specifically and Defendants' sabotage of the ACA more generally.

### C.    Cincinnati, Ohio

218.    The City of Cincinnati will, like Columbus and Baltimore, be harmed by having to pay more to support clinics that serve the uninsured and underinsured population, to maintain ambulance services that respond to calls from uninsured residents, and to manage an increasingly less healthy and less productive population.

219.    "Since 1826, the Cincinnati Health Department . . . has been committed to protecting and improving the health of the people of Cincinnati." The Department is "a nationally recognized leader in public health" that "advocates for responsive health and human services that promote healthy living environments and social well-being, as well as works to reduce health inequities such as poverty and unemployment."[278] The Department has an annual budget of approximately $51 million and is staffed by 490 employees.

220.    The Cincinnati Health Department subsidizes a number of health centers that will, again, face greater demand as the rate of uninsured and underinsured individuals increases. These centers have an annual budget of $23 million. In 2017, these centers saw about 45,000

---

[276] *March 2018 Urban Institute Study*, *supra* n.116, at 10.

[277] *See Selected Characteristics of Health Insurance Coverage in the United States*, U.S. Census Bureau (2016), https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (select table and enter "Maryland" and "Baltimore city, Maryland").

[278] *About the Health Department*, City of Cincinnati, https://www.cincinnati-oh.gov/health/about-the-health-department/.

patients, with 95,000 individual visits. Specifically, these centers saw 13,123 uninsured

patients—an 11 percent increase over the 2016 figure of 11,776 patients.

221.    Most importantly, the Cincinnati Health Department operates seven freestanding

primary-care centers, which provide a full range of general medical services to Cincinnati's

uninsured residents. Cincinnati also operates nine dental centers, including one combined vision

and dental center. The Department's centers operate on a sliding-fee scale basis, where uninsured

residents pay based on their income. Thus, an increase in the uninsured and underinsured rate

will mean that Cincinnati must pay more to provide care to its residents.

222.    Aside from its free-standing health clinics, the Cincinnati Health Department

operates thirteen School Based Health Centers, serving 10,000 students, out of Cincinnati public

schools, which provide "physicals, asthma management, immunizations, prescription

medications, sick and injury care, and health education to children and families."[279] These

centers are available to uninsured students, and will likewise see greater demand if those students

and their families lack health insurance coverage.

223.    The Cincinnati Health Department also operates several other programs designed

to improve the health of city residents. For example, the Department operates a First Steps

Program that provides services, including home visits, to new mothers and their infant

children;[280] a Men's Health Initiative that "specializes in providing health education and linking

services to men who have been historically underserved";[281] and a Community Health Nursing

---

[279] *School & Adolescent Health*, City of Cincinnati, https://www.cincinnati-oh.gov/health/cincinnati-health-department-divisions1/school-adolescent-health/.

[280] *Maternal and Infant Health*, City of Cincinnati, https://www.cincinnati-oh.gov/health/cincinnati-health-department-divisions1/fetal-infant-mortality/.

[281] *Men's Health*, City of Cincinnati, https://www.cincinnati-oh.gov/health/cincinnati-health-department-divisions1/men-s-health1/.

Program that provides "comprehensive nursing services" on a sliding-scale basis because "when coverage stops, we don't."[282] Each of these services, too, will cost more to run as the rate of the uninsured and underinsured goes up.

224.    Cincinnati also maintains an emergency medical services system, operated by the Cincinnati Fire Department.[283] That system dispatches ambulances to meet urgent health needs, regardless of whether the call comes from an individual who has health insurance or is otherwise able to pay for the call. In 2017, the Cincinnati Fire Department had a budget of over $60 million, and answered over 62,000 emergency medic calls. Around 34,000 of those calls resulted in hospital transports, and around 4,300 of those transports involved uninsured patients. Each of these numbers increased from 2016 to 2017, and all else being equal will continue to increase in 2018 because of the Trump Administration's actions.

225.    If a transported patient lacks insurance, Cincinnati will attempt to recoup its costs from the patient directly. However, while Cincinnati recoups between 93 percent and 94 percent of its billed costs from private insurers (based on rates negotiated by the city), it recoups less than 3 percent of its costs from uninsured individuals. Thus, as explained above, an increase in the number of uninsured or underinsured individuals will result in more transports for which Cincinnati receives little reimbursement and thus must make up for the shortfall in its budget. *See supra* ¶ 189.

226.    Setting aside these budgetary impacts, Cincinnati—a city of around 300,000 people, with an economy of $132 billion—is harmed by the need to care for an increasingly

---

[282] *Nursing Services*, City of Cincinnati, https://www.cincinnati-oh.gov/health/cincinnati-health-department-divisions1/nursing-services/.

[283] *EMS Operations*, City of Cincinnati, https://www.cincinnati-oh.gov/fire/operations/ems-operations/.

uninsured and less healthy population. As explained above, an increase in the rate of uninsured and underinsured individuals will impose additional drains on Cincinnati's budget and its personnel, and will make the city a less attractive place to live and work.

227.    Cincinnati's harms, too, are traceable to Defendants' unlawful actions—as explained above, those actions increase the rate of the uninsured and underinsured, which in turn affects Cincinnati's budget and diminishes Cincinnati's economic prospects. As explained above, Defendants' actions are causing the uninsured rate in Ohio to rise. *See supra* ¶ 206. Like Columbus, Cincinnati has a higher uninsured rate than Ohio overall, and is likewise particularly vulnerable to Defendants' attempts to sabotage the ACA.[284] Accordingly, each of these harms will also be redressed by countermanding the challenged provisions of the 2019 Rule specifically and Defendants' sabotage of the ACA more generally.

### D.    Chicago, Illinois

228.    Much like Columbus, Baltimore, and Cincinnati, the City of Chicago, too, will be harmed by the rise in the uninsured and underinsured rate caused by Defendants' unlawful actions, including by being forced to pay more to operate and subsidize the clinics that serve its uninsured and underinsured residents, to fund its ambulance system in the face of greater unrecouped costs from calls by uninsured and underinsured individuals, and to manage the downstream costs of a population that is necessarily sicker and less productive.

---

[284] *See Community Health Assessment* 33, City of Cincinnati, https://www.cincinnati-oh.gov/health/assets/File/EDIT%20THIS%20CHA_12_21_17%20FINAL.pdf (last updated Dec. 21, 2017); *Selected Characteristics of Health Insurance Coverage in the United States*, U.S. Census Bureau (2016), https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (select table and enter "Ohio" and "Cincinnati city, Ohio").

229.    Chicago has a Department of Public Health that seeks to promote and improve the health of city residents. The Department has an annual budget of about $159 million and is staffed by more than 600 full-time employees.[285]

230.    The Chicago Department of Public Health operates free or reduced-cost clinics that, as described above, will face greater demand from uninsured or underinsured individuals who cannot obtain health care elsewhere. Specifically, the Department operates five clinics that provide free vaccinations;[286] five clinics that provide mental-health services at no cost for uninsured Chicago residents;[287] and three clinics that provide free testing and treatment for sexually transmitted infections.[288] Collectively, these clinics serve thousands of uninsured city residents.

231.    The Chicago Department of Public Health also partners with community-based health centers to offer a wide array of medical services, including for uninsured patients. These health centers operate six clinics that provide primary care as well as care directed to the needs

---

[285]  *2018 Budget Overview* 122, City of Chicago, https://www.cityofchicago.org/content/dam/city/depts/obm/supp_info/2018Budget/2018_Budget _Overview.pdf [hereinafter *2018 Budget Chicago Overview*].

[286]  *Walk-In Immunization Clinics*, City of Chicago, https://www.cityofchicago.org/city/en/depts/cdph/supp_info/health-protection/immunizations_walk-inclinics.html.

[287]  *Mental Health Centers*, City of Chicago, https://www.cityofchicago.org/city/en/depts/cdph/supp_info/behavioral-health/mental_health_centers.html.

[288]  *STI/HIV Testing and STI Treatment*, City of Chicago, https://www.cityofchicago.org/city/en/depts/cdph/provdrs/health_services/svcs/get_yourself_eva luatedforstihivaids.html.

of women and children and two primary-care clinics for people living with HIV/AIDS.[289] Chicago provides funding for these clinics as well.[290]

232.    If the rate of uninsured or underinsured individuals increases, then the clinics operated by the Chicago Department of Public Health and its community-based partners will necessarily have to provide free or reduced-cost care to more patients. In that event, Chicago either must provide the Department and its partners with more funding, or the Department and its partners must decrease the services that they provide.

233.    The Chicago Fire Department also provides ambulance transportation services to its residents, including its uninsured and underinsured residents. The Department receives about $88 million in annual funding for emergency medical services, employing nearly 800 people to provide those services.[291] The Department's paramedics provide ambulance-transportation services approximately 250,000 times per year.

234.    The Chicago Fire Department provides ambulance services regardless of the patient's income or insurance status. Chicago generally seeks reimbursement for ambulance services from the patient or, if applicable, the patient's insurer.[292] But Chicago usually does not receive full reimbursement for ambulance services from its uninsured residents. In 2017, for example, the Chicago Fire Department provided ambulance services to 53,326 patients for whom

---

[289]  *Health Services*, City of Chicago,
https://www.cityofchicago.org/city/en/depts/cdph/provdrs/health_services.html.
[290]  *Neighborhood Health Clinic Information 2012*, City of Chicago,
https://www.cityofchicago.org/city/en/depts/cdph/supp_info/clinical_health/neighborhood_healt
hclinicinformation2012.html.
[291]  *2018 Chicago Budget Overview*, *supra* n.285, at 119.
[292]  *Ambulance Bills*, City of Chicago,
https://www.cityofchicago.org/city/en/depts/fin/supp_info/revenue/ambulance_bills.html.

no insurance was identified. Chicago charged these patients $55,242,627 for ambulance services but collected just $1,755,545—a loss of $53,487,082.

235.     As explained above, an increase in the number of uninsured or underinsured individuals will result in more ambulance transports for which Chicago does not receive reimbursement and thus must make up for the shortfall in its budget.

236.     Aside from these budgetary impacts, Chicago—a city of some 2.7 million people with a gross regional product exceeding $600 billion—is, unsurprisingly, harmed by the need to care for a population that is increasingly uninsured and less healthy. As explained above, an increase in the rate of uninsured and underinsured individuals will impose additional drains on the city's budget and its personnel and will make the city a less attractive place to live and work.

237.     Each of these harms is traceable to Defendants' unlawful actions. As explained above, Defendants' actions increase the rate of the uninsured and underinsured, which in turn affects Chicago's budget and diminishes Chicago's economic prospects. Indeed, the Urban Institute projects that Defendants' sabotage efforts, among other factors, will cause enrollment in ACA-compliant plans to decrease in Illinois by 25 percent for 2019—39.1 percent if expanded access to short-term policies is factored in[293]—thus increasing the rate of the uninsured and the underinsured. Another study estimates that Illinois has a "high risk" of a potential 50 percent premium increase.[294] Moreover, Chicago tends to have a higher rate of uninsured individuals than Illinois overall, leaving Chicago particularly exposed to Defendants' sabotage efforts.[295]

---

[293] *March 2018 Urban Institute Study*, *supra* n.116, at 10.

[294] *March 2018 Covered California Study*, *supra* n.155.

[295]  *See Selected Characteristics of Health Insurance Coverage in the United States*, U.S. Census Bureau (2016), https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (select table and enter "Illinois" and "Chicago city, Illinois").

Once again, each of these harms will be redressed by enjoining the challenged provisions of the 2019 Rule and Defendants' efforts to sabotage the ACA.

III.   **Defendants' Unlawful Actions Harm the Individual Plaintiffs by Making Insurance Coverage Harder and More Expensive to Procure**

238.   Defendants' unlawful actions have also harmed individuals and families, by making it harder and more expensive for them to purchase health insurance on the individual market. As explained above, Defendants' conduct has caused premiums and deductibles to skyrocket nationwide, and will only drive them higher still.

239.   Every additional dollar that, owing to Defendants' actions, an individual must spend to acquire health insurance constitutes financial harm. There can be no dispute that the rising cost of health insurance is a problem Congress specifically set out to address in enacting the ACA. Congress specifically noted its desire to "significantly reduc[e] the number of the uninsured," and thereby "lower health insurance premiums." 42 U.S.C. § 18091(2)(F). In other words, the ACA expressly "seeks to make insurance more affordable" for individuals and families. *King*, 135 S. Ct. at 2487.

240.   Since President Trump took office, however, premiums for health insurance purchased on the individual market have sharply increased. In the spring of 2017, insurers planned for single-digit premium increases; by the fall, insurers had begun announcing hikes of 40 percent or higher. Many experts agree that "[i]f the White House had made a good-faith effort to implement Obamacare . . . premiums on the marketplaces likely would have increased by single digits on average."[296] Similarly, "[i]nsurers in several states have requested large rate

---

[296]  Dylan Scott, *Obamacare Premiums Were Stabilizing. Then Trump Happened*, Vox, Oct. 18, 2018, https://www.vox.com/policy-and-politics/2017/10/18/16458316/obamacare-premiums-trump.

hikes for 2019, with many pointing to steps taken by President Donald Trump and Republicans in Congress as the main reasons why."[297]

241.    Perhaps nowhere has the rising cost of health insurance been felt more than in Charlottesville, Virginia. For the 2018 benefit year, "[m]onthly health-care insurance premiums increased all over America . . . but nowhere as dramatically as in Charlottesville," according to the Kaiser Family Foundation.[298] "An exodus of carriers, which was blamed on losses caused by the instability of the Obamacare marketplace," and in turn directly attributable to the Trump Administration's actions, "created a coverage vacuum, leaving locals and insurance regulators scrambling."[299] As a result, monthly premiums for individuals and families tripled for 2018— becoming the highest in the nation.[300]

242.    Specifically, Optima Health, then the area's only individual market insurer, offered plans with premiums around $2,500 to $3,000 a month for a family of four, with an annual deductible of around $10,000 to $15,000—meaning that a family would have to pay nearly $50,000 before it saw any benefit from its health insurance.[301] Rising premiums and

---

[297]  Tami Luhby, *Trump Moves Pushing Up Obamacare Premiums for 2019*, CNN, June 7, 2018, https://www.cnn.com/2018/06/07/politics/obamacare-premiums/index.html.

[298]  Colby Itkowitz, *Where Are the Most Expensive ACA Plans in America? Charlottesville.*, Washington Post, Nov. 16, 2017, https://www.washingtonpost.com/local/where-are-the-most-expensive-aca-plans-in-america-charlottesville/2017/11/16/e1b352d8-ca27-11e7-aa96-54417592cf72_story.html.

[299]  Rachel Bluth, *The City With the Most Expensive ACA Insurance in the U.S.*, Atlantic, Apr. 24, 2018, https://www.theatlantic.com/health/archive/2018/04/the-city-with-the-most-expensive-aca-insurance-in-the-united-states/558605/.

[300]  Lisa Provence, *Sticker Shock: Charlottesville Health Insurance Premiums Spike to Highest in Nation*, C-Ville, Nov. 14, 2017, http://www.c-ville.com/sticker-shock-charlottesville-health-insurance-premiums-spike-highest-nation/#.W1dgkdJKhyw.

[301]  Robert Pear, *Middle-Class Families Confront Soaring Health Insurance Costs*, New York Times, Nov. 16, 2017, https://www.nytimes.com/2017/11/16/us/politics/obamacare-premiums-middle-class.html?_r=0.

deductibles forced Charlottesville residents to resort to desperate measures to afford health insurance, including hiring an unnecessary employee to purchase small business insurance, moving to another county, cutting their own pay, obtaining a new job, or purchasing multiple non-ACA compliant plans.[302]

243.    Insurers have again sought to increase their rates in Virginia for 2019 by around 20 percent.[303] While Optima sought to slightly decrease its rates, that reduction does not come close to canceling out the impact of its staggering rate increases in the past.[304] Moreover, Optima's (and other insurers') rates would likely be lower still, if not for Defendants' attempts to sabotage the ACA.

244.    For all the reasons described above, Defendants' actions have caused these staggering increases in the cost of health insurance, in Virginia and nationwide. The Virginia Bureau of Insurance reports that insurers are raising rates "due to the rising cost of health care but also federal actions or inaction that raise costs and create uncertainty in the insurance markets."[305] Multiple independent studies have also connected rising health care premiums to Defendants' sabotage efforts. The Urban Institute, for example, attributes a potential 19.1 percent

---

[302]   Colby Itkowitz, *Where Are the Most Expensive ACA Plans in America? Charlottesville.*, Washington Post, Nov. 16, 2017, https://www.washingtonpost.com/local/where-are-the-most-expensive-aca-plans-in-america-charlottesville/2017/11/16/e1b352d8-ca27-11e7-aa96-54417592cf72_story.html.

[303]   John Tozzi, *Obamacare Premiums to Surge Next Year, Early Requests Show*, Bloomberg, May 7, 2018, https://www.bloomberg.com/news/articles/2018-05-07/obamacare-premiums-to-surge-next-year-early-rate-requests-show.

[304]   *Id.*

[305]   Press Release, Virginia Gov. Ralph S. Northam, *Governor Northam Statement on Anticipated Double-Digit Health Insurance Rate Increases* (May 10, 2018), https://www.governor.virginia.gov/newsroom/all-releases/2018/may/headline-825487-en.html.

increase in insurance premiums in Virginia to Defendants' policies, among other factors.[306] Similarly, the Kaiser Family Foundation reports increases of 7 to 14 percent for lower-cost insurance plans in 2019.[307] And Covered California describes Virginia as being at "high risk" for future premium increases of up to 50 percent due to "ongoing federal uncertainty."[308] By the same token, premiums and deductibles would fall if Defendants implemented the Affordable Care Act faithfully, as they are required to do.

245.    Optima has also placed the blame on Defendants, justifying its 2018 rate increases by pointing to "marketplace changes," including "the uncertainty in Washington, and other carriers withdrawing from the market or reducing their service area."[309] Specifically, Optima's 2018 rate filing attributed the increases to "growing uncertainty in the marketplace, particularly with respect to various aspects of the Affordable Care Act . . . that continue to remain undecided and unstable," including "the effectiveness / enforceability of the individual mandate, stability of available plan options in the marketplace (e.g., carriers exiting the market), unknown funding of the CSR subsidies, and preliminary rate filings indicating substantial rate actions for 2018 across various marketplaces, including Virginia."[310] Optima's then-CEO and President, Michael

---

[306]  *March 2018 Urban Institute Study*, *supra* n.116, at 16.

[307]  *KFF Tracking 2019 Premium Changes*, *supra* n.216; *see also* John Tozzi, *Obamacare Premiums to Surge Next Year, Early Requests Show*, Bloomberg, May 7, 2018, https://www.bloomberg.com/news/articles/2018-05-07/obamacare-premiums-to-surge-next-year-early-rate-requests-show.

[308]  *March 2018 Covered California Post*, *supra* n.216.

[309]  *2018 Individual & Family Plan Information*, Optima Health, https://www.optimahealth.com/plans/individual/2018-plan-coverage-information.

[310]  *Part III Actuarial Memorandum, Optima Health Plan Individual Rate Filing* 6, 28-29 Milliman (Sept. 15, 2017), http://ratereview.healthcare.gov/files/1023591_2018_I_OHP_PartIII_Act_Memo_20170915.pdf.

Dudley, confirmed that "Optima is affected by the same factors destabilizing insurance markets elsewhere."[311]

246.    Other regional insurers, like CareFirst Blue Cross Blue Shield and Evergreen Health, have stated that Defendants are partly responsible for these substantial premium hikes.[312] And still others, like Anthem, have cited Defendants' sabotage efforts in defending their decision to exit the Virginia market, thus limiting choice and driving up prices for individual consumers.[313] These are not isolated cases: a study of insurer decisionmaking by the Urban Institute found that most insurers "remain committed to participating in the individual market," but that their "commitment has been tested by the continued erosion of policies designed to maintain the stability of the individual market."[314]

247.    Steve Vondra and Bonnie Morgan, a married couple who have been residents of Charlottesville since 2009 and 2010, respectively, have therefore been forced to pay higher premiums for lower-quality insurance because of Defendants' actions.

---

[311]  Robert Pear, *Middle-Class Families Confront Soaring Health Insurance Costs*, New York Times, Nov. 16, 2017, https://www.nytimes.com/2017/11/16/us/politics/obamacare-premiums-middle-class.html?_r=0..

[312]  Sarah Kliff, *The Trump Administration Is Making Obamacare More Expensive*, Vox, May 8, 2017, https://www.vox.com/2017/5/8/15563448/trump-insurance-premiums-2018.

[313]  Michael Martz, *Anthem, State's Largest Health Insurer, Drops Out of Virginia's Individual Market for 2018*, Richmond Times-Dispatch, Aug. 11, 2017, https://www.richmond.com/news/virginia/government-politics/anthem-state-s-largest-health-insurer-drops-out-of-virginia/article_c704aecb-f84d-5602-92ce-a04b711edb30.html; Katie O'Connor, *58 Virginia Counties Left Without an Insurance Option in 2018 Exchanges as Deadline Approaches*, Richmond Times-Dispatch, Sept. 13, 2017, https://www.richmond.com/life/health/virginia-counties-left-without-an-insurance-option-in-exchanges-as/article_2e83056f-3d2e-5a04-9967-32bcbc93ea71.html.

[314]  Sabrina Corlette et al., *Insurers Remaining in Affordable Care Act Markets Prepare for Continued Uncertainty in 2018, 2019* at 3, Urban Institute (Mar. 2018), https://www.rwjf.org/content/dam/farm/reports/issue_briefs/2018/rwjf444308.

248.    Steve has a preexisting condition. Before the ACA, Steve's health insurance situation was precarious: he had not had health insurance since 2005, when he closed his business. He was unable to purchase insurance because, at the time, insurers were able to discriminate against individuals on the basis of their health history and health status. While Bonnie had insurance through her work, Steve was ineligible, as the two were not married at the time.

249.    After the ACA prohibited discrimination on the basis of preexisting conditions, Steve and Bonnie were finally able to purchase insurance on the individual exchange. In 2016, they purchased a bronze plan with a premium of around $1050 a month for the two of them. They subsequently upgraded their coverage in 2017 to a silver plan with a premium of around $1270 a month.

250.    Defendants' attempts to sabotage the ACA, however, have dramatically increased the prices Steve and Bonnie pay for coverage. Steve and Bonnie do not receive subsidized coverage (advance premium tax credits) under the Act. In 2018, Steve and Bonnie returned to a bronze plan, sold by Optima. However, the monthly premium rose to a staggering $3327.65 for the two of them—a 261 percent increase above what they paid for a silver plan in 2017. Moreover, the plan's annual deductible, around $14,400, is also significantly higher than the deductible for the plans they purchased in 2016 and 2017. Combining a year's worth of premiums and the annual deductible, Steve and Bonnie would have to spend nearly $55,000 before receiving any benefit from their insurance.

251.    Steve and Bonnie have been injured by having to pay higher premiums and deductibles for their health coverage—the very injury the ACA was intended to prevent. That injury is the direct result of Defendants' ongoing attempts to sabotage the ACA, including the

2019 Rule and Defendants' other unlawful actions. And Steve and Bonnie's injury would be redressed if Defendants were instead required to implement the ACA lawfully and in good faith.

## CLAIMS FOR RELIEF

### Count One (Violation of the Administrative Procedure Act)

252.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

253.    The 2019 Rule is "final agency action for which there is no other adequate remedy in a court" and is "subject to judicial review." 5 U.S.C. § 704; *see id.* § 702.

254.    Under the Administrative Procedure Act, a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

255.    As detailed above, Defendants HHS, Secretary Azar, CMS, and Administrator Verma have failed to provide adequate reasons, and failed to adequately respond to comments, for many provisions of the 2019 Rule, such that they are "arbitrary" and "capricious." *Id.* In addition, as also detailed above, many provisions of the 2019 Rule violate the Affordable Care Act, and therefore are "not in accordance with law." *Id.* Accordingly, upon application by the specified Plaintiffs, this Court must "hold unlawful and set aside" the following provisions of the 2019 Rule:

    a.    The provision depriving taxpayers of advance premium tax credits for failing to reconcile credits for prior years on their tax returns without direct notification of their ineligibility. *See supra* ¶¶ 50-54. (Columbus, Baltimore, Cincinnati, Chicago, Individual Plaintiffs)

    b.    The provision outsourcing plan review on FFEs to states. *See supra* ¶¶ 55-61. (Columbus, Cincinnati, Individual Plaintiffs)

c.   The provision allowing insurance agents, brokers, and insurers to select their own third-party auditors. *See supra* ¶¶ 62-66. (Columbus, Cincinnati, Chicago, Individual Plaintiffs)

d.   The provision discontinuing support for standardized option insurance plans. *See supra* ¶¶ 68-72. (Columbus, Cincinnati, Chicago, Individual Plaintiffs)

e.   The provisions eliminating the requirements that exchanges have at least two Navigators, that one of those Navigators be a community non-profit, and that Navigators have a physical presence in the state. *See supra* ¶¶ 73-77. (Columbus, Baltimore, Cincinnati, Chicago, Individual Plaintiffs)

f.   The provision eliminating requirements that Small Business Health Options Program Health Insurance Exchanges maintain employee eligibility, premium aggregation, and online enrollment functionality. *See supra* ¶¶ 78-80. (Columbus, Cincinnati, Chicago)

g.   The provision requiring consumers who attest to income between 100 percent and 400 percent of the federal poverty line to verify their income if available electronic data sources indicate their income to be below the federal poverty line. *See supra* ¶¶ 81-84. (Columbus, Cincinnati, Chicago, Individual Plaintiffs)

h.   The provision allowing states to petition for a reduction in risk adjustment transfer payments. *See supra* ¶¶ 86-93. (Columbus, Baltimore, Cincinnati, Chicago, Individual Plaintiffs)

    i.      The provisions exempting student health insurance plans from rate review and increasing the threshold for insurance rate increases subject to review to 15 percent. *See supra* ¶¶ 94-99. (Columbus, Baltimore, Cincinnati, Chicago, Individual Plaintiffs)

    j.      The provision allowing insurers to claim a standard 0.8 percent of premium for quality improvement activities when calculating medical loss ratio. *See supra* ¶¶ 100-05. (Columbus, Baltimore, Cincinnati, Chicago, Individual Plaintiffs)

**Count Two (Violation of the Take Care Clause)**

256.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

257.    Under the Take Care Clause of the U.S. Constitution, the President and his or her Administration must "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

258.    As detailed above, Defendants have violated the Take Care Clause by failing to take care to faithfully execute the Affordable Care Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1.    declare that the provisions of the 2019 Rule identified in Count One are arbitrary, capricious, or otherwise not in accordance with law under the Administrative Procedure Act;

2.    vacate the provisions of the 2019 Rule identified in Count One under the Administrative Procedure Act;

3.    declare that Defendants are violating the Take Care Clause by not faithfully executing the Affordable Care Act;

4.      declare that Defendants are violating the Take Care Clause by taking executive

action to:

      a.      suppress the number of individuals and families obtaining health insurance

           through ACA exchanges;

      b.      increase premiums for health insurance in the ACA exchanges;

      c.      diminish the availability of comprehensive, reasonably-priced health

           insurance for individuals and families with preexisting conditions;

      d.      discourage individuals and families from obtaining health insurance that

           provides the coverage that Congress, in the ACA, determined is necessary

           to protect American families against the physical and economic

           devastation that results from lesser insurance, with limits on coverage that

           leaves them unable to cover the costs of an accident or unexpected illness;

5.      order Defendants to comply with their constitutional obligation to take care to

faithfully execute the ACA, including by acting to:

      a.      expand, rather than suppress, the number of individuals and families

           obtaining health insurance through ACA exchanges;

      b.      reduce, rather than increase, premiums for health insurance in the ACA

           exchanges;

      c.      promote, rather than diminish, the availability of comprehensive,

           reasonably-priced health insurance for individuals and families with

           preexisting conditions;

      d.      encourage, rather than discourage, individuals and families to obtain

           health insurance that provides the coverage that Congress, in the ACA,

determined is necessary to protect American families against the physical and economic devastation that results from lesser insurance, with limits on coverage that leaves them unable to cover the costs of an accident or unexpected illness;

6.     enjoin Defendants from implementing Executive Order No. 13,765 so as to undermine, rather than faithfully execute, the ACA;

7.     order Defendants to fully fund advertising under the ACA;

8.     enjoin Defendants from producing and disseminating advertisements that aim to undermine the ACA;

9.     order Defendants to fully fund Navigators under the ACA;

10.     enjoin Defendants from incentivizing Navigators to advertise non-ACA compliant plans;

11.     order Defendants to lengthen the open enrollment period;

12.     order Defendants to resume participation in enrollment events and other outreach activities under the ACA;

13.     order Defendants to faithfully enforce the individual mandate as prescribed in the ACA (as amended);

14.     order Defendants to process states' waiver applications under the ACA so as to faithfully implement the Act;

15.     enjoin Defendants from implementing Executive Order No. 13,813 so as to undermine, rather than faithfully execute, the ACA;

16.     award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

17.  grant any other relief this Court deems appropriate.

Dated: Aug. 2, 2018

**City of Columbus**
Zach Klein (OH Bar No. 0078222)
City Attorney

Lara N. Baker-Morrish (OH Bar No. 0063721)
City Solicitor General

Charles P. Campisano (OH Bar No. 0095201)
Jennifer L. Shea (OH Bar No. 0085239)
Assistant City Attorneys

Columbus City Attorney's Office
77 N. Front St., 4th Floor
Columbus, OH  43215
(614) 645-7385
zmklein@columbus.gov
lnbaker-morrish@columbus.gov
cpcampisano@columbus.gov
jlshea@columbus.gov

**Mayor and City Council of Baltimore**
Andre M. Davis #00362
City Solicitor

Suzanne Sangree #26130
Senior Counsel for Public Safety & Director of
Affirmative Litigation

Elizabeth R. Martinez #29394
Assistant Solicitor, Litigation

City of Baltimore Department of Law
City Hall, Room 109
100 N. Holliday St.
Baltimore, MD  21202
(443) 388-2190
andre.davis@baltimorecity.gov
suzanne.sangree2@baltimorecity.gov
liz.martinez@baltimorecity.gov

Respectfully submitted,

Javier M. Guzman (D.C. Bar No. 462679) (*pro hac vice* motion forthcoming)
Legal Director

Adam Grogg (D.C. Bar No. 1552438) (*pro hac vice* motion forthcoming)
Senior Counsel

John Lewis (D.C. Bar No. 1033826) (*pro hac vice* motion forthcoming)
Counsel

Democracy Forward Foundation
1333 H St. NW
Washington, DC  20005
(202) 448-9090
jguzman@democracyforward.org
agrogg@democracyforward.org
jlewis@democracyforward.org

/s/ *Sara E. Kropf*
Sara E. Kropf (D. Md. Bar No. 26818)
Law Office of Sara Kropf, PLLC
701 8th St. NW, Suite 300
Washington, DC  20001
(202) 627-6900
sara@kropf-law.com

***Counsel for Plaintiffs***

129

**City of Cincinnati**
Paula Boggs Muething (OH Bar No. 0080018)
City Solicitor

Office of the City Solicitor, Cincinnati
City Hall, Room 214
801 Plum St.
Cincinnati, OH  45202

**City of Chicago**
Edward N. Siskel (IL Bar No. 6279423)
Corporation Counsel

Jane Elinor Notz (IL Bar No. 6270361)
Deputy Corporation Counsel
Affirmative Litigation Division

Stephen J. Kane (IL Bar No. 6272490)
Assistant Corporation Counsel
Affirmative Litigation Division

City of Chicago Department of Law
121 N. LaSalle St., Room 600
Chicago, IL  60602
edward.siskel@cityofchicago.org