**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

---

CITY OF COLUMBUS, *et al.*,

      *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity
    as President of the United States of
    America, *et al.*,

      *Defendants.*

No. 18-cv-2364

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## TABLE OF CONTENTS

Table of Authorities ............................................................................................. iii

Introduction ........................................................................................................... 1

Background ............................................................................................................ 3

Legal Standard ...................................................................................................... 8

Argument ............................................................................................................... 8

    I.    This Court Has Jurisdiction Over Plaintiffs' Claims ............................... 8

        A.    Plaintiffs Have Plausibly Alleged that They Have Standing to Sue ........... 9

            1.    Defendants' actions have undermined the Affordable Care Act .. 11

            2.    The Individual Plaintiffs have standing ....................................... 18

            3.    The City Plaintiffs have standing ................................................. 23

        B.    Plaintiffs' Claims Are Ripe ..................................................................... 28

    II.    Plaintiffs Have Stated a Claim Under the Administrative Procedure Act ........... 30

        A.    Plaintiffs Have Plausibly Alleged that the 2019 Rule's Provisions Eliminating Protections Guaranteed by the ACA Violate the APA ......... 31

            1.    Permitting exchanges to strip individuals of eligibility for tax credits without providing direct notification (AC ¶¶ 52-56; Mot. at 35-38) ................................................................................. 31

            2.    Outsourcing to states the compliance review of insurance plans to be offered on federal exchanges (AC ¶¶ 57-63; Mot. at 41-43) ..................................................................................... 34

            3.    Reducing oversight of insurance brokers participating in direct enrollment (AC ¶¶ 64-68; Mot. at 33-35) ..................................... 36

        B.    Plaintiffs Have Plausibly Alleged that the 2019 Rule's Provisions Deterring Families from Enrolling in Quality Health Insurance Plans Violate the APA .................................................................................... 37

            1.    Making it harder to compare insurance programs (AC ¶¶ 70-74; Mot. at 30-32) .......................................................................... 37

            2.    Undermining the Navigator program (AC ¶¶ 75-79; Mot. at 32-33) ....................................................................................... 39

            3.    Making small business exchanges less user-friendly (AC ¶¶ 80-82; Mot. at 39-41) ....................................................... 41

            4.    Imposing unnecessary income verification requirements (AC ¶¶ 83-86; Mot. at 38-39) ....................................................... 42

        C.    Plaintiffs Have Plausibly Alleged that the 2019 Rule's Provisions Driving Up Insurance Costs Violate the APA ......................................... 44

|  | 1. | Curtailing review of insurance rate increases (AC ¶¶ 88-93; Mot. at 26-29) ............................................................................ 44 |
|  | 2. | Reducing rebates for poor insurer performance (AC ¶¶ 94-98; Mot. at 44-47) ............................................................................ 47 |

III. Plaintiffs Have Stated a Claim Under the Take Care Clause............................... 49

A. The Take Care Clause Is a Critical Component of the Constitution's Separation of Powers and Requires the Executive Branch to Faithfully Implement the ACA ............................................................................... 50

B. Plaintiffs Have Plausibly Alleged that Defendants Have Failed to Faithfully Execute the ACA ...................................................................... 54

C. Defendants' Threshold Objections Lack Merit......................................... 61

1. The Court has the authority to hear Plaintiffs' claim.................... 61

2. Defendants provide no grounds for dismissing the President at this early stage............................................................................. 64

3. The Take Care Clause requires the President's subordinates to faithfully execute the law.............................................................. 67

Conclusion ..................................................................................................................... 68

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*AARP v. EEOC*,
   226 F. Supp. 3d 7 (D.D.C. 2016) ............................................................................18

*Adams v. Watson*,
   10 F.3d 915 (1st Cir. 1993) ....................................................................................12

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) ........................................................................63, 68

*Air Alliance Houston v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018) ..............................................................................24

*Air Evac EMS, Inc. v. Cheatham*,
   910 F.3d 751 (4th Cir. 2018) ..........................................................................10, 18

*al-Marri v. Pucciarelli*,
   534 F.3d 213 (4th Cir. 2008) ..................................................................................67

*Allen v. Wright*,
   468 U.S. 737 (1984) ................................................................................................21

*Amador County v. Salazar*,
   640 F.3d 373 (D.C. Cir. 2011) ................................................................................23

*American Freedom Law Center v. Obama*,
   106 F. Supp. 3d 104 (D.D.C. 2015) ........................................................................22

*American Freedom Law Center v. Obama*,
   821 F.3d 44 (D.C. Cir. 2016) ............................................................................22, 23

*Appalachian Voices v. State Water Control Board*,
   912 F.3d 746 (4th Cir. 2019) ..........................................................................38, 43

*Armstrong v. Exceptional Child Center, Inc.*,
   135 S. Ct. 1378 (2015) ............................................................................................62

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................2, 8, 14

*Attias v. Carefirst, Inc.*,
   865 F.3d 620 (D.C. Cir. 2017) ..................................................................................9

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................................................64

*Batalla Vidal v. Duke,*
   295 F. Supp. 3d 127 (E.D.N.Y. 2017) ...............................................................24

*Bishop v. Bartlett,*
   575 F.3d 419 (4th Cir. 2009) ...........................................................................22

*Block v. Meese,*
   793 F.2d 1303 (D.C. Cir. 1986) ........................................................................10

*Blumenthal v. Trump,*
   No. 17-cv-1154, 2019 WL 1923398 (D.D.C. Apr. 30, 2019)...........................65, 66

*In re Border Infrastructure Environmental Litigation,*
   284 F. Supp. 3d 1092 (S.D. Cal. 2018)..............................................................68

*Bowen v. American Hospital Association,*
   476 U.S. 610 (1986)....................................................................................36, 48

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ......................................................................24, 28

*Carpenters Industrial Council v. Zinke,*
   854 F.3d 1 (D.C. Cir. 2017).........................................................................18, 26

*Carter v. Fleming,*
   879 F.3d 132 (4th Cir. 2018) ...........................................................................23

*CASA de Maryland, Inc. v. Trump,*
   355 F. Supp. 3d 307 (D. Md. 2018)..............................................................65, 66

*CASA de Maryland v. DHS,*
   -- F. 3d. --, 2019 WL 2147204 (4th Cir. May 17, 2019)...............................31, 39

*Centro Presente v. DHS,*
   332 F. Supp. 3d 393 (D. Mass. 2018) ...........................................................65, 66

*Clark v. Martinez,*
   543 U.S. 371 (2005).........................................................................................32

*Colorado River Indian Tribes v. National Indian Gaming Commission,*
   466 F.3d 134 (D.C. Cir. 2006) ..........................................................................46

*Congaree Riverkeeper, Inc. v. Carolina Water Service, Inc.,*
   248 F. Supp. 3d 733 (D.S.C. 2017)....................................................................22

*Cooksey v. Futrell,*
   721 F.3d 226 (4th Cir. 2013) ...........................................................................29

*CREW v. Trump,*
   302 F. Supp. 3d 127 (D.D.C. 2018) ..............................................................64, 65

*Curtis v. Propel Property Tax Funding, LLC,*
   915 F.3d 234 (4th Cir. 2019) ...........................................................................9

*District Hospital Partners, LP v. Sebelius,*
   794 F. Supp. 2d 162 (D.D.C. 2011) ..............................................................31

*District of Columbia v. Trump,*
   291 F. Supp. 3d 725 (D. Md. 2018) ........................................................ *passim*

*Doe v. Obama,*
   631 F.3d 157 (4th Cir. 2011) .......................................................................9, 21

*Doe v. Virginia Department of State Police,*
   713 F.3d 745 (4th Cir. 2013) ........................................................................21

*Duke Power Co. v. Carolina Environmental Study Group, Inc.,*
   438 U.S. 59 (1978) ........................................................................................28

*Encino Motorcars v. Navarro,*
   136 S. Ct. 2117 (2016) ..................................................................................30

*Ergon-West Virginia, Inc. v. EPA,*
   896 F.3d 600 (4th Cir. 2018) ........................................................................46

*Farrell v. Tillerson,*
   315 F. Supp. 3d 47 (D.D.C. 2018) ...............................................................31

*FCC v. Fox Television Stations,*
   556 U.S. 502 (2009) ..................................................................34, 37, 38, 42

*Frank Krasner Enterprises, Ltd. v. Montgomery County,*
   401 F.3d 230 (4th Cir. 2005) ........................................................................22

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ..............................................................................61, 64, 65

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
   561 U.S. 477 (2010) ..............................................................................62, 67

*Friends of Back Bay v. U.S. Army Corps of Engineers,*
   681 F.3d 581 (4th Cir. 2012) ........................................................................34

*Friends of the Earth v. Gaston Copper Recycling Corp.,*
   204 F.3d 149 (4th Cir. 2000) ........................................................................23

*Giarratano v. Johnson*,
521 F.3d 298 (4th Cir. 2008) ...........................................................64

*Goldberg v. Kelly*,
397 U.S. 254 (1970)...........................................................................32

*Holland v. Pardee Coal Co.*,
269 F.3d 424 (4th Cir. 2001) .............................................................35

*Humane Society v. Zinke*,
865 F.3d 585 (D.C. Cir. 2017).............................................................36

*Huntco Pawn Holdings v. Department of Defense*,
240 F. Supp. 3d 206 (D.D.C. 2016) ...................................................43

*INS v. Chadha*,
462 U.S. 919 (1983)..............................................................49, 50, 62

*International Refugee Assistance Project v. Trump*,
857 F.3d 554 (4th Cir. 2017) .............................................................64

*International Refugee Assistance Project v. Trump*,
883 F.3d 233 (4th Cir. 2018) .............................................................61

*International Refugee Assistance Project v. Trump*,
No. 17-cv-0361, 2019 WL 1981884 (D. Md. May 2, 2019)....................8

*International Union, United Automobile, Aerospace & Agricultural Implement
Workers of America v. General Dynamics Land Systems Division*,
815 F.2d 1570 (D.C. Cir. 1987).........................................................33

*Jimenez-Cedillo v. Sessions*,
885 F.3d 292 (4th Cir. 2018) .............................................................31

*Johnson v. Sessions*,
No. 15-cv- 3317, 2017 WL 1207537 (D. Md. Apr. 3, 2017)...............31

*Kendall v. United States*,
37 U.S. (12 Pet.) 524 (1838) ........................................................51, 61

*Kenny v. Wilson*,
885 F.3d 280 (4th Cir. 2018) ...............................................................8

*King v. Burwell*,
135 S. Ct. 2480 (2015)..............................................................3, 4, 37

*Knight First Amendment Institute v. Trump*,
302 F. Supp. 3d 541 (S.D.N.Y. 2018)..................................................66

*Lane v. Holder,*
    703 F.3d 668 (4th Cir. 2012) .........................................................................21, 22

*Lane Hollow Coal Co. v. Director, Office of Workers' Compensation Programs,*
    137 F.3d 799 (4th Cir. 1998) ...................................................................................32

*Lansdowne on the Potomac Homeowners Association, Inc. v. OpenBand at*
    *Lansdowne, LLC,*
    713 F.3d 187 (4th Cir. 2013) ...................................................................................29

*Liberty University, Inc. v. Lew,*
    733 F.3d 72 (4th Cir. 2013) .......................................................................................8

*Lilly v. United States,*
    238 F.2d 584 (4th Cir. 1956) ...................................................................................33

*Marbury v. Madison,*
    5 U.S. (1 Cr.) 137 (1803) .........................................................................................62

*Maryland v. United States,*
    360 F. Supp. 3d 288 (D. Md. 2019) ...................................................................23, 51

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)..................................................................................................10

*Massachusetts v. HHS,*
    -- F.3d --, 2019 WL 1950427 (1st Cir. May 2, 2019) .............................................24

*MCI Telecommunications Corp. v. AT&T,*
    512 U.S. 218 (1994)..................................................................................................49

*MCI Telecommunications Corp. v. FCC,*
    842 F.2d 1296 (D.C. Cir. 1988) ...............................................................................41

*McLean v. United States,*
    566 F.3d 391 (4th Cir. 2009) ...................................................................................60

*Medellín v. Texas,*
    552 U.S. 491 (2008)..................................................................................................51

*Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft*
    *Noise, Inc.,*
    501 U.S. 252 (1991)......................................................................................50, 63, 68

*Mississippi v. Johnson,*
    71 U.S. (4 Wall) 475 (1866) .....................................................................................64

*Morris v. California Physicians' Service*,
    918 F.3d 1011 (9th Cir. 2019) ................................................................47, 48, 49

*Morrison v. Olson*,
    487 U.S. 654 (1988).........................................................................................50

*Motor Vehicles Manufacturers. Association v. State Farm Mutual Automobile*
    *Insurance Co.*,
    463 U.S. 29 (1983)................................................................................ *passim*

*Myers v. United States*,
    272 U.S. 52 (1926)...........................................................................................67

*North Carolina Growers' Association, Inc. v. United Farm Workers*,
    702 F.3d 755 (4th Cir. 2012) ...........................................................................43

*North Carolina Wildlife Federation v. North Carolina Department of*
    *Transportation*,
    677 F.3d 596 (4th Cir. 2012) ...........................................................................30

*In re Naranjo*,
    768 F.3d 332 (4th Cir. 2014) ...........................................................................29

*National Association of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012).......................................................................42

*National Audubon Society, Inc. v. Davis*,
    307 F.3d 835 (9th Cir. 2002) ...........................................................................10

*National Resource Defense Council, Inc. v. Watkins*,
    954 F.2d 974 (4th Cir. 1992) ...........................................................................10

*National Treasury Employees Union v. Horner*,
    854 F.2d 490 (D.C. Cir. 1988).........................................................................36

*National Treasury Employees Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974)...........................................................53, 65, 68

*New York v. Department of Commerce*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2019)..............................................................10

*New York v. Department of Labor*,
    363 F. Supp. 3d 109 (D.D.C. 2019)..................................................................58

*New York Times Co. v. United States*,
    403 U.S. 713 (1971).........................................................................................52

*NFIB v. Sebelius*,
   567 U.S. 519 (2012)........................................................................................35

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982)...............................................................................65, 66

*NLRB v. Enterprise Leasing Co. Se.*,
   722 F.3d 609 (4th Cir. 2013) ................................................................62, 63

*Norton v. SUWA*,
   542 U.S. 55 (2004)........................................................................................61

*Olmsted Falls v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002)......................................................................23

*Osborn v. Visa Inc.*,
   797 F.3d 1057 (D.C. Cir. 2015) ...................................................................12

*Pennsylvania v. Trump*,
   351 F. Supp. 3d 791 (E.D. Pa. 2019) .....................................................24, 28

*Printz v. United States*,
   521 U.S. 898 (1997)......................................................................................68

*Roman Catholic Archbishop of Washington v. Sebelius*,
   19 F. Supp. 3d 48 (D.D.C. 2013) .................................................................45

*Saget v. Trump*,
   345 F. Supp. 3d 287 (E.D.N.Y. 2018) ..........................................................65

*Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) ......................................................................23

*Save Our Heritage, Inc. v. FAA*,
   269 F.3d. 49 (1st Cir. 2003)..........................................................................26

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947)................................................................................30, 45

*Shelby County v. Holder*,
   570 U.S. 529 (2013)......................................................................................46

*Sierra Club v. Department of the Interior*,
   899 F.3d 260 (4th Cir. 2018) ..................................................................10, 21

*Simon v. Eastern Kentucky Welfare Rights Organization*,
   426 U.S. 26 (1976)........................................................................................21

*Stewart v. Azar,*
   313 F. Supp. 3d 237 (D.D.C. 2018) ......................................................18, 49

*Stinnie v. Holcomb,*
   734 F. App'x 858 (4th Cir. 2018) ................................................................10

*Swan v. Clinton,*
   100 F.3d 973 (D.C. Cir. 1996) ....................................................................64

*Swedish American Hospital v. Sebelius,*
   691 F. Supp. 2d 80 (D.D.C. 2010) ..............................................................31

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ................................................................18, 24

*Tozzi v. HHS,*
   271 F.3d 301 (D.C. Cir. 2001) ....................................................................11

*Tripoli Rocketry Association, Inc. v. ATF,*
   437 F.3d 75 (D.C. Cir. 2006) ......................................................................43

*U.S. House of Representatives v. Price,*
   No. 16-5202, 2017 WL 3271445 (D.C. Cir. 2017)......................................24

*U.S. Telecom Association v. FCC,*
   855 F.3d 381 (D.C. Cir. 2017)....................................................................60

*United States v. Juarez-Escobar,*
   25 F. Supp. 3d 774 (W.D. Pa. 2014)......................................................63, 64

*United States v. Midwest Oil Co.,*
   236 U.S. 459 (1915)....................................................................................51

*United States v. SCRAP,*
   412 U.S. 669 (1973)....................................................................................26

*United Technologies Corp. v. Department of Defense,*
   601 F.3d 557 (D.C. Cir. 2010) ..............................................................34, 42

*Utility Air Regulatory Group v. EPA,*
   573 U.S. 302 (2014)............................................................................ *passim*

*Wikimedia Foundation v. National Security Agency,*
   857 F.3d 193 (4th Cir. 2017) ..................................................................8, 60

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)............................................................................ *passim*

## Constitution

U.S. Const.
art. I, § 1 ................................................................................50, 68
art. II, § 1 ...............................................................................50, 52
art. II, § 3 ................................................................................ *passim*
art. III, § 1 ...................................................................................50

## Statutes

5 U.S.C. § 706 ...........................................................................7, 30

26 U.S.C.
§ 36B .............................................................................31, 32, 42
§ 5000A ..............................................................................5

42 U.S.C.
§ 300gg............................................................................4
§ 300gg-1............................................................................4
§ 300gg-4............................................................................4
§ 300gg-6............................................................................4
§ 300gg-18............................................................47, 48
§ 300gg-94............................................................44
§ 18021............................................................4
§ 18022............................................................4
§ 18031............................................4, 35, 39, 40, 41
§ 18071............................................................5
§ 18081............................................................31, 42
§ 18082............................................................31, 42
§ 18118............................................................44, 45

Pub. L. No. 111-148, 124 Stat. 119 (2010)................................3

Pub. L. No. 111-152, 124 Stat. 1029 (2010).............................3

Pub. L. No. 115-97, 131 Stat. 2054 (2017)................................5

## Administrative and Executive Authorities

35 C.F.R. § 154.101 ................................................................44

45 C.F.R. § 155.305 ................................................................32

Executive Order No. 13,765 ...............................................17, 54

Executive Order No. 13,813 ...................................................57

75 Fed. Reg. 74,864 (Dec. 1, 2010)......................................48

77 Fed. Reg. 16,453 (Mar. 21, 2012) ..........................................................................45

79 Fed. Reg. 15,808 (Mar. 21, 2014) ..........................................................................40

80 Fed. Reg. 75,488 (Dec. 2, 2015) .......................................................................37, 38

81 Fed. Reg. 12,204 (Mar. 8, 2016) ...........................................................................37

81 Fed. Reg. 94,058 (Dec. 22, 2016) ....................................................................32, 33

83 Fed. Reg. 16,930 (Apr. 17, 2018) ................................................................... *passim*

84 Fed. Reg. 17,454 (Apr. 15, 2019) ..........................................................................29

38 Op. O.L.C. 1 (2014) ..............................................................................................53

**Other Authorities**

Aaron Rupar, *ACA, Decoded*, Vox (Apr. 9, 2019), https://www.vox.com/policy-and-
    politics/2019/4/9/18302270/bill-barr-testimony-obamacare-house-lawsuit .........................59

Andrew Kent, Ethan J. Leib, & Jed Handelsman Shugerman, *Faithful Execution and
    Article II*, 132 Harv. L. Rev. ___ (June 2019), *available at*
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3260593 .................................51, 52, 53

Andrew Sprung, *CSR Takeup Bends Slightly Under Silver Load for Second Straight
    Year*, XpostFactoid (Apr. 8, 2019), https://xpostfactoid.blogspot.com/2019/04/csr-
    takeup-bends-slightly-under-silver.html ........................................................................16

*Association Health Plans and Short-Term Plans*, CBO (Jan. 31, 2019),
    https://www.cbo.gov/publication/54915; ........................................................................16

*Average Monthly Premiums for Second-Lowest Cost Silver Plan and Lowest Cost Plan
    for States Using the HealthCare.gov Platform*,
    *2016-2019*, CMS, https://perma.cc/M3UN-VBZ9 ...........................................................13

Aviva Aron-Dine & Matt Broaddus, *Improving ACA Subsidies for Low- and Moderate-
    Income Consumers Is Key to Increasing Coverage*, Center on Budget & Policy
    Priorities (Mar. 21, 2019), https://perma.cc/HV4F-FDTL .............................................27

*DC – Justice in Aging*, Regulations.gov,
    https://www.regulations.gov/document?D=CMS-2017-0141-0299 ...................................39

*DC – Leukemia & Lymphoma*, Regulations.gov,
    https://www.regulations.gov/document?D=CMS-2017-0141-0139 ...................................39

*DC – Public Health Education*, Regulations.gov,
    https://www.regulations.gov/document?D=CMS-2017-0141-0136 ...................................39

*Erasing the Affordable Care Act: Using Government Web Censorship to Undermine the Law*, Web Integrity Project (May 2019), http://sunlightfoundation.com/wp-content/uploads/2019/05/Erasing-the-ACA-Using-Web-Censorship.pdf ..............................56

Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 Yale L.J. 1836 (2015) ...............67

*Health Insurance Coverage: Early Release of Estimates from the National Health Interview Survey, 2018*, National Center for Health Statistics (May 2019), https://www.cdc.gov/nchs/data/nhis/earlyrelease/insur201905.pdf.........................................15

*Health Insurance Coverage for People Under Age 65: Definitions and Estimates for 2015 to 2018*, CBO (Apr. 2019), https://www.cbo.gov/system/files/2019-04/55094-CoverageUnder65_0.pdf.........................................................................................................15

*Health Insurance Coverage of the Total Population*, Kaiser Family Foundation (2017), https://www.kff.org/other/state-indicator/total-population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D ...............................................................................26

Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa. L. Rev. 1835 (2016)..................................................................................................................51

Joseph Story, *A Familiar Exposition of the Constitution of the United States* (1840) .................53

Josh Blackman, *United States v. Texas (Scalia, J., Concurring)*, 2016 Cato Sup. Ct. Rev. 79 (2015-16) .......................................................................................................52

Karen Pollitz & Gary Claxton, *Proposals for Insurance Options that Don't Comply with ACA Rules: Trade-offs in Cost and Regulation*, Kaiser Family Foundation (Apr. 18, 2018), https://www.kff.org/health-reform/issue-brief/proposals-for-insurance-options-that-dont-comply-with-aca-rules-trade-offs-in-cost-and-regulation/ .............................................................................................................27

Linda J. Blumberg et al., *State-by-State Estimates of the Coverage and Funding Consequences of Full Repeal of the ACA*, Urban Institute (Mar. 2019), https://www.urban.org/sites/default/files/publication/100000/repeal_of_the_aca_by_state.pdf.........................................................................................................16

Mark Hall & Caitlin Brandt, *Neatwork Adequacy Under the Trump Administration*, Health Affairs Blog (Sept. 24, 2017), https://perma.cc/E7LR-3NRU ....................................35

Patricia L. Bellia, *Faithful Execution and Enforcement Discretion*, 164 U. Pa. L. Rev. 1753 (2016)..................................................................................................................67

Press Release, Virginia Governor Ralph S. Northam, *Governor Northam Statement on Anticipated Double-Digit Health Insurance Rate Increases* (May 10, 2018), https://www.governor.virginia.gov/newsroom/all-releases/2018/may/headline-825487-en.html .........................................................................................................20

Rachel Fehr et al., *How Affordable Are 2019 ACA Premiums for Middle-Income People?*, Kaiser Family Foundation (Mar. 5, 2019), https://www.kff.org/health-reform/issue-brief/how-affordable-are-2019-aca-premiums-for-middle-income-people/ ...............................................................................................................16

Robert J. Delahunty & John C. Yoo, *Immigration Laws, the Dream Act, and the Take Care Clause,* 91 Tex. L. Rev. 781 (2013) .........................................................51, 52

Samuel Johnson, *A Dictionary of the English Language* (1755) .....................................52

*Trends in Subsidized and Unsubsidized Individual Health Insurance Enrollment*, CMS (July 2, 2018), https://perma.cc/D3TW-W86P ........................................................27

**INTRODUCTION**

When the Executive Branch endeavors to undermine a duly passed law, it violates the Administrative Procedure Act and the Constitution's separation of powers. And when plaintiffs who are injured by the Executive's actions challenge their legality, courts consider whether those actions are well-reasoned and faithful to Congress's design. This case fits squarely within these well-established principles. The Court should deny Defendants' motion to dismiss.

Plaintiffs' Amended Complaint describes, in detail, a relentless campaign by Defendants—the President and his officers and agencies charged with implementing the Affordable Care Act—to make the Act fail. Congress crafted the Act to support, and be supported by, strong enrollment in quality health insurance plans; Defendants have acted to make such plans less attractive, less accessible, and more expensive, and to drive healthy people in particular away from them. Congress built mechanisms into the law to help families shop and sign up for such plans; Defendants have undermined them. Congress conceived of safeguards to keep premiums and costs down; Defendants have eschewed them. Congress designed the Act's reforms understanding that insurers seek stability; Defendants have sown uncertainty at every turn. This is not reasoned administration or faithful execution.

Throughout, Defendants have been remarkably transparent about their aims. "If we don't get it done" in Congress, the President has said, "we are going to watch Obamacare go down the tubes, and we'll blame the Democrats . . . [a]nd at some point, they are going to come and say, 'You've got to help us.'"[1] "[W]e are getting rid of Obamacare," the President has boasted, "essentially, we have gotten rid of it," "[i]t's dead[,] [i]t's essentially dead," "there is no Obamacare, it's dead." AC ¶ 3. In the face of these words and actions, Defendants cannot claim that they are taking care to ensure that the Affordable Care Act is faithfully executed, as the Constitution's Take Care Clause requires and the Administrative Procedure Act guarantees.

---

[1] *See* Am. Compl. for Decl. & Inj. Relief ("AC") ¶ 3 (Jan. 25, 2019), ECF No. 44.

Nor do they. Instead, in their motion to dismiss, Defendants ask this Court to discard Plaintiffs' well-pleaded factual allegations, pre-judge Plaintiffs' claims on the merits, and ignore decades of cases enforcing the Constitution's separation of powers. Defendants' arguments fail.

As to standing, the Amended Complaint plausibly alleges—at a minimum—that Defendants' actions have made insurance harder to procure and more expensive. For individuals, that means they must pay increased premiums to obtain the quality coverage that the Affordable Care Act (ACA) guarantees; for cities, it means more uninsured individuals, which strain their uncompensated care programs. That is quintessential injury-in-fact. Defendants respond by trying to shift the blame, asserting that the independent decisions of insurers and consumers, rather than their own actions, are responsible for those costs. Not so. The Amended Complaint's detailed factual allegations include independent, objective analyses of health insurance markets, insurers' own statements, and statistics concerning premiums and uninsured rates, all of which tie Defendants' actions to insurers' decisions to raise rates and consumers' decisions to go without insurance. That is more than sufficient to plead a "plausible" connection between Defendants' actions and Plaintiffs' harms. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs have also stated claims on which relief can be granted. Plaintiffs' claim under the Administrative Procedure Act addresses a regulation issued by Defendant the Centers for Medicare and Medicaid Services (CMS) that governs health insurance markets starting in the 2019 plan year. The Amended Complaint explains how many provisions of that rule cannot be squared with the Affordable Care Act or supported by the rationales CMS put forward. In some cases, the rule's provisions make a hash of the ACA's text and purpose, ignoring mandates the ACA imposes and imposing restrictions on consumers that the ACA does not. In all cases, CMS's decisions were arbitrary and capricious, failing to articulate an adequate justification for the agency's actions, overlooking essential aspects of its task, making choices without citing supporting evidence, and ignoring well-reasoned comments from patients, providers, and others harmed by Defendants' actions. *See Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 43 (1983). Defendants urge deference to the agency's purportedly reasonable decisions, but any level of analysis reveals that the agency's choices were anything but.

Finally, as to the Take Care Clause, the Amended Complaint details how Defendants have matched word with deed, carrying out a systematic effort to sabotage the ACA. Under the Constitution, the Executive Branch must "take care that the law[] be faithfully executed." U.S. Const., art. II, § 3. That duty is fundamental to the Constitution's separation of powers, requiring that the Executive implement the law rather than undermine it. Instead of explaining how their actions fulfill that duty, Defendants instead invoke a number of procedural bars aimed at convincing the Court that it cannot review their actions at all. None apply: Plaintiffs ask the Court to enforce the separation of powers as the Constitution requires, a task courts have long performed; the President is an appropriate defendant in this action, particularly at this early stage of the litigation; and the Take Care Clause applies to the entirety of the Executive Branch, binding the President as well as the subordinates charged with executing his decisions.

For these reasons and those explained below, Defendants' arguments should be rejected and their motion to dismiss denied.

## BACKGROUND

In 2010, Congress passed, and the President signed, the Patient Protection and Affordable Care Act.[2] The Act "grew out of a long history of failed health insurance reform," *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015), that consistently struggled to address rising premiums, inadequate coverage, and high uninsured rates, *see* AC ¶¶ 32-33. While the ACA's reach extends to almost all facets of the provision of health care across the country, a central purpose of the Act—encompassing many of the actions at issue here—is "to expand coverage in the individual health insurance market." *King*, 135 S. Ct. at 2485. That market comprises plans that individuals purchase themselves, rather than plans obtained from their employers (employer-sponsored group health plans) or from the government (Medicare and Medicaid).

---

[2]   Pub. L. No. 111-148, 124 Stat. 119 (2010), *as amended*, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

To enable consumers to compare and purchase individual plans, the ACA "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *Id.* at 2487 (quoting 42 U.S.C. § 18031(b)(1)).[3] These exchanges, also known as health insurance marketplaces, enable people not eligible for Medicare or Medicaid to obtain quality insurance independent of their jobs—plans known as qualified health plans (QHPs) under the Act. 42 U.S.C. § 18031(b)(1); *see id.* § 18021(a). Individuals primarily enroll in qualified health plans on an exchange during a specified annual open enrollment period. *Id.* § 18031(c)(6). To assist them, the ACA requires exchanges to award grants to healthcare "Navigators" that conduct public education and awareness campaigns, help consumers understand their choices, facilitate their enrollment, and ensure their access to consumer protections. *Id.* §§ 18031(i)(1), (3).

All individual market health plans must meet certain requirements that guarantee quality coverage. Crucially, the plans cannot discriminate on the basis of health status or health history: they must cover pre-existing conditions, including by not excluding services, denying coverage, or charging more. *Id.* §§ 300gg, 300gg-1(a), 300gg-4. They must cover "essential health benefits," *id.* § 300gg-6(a), including hospitalization, prescription drugs, maternity and newborn care, and preventive, pediatric, emergency, ambulatory, mental health, and substance use disorder services, *see id.* § 18022(b)(1). And to protect patients against devastating costs when a medical condition exhausts their coverage, the ACA limits so-called "cost-sharing"—for example, deductibles and copayments—for essential health benefits, and prohibits plans from imposing annual or lifetime limits on such coverage. *See id.* §§ 300gg-6(b), 18022(a)(2), (c).

The ACA also "seeks to make insurance more affordable by giving refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line." *King*, 135 S. Ct. at 2487 (citing 26 U.S.C. § 36B; 42 U.S.C. §§ 18081, 18082). Financial assistance comes through income-related, premium-based tax credits—known as

---

[3]   An exchange may be established by the state in which it operates (state-based exchanges or SBEs, like in Maryland) or, in states that elect not to establish exchanges, by the federal government (federally-facilitated exchanges or FFEs, like in Ohio and Pennsylvania), or a combination of the two (a so-called "hybrid" exchange, like in Illinois). *See* AC ¶ 38.

advance premium tax credits (APTCs)—for qualified individuals, which are set based on the premium for the so-called "benchmark silver plan," or the second-lowest cost silver plan offered within a market. *See* AC ¶¶ 33(c), 35. The Act also requires health insurance issuers to reduce certain individuals' cost-sharing expenditures and directs the Department of Health and Human Services (HHS) to reimburse issuers for such cost-sharing reductions (CSRs). 42 U.S.C. § 18071.

In addition, as enacted, the ACA required individuals to maintain health insurance coverage or make a shared responsibility payment to the Internal Revenue Service. 26 U.S.C. § 5000A. As a result of a law passed in 2017, starting after December 31, 2018, the shared responsibility payment was reduced to $0. Budget Fiscal Year, 2018, Pub. L. No. 115-97, § 11081, 131 Stat. 2054, 2092 (2017) (codified as amended at 26 U.S.C. §§ 5000A, 5000A note). Although it was initially believed that the shared responsibility payment was essential for creating stable health insurance markets, experience from the ACA's implementation has indicated that the elimination of the payment will increase premiums for unsubsidized enrollees by 10 percent for 2019 but will not destabilize markets. *See* AC ¶ 34.

In sum, the ACA requires that issuers generally offer only quality health insurance, and aims to lower the cost of coverage in an effort to encourage individuals to enroll. Such coverage has been found to improve access to care and overall health, and to reduce financial burdens on consumers as well as institutions that pay for uncompensated care. But increasing enrollment in quality health insurance coverage is not only the ACA's immediate goal; it is also key to the Act's long-term success. Insurance market stability requires robust enrollment, particularly by relatively healthy individuals. *See id.* ¶ 39. Limiting the cost of health insurance is, in turn, essential to promoting enrollment. Indeed, the government has found that cost is the top reason cited by individuals ending their coverage. *Id.* ¶ 40. By driving costs down and insured rates up, the ACA ensures that insurance markets function smoothly.

When faithfully implemented, the ACA's reforms successfully met Congress's goal of enabling more individuals—specifically, 20 million more individuals—to enroll in health insurance coverage. Indeed, the number of uninsured nonelderly Americans decreased from 44

million in 2013 (the year before the ACA's major coverage provisions went into effect) to around 28 million by the end of 2016. *Id.* ¶ 41. Experts have found that the exchanges' policies are a major contributor to these coverage gains. *Id.* ¶ 42. Indeed, if faithfully implemented, experts estimated that the ACA would have continued to expand coverage and slow premium growth through 2017 and beyond. *Id.* ¶ 43.

The ACA, however, is no longer being faithfully implemented. To the contrary, Defendants have undertaken a concerted campaign to undermine the law. They have eliminated protections that the ACA guarantees by making it more difficult for individuals to maintain access to subsidies, eliminating federal review of whether plans have adequate provider networks, and reducing oversight of insurance brokers. *Id.* ¶¶ 51-68. Defendants have deterred enrollment by making it harder for individuals and families to compare insurance plans, undermining the ACA's Navigator program, making small business exchanges less user-friendly, and imposing unnecessary income verification requirements. *Id.* ¶¶ 69-86. They have driven up costs by curtailing their review of insurance rate increases and limiting the rebates consumers receive when insurers perform poorly. *Id.* ¶¶ 87-98. The President has directed his agencies to pursue these ends, *id.* ¶¶ 100-03, and to promote bare-bones plans that weaken ACA exchanges, *id.* ¶¶ 109-15. Defendants have created uncertainty by equivocating regarding reimbursements for cost-sharing reductions, underenforcing the Act's individual mandate, and attempting to weaken public confidence in ACA exchanges. *Id.* ¶¶ 104-08, 116-22, 129-32. They have exploited the Act's provision permitting states to seek waivers of some of its requirements, refusing to grant waiver requests that would further the ACA's goals while encouraging requests that undermine them. *Id.* ¶¶ 123-28. They have taken actions to decrease enrollment, shortening the window during which sign-ups are permitted, cutting funding for advertising, cutting funding for Navigators, failing to set enrollment targets, refusing to participate in enrollment events, and arbitrarily driving up premiums. *Id.* ¶¶ 133-76. Defendants have even gone so far as to back a court case that seeks the Act's wholesale invalidation. *Id.* ¶¶ 177-80.

Plaintiffs are paying the price for Defendants' actions and have brought suit to stop them. Plaintiffs are the cities of Columbus, Ohio, Baltimore, Maryland, Cincinnati, Ohio, Chicago, Illinois, and Philadelphia, Pennsylvania, which collectively represent over six million residents (the "City Plaintiffs"), and Steve Vondra and Bonnie Morgan, two individuals living in Charlottesville, Virginia, who purchase insurance on the individual market (the "Individual Plaintiffs"). As explained in detail below, Defendants' actions are making health insurance more expensive and harder to purchase, increasing the rate of the uninsured and the underinsured. *Id.* ¶¶ 182-96. Defendants' actions are thereby increasing the costs the City Plaintiffs must pay to fund their uncompensated care programs, including free and reduced-fee health clinics and ambulance services. *Id.* ¶¶ 197-264. Defendants' actions are also increasing the premiums the Individual Plaintiffs must pay to purchase health insurance coverage. *Id.* ¶¶ 265-78.

Plaintiffs assert two claims. *First*, under the Administrative Procedure Act (APA), 5 U.S.C. § 706, Plaintiffs challenge certain provisions of a regulation issued by CMS: the *Notice of Benefit and Payment Parameters for 2019*, 83 Fed. Reg. 16,930 (Apr. 17, 2018). Called the "2019 Rule" because, as of the 2019 plan year, it has governed many aspects of ACA insurance markets, the Rule implements a number of changes that increase the cost of health coverage and impose other barriers to enrollment. These changes are arbitrary and capricious and contrary to law under the APA. *See* AC ¶¶ 50-98, 279-82. *Second*, Plaintiffs assert a claim under the Constitution's Take Care Clause, detailing the many ways in which Defendants have violated the separation of powers by failing to "take care that the [Affordable Care Act] be faithfully executed." U.S. Const. art. II, § 3. These include not only the 2019 Rule's unlawful provisions but, more fundamentally, a slew of additional actions intentionally undertaken by Defendants to make the ACA fail. *See* AC ¶¶ 99-180, 283-85.

Defendants have now moved to dismiss, arguing that Plaintiffs lack standing under Federal Rule of Civil Procedure 12(b)(1), and that they fail to state a claim under Rule 12(b)(6).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must "accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). "Indeed, a court cannot favor its perception of the relevant events over the narrative offered by the complaint, thereby recasting plausibility into probability." *Id.* (quotation omitted). Rather, "under the highly deferential Rule 12(b)(6) standard," a "court must . . . find for the plaintiff 'if relief could be granted under any set of facts that could be proved consistent with the allegations.'" *IRAP v. Trump*, No. 17-cv-0361, 2019 WL 1981884, at *18 (D. Md. May 2, 2019) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008)).

Although Defendants' jurisdictional arguments arise under Rule 12(b)(1), the court must "accept the facts of the complaint as true as [it] would in context of a Rule 12(b)(6) challenge because defendants' motions to dismiss are facial challenges to standing that do not dispute the jurisdictional facts alleged in the complaint." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018). "'General factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim.'" *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 89-90 (4th Cir. 2013) (alterations omitted) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992)).

## ARGUMENT

### I.    This Court Has Jurisdiction Over Plaintiffs' Claims

As the Amended Complaint alleges, Defendants' actions have made individual health insurance plans more expensive and harder to access, according to independent studies and analyses, issuers' own statements, and available statistics. Defendants' actions thereby harm the Individual Plaintiffs by forcing them to pay higher premiums than they otherwise would for insurance coverage on the individual market. Similarly, Defendants' actions have driven up

uninsured rates, thereby imposing additional costs on the City Plaintiffs' uncompensated care programs. Plaintiffs therefore have Article III standing and their claims are ripe.

A.     **Plaintiffs Have Plausibly Alleged that They Have Standing to Sue**

"To meet the constitutional minimum requirements for standing to sue, a 'plaintiff must have . . . suffered an injury in fact, . . . that is fairly traceable to the challenged conduct of the defendant, and . . . that is likely to be redressed by a favorable judicial decision.'" *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240 (4th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Plaintiffs' burden is not demanding: "plaintiffs are required only to state a *plausible* claim that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (quotation omitted). "The bar of standing must not be set too high, lest many regulatory actions escape review contrary to the intent of Congress." *Doe v. Obama*, 631 F.3d 157, 163 (4th Cir. 2011); *see also District of Columbia v. Trump*, 291 F. Supp. 3d 725, 738 (D. Md. 2018) ("Injury-in-fact is not Mount Everest." (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.))), *appeal pending*, No. 18-2488 (4th Cir. argued Mar. 19, 2019).[4]

That bar is easily met here. Indeed, Defendants largely do not dispute that the financial costs described in the Amended Complaint—increased premiums for the Individual Plaintiffs, and budgetary outlays for the City Plaintiffs—constitute injury-in-fact. Instead, Defendants focus on causation, arguing that the decisions of issuers (who set rates) and consumers (who purchase insurance), not their own actions, are responsible for those harms. Mot. at 12-13, 16-18. Defendants' arguments rely on several overarching errors of law.

---

[4]    Although Defendants note that "the court may consider evidence outside of the pleadings" in deciding a motion under Rule 12(b)(1), they do not specify what evidence they wish the Court to consider. Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Mot.") at 11 (Mar. 8, 2019), ECF No. 52-1. To the extent they mean to reference the Wu Declaration, it does not dispute any of the allegations in the Amended Complaint. *See* Second Decl. of Jeff Wu in Supp. of Defs.' Mot. to Dismiss Am. Compl. ("Wu Declaration") (Mar. 8, 2019), ECF No. 52-2.

To start, "[i]t is impossible to maintain, of course, that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons." *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.). Thus, "[w]hile the defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was caused by the defendant, as opposed to the 'independent action of some third party not before the court.'" *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Frank Krasner Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234 (4th Cir. 2005)). "[W]hat matters is not the 'length of the chain of causation,' but rather the 'plausibility of the links that comprise the chain.'" *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) (quoting *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C. Cir. 1984)). Ultimately, the question is whether the plaintiff's injury "can be fairly traced through the third party's intervening action back to [the defendant]," *District of Columbia*, 291 F. Supp. 3d at 749, through means like "statistical analysis, common sense, or record evidence," *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 576 (S.D.N.Y. 2019).

Defendants repeatedly stress that there are a "wide range of factors" that affect the decisions of issuers and consumers. *See, e.g.*, Mot. at 13, 15, 17-18. But it is black-letter law that "standing does not require the challenged action to be the sole or even immediate cause of the injury," *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018), nor "that a particular defendant is the only cause of [the plaintiff's] injury," *Nat. Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 (4th Cir. 1992). "Thus, causation may be established even when there are multiple contributory or independent causes of injury." *Stinnie v. Holcomb*, 734 F. App'x 858, 871 (4th Cir. 2018). Indeed, in *Massachusetts v. EPA*, the Supreme Court rejected the EPA's argument that "its decision not to regulate greenhouse gas emissions from new motor vehicles contributes so insignificantly to petitioners' injuries that the Agency cannot be haled into federal court," explaining that EPA's argument "rests on the erroneous assumption that a small incremental step . . . can never be attacked in a federal judicial forum." 549 U.S. 497, 523-24 (2007). Ultimately, a plaintiff need only prove that "the agency action is at least a substantial

factor motivating the third parties' actions." *Tozzi v. HHS*, 271 F.3d 301, 308 (D.C. Cir. 2001) (quotation omitted). The Amended Complaint plausibly alleges exactly that.

Here, Plaintiffs begin by describing how Defendants' actions have undermined the Affordable Care Act, driving up premiums and uninsured rates nationwide. Plaintiffs then detail how the Individual Plaintiffs are harmed by Defendants' actions, which have increased the price they must pay for their health insurance, and how the City Plaintiffs are harmed by Defendants' actions, which have increased the share of their budget they must devote to providing uncompensated care to their uninsured residents.

### 1.   *Defendants' actions have undermined the Affordable Care Act*

The facts alleged in the Amended Complaint paint a distressingly clear picture—one in which Defendants have engaged in a systematic campaign to undermine the ACA, resulting in insurance that costs more, covers less, and is harder to buy. As noted above, Defendants spill considerable ink disputing whether their actions have caused these harms, *see, e.g.*, Mot. at 12-13, 16-17, 19-22, and whether rises in premiums and uninsured rates can even be traced to one factor or another, *see, e.g.*, *id.* at 13, 15-16, 18, 21-22. But they have very little to say about the Amended Complaint's factual allegations themselves. Those allegations detail, in page upon page of independent studies and analyses, statements from issuers, and statistics, how Defendants' actions have harmed health insurance markets. Because Defendants devote so little attention to these allegations, Plaintiffs summarize them in detail.

a.   First, Defendants' actions have driven premiums up nationwide. Defendants' actions contributed to stark premium increases from 2017 to 2018—increases of roughly 37 percent, according to estimates by the Congressional Budget Office (CBO). AC ¶ 184. In particular, Defendants' efforts to sow uncertainty concerning cost-sharing reduction payments, expand access to non-ACA compliant plans, weaken the individual mandate, and hamper enrollment encouraged healthy individuals to leave the ACA's insurance markets and drove up costs for issuers. The Court need not take Plaintiffs' word for it: these were the conclusions of the Kaiser Family Foundation, the USC-Brookings Schaeffer Initiative for Health Policy, and the

CBO, among others. *Id.* ¶¶ 183-84, 188 & nn.219-21. Courts have long held that similar expert analyses can confirm standing. *See, e.g.*, *Osborn v. Visa Inc.*, 797 F.3d 1057, 1065 (D.C. Cir. 2015); *Adams v. Watson*, 10 F.3d 915, 923-24 (1st Cir. 1993).

Moreover, issuers themselves cited Defendants' actions in explaining why they chose to raise premiums or exit markets from 2017-2019. Many issuers sharply raised premiums given "the Trump Administration's erratic management of the [ACA] and its conflicting signals about the fate of aid for low-income consumers and other key issues." AC ¶ 184 & n.222; *see also id.* ¶ 186 & n.230. Others decided to leave markets entirely; the average number of insurers per state fell from 5.6 in 2016 to 4.3 in 2017 and 3.5 in 2018, decreasing price competition in markets across the country. *Id.* ¶ 187. A nationwide analysis conducted by the Kaiser Family Foundation found that issuers' exit decisions were the result of the "legislative and regulatory uncertainty" produced by Defendants. *Id.* ¶ 187 & n.233. As the CEO of CareFirst Blue Cross Blue Shield put it, the "[c]ontinuing actions on the part of the [A]dministration to systematically undermine the market . . . make it almost impossible to carry out the mission." *Id.* ¶ 187 & n.234.

Defendants' efforts to undermine open enrollment also drove, and continue to drive, premiums up. Data shows that Defendants' cuts to advertising and outreach left many unaware of the process for enrolling in ACA-compliant individual market coverage. *Id.* ¶ 188. And Defendants' cuts to Navigator funding forced Navigators to "focus[] their limited budgets on re-enrolling existing clients rather than trying to reach new customers." *Id.* These actions worked to "siphon off healthy enrollees, damaging the [ACA] 'risk pool,' so that its customers tend to be sicker and more expensive to carriers," and thereby leading issuers to charge higher premiums for customers who remain. *Id.* Thus, Defendants' actions both decreased insured rates among healthy customers and drove prices up for the relatively less healthy customers who remained.

These factual allegations place Defendants' misleading assertions that 2019 premiums have "stabilized" and "seen dramatic decreases" in a clearer light. *See* Mot. at 12-13, 22. In fact, premiums fell nationwide by a negligible 0.3 to 2 percent in 2019, AC ¶ 185, and then only after having increased by nearly 40 percent since 2017. Premiums for some plans and categories of

consumers actually *increased* in the states of each of the City Plaintiffs.[5] But more to the point, the decreases Defendants cite do not come close to canceling out the staggering increases in premiums from 2017 to 2018—increases that are directly attributable to Defendants' actions. As the Amended Complaint alleges, with no response from Defendants, the Kaiser Family Foundation, the Center on Budget & Policy Priorities, and Brookings have all concluded that the slight decreases in 2019 cited repeatedly by Defendants represent an adjustment after insurers "over-corrected," "overshot," "set . . . premiums too high," or acted "a year early" based on their assessment of Defendants' actions. *Id.* ¶ 189 & nn.239-40. In other words, Defendants' attempts to undermine the ACA continue to force issuers to keep premiums higher than they otherwise would, and premiums would have dropped further still if not for Defendants' actions.

Indeed, health economists and policy analysts have even identified *how much* Defendants' actions, among others not at issue here, caused premiums to rise from 2017 to 2019. Brookings found that in a stable environment where the mandate remained enforceable, rules regarding non-ACA compliant plans remained the same, Defendants refrained from skewing issuers' risk pools, and other fees remained the same, premiums would have gone down by 4.3 percent in 2019. *Id.* ¶ 185 & n.225. Similarly, the Kaiser Family Foundation found that the mandate repeal and expansion of non-ACA compliant plans "[c]reat[ed] parallel insurance markets," which left "the ACA-regulated market with a sicker pool" and premiums about 6 percent higher than they would otherwise be. *Id.* ¶ 186 & nn.228-29. An independent analyst and the Center for American Progress have pegged the average increase in premiums in 2019 at $580 and $970, respectively. *Id.* ¶ 185 & nn.226-27.

---

[5]   *See* AC ¶¶ 220, 230, 251, 263. The CMS website referenced in the Wu Declaration (¶¶ 13-14) corroborates this point, although it addresses only some of the states at issue, two categories of insurance plans, and one class of consumer. Specifically, that website shows that the cost of the second lowest-cost silver plan went up in Ohio, and the cost of the lowest cost silver plan went up in both Ohio and Illinois. *Average Monthly Premiums for Second-Lowest Cost Silver Plan and Lowest Cost Plan for States Using the HealthCare.gov Platform, 2016-2019*, CMS, https://perma.cc/M3UN-VBZ9.

These analyses—and the others discussed at length in the Amended Complaint, and yet ignored by Defendants in their motion—plausibly trace Defendants' actions to increases in the cost of health insurance. And, of course, *plausibly* is key at this stage of the litigation, when the question before the Court is only whether Plaintiffs' allegations of causation cross the line from possible to plausible. *Iqbal*, 556 U.S. at 677-78.

b.      By increasing premiums, and also by making it more difficult to enroll in affordable, ACA-compliant health coverage, Defendants' actions are driving up the rates of uninsured and underinsured individuals nationwide. Census data shows that in 2017 the uninsured rate stayed the same, rather than falling significantly, for the first time in the four years since the implementation of the ACA. AC ¶ 190. That progress stalled in part because of a 3.9 percent decline in ACA marketplace enrollment in 2017—one that the Center on Budget and Policy Priorities blames on Defendants' "sabotage efforts," which "likely prevented additional coverage gains by creating barriers to obtaining available and affordable coverage." *Id.*

Moreover, in 2018, Defendants' actions caused uninsured rates to rise, reversing the ACA's progress. Gallup found that the uninsured rate in 2018 rose from 12.2 to 13.7 percent because of Defendants' actions, including "an increase in the rates of insurance premiums"; policy decisions like "a significant reduction in public marketing and shortened enrollment periods" and reduced "[f]unding for ACA navigators"; "political forces that may have increased uncertainty surrounding the ACA marketplace," like the President's decrees of the ACA's purported death; and the termination of cost-sharing reduction payments. *Id.* ¶ 191. The Commonwealth Fund found that the uninsured rate among working-age people rose from 12.7 percent in April 2016 to 15.5 percent in March 2018, an increase that it also attributed to Defendants' "deep cuts in advertising and outreach . . . , a shorter open enrollment period, and other actions that collectively may have left people with a general sense of confusion about the status of the law." *Id.* ¶ 192. And CBO found that the number of uninsured Americans rose from 27 million in 2016 to 29 million in 2018, and projected a further 3 million increase in 2019 because of higher premiums. *Id.* ¶ 193.

14

Indeed, Defendants' actions will likely drive the uninsured rate even higher in 2019. The Amended Complaint alleges that Defendants hampered 2019 enrollment by slashing advertising and outreach, shortening the open enrollment period, and promoting non-ACA compliant plans. *Id.* ¶ 195; *see also id.* ¶¶ 133-72 (describing these actions). As a result, 2019 open enrollment decreased by 4.2 percent, while open enrollment among new and low-income enrollees, who are typically more sensitive to changes to the open enrollment process and outreach, fell by 18.7 percent. *Id.* ¶ 194. These results of Defendants' attempts to sabotage enrollment are all the more concerning if one credits Defendants' misleading and incorrect assertions that premiums have "stabilized," Mot. at 12, because lower premiums would otherwise mean increased enrollment.

Defendants' actions have also driven up uninsured rates in each of the City Plaintiffs' jurisdictions, contrary to Defendants' assertions that the City Plaintiffs have not seen "an exodus of current enrollees large enough to burden" them. Mot. at 20. In 2019, open enrollment on the federally-facilitated exchanges fell by 11.1 percent in Ohio, AC ¶ 221; by 6.8 percent in Illinois, *id.* ¶ 252; and by 6 percent in Pennsylvania, *id.* ¶ 264. Maryland has seen similar decreases: enrollees on the state-based exchange dropped by 13 percent in 2018. *Id.* ¶ 231. And across the board, the Urban Institute estimated even sharper decreases over the course of 2019, ranging from 20 to 45 percent, depending on the state. *Id.* ¶¶ 221, 231, 252, 264. These allegations are more than sufficient to meet Plaintiffs' pleading burden.[6]

---

[6]   Since Plaintiffs filed the Amended Complaint, additional studies have concluded that Defendants' actions are responsible for rising premiums and uninsured rates. Specifically, CBO has estimated that the rate of the uninsured rose by 1.1 million from 2017 to 2018, with most of the coverage losses involving nongroup coverage. *Health Insurance Coverage for People Under Age 65: Definitions and Estimates for 2015 to 2018* at 7 tbl. 1, CBO (Apr. 2019), https://www.cbo.gov/system/files/2019-04/55094-CoverageUnder65_0.pdf. Similarly, the Centers for Disease Control and Prevention found that the uninsured rate among adults aged 45-64 rose from 9.3 percent in 2017 to 10.3 percent in 2018, and among all persons from 9.1 to 9.4 percent. *Health Insurance Coverage: Early Release of Estimates from the National Health Interview Survey, 2018* at 1-2, Nat'l Ctr. for Health Stats. (May 2019), https://www.cdc.gov/nchs/data/nhis/earlyrelease/insur201905.pdf. Marketplace enrollment numbers also show that the steepest drops in coverage have been among lower-income enrollees dependent on advertising and assistance. Andrew Sprung, *CSR Takeup Bends Slightly Under*

c.      In addition to relying on expert studies and detailed figures, the Amended

Complaint also ties each and every one of the challenged provisions of the 2019 Rule to

increased costs, inaccessibility of quality coverage, and rises in the uninsured and underinsured

rates. Specifically, Plaintiffs explain, with respect to the 2019 Rule, that:

- eliminating the direct notification requirement causes individuals to lose their premium tax credits and drop insurance coverage, AC ¶ 56;

- outsourcing plan review to states allows restrictive networks to flourish, meaning that more individuals purchase inadequate insurance, *id.* ¶ 63;

- scaling back oversight of agents, brokers, and issuers makes it harder for consumers to receive accurate information and enroll in the right plan, *id.* ¶ 68;

- eliminating support for standardized options limits price competition, thereby raising premiums, cost-sharing payments, and deductibles, *id.* ¶ 74;

- decreased access to impartial, in-person Navigators deprives individuals of the assistance they need to enroll, *id.* ¶ 79;

- making exchanges for small businesses less functional impedes employers from enrolling their employees and inhibits price competition among issuers, *id.* ¶ 82;

- requiring enrollees to verify their income will deter enrollment, particularly among healthy individuals, which will thereby increase premiums, *id.* ¶¶ 85-86;

- scaling back rate review will make it easier for insurers to raise premiums, causing more individuals to forgo insurance, *id.* ¶ 93; and

---

*Silver Load for Second Straight Year*, XpostFactoid (Apr. 8, 2019), https://xpostfactoid.blogspot.com/2019/04/csr-takeup-bends-slightly-under-silver.html. Both CBO and the Kaiser Family Foundation found that Defendants' attempts to promote short-term and association health plans will cause millions of consumers to shun comprehensive, ACA-compliant coverage, driving up premiums for those who remain. *How CBO and JCT Analyzed Coverage Effects of New Rules for Association Health Plans and Short-Term Plans*, CBO (Jan. 31, 2019), https://www.cbo.gov/publication/54915; Rachel Fehr et al., *How Affordable Are 2019 ACA Premiums for Middle-Income People?*, Kaiser Family Found. (Mar. 5, 2019), https://www.kff.org/health-reform/issue-brief/how-affordable-are-2019-aca-premiums-for-middle-income-people/. Finally, the Urban Institute found that marketplace enrollment fell in 2019 in each of the City Plaintiffs' states except for Maryland. Linda J. Blumberg et al., *State-by-State Estimates of the Coverage and Funding Consequences of Full Repeal of the ACA* 21 tbl. 9, Urban Inst. (Mar. 2019), https://www.urban.org/sites/default/files/publication/100000/repeal_of_the_aca_by_state.pdf. If the Court deems it necessary, Plaintiffs would promptly seek leave to amend their pleadings again to include these studies and others.

- allowing issuers to claim a set figure for quality improvement activities will make it easier to avoid paying rebates, increasing the cost of health care without increasing quality, *id.* ¶ 98.

Similarly, Plaintiffs' Take Care claim alleges that Defendants have engaged in a campaign to undermine the ACA comprising many discrete actions that, both individually and in combination, make ACA-compliant health insurance more expensive, less effective, and less accessible. Specifically, the Amended Complaint alleges that:

- Executive Order No. 13,765 discouraged, and continues to discourage, individuals from enrolling in health insurance, distorting risk pools, *id.* ¶¶ 102-03;

- sowing uncertainty with regard to cost-sharing reduction payments caused premiums to increase, *id.* ¶¶ 105-08;

- promoting and expanding access to non-ACA compliant plans causes individuals, particularly healthy individuals, to leave the marketplace, driving up premiums for those that remain, *id.* ¶¶ 110-11, 115;

- threatening to not enforce the individual mandate and expanding exemptions similarly caused individuals, particularly healthy individuals, to leave the marketplace, driving up premiums for those that remained, *id.* ¶¶ 120-22;

- refusing to grant state waiver requests designed to expand coverage and stabilize markets results in fewer individuals obtaining insurance and weakens those markets, driving up premiums, *id.* ¶ 126, and enabling states to seek waivers designed to undermine the ACA has the same effects, *id.* ¶ 128;

- weakening public confidence in the ACA and its exchanges discourages individuals from enrolling in ACA-compliant insurance and further destabilizes marketplaces, increasing premiums, *id.* ¶ 132;

- shortening open enrollment, cutting advertising and Navigator funding, failing to set enrollment targets, and refusing to participate in enrollment events and outreach discourages individuals from enrolling in ACA-compliant insurance and destabilizes markets, increasing premiums, *id.* ¶¶ 142, 154, 167, 170, 172;

- arbitrarily increasing costs for the 2020 benefit year will raise premiums, discouraging individuals from obtaining ACA-compliant coverage, *id.* ¶¶ 175-76; and

- refusing to defend the ACA in court sows uncertainty about its continued validity, further destabilizing insurance markets, *id.* ¶ 179.

Once again, Defendants address few of these detailed factual allegations, which establish

a causal link between each of Defendants' actions and Plaintiffs' harms.[7]

Plaintiffs are prepared to prove how Defendants' actions have harmed American's health

insurance. But at this stage, Plaintiffs need only allege a plausible connection between

Defendants' actions and those effects. They have done so.

2. *The Individual Plaintiffs have standing*

Against this backdrop, the Individual Plaintiffs, Steve Vondra and Bonnie Morgan, have

standing because Defendants' actions have caused issuers in Charlottesville to charge them and

other Charlottesville-area consumers higher premiums. There can be no question that such

financial harms constitute injury: "financial harm is a classic and paradigmatic form of injury in

fact." *Air Evac EMS*, 910 F.3d at 760 (quotation omitted). The "amount is irrelevant"; "[a] dollar

of economic harm is still an injury-in-fact for standing purposes." *Carpenters Indus. Council v.*

*Zinke*, 854 F.3d 1, 5-6 (D.C. Cir. 2017). As specifically relevant here, multiple courts have held

that even slight increases in premiums are sufficient for standing purposes. *See, e.g.*, *Stewart v.*

*Azar*, 313 F. Supp. 3d 237, 252 (D.D.C. 2018) ("Plaintiffs would be required to pay increased

premiums and thus would suffer a concrete injury."); *AARP v. EEOC*, 226 F. Supp. 3d 7, 18

(D.D.C. 2016) ("An increase in premiums would certainly constitute an injury.").

Indeed, Defendants themselves recently endorsed a similar theory of standing in *Texas v.*

*United States*, the challenge to the Affordable Care Act pending before the Fifth Circuit that

Defendants have refused to defend (in violation of their constitutional duties). *See* No. 19-10011

(5th Cir. filed Jan. 7, 2019). In *Texas*, the plaintiffs allege that the ACA's guaranteed-issue and

---

[7]    In addressing Plaintiffs' APA claim, Defendants do mention Plaintiffs' allegations
concerning standardized options and medical loss ratio. As to standardized options, Defendants
say that there are "other tools" to help consumers enroll, Mot. at 32; as to medical loss ratio,
Defendants emphasize that issuers can continue to report QIA expenditures, and have other
"incentives" to improve care, *id.* at 46. But Plaintiffs' factual allegations, which must be assumed
true, establish that Defendants' actions are one factor responsible for decreased enrollment and
increased costs. Defendants also dispute whether their decision not to defend the ACA can cause
harm, Mot. at 53, but as the Amended Complaint explains, Defendants' decision deprives the
courts of the experience and expertise of the agency charged with administering it, AC ¶ 179.

community-rating provisions have caused their premiums to rise. Defendants' response in *Texas* fatally contradicts their arguments here. With respect to injury, Defendants say in this case that "rising premiums alone [cannot] constitute an injury in fact." Mot. at 12. But in *Texas*, Defendants say that higher premiums constitute "concrete financial and practical injuries." Brief for the Federal Defendants at 24, *Texas*, No. 19-10011. With respect to traceability, Defendants say in this case that "traceability and redressability may not be established" because "Defendants do not set individual health insurance premiums; rather, issuers set them by taking into account a wide range of factors that are in turn dependent on a whole host of other third party actors." Mot. at 13. But in *Texas*, Defendants say that "increased costs and decreased options are attributable to . . . [t]he guaranteed-issue and community-rating provisions" because those provisions "limit the ability of insurance companies to change their prices based on the health of the insured, thus increasing costs for relatively young and healthy individuals." Brief for the Federal Defendants at 24. Thus, by Defendants' own admission, plaintiffs have standing where they plausibly allege that government action has caused issuers to raise premiums.

That is precisely what the Amended Complaint alleges. As explained above, Defendants' actions led to significant premium increases nationwide from 2017 to 2019. Charlottesville, Virginia, where the Individual Plaintiffs reside, is no exception. Overall, premiums tripled in Charlottesville in 2018, becoming the highest in the nation. AC ¶¶ 267-68. In 2017, the Individual Plaintiffs paid a monthly premium of $1,270 for an Optima silver plan; in 2018, they paid $3,300 a month for their Optima bronze plan, *261 percent higher* than their 2017 premium, and with a significantly higher deductible of $14,400. *Id.* ¶¶ 275-76. Now, in 2019, they pay $1,899 a month for their Anthem bronze plan—still *50 percent higher* than what they paid for the Optima silver plan in 2017—with a deductible of $13,000. *Id.* ¶ 277. Anthem also raised its

19

statewide rates from 2018 to 2019 by 3.2 percent. *Id.* ¶ 272. Indeed, the price of the plan

purchased by the Individual Plaintiffs itself rose by 1.6 percent from 2018 to 2019.[8]

Charlottesville's high premiums, like those nationwide, are directly attributable to

Defendants' actions. As the Amended Complaint alleges and explains, premiums in

Charlottesville skyrocketed because "the instability of the Obamacare marketplace" led to "[a]n

exodus of carriers." *Id.* ¶ 267. The Governor of Virginia and the Virginia Bureau of Insurance

attributed that instability in part to "the Trump administration's active sabotage of the health care

system," including by "encouraging substandard short-term health insurance plans" and other

"federal actions or inaction that raise costs and create uncertainty in the insurance markets."[9]

Optima also placed the blame on Defendants' actions, citing as justification for its rate increases

"growing uncertainty in the marketplace, . . . the effectiveness/enforceability of the individual

mandate, stability of available plan options . . . , [and] unknown funding of the CSR subsidies."

*Id.* ¶ 270. Other issuers made similar statements. *Id.* ¶ 271. And analysts continue to attribute

higher premiums in Virginia to Defendants' actions, with one analyst finding that the average

unsubsidized annual insurance premium in Virginia in 2019 is $1,078 higher than it would

otherwise be. *Id.* ¶ 272. In sum, Plaintiffs have plausibly alleged that Defendants' actions are

responsible for driving up premiums in Charlottesville.

The only factual allegation concerning causation that Defendants address at any length is

Anthem's actuarial memorandum, *see* Mot. at 16-17, which attributes the issuer's 2019 rate

increases to "the elimination of the individual mandate penalty for lack of minimum essential

coverage and potential movement into other markets," among other factors, AC ¶ 277 & n.365.

This "potential movement" describes largely young, healthy consumers who have decided to

---

[8]    Specifically, the Individual Plaintiffs purchased the Anthem-HealthKeepers Bronze X 6500 plan. *Compare My Plans & Programs*, Care.gov (Ex. A), *with Actuarial Memorandum* at 15, Anthem-Healthkeepers (Ex. B).

[9]    Press Release, Va. Gov. Ralph S. Northam, *Gov. Northam Statement on Anticipated Double-Digit Health Insurance Rate Increases* (May 10, 2018), https://www.governor.virginia.gov/newsroom/all-releases/2018/may/headline-825487-en.html (cited in AC ¶ 269).

purchase non-ACA compliant plans, thereby raising prices for ACA-compliant plans. As explained above, that factor is entirely attributable to Defendants' attempts to undermine the ACA. Moreover, Defendants' arguments fail to acknowledge that Anthem's 2019 increases were on top of substantial increases in 2018 that Defendants also caused. *Id.* Defendants also reference Anthem's statement that other factors affected rates, but again, the Individual Plaintiffs need not plausibly allege that Defendants' actions are the *sole* factor affecting issuers' rate-setting decisions—only that they *are* a factor. *Sierra Club*, 899 F.3d at 284.

Notwithstanding the Amended Complaint's allegations, Defendants respond that Plaintiffs' "prediction about continued rising individual market insurance premiums has been proven to be incorrect." Mot. at 12. As noted above, the average price for Anthem's plans, including the price for the bronze plan the Individual Plaintiffs purchased, actually *did* increase in 2019. But the point for standing purposes is not that premiums are continuing to increase. It is that premiums went up, and remain higher than they should be, because of Defendants' ongoing attempts to undermine the ACA. It is no answer for Defendants to say that premiums declined slightly in 2019 when Defendants' actions are the reason those premiums are so high in the first place, remaining well above 2017 rates. In other words, the Individual Plaintiffs are paying more today for their plan than they would pay in a market unaffected by Defendants' actions. It is that difference that constitutes cognizable injury.

Defendants' remaining attacks on the Individual Plaintiffs' standing rely on cases involving a wide array of factual circumstances that shed little light on the sufficiency of the allegations here. *See id*. at 13-16. In many of those cases, the plaintiffs lacked standing because they failed to allege essential elements of their theories of causation, not simply because those theories involved third party actors.[10] *Lane v. Holder* is even further afield; the plaintiffs' injuries

---

[10]   *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 757 (1984) (number of discriminatory schools in the area); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43-44 (1976) (whether hospitals would forgo favorable tax treatment); *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 757 (4th Cir. 2013) (how Virginia circuit court would react); *Doe v. Obama*, 631 F.3d 157, 163 (4th Cir. 2011)

there were caused by transfer fees charged by federal firearms licensees without any influence from the government. *See* 703 F.3d 668, 674 (4th Cir. 2012). Defendants devote somewhat more time to *Frank Krasner Enterprises*, 401 F.3d 230, but courts have distinguished that case from circumstances where the third parties' choices are a "sufficiently predictable" result of the government's actions, *Congaree Riverkeeper, Inc. v. Carolina Water Serv., Inc.*, 248 F. Supp. 3d 733, 747 (D.S.C. 2017). That is the case here, where independent analyses and issuers' explanations confirm Plaintiffs' allegations that Defendants' actions have caused price increases.

The only case with a passing resemblance to this one is *American Freedom Law Center v. Obama* ("*AFLC*"), 821 F.3d 44 (D.C. Cir. 2016). *See* Mot. at 15-16. But it is no more than that. In *AFLC*, the plaintiffs challenged a policy whereby HHS would temporarily permit issuers to continue providing non-ACA compliant plans, arguing that the policy drove up premiums for ACA-compliant plans like the one they purchased. *Id.* at 45. The "only evidence" the plaintiffs offered to support causation was "Blue Cross's 2014 rate increase filing, which included as a reason for the rate increase the fact that the overall risk pool for ACA-compliant plans was smaller than Blue Cross had anticipated." *Id.* at 49. That filing, the court explained, was insufficient; the plaintiffs did not specify "whether the rate increase . . . applied to [their] health care plan at all," and a subsequent filing attributed rate *decreases* to the challenged policy as well. *Id.* at 48-50. Because the plaintiffs otherwise "made no attempt to separate out" the various factors that affect insurance pricing, the court held they had failed to sufficiently allege that the policy caused their rates to increase. *Id.* at 51.

The Individual Plaintiffs allege far more than the plaintiffs in *AFLC*. Because the 19-page complaint in *AFLC* contained virtually no allegations concerning standing, the district court concluded that the plaintiffs had "fallen woefully short of meeting their burden." 106 F. Supp. 3d 104, 109 (D.D.C. 2015); *see* Complaint, *AFLC*, No. 14-cv-1143 (D.D.C. July 4, 2014), ECF No. 1. By contrast, the Individual Plaintiffs have supplied multiple studies of premium rates that

---

(identity of plaintiff embryos and plaintiff parents' plans to adopt); *Bishop v. Bartlett*, 575 F.3d 419, 425 (4th Cir. 2009) (whether election outcome would have been different).

identify precisely how much more they are paying because of Defendants' actions. The Amended Complaint also cites statements by multiple issuers that consistently attribute premium increases to Defendants' actions. Moreover, unlike the insurer filing in *AFLC*, the Anthem actuarial memorandum here lists an increase for the Individual Plaintiffs' specific plan, and it has not been contradicted by any other subsequent rate filing. The Individual Plaintiffs have therefore plausibly alleged that Defendants' actions have caused them to pay higher premiums.

By the same token, the Individual Plaintiffs' injuries would be redressed by a decision invalidating Defendants' actions. *See Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (causation and redressability "often overlap[]"). As the Fourth Circuit has explained, an injury is redressable where "the court's decision would reduce 'to some extent' plaintiffs' risk of additional injury." *Carter v. Fleming*, 879 F.3d 132, 138 (4th Cir. 2018) (quoting *Massachusetts*, 549 U.S. at 526). That is the case here. The Court need not compel issuers to set rates at a particular level; a favorable decision would abate Defendants' ongoing attempts to undermine the ACA, curbing actions that issuers have cited as reasons for their high premiums, and thereby redressing the Individual Plaintiffs' injuries.

### 3. *The City Plaintiffs have standing*

Similarly, the City Plaintiffs have standing because Defendants' actions drive up the rate of uninsured and underinsured individuals, increasing the City Plaintiffs' costs for providing uncompensated care. A city has standing "when a harm to the city itself has been alleged." *Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002). "The 'proprietary interests' that a municipality may sue to protect are as varied as a municipality's responsibilities, powers, and assets," and include "management, public safety, [and] economic" harms. *Sausalito v. O'Neill*, 386 F.3d 1186, 1197-99 (9th Cir. 2004); *see Amador Cty. v. Salazar*, 640 F.3d 373, 378 (D.C. Cir. 2011) (finding standing where action "would increase the County's infrastructure costs and impact the character of the community"); *cf. Maryland v. United States*, 360 F. Supp. 3d 288, 309 (D. Md. 2019) ("Like any other party, a state can establish standing by alleging a direct

injury to its financial or proprietary interests.").[11] Thus, cities can establish standing by alleging

financial injury, like any other plaintiff.

Several recent cases have found standing where, as here, Defendants' policies have

shifted costs onto governments to provide uncompensated health care. The First Circuit, the

Ninth Circuit, and the Eastern District of Pennsylvania have all held that states have standing to

challenge federal regulations allowing employers to refrain from providing contraceptive

coverage on the grounds that the states will be forced to pay to provide that coverage. *See*

*Massachusetts v. HHS*, -- F.3d --, 2019 WL 1950427, at \*12 (1st Cir. May 2, 2019) (finding

standing because state had shown "a substantial risk that a portion of the women who would lose

contraceptive coverage would then obtain state-funded contraceptive care or state-funded

prenatal care"); *California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018) (finding standing because

"women who lose coverage will seek contraceptive care through state-run programs or programs

that the states are responsible for reimbursing"); *Pennsylvania v. Trump*, 351 F. Supp. 3d 791,

807 (E.D. Pa. 2019) (finding standing because federal rules "allow more entities to stop

providing contraceptive coverage, which will result in more women residents seeking

contraceptive care through State-funded programs"). And in circumstances even closer to those

present here, in *U.S. House of Representatives v. Price*, the D.C. Circuit found a "substantial

risk" that the cancellation of cost-sharing reduction payments—one of the actions addressed by

Plaintiffs here—"would lead directly and imminently to an increase in insurance prices, which in

turn will increase the number of uninsured individuals for whom the States will have to provide

health care." No. 16-5202, 2017 WL 3271445, at \*1 (D.C. Cir. 2017) (per curiam).

Under these established principles, the City Plaintiffs have plausibly alleged their

standing to sue. *First*, the City Plaintiffs allege that Defendants' efforts to undermine the ACA

have increased the rate of uninsured and underinsured individuals by making it harder to enroll

---

[11] *See, e.g.*, *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1059 (D.C. Cir. 2018); *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016); *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 158-59 (E.D.N.Y. 2017).

in ACA-compliant coverage and by increasing premiums for such coverage. AC ¶¶ 190-96. *Second*, the City Plaintiffs allege that, as uninsured rates rise, they must pay more to operate and support their uncompensated care programs, including their free and reduced-cost health clinics, *id.* ¶¶ 201-02, and their ambulance services, *id.* ¶ 203. The City Plaintiffs further allege that, owing to Defendants' actions, they will have to confront the downstream costs of a population that is less healthy and less productive. *Id.* ¶¶ 205-07. The Amended Complaint then describes each City Plaintiff's uncompensated care programs and summarizes data concerning program use, premium rises, and uninsured rates in each jurisdiction. *Id.* ¶¶ 209-64.

For their part, Defendants generally do not dispute that rises in uninsured rates impose costs on the City Plaintiffs, or that invalidating actions that cause such rises would redress the City Plaintiffs' injuries. Rather, Defendants dispute whether their actions are the cause of those rising rates. As explained above, however, Plaintiffs have plausibly alleged that Defendants have driven up the rates of uninsured and underinsured individuals in a number of ways—by driving up premiums, certainly, but also by making it more difficult to enroll in suitable insurance plans and by lowering the quality of those plans. Defendants ignore many of these factual allegations, particularly those pertaining to enrollment barriers and access. Instead, Defendants focus narrowly on the Amended Complaint's allegations concerning premiums, arguing that those allegations are wrong, overstated, or speculative. Defendants are incorrect.

*First*, Defendants argue that their actions have not caused an "exodus of carriers." Mot. at 19-20. But issuer exit is only one of the ways by which Defendants' actions have increased premiums, alongside distorting the risk pool, fostering instability and uncertainty, and interfering with markets, among others. Regardless, Defendants again ignore that the number of issuers per state dropped substantially from 2016 to 2018 as a result of their actions, from 5.6 to 3.5 issuers per state. AC ¶ 187. While that figure rebounded to 4.0 issuers per state in 2019, *id.*, it remains lower than it was before Defendants' actions commenced, and Plaintiffs have detailed how Defendants' actions deter issuers from entering markets. *See, e.g.*, *id.* ¶¶ 104, 106 & n.105, 184 & n.222, 187 & nn.231-235. As with premium rate increases, Defendants cannot defeat

Plaintiffs' allegations by simply arguing that some small portion of the damage done has been reversed. Moreover, contrary to Defendants' assertion, Mot. at 20, Plaintiffs did not predict that issuers would continue to leave markets in 2019; Plaintiffs instead argue that the number of issuers per state is lower than it *otherwise would be* because of Defendants' actions, AC ¶ 187.

*Second*, Defendants claim that the City Plaintiffs are incorrect to allege that "premium increases for qualified health plans will inevitably lead to an exodus of current enrollees large enough to burden the City Plaintiffs," in part because tax credits insulate some enrollees from the effect of premium increases. Mot. at 20-21. But premium increases are only one of the ways in which Defendants' actions have driven up rates of uninsured and underinsured individuals. Defendants have also made it more difficult to enroll and encouraged individuals to enroll in non-ACA compliant plans, among other things.

Regardless, Defendants are wrong on both the law and the facts. As a matter of law, the size of the City Plaintiffs' injuries is irrelevant. *See, e.g.*, *United States v. SCRAP*, 412 U.S. 669, 689 & n.14 (1973) (explaining that an "identifiable trifle" is "sufficient" to support standing); *Carpenters Indus. Council*, 854 F.3d at 5-6 ("[a] dollar of economic harm is still an injury-in-fact for standing purposes"); *Save Our Heritage, Inc. v. FAA*, 269 F.3d 49, 56 (1st Cir. 2003) ("A reasonable claim of minimal impact is enough for standing."). There is no requirement, express or otherwise, that the City Plaintiffs' injuries be "large enough," Mot. at 20, to support standing.

As a matter of fact, Defendants substantially understate the number of individuals affected by their actions. In general, Defendants' actions affect everyone who participates in the individual health insurance market, a number that includes both the 7 percent of the population that currently possesses non-group health insurance, *i.e.*, over 20 million people, as well as the 9 percent more that lack insurance whatsoever, *i.e.*, over 27 million people—adding up to around 47 million.[12] Defendants also overstate the insulating effect of premium tax credits, *id.* at 20-21,

---

[12]   *See Health Insurance Coverage of the Total Population*, Kaiser Family Found. (2017), https://www.kff.org/other/state-indicator/total-population/?dataView=1&currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

leaving aside that several of Defendants' actions make it more difficult for marketplace enrollees to receive those credits in the first place. According to the Kaiser Family Foundation, 1.6 million consumers bought ACA-compliant plans on the exchanges without subsidies; 5.1 million consumers bought ACA-compliant plans off the exchanges without subsidies; and 2.1 million consumers bought non-compliant plans without subsidies, meaning that at least 9 million people were directly exposed to the premium hikes caused by Defendants.[13] Individuals who purchase insurance with subsidies are also affected if the price for their plan (which may be the one most suitable to their needs) rose more sharply than the cost of the benchmark silver plan; indeed, the Kaiser Family Foundation specifically found that the after-tax credit cost of many plans rose in the City Plaintiffs' jurisdictions in 2019. *See* AC ¶¶ 220, 230, 251, 263. Moreover, Defendants do not address the over 4 million unsubsidized individuals who have decided not to purchase insurance at all in the wake of the stark rises in premium rates caused by Defendants' actions.[14] Stripped down, what this means is that millions of people are affected by Defendants' actions—a number "large enough" to matter, even if Defendants think otherwise.

*Third*, Defendants say that rises in uninsured rates could be "traceable to the recent change in the individual mandate tax penalty [or] other market factors beyond Defendants' control," rather than "the actions complained of in this lawsuit." Mot. at 21. As explained above, Defendants' actions need not be the sole cause of individuals losing or forgoing health insurance. Plaintiffs have plausibly alleged how each of the actions challenged in the Amended Complaint has led to uninsured rates that are higher than they would otherwise be. Regardless, the only alternative cause that Defendants highlight in any detail is Congress's decision to reduce the

---

[13]    *See* Karen Pollitz & Gary Claxton, *Proposals for Insurance Options that Don't Comply with ACA Rules: Trade-offs in Cost and Regulation* fig. 2, Kaiser Family Found. (Apr. 18, 2018), https://www.kff.org/health-reform/issue-brief/proposals-for-insurance-options-that-dont-comply-with-aca-rules-trade-offs-in-cost-and-regulation/; AC ¶ 184.

[14]    *See* Aviva Aron-Dine & Matt Broaddus, *Improving ACA Subsidies for Low- and Moderate-Income Consumers Is Key to Increasing Coverage*, Ctr. on Budget & Pol'y Priorities (Mar. 21, 2019), https://perma.cc/HV4F-FDTL; *Trends in Subsidized and Unsubsidized Individual Health Insurance Enrollment*, CMS (July 2, 2018), https://perma.cc/D3TW-W86P.

individual mandate penalty to $0, which, they say, may have encouraged individuals to purchase "alternative options to qualified health plans." *Id.* But that confirms, rather than defeats, Plaintiffs' allegations concerning causation; the availability and desirability of those alternatives (including short-term, limited-duration insurance and association health plans) is *itself* a result of Defendants' own decisions to expand access to them. *See, e.g.*, AC ¶¶ 109-15. Finally, Defendants again assert that premium rates are "inherently variable" and have now "stabilized," Mot. at 21-22, but those arguments are incorrect for the reasons already explained.

As a last gasp, Defendants say that the City Plaintiffs "cannot establish standing by claiming that they likely will need to increase expenditures to account for [uninsured] populations" because "[n]o provision of federal law requires the City Plaintiffs to allocate any portion of their budgets to public health spending." Mot. at 22. If Defendants mean that the City Plaintiffs are not injured because they chose to establish their uncompensated care programs, they are wrong; the contraceptive coverage cases, *House of Representatives v. Price*, and the many other decisions cited above all involve similar programs created by governments to serve their residents. There is no reason why a city's decision to operate uncompensated care programs—indeed, its *responsibility* to do so—should mean that it lacks standing to challenge federal action that imposes increased costs on those programs. If Defendants mean instead that the City Plaintiffs might abruptly decide to stop providing uncompensated care, they are still wrong; all of the City Plaintiffs have continued to operate their uncompensated care programs, despite year-to-year fluctuations in use and cost. *See* AC ¶¶ 197-264. Plaintiffs are not required to "negate" such "speculative and hypothetical possibilities" to demonstrate standing. *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 78 (1978).

B.     **Plaintiffs' Claims Are Ripe**

For the same reasons, Plaintiffs' claims are ripe. As Defendants recognize, often "standing and ripeness boil down to the same question," Mot. at 23 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)), and here they have the same answer. In determining ripeness, the court considers "(1) the fitness of the issues for judicial decision and

(2) the hardship to the parties of withholding court consideration." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (quotation omitted). Plaintiffs' claims are fit for review because the issues they present are "largely legal ones that [do] not depend on future uncertainties." *In re Naranjo*, 768 F.3d 332, 347 (4th Cir. 2014). Similarly, withholding review would cause hardship because Defendants' actions have "already caused immediate harm" to Plaintiffs. *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198-99 (4th Cir. 2013) (quotation omitted). Defendants' responses largely rehash their arguments concerning standing and are unavailing for the same reasons.

Defendants add that "the impact of some of the challenged actions are not yet known," including the regulations concerning association health plans (AHPs), health reimbursement arrangements (HRAs), and short-term limited-duration insurance (STLDI) plans, as well as the 2020 Rule. Mot. at 24. But Defendants' argument misunderstands Plaintiffs' claim under the Take Care Clause. Plaintiffs do not raise individual challenges to each of these regulations; instead, these regulations serve as concrete examples of Defendants' ongoing efforts to undermine the ACA, and as evidence of Defendants' intent. Plaintiffs' challenge to Defendants' continuing violation of the Take Care Clause is ripe, whether or not individual challenges to those regulatory actions under the APA—which Plaintiffs do not bring—would be.

In any event, nearly all such challenges would be ripe. As Defendants admit, by its terms the AHP rule became effective on April 1, 2019. Mot. at 24. The STLDI rule has been effective for over six months now. *Id*. While some states have taken measures to restore limitations on STLDI plans, *id.*, those limitations generally do not extend as far as preexisting federal law. It is some defense indeed for Defendants to rely on the fact that states have been forced to implement laws of their own to blunt the harms of Defendants' actions. Finally, the 2020 Rule was finalized on April 25, 2019, and contains the indexing provision highlighted in the Amended Complaint. 84 Fed. Reg. 17,454, 17,537-41 (Apr. 15, 2019). That leaves only the HRA proposed rule, which is now pending review at the Office of Information and Regulatory Affairs before final release,

and which further demonstrates Defendants' intent to draw individuals away from ACA-compliant plans. Ripeness poses no bar to hearing Plaintiffs' claims on the merits.

## II.    **Plaintiffs Have Stated a Claim Under the Administrative Procedure Act**

Defendants' argument that Plaintiffs have failed to state a claim fares no better than their objections to this Court's jurisdiction. In Count One of the Amended Complaint, AC ¶¶ 279-82, Plaintiffs challenge nine provisions of the 2019 Rule under the Administrative Procedure Act, which provides that a "court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). Plaintiffs allege that several of the 2019 Rule's provisions violate the Affordable Care Act's mandates, and therefore are not in accordance with law.

Plaintiffs also allege that all nine provisions are arbitrary and capricious: Defendants have not "give[n] adequate reasons for [their] decisions." *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2125 (2016). In assessing whether the 2019 Rule is arbitrary, the Court "must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action." *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 601 (4th Cir. 2012) (quotations omitted). Specifically, the 2019 Rule is arbitrary and capricious where CMS "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that [the decision] could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Moreover, where CMS has "change[d] [its] existing policies," it must "provide a reasoned explanation for the change." *Encinco Motorcars*, 136 S. Ct. at 2125 (citing *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-82 (2005)). At minimum, that requires CMS to "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* at 2126 (quoting *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)).

In arguing for dismissal of Plaintiffs' APA claim, Defendants may appropriately rely only on the explanations set forth in the 2019 Rule. Under *SEC v. Chenery Corp.*, 332 U.S. 194,

196 (1947), "a reviewing court may not speculate on reasons that might have supported" the agency's action, "nor supply a reasoned basis for the agency's action that the agency itself has not given." *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 299-300 (4th Cir. 2018) (quotation omitted). Moreover, at this early stage of the litigation, Defendants have yet to produce the administrative record, so the Rule itself is all that Plaintiffs and the Court have to go by. That posture alone counsels in favor of permitting Plaintiffs' claims to proceed, as "the Court cannot properly evaluate" whether Defendants "acted arbitrarily and capriciously" where "the Court does not have a complete administrative record." *Farrell v. Tillerson*, 315 F. Supp. 3d 47, 69 (D.D.C. 2018); *see also CASA de Maryland v. DHS*, -- F. 3d. --, 2019 WL 2147204, at *12 (4th Cir. May 17, 2019) (courts "must engage in a searching and careful inquiry *of the administrative record*, so that [they] may consider whether the agency considered the relevant factors and whether a clear error of judgment was made" (emphasis added, quotation omitted)), *cert. filed*, No. 18-1469 (U.S. May 24, 2019).[15] Regardless, Defendants' challenges each fail.

A. **Plaintiffs Have Plausibly Alleged that the 2019 Rule's Provisions Eliminating Protections Guaranteed by the ACA Violate the APA**

1. *Permitting exchanges to strip individuals of eligibility for tax credits without providing direct notification* (AC ¶¶ 52-56; Mot. at 35-38)

One of the many ways that the 2019 Rule unlawfully departs from CMS's prior policies is by eliminating a basic due process protection. Under the ACA, certain individuals are eligible for premium subsidies known as advance premium tax credits. 26 U.S.C. § 36B; 42 U.S.C. §§ 18081, 18082. CMS regulations direct exchanges to deny APTCs to an individual if the Internal Revenue Service notifies the exchange that the individual or a member of her household

---

[15]   *Accord Johnson v. Sessions*, No. 15-cv- 3317, 2017 WL 1207537, at *8 (D. Md. Apr. 3, 2017) ("[C]hallenges under the APA such as that now before this Court are properly adjudicated at the summary judgment stage."); *Dist. Hosp. Partners, LP v. Sebelius*, 794 F. Supp. 2d 162, 171 (D.D.C. 2011) (explaining that D.C. Circuit precedent "strongly counsels" in favor of examining the administrative record because "a review of the administrative record is necessary to a determination of whether the [agency's] methodology was arbitrary and capricious"); *Swedish Am. Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 88 (D.D.C. 2010) (explaining that "[w]ithout the administrative record, the court is unable to perform [its] function").

did not reconcile the amount of APTCs she received with the amount of the actual premium tax credits she should have been allowed on her prior year's tax return. 45 C.F.R. § 155.305(f)(4). In 2016, CMS amended this provision, known as the failure to reconcile provision, to specify that an exchange may not deny APTCs unless direct notification is first sent to the tax filer. 81 Fed. Reg. 94,058, 94,124 (Dec. 22, 2016). But in the 2019 Rule, CMS removed this requirement. 83 Fed. Reg. at 16,982. CMS's decision is contrary to law and arbitrary and capricious.

a.      The 2019 Rule deepens a conflict between CMS regulations and the Internal Revenue Code. Under the Code, "[i]n the case of an applicable taxpayer, there *shall* be allowed as a credit against the tax imposed . . . for any taxable year an amount equal to the premium assistance credit amount of the taxpayer for the taxable year." 26 U.S.C. § 36B(a) (emphasis added). The statute's plain terms thus require that any "applicable taxpayer"—defined as one whose annual household income is between 100 and 400 percent of the federal poverty line, *id.* § 36B(c)(1)(A)—be allowed to claim an APTC. Whether an individual has reconciled her APTC has no bearing on whether she is an "applicable taxpayer" under the statute. Therefore, depriving an "applicable taxpayer" of the credit that the statute says "shall be allowed" based on a failure to reconcile her taxes violates the statute's plain language.

Even worse, interpreting the statute to permit stripping tax credits that a taxpayer needs to obtain medical care without first providing notification would raise significant due process concerns. As the Supreme Court explained in *Goldberg v. Kelly*, due process requires that "a recipient have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend" before the government terminates "essential" benefits like "medical care." 397 U.S. 254, 264, 267-68 (1970); *see Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs*, 137 F.3d 799, 807 (4th Cir. 1998) ("No process, however thorough, can provide what is due without notice to those who stand to lose out thereby." (quotation omitted)). The 2019 Rule therefore offends at least two canons of construction: that the Court interprets ambiguous statutes to avoid constitutional problems, even where those problems involve litigants not before the Court, *see Clark v. Martinez*, 543 U.S. 371, 380 (2005), and that

32

"taxing statutes are strictly construed against the government and in favor of the taxpayer," *Lilly v. United States*, 238 F.2d 584, 587 (4th Cir. 1956).

Defendants respond with a curious contention: there can be no conflict, they say, because the Internal Revenue Code "provision on which Plaintiffs rely is not under the jurisdiction of CMS." Mot. at 36. Defendants cite no authority for the extraordinary proposition that agency regulations must only comply with statutes that the agency administers, and there is none. To the contrary, where there is a conflict between a regulation and a statute, the Supremacy Clause says that the statute controls regardless of where it is codified in the U.S. Code. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Gen. Dynamics Land Sys. Div.*, 815 F.2d 1570, 1574 (D.C. Cir. 1987). And contrary to Defendants' claim, *see* Mot. at 36-37, there is indeed a conflict here. Under CMS's regulation, a tax filer who has failed to reconcile her prior year's APTC cannot claim APTC, even if she falls within the statutory income bracket; under the statute, she can. The "canon against reading conflicts *into statutes*" that Defendants cite, *id.* at 36 (emphasis added), is irrelevant, as the conflict here is not between statutes but rather between the Code and CMS's regulation. The former controls. The latter is contrary to law.

b.      The 2019 Rule's elimination of the direct notification requirement is also arbitrary and capricious. When adding the requirement in 2016, CMS affirmed "that targeted and detailed messaging to tax filers that highlights the specific requirement to file an income tax return and reconcile APTC paid on their behalf—and the potential adverse impact on APTC eligibility for future coverage years—is *essential*." 81 Fed. Reg. at 94,124 (emphasis added). Although "[m]any commenters" on the proposed 2019 Rule agreed with that position, 83 Fed. Reg. at 16,983, CMS nonetheless reversed course. CMS has now reoriented its focus to "ensuring consumers are not receiving APTC improperly," *id.* at 16,984, without citing any evidence of such a problem. CMS also asserts that direct notification "*may* be" difficult to implement for state-based exchanges given IRS rules prohibiting unauthorized disclosures of tax information, and that SBEs "*may* have fewer options available to them" than federally-facilitated exchanges, which will continue to provide direct notification. *Id.* at 16,983 (emphasis added). But the Court

33

cannot "defer to the agency's conclusory or unsupported suppositions," *United Techs. Corp. v. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (quotation omitted), particularly when such weighty due process concerns are at stake. Whether or not the agency's decision is "prophylactic," Mot. at 37, CMS offered no evidence that consumers are in fact "receiving APTC improperly," 83 Fed. Reg. at 16,984, and the APA does not countenance tilting at windmills, *see Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("An unjustified leap of logic or unwarranted assumption . . . can erode any pillar underpinning an agency action, whether constructed from the what-is or the what-may-be.").

Finally, CMS now purports to be of the view that even without direct notification, "there are adequate protections for due process." 83 Fed. Reg. at 16,983. But CMS does not claim that the "protections" it now cites are in any way new, *see id.*, nor does CMS explain why it finds them "adequate" now but did not when it promulgated the direct notification requirement it deemed "essential" in 2016. CMS may change its mind, of course, but not without acknowledging that it has done so and not without explaining why good reasons support its new policy. *FCC v. Fox*, 566 U.S. at 515. Because CMS has done neither, the provision of the 2019 Rule eliminating the direct notification requirement is arbitrary and capricious.

2.      *Outsourcing to states the compliance review of insurance plans to be offered on federal exchanges* (AC ¶¶ 57-63; Mot. at 41-43)

The provision of the 2019 Rule that continues to shift to states the federal government's duty to ensure that plans sold on Affordable Care Act exchanges have adequate networks is also contrary to law and arbitrary and capricious. Outsourcing plan review will permit insurers to market plans with overly restrictive networks of providers that could limit patient access to care. AC ¶ 63. Even before the 2019 Rule, only 41 percent of qualified health plans in FFE states had networks that included National Cancer Institute-designated cancer centers, for example, and one study estimated that 15 percent of FFE plans lacked in-network physicians for at least one specialty. *Id.* These numbers will continue to fall now that the federal government has again shirked its plan review responsibilities. *Id.*

34

a.     The provision is contrary to the ACA. Under the statute, HHS "*shall*, by regulation, establish criteria for the certification of health plans as qualified health plans," including criteria that "ensure a sufficient choice of providers"—*i.e.*, criteria that ensure network adequacy. 42 U.S.C. § 18031(c)(1) (emphasis added). Pursuant to those criteria, "[a]n Exchange *shall, at a minimum*[,] implement procedures for the certification, recertification, and decertification . . . of health plans as qualified health plans." *Id*. § 18031(d)(4)(A) (emphasis added). The statute's repeated use of the term "shall" makes plain that these are mandatory duties, *see Holland v. Pardee Coal Co.*, 269 F.3d 424, 431 (4th Cir. 2001), and the statute is likewise clear that the exchange—in states with federally-facilitated exchanges, CMS—must carry them out. Contrary to Defendants' claim, Mot. at 42-43, CMS does not "implement procedures for . . . certification" by leaving certification to others. Moreover, the statutory requirement to certify health plans is a "minimum" requirement, 42 U.S.C. § 18031(d)(4)(A), below which an exchange cannot fall. Finally, CMS's approach is inconsistent with the ACA's purpose to "increase the number of Americans covered by health insurance" that is adequate to meet their needs. *NFIB v. Sebelius*, 567 U.S. 519, 538 (2012).

b.     CMS's policy is also arbitrary and capricious. Commenters submitted that "[s]tates' and accrediting entities' review processes do not do enough to ensure enrollees have adequate access to necessary care." 83 Fed. Reg. at 17,025.[16] CMS counters that it had relied on states in the past and felt they did an alright job, Mot. at 43, but that is no response: precisely because CMS outsourced review to states in prior years, *id.* at 42, the comments reflected how CMS's policy had fared on the ground, and found it lacking. CMS was obligated to provide evidence to buttress its assertion that state review procedures are sufficient to guarantee network adequacy, such as an analysis of the rigor of state procedures or assessments of plans certified by state regulators. CMS did not do so, and instead relied solely on its "prior experience." *Id.* at 43.

---

[16]   Data from 2015 indicated that 23 states had no quantitative standards of network adequacy in place, and an additional 11 had standards only for health maintenance organizations. Mark Hall & Caitlin Brandt, *Network Adequacy Under the Trump Administration*, Health Affairs Blog (Sept. 24, 2017), https://perma.cc/E7LR-3NRU (cited in AC ¶ 62 n.74).

But "the mere fact that there is some rational basis within the knowledge and experience" of CMS, "under which [it] might have" justified its conclusion, "will not suffice to validate [its] decisionmaking." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 627 (1986) (quotation omitted). CMS's appeal to its "expert judgment" is unavailing given that it failed "to point . . . to any data of the sort it would have considered if it had considered [the issue] in any meaningful way." *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 499 (D.C. Cir. 1988). Moreover, problems with outsourcing review of insurance plans *were* "factually substantiated in the record," *Humane Soc'y v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017), and yet CMS failed to consider them. On all fronts, CMS's decision is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

3.  *Reducing oversight of insurance brokers participating in direct enrollment*
    (AC ¶¶ 64-68; Mot. at 33-35)

By reducing federal oversight of insurance brokers that assist consumers in signing up for insurance on ACA exchanges via direct enrollment, *see* 83 Fed. Reg. at 16,981-82, the 2019 Rule gives brokers free reign to provide consumers with incorrect information and deny them the assistance that they need—and that the ACA requires. Direct enrollment allows consumers to use a third-party website instead of healthcare.gov to purchase insurance coverage. Given evidence that brokers and issuers were abusing direct enrollment—committing fraud, enrolling individuals without their consent, and using inaccurate calculators for APTC eligibility—prior rules provided for strong oversight and required such entities to be audited by third parties that HHS approved. AC ¶ 65. The 2019 Rule puts the fox in charge of the henhouse, permitting brokers to choose their own auditors without requiring HHS to approve them. 83 Fed. Reg. at 16,981.

Commenters pointed out the dangers, *id.* at 16,982, which CMS itself recognized in implementing strong oversight in the first place. In reversing course and reducing that oversight, CMS relied on the mere existence of requirements that brokers and issuers "display all qualified health plan data" and "provide consumers with correct information." Mot. at 34. But exhortations without enforcement—for example, audits by vetted third parties, as CMS's prior policy provided—are no answer to demonstrated fraud. CMS also claims a "*commit[ment] to*

36

continuous monitoring and oversight," *id.* (emphasis added); *see id.* at 34-35, but that is no match for *actual* oversight. CMS's old policy recognized that regulatory requirements alone did not adequately protect consumers. Because CMS's new policy entirely ignores that issue, it is arbitrary and capricious. *State Farm*, 463 U.S. at 43; *FCC v. Fox*, 556 U.S. at 515.

**B.     Plaintiffs Have Plausibly Alleged that the 2019 Rule's Provisions Deterring Families from Enrolling in Quality Health Insurance Plans Violate the APA**

1.     *Making it harder to compare insurance programs* (AC ¶¶ 70-74; Mot. at 30-32)

Aside from removing protections that the ACA guarantees, the 2019 Rule also makes it harder to enroll in ACA-compliant health plans. The 2019 Rule's decision to remove so-called "standardized options" is a prime example. A key function of the ACA's exchanges is to "allow[] people to compare and purchase" qualified health plans. *King*, 135 S. Ct. at 2485. In an effort "to simplify the consumer shopping experience and to allow consumers to more easily compare plans across issuers," and thereby fulfill this statutory objective, CMS used to support "standardized options": qualified health plans offering different levels of coverage and price, but with a standard cost-sharing structure that makes it easier for consumers to compare plans. 81 Fed. Reg. 12,204, 12,205, 12,289-293 (Mar. 8, 2016). The 2019 Rule eliminates support for standardized options without sufficient justification, and is arbitrary and capricious. AC ¶ 72.

CMS previously gave a thorough account of its decision to offer standardized plans. Citing analyses of consumer behavior, CMS found that "[a]n excessive number of health plan options makes consumers less likely to make any plan selection, more likely to make a selection that does not match their health needs, and more likely to make a selection that leaves them less satisfied." 80 Fed. Reg. 75,488, 75,542 (Dec. 2, 2015). CMS buttressed that finding with reference to its *specific* experience during past open enrollment periods, which showed "that many consumers, particularly those with a high number of health plan options, find the large variety of cost-sharing structures available on the Exchanges difficult to navigate." *Id*. CMS concluded that "standardized options will provide these consumers the opportunity to make simpler comparisons of plans," while relieving consumers from having "to make complex

tradeoffs among cost-sharing differences." *Id.* CMS thus supported standardized options in the 2017 and 2018 benefit years.

The 2019 Rule nevertheless eliminates support for standardized options. And in contrast to the real-world experience that informed the prior rule, CMS's reversal is grounded merely in its desire to "encourage free market principles in the individual market, and to maximize innovation by issuers in designing and offering a wide range of plans to consumers." 83 Fed. Reg. at 16,974. CMS made the change even though "many" commenters noted that standardized options are "a useful consumer-support tool that aids in plan comparisons and selection and that withdrawing the standardized options could create confusion for consumers, especially those with low health literacy or certain health conditions." *Id.* at 16,975.

CMS's decision is arbitrary and capricious, for two reasons. AC ¶ 72. *First*, CMS's decision failed to "examine[] the relevant data and provide[] an explanation of its decision that includes a rational connection between the facts found and the choice made." *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019) (quotation omitted). CMS was obligated to "provide a more detailed justification" because "its new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox*, 556 U.S. at 515. However, CMS offered only bare assertions that "HealthCare.gov plan filters [and] other tools are sufficient," and that "consumers with specific health conditions may be better served by a different QHP," 83 Fed. Reg. at 16,975—a far cry from the independent analyses it cited before, *see* 80 Fed. Reg. at 75,542. Defendants respond by leaning on CMS's "substantial expertise" in managing exchanges. Mot. at 31. But as explained above, expertise is no substitute for evidence.

*Second*, CMS failed to substantiate its assertion that standardized options "remov[e] incentives for issuers to offer coverage with innovative plan designs," or to address well-reasoned comments to the contrary. 83 Fed. Reg. at 16,974. The Society for Public Health Education, echoed by the Leukemia and Lymphoma Society, explained that standardized options do not stifle innovation "because there is no requirement that issuers offer them, and issuers are

allowed to offer other plans," and their existence instead "encourages greater innovation and differences among plans." Moreover, Justice in Aging stressed that, "[b]y restricting the flexibility to set differential cost-sharing amount for certain items and services, standardized options encourage plans to compete based on the generosity of other plan design elements, such as by providing more robust provider networks and formularies," and that removing standardized options would "eliminate an important tool to incentivize insurers to improve and compete on the quality of their offerings."[17] Defendants claim that CMS "rejected the premise" of these comments. Mot. at 31. Perhaps, but CMS did so without offering any reasoned explanation. These questions cut to the heart of CMS's rationale, rendering it arbitrary and capricious.

2. *Undermining the Navigator program* (AC ¶¶ 75-79; Mot. at 32-33)

Under HHS's prior rules, each exchange was required to have two Navigators, one of those Navigators was required to be a community- and consumer-focused nonprofit, and Navigators were required to have physical presences in the areas they served. AC ¶ 75. The 2019 Rule's elimination of these requirements, *see* 83 Fed. Reg. at 16,979-80, violates the APA.

a. CMS's decision to eliminate the physical-presence requirement is contrary to law because it permits entities to qualify as Navigators that cannot satisfy the relevant statutory criteria. Navigators must demonstrate "that [they have] existing relationships, or could readily establish relationships, with employers and employees, consumers (including uninsured and underinsured consumers), or self-employed individuals likely to be qualified to enroll in a qualified health plan." 42 U.S.C. § 18031(i)(2)(A). Moreover, the ACA requires Navigators to "conduct public education activities to raise awareness of the availability of qualified health

---

[17] *See DC – Society for Public Health Education*, Regulations.gov, https://www.regulations.gov/document?D=CMS-2017-0141-0136; *DC – Leukemia & Lymphoma*, Regulations.gov, https://www.regulations.gov/document?D=CMS-2017-0141-0139; *DC – Justice in Aging*, Regulations.gov, https://www.regulations.gov/document?D=CMS-2017-0141-0299. Comments like these—and many, many more—presumably will be included in the administrative record. The fact that Defendants have yet to produce that record makes any consideration by this Court of whether Defendants' actions are arbitrary both premature and incomplete. *CASA de Maryland*, 2019 WL 2147204, at *12.

plans," *id.* § 18031(i)(3)(A); "distribute fair and impartial information concerning enrollment in qualified health plans, and the availability of premium tax credits . . . and cost-sharing reductions," *id.* § 18031(i)(3)(B); "facilitate enrollment in qualified health plans," *id.* § 18031(i)(3)(C); provide enrollees with grievances, complaints, or questions about their health plans with referrals to specified entities, *id.* § 18031(i)(3)(D); and "provide information in a manner that is culturally and linguistically appropriate to the needs of the population being served by the Exchange or Exchanges," *id.* § 18031(i)(3)(E). But Navigators without a physical presence in an exchange service area cannot effectively perform these duties because they cannot, in the terms CMS itself used in proposing the physical presence requirement in the first place, "provide[]" "face-to-face assistance . . . to applicants and enrollees." 79 Fed. Reg. 15,808, 15,832 (Mar. 21, 2014). Accordingly, Defendants are incorrect in claiming that "the new standard is consistent with § 18031." Mot. at 33.

CMS's decision to eliminate the prior requirements that exchanges award grants to at least two Navigators, and that one be a community- and consumer-focused nonprofit, is similarly contrary to law. An Exchange's Navigators cannot adequately build relationships with consumers, 42 U.S.C. § 18031(i)(2)(A), or perform the duties listed above, *id.* § 18031(i)(3)(A)-(E), if they lack the coverage, diversity, and approach to serve all of the populations that seek to enroll on the exchanges, AC ¶ 77. Under CMS's interpretation, Arizona's exchange could be serviced by a single Navigator, like a "commercial fishing industry organization[]" with ties to the insurer that serves its members, and claim that it will be sufficient to provide assistance to all of the state's communities. That plainly does not comply with the statutory mandate. "Plaintiffs' subjective beliefs about how best to implement the Navigator program," Mot. at 33, are irrelevant. What matters instead are the requirements that *Congress* has imposed concerning Navigators, and how the 2019 Rule undermines them.

b.      CMS's elimination of the physical presence requirement is also arbitrary. The 2019 Rule itself acknowledges—twice—"that entities with a physical presence and strong relationships in their [exchange] service areas tend to deliver the most effective outreach and

enrollment results." 83 Fed. Reg. at 16,980; *see id.* at 16,979-80 (similar). And yet CMS

dismissed comments *documenting* how physically absent entities are less effective, particularly

when it comes to hard-to-reach populations, *see* AC ¶ 78, insisting—against such evidence—that

exchanges know best, *see* Mot. at 32-33. Instead, CMS theorized that "other resources," like self-

interested "agents, brokers, and direct enrollment partners," can pick up the slack for deficient

Navigators, *id.* at 33, ignoring the need to ensure that Navigators themselves can perform their

statutory duties. CMS's "willful blindness in this regard fully deserves the label 'arbitrary and

capricious.'" *MCI Telecomms. v. FCC*, 842 F.2d 1296, 1304 (D.C. Cir. 1988).

3.    *Making small business exchanges less user-friendly* (AC ¶¶ 80-82; Mot. at 39-41)

Exchanges under the ACA are directed to "provide[] for the establishment of a Small

Business Health Options Program." 42 U.S.C. § 18031(b)(1)(B)). These "SHOPs" are "designed

to assist . . . small employers in facilitating the enrollment of their employees in qualified health

plans offered in the small group market." *Id.* In past years, CMS interpreted the ACA as

requiring SHOPs to perform certain functions in order to make them as user-friendly as possible.

AC ¶ 81. CMS now reinterprets the ACA to remove these requirements. *Id.* ¶ 82. Specifically,

the 2019 Rule eliminates the requirement that SHOP exchanges allow employers to determine

employee eligibility, aggregate premiums, and enroll employees online, and instead pushes small

businesses to use insurance brokers or to buy directly from an insurance company. *Id.* These

changes limit the ability of employers and employees to compare plan benefits and prices, which

will ultimately result in premium increases and greater numbers of uninsured small business

employees. *Id.* Because these changes will permit SHOPs to operate even where they cannot

possibly meet the ACA's command that they "make available qualified health plans to qualified

individuals and qualified employers," 42 U.S.C. § 18031(d)(2)(A), the 2019 Rule undercuts the

ACA's purpose.

CMS's decision to delete key SHOP requirements is also arbitrary and capricious.

Defendants argue that CMS is responding to declining issuer participation and enrollment and

out of a desire to reduce "regulatory burden[]." *See* Mot. at 40. But Defendants do not explain how removing key SHOP requirements will boost participation and enrollment rates. Indeed, these changes will likely have the opposite effect. Instead, Defendants offer only the unsupported conclusion that, despite these cuts, "SHOPs that opt to operate in a leaner fashion . . . will still assist qualified employers . . . in facilitating the enrollment of their employees." 83 Fed. Reg. at 16,997; *see* Mot. at 40. Such conclusory statements do not suffice. *United Techs.*, 601 F.3d at 562. In addition, Defendants fail to consider the costs that the 2019 Rule effectively transfers to small business employers and their employees as they lose the benefit of a number of SHOP functions and have to perform these functions directly, or hire an insurance broker. *See* AC ¶ 82.

Ultimately, the 2019 Rule is responsive only to one concern: the cost to SHOP *operators*, like CMS, of running user-friendly SHOPs. *See* 83 Fed. Reg. at 16,996. That is incomplete. "When an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). And because Defendants ignore the concerns cited above, fail to articulate a satisfactory explanation for their action, *see State Farm*, 463 U.S. at 43, and do not acknowledge employers' and employees' reliance interests that the Rule upsets, *see FCC v. Fox*, 556 U.S. at 515, the Rule's provisions concerning SHOPs must be set aside.

4.    *Imposing unnecessary income verification requirements* (AC ¶¶ 83-86; Mot. at 38-39)

The ACA seeks to lower the cost of health insurance on the individual market by allocating advance premium tax credits to consumers who have income between 100 and 400 percent of the federal poverty line (FPL). *See* 26 U.S.C. § 36B(c)(1)(A); 42 U.S.C. §§ 18081, 18082. In light of the fact that lower-income households frequently experience substantial and unpredictable fluctuations in income, previous rules required exchanges to "accept a consumer's attestation" of income between 100-400 percent FPL even if available data sources indicate that their income is below 100 percent FPL. 83 Fed. Reg. at 16,985. The 2019 Rule removes that

limitation and requires exchanges to "request additional documentation to protect against overpayment of APTC" where data sources reveal a discrepancy. *Id.*

CMS's rationale is arbitrary and capricious for two reasons. *See* AC ¶¶ 84-86. *First*, CMS failed to "examine[] the relevant data and provide[] an explanation of its decision." *Appalachian Voices*, 912 F.3d at 753. CMS even "*acknowledge[d]* that it does not have firm data on the number of applicants that might be inflating their income to gain APTC." 83 Fed. Reg. at 16,986 (emphasis added). That is because the evidence demonstrates that discrepancies in income often result from natural income fluctuations, rather than fraud. AC ¶ 86 & n.91. Defendants respond that CMS's decision was "based on its experience and expertise that income-dependent benefits programs, such as the APTC program, may be subject to abuse." Mot. at 38. Again, however, the Court cannot "simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment," and it "owe[s] no deference to [CMS's] purported expertise" where it has failed to "offer[] data" to support its conclusion. *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006). Defendants also cite *Huntco Pawn Holdings v. Department of Defense*, 240 F. Supp. 3d 206, 225-26 (D.D.C. 2016), but that case is inapposite; Defendants here have not provided any reason why CMS could not collect data demonstrating what percentage of discrepancies are the result of fraud, rather than fluctuating incomes. Finally, Defendants say that tax reconciliation cannot recoup all improperly awarded APTC funds, Mot. at 38-39, but CMS likewise neglected to provide any data quantifying that risk.

*Second*, CMS failed to adequately "consider an important aspect of the problem" and to "respond to relevant, significant issues," *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 769 (4th Cir. 2012): namely, the effect of its new income verification requirement on lower-income households. CMS acknowledged that "many commenters expressed concern that low-income consumers have difficulty in providing documentation to resolve their annual income data matching issues." 83 Fed. Reg. at 16,986. Indeed, multiple studies have found that additional paperwork burdens deter low-income consumers, particularly younger and healthier consumers, from obtaining health insurance. *See* AC ¶ 85 & nn.88-90. As a solution, Defendants

43

point to "available resources" to assist consumers with preparing the necessary paperwork—and potential "future resources," Mot. at 39—but fail to address the risk that those resources will be inadequate for individual consumers. In other words, CMS arbitrarily opted to minimize an entirely hypothetical and unproven risk (fraud) in exchange for worsening a well-documented and pressing one (consumers opting out).

### C. Plaintiffs Have Plausibly Alleged that the 2019 Rule's Provisions Driving Up Insurance Costs Violate the APA

  1. *Curtailing review of insurance rate increases* (AC ¶¶ 88-93; Mot. at 26-29)

Finally, the 2019 Rule unlawfully drives up the cost of insurance, including by relieving CMS of its obligation to *review* the cost of insurance. Under the ACA, "[t]he Secretary, in conjunction with States, shall establish a process for the annual review . . . of unreasonable increases in premiums for health insurance coverage." 42 U.S.C. § 300gg-94(a)(1). To fulfill that duty, CMS promulgated regulations requiring insurers to justify annual rate increases above a certain threshold. *See* 35 C.F.R. §§ 154.101 *et seq.* The 2019 Rule changes this scheme—and flouts the ACA's mandate—in two respects. *First*, the 2019 Rule exempts student health plans from rate review beginning July 1, 2018. 83 Fed. Reg. at 16,972. *Second*, the 2019 Rule raises the threshold for rate review to rate increases of 15 percent rather than the current 10 percent. *Id* at 16,972-73. Both of these changes unjustifiably scale back rate review and are unlawful.

  a. Defendants' decision to exempt student health plans is both contrary to the text of the ACA and arbitrary and capricious. The ACA requires review of "unreasonable increases in premiums for health insurance coverage," a category that plainly encompasses student coverage. 42 U.S.C. § 300gg-94(a)(1). As CMS acknowledged in the 2019 Rule and as Defendants reiterate, "[s]tudent health insurance coverage is considered by HHS to be a type of individual market coverage and is generally subject to . . . individual market requirements . . . includ[ing] rate review." 83 Fed. Reg. at 16,972; *see* Mot. at 26. Defendants do not, and cannot, dispute this commonsense interpretation of the statute's language.

Defendants instead rely on a separate provision of the ACA that bars its requirements from being "construed to prohibit an institution of higher education . . . from offering a student health insurance plan." 42 U.S.C. § 18118(c). To that end, Defendants compare rate review to several other ACA requirements from which student health plans are exempt. Mot. at 27. But CMS did not invoke § 18118 in the 2019 Rule itself—let alone articulate this novel rationale— and Defendants cannot do so now. *See Chenery*, 332 U.S. at 196.

Regardless, Defendants' argument makes little sense. According to Defendants, the mere act of reviewing rate increases would have "*the effect* of prohibiting an institution of higher education from offering a student health plan," even though institutions could legally continue to offer them. Mot. at 26 (emphasis added) (quoting 78 Fed. Reg. 13,406, 13,424 (Feb. 27, 2013)). But the only court to interpret § 18118 has limited it to requirements that would make student plans "economically infeasible" or "impossible."[18] Rate review does nothing of the sort. Indeed, CMS previously emphasized that § 18118 "does not allow CMS to except student health insurance coverage from compliance with all Federal requirements," including "the Federal rate review process," 77 Fed. Reg. 16,453, 16,458 (Mar. 21, 2012)—which is why CMS reviewed student plan rate increases for roughly *six years* before inexplicably changing course in the 2019 Rule. The fact that student coverage is "generally rated and administered differently," Mot. at 27, is neither new nor a reason why rate review would impose an insuperable burden on schools.[19]

Even assuming that the ACA permits Defendants to exempt student health plans from rate review, their decision to do so is arbitrary and capricious. In the 2019 Rule, CMS offered two reasons: student coverage is rated differently from other individual plans, and states may

---

[18]   *Roman Catholic Archbishop of Wash. v. Sebelius*, 19 F. Supp. 3d 48, 109-10 (D.D.C. 2013), *aff'd in part, vacated in part sub nom. Priests for Life v. HHS*, 772 F.3d 229 (D.C. Cir. 2014), *vacated and remanded sub nom. Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

[19]   Rate review is also far less onerous than the requirements cited by Defendants, like "guaranteed availability and renewability," which would require student health plans to admit non-students, "the ACA requirement that coverage be offered on a calendar year basis" different from the academic calendar, and the ACA's risk pooling provisions, which would interfere with widely accepted student health plan contracting procedures. Mot. at 27.

continue to review student rates if they choose. 83 Fed. Reg. at 16,972. As explained above, CMS did not point to any recent changes in how student health plans are rated nor explain why those differences preclude rate review. That leaves only CMS's reliance on state regulators, which commenters explained "would result in minimal oversight and decreased affordability." AC ¶ 91. Indeed, CMS expressly acknowledged that some states lack "an Effective Rate Review Program," meaning that those states would lack any automatic, systematic review of student rate increases. *Id.* Defendants offer little in response.

b.      CMS's decision to raise the threshold for rate review from 10 to 15 percent is also arbitrary. CMS raised the threshold "in recognition of significant rate increases," asserting that it would "provid[e] an opportunity for States to reduce their review burden" and "reduce burden for issuers." 83 Fed. Reg. at 16,972. In other words, CMS sought to relieve states from having to review, and issuers from having to submit, justifications for rate increases that CMS itself saw as increasingly common. That does exactly what "many" commenters worried about: "normalize excessive increases." *Id.* at 16,973. The prospect of significant rate increases mean that more review, not less, is needed. CMS failed to consider these "important aspects of the problem." *Ergon-W.V., Inc. v. EPA*, 896 F.3d 600, 609 (4th Cir. 2018).

Defendants' responses miss the mark. To start, Defendants say that the ACA leaves a "gap" for the agency to fill regarding "what constitutes an 'unreasonable' premium rate increase" and "the process that should be used for determining whether a particular increase is 'unreasonable.'" Mot. at 28. But "[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006). Whether or not the statute leaves a gap for CMS to fill, it may not fill it arbitrarily.

Defendants also try to defend CMS's rationale on the merits. *First*, Defendants reiterate that only one filing that fell within the 10 to 15 percent range was ultimately deemed unreasonable. Mot. at 28-29. But Defendants' argument overlooks that the prior review process deterred issuers from submitting unreasonable increases, encouraged them to lower increases

46

they did submit, and forced them to submit adequate public justifications. AC ¶ 92. Scaling back rate review because it uncovered fewer unreasonable increases is therefore like "throwing away your umbrella in a rainstorm because you are not getting wet." *Shelby Cty. v. Holder*, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting). *Second*, Defendants point again to state regulators, some of which apply a lower threshold. Their argument fails for the same reasons: state review practices vary, and Defendants' decision invariably means that some states will lack systematic review of rates increases in the 10 to 15 percent range. *Third*, Defendants claim that the higher threshold "represents a reasonable effort to balance" competing concerns. Mot. at 29. But that only begs the question; for the reasons explained above, CMS's action is unreasonable. In sum, the 2019 Rule substantially curtails rate review without adequate justification.

2.    *Reducing rebates for poor insurer performance* (AC ¶¶ 94-98; Mot. at 44-47)

The 2019 Rule also makes it easier for issuers to avoid paying rebates to consumers if they provide subpar coverage. Under the ACA, issuers must pay rebates if the "medical loss ratio," or percentage of each premium that they spend on paying claims and improving their services, drops below 85 percent (for large group insurance plans) or 80 percent (for small group and individual insurance plans). 42 U.S.C. § 300gg-18(b)(1)(A). The 2019 Rule, however, allows issuers to claim a flat 0.8 percent for "quality improvement activities" (QIA), rather than a percent based on the amount actually spent on such activities. 83 Fed. Reg. at 17,032-33. In other words, the 2019 Rule allows issuers to take credit for improving their services whether they did so or not. That change is both contrary to the ACA and arbitrary and capricious.

To start, allowing issuers to claim a flat credit for quality improvement activities is foreclosed by the text of the ACA. AC ¶ 96. The ACA requires an issuer to report "the percentage of total premium revenue . . . that such coverage expends" for quality improvement activities, as well as paying claims and other non-claims costs, and to "provide an annual rebate" based on "the amount of premium revenue expended" on those costs. 42 U.S.C. § 300gg-18(a)(2), (b)(1)(A). "The statute requires a rebate when *reported amounts paid out* for actual

47

clinical and related services are less than 80% of reported premium revenue." *Morris v. Cal.
Physicians' Serv.*, 918 F.3d 1011, 1013 (9th Cir. 2019) (emphasis added). Its text can only be
read to require issuers to report the amount they in fact "expended" on quality improvement (or,
for that matter, paying claims), not some flat amount determined by HHS. Moreover, allowing
issuers to claim a credit whether they improve quality or not undermines the one of the statute's
primary purposes: "incentivizing issuers to maximize spending on health care and activities that
improve health care quality, thereby promoting greater efficiency in health insurance markets."
*Id.* at 1016; *see also* 42 U.S.C. § 300gg-18(a), (b) (sections titled "Clear accounting for costs"
and "Ensuring that consumers receive value for their premium payments.").

Defendants' only response is that "the statute does not require issuers to provide an
itemized list of each QIA expenditure." Mot. at 45. But that is a strawman, and a bad one at that:
Plaintiffs argue only that issuers must state the aggregate amount they actually spent on QIA, not
that they have to itemize every expenditure. Regardless, in crafting the initial medical loss ratio
regulations, CMS emphasized that the statute requires reporting of actual expenditures, noting
that "[t]he statute does not simply require the issuer to report the numeric ratio of the incurred
loss to earned premium," and that it "requires health insurance issuers to submit an annual report
to the Secretary concerning the percent of total premium revenue that is spent on activities that
improve health care quality." 75 Fed. Reg. 74,864, 74,866, 74,875 (Dec. 1, 2010).

Even if the ACA permitted Defendants' decision to apply a flat credit for quality
improvement activities, that decision is arbitrary and capricious. AC ¶ 97. *First*, CMS failed to
corroborate its assertion that issuers faced "significant burden" in reporting quality improvement
activity. 83 Fed. Reg. at 17,032. Defendants respond that CMS's decision was "based on its
experience over several years of conducting audits," and that the 0.8 percent figure "was
reflective of what most health plan issuers would claim." Mot. at 45. That does not obviate
CMS's burden to supply evidence for its assertions. *Bowen*, 476 U.S. at 627. *Second*, CMS failed
to meaningfully address "many" comments explaining that "a standardized credit for [quality
improvement activities] would disincentivize issuers from making such investments." 83 Fed.

Reg. at 17,032. CMS's assertions that issuers have other incentives to improve quality and that they can use administrative savings to do so are both insufficient; in establishing the medical loss ratio system, Congress recognized that it provided a needed incentive for quality improvement regardless of the burdens it might impose. *Morris*, 918 F.3d at 1016. Defendants' decision to provide a flat credit for quality improvement thus conflicts with the purpose of the statute.

* * *

Although the specifics differ, what the 2019 Rule provisions addressed above share is a purpose at odds with Congress's purpose in enacting the ACA. "As the name implies, the Affordable Care Act was designed to provide 'quality, affordable health care for all Americans' . . . ." *Stewart*, 313 F. Supp. 3d at 261 (quoting Pub. L. No. 111-148, 124 Stat. 119, 130, 271 (2010)). And agencies are "bound . . . by the ultimate purposes Congress has selected," even if they disagree with Congress's choice. *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994). Plaintiffs have plausibly alleged that, in the 2019 Rule, Defendants have eliminated protections that the ACA guarantees, made it harder to enroll in ACA-compliant plans, and driven up costs. Those detailed allegations readily state a claim under the APA.

### III.   Plaintiffs Have Stated a Claim Under the Take Care Clause

When Congress passed, and the President signed, the Affordable Care Act, the Legislative and Executive branches enacted the ACA into law pursuant to the "single, finely wrought and exhaustively considered[] procedure" set forth in the Constitution. *INS v. Chadha*, 462 U.S. 919, 951 (1983) (citing U.S. Const. art. I, §§ 1, 7). Under the Constitution, the ACA would cease being law only if Congress and the President revise or repeal it by that same procedure. *Id.* at 954. Barring that, the President and his Administration's duty is as singular as it is profound: they must "take care that the law[] be faithfully executed." U.S. Const. art. II, § 3.

Defendants have defied this obligation. As the Amended Complaint alleges, they have worked to undermine, rather than faithfully implement, the ACA at every turn. Among other things, Defendants have promoted plans that do not comply with the ACA's most basic requirements, refused to grant state waivers designed to effectuate the underlying purposes of the

49

ACA while granting those designed to undercut it, slashed funding for proven outreach and enrollment strategies, and sown uncertainty about their willingness to enforce and administer the ACA. Their purpose is plain: to pressure Congress to repeal the law or, failing that, to achieve repeal through executive action alone. In so doing, the Executive has usurped the Legislature's role in violation of the Constitution's "separation-of-powers principle." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991). Plaintiffs have therefore stated a claim under the Take Care Clause.

Defendants do not—indeed, cannot—dispute that the Executive is obliged to faithfully execute the law. Nor do they explain how their actions fulfill that fundamental obligation. Instead, Defendants assert a number of threshold objections aimed at convincing the Court that it cannot review the lawfulness of the Executive's actions. But it is the province, and indeed the "responsibility," of the Judiciary "to enforce the principle" of separation of powers here. *Id.*

A.     **The Take Care Clause Is a Critical Component of the Constitution's Separation of Powers and Requires the Executive Branch to Faithfully Implement the ACA**

"Time and again" the Supreme Court has "reaffirmed the importance in our constitutional scheme of the separation of governmental powers into the three coordinate branches." *Morrison v. Olson*, 487 U.S. 654, 693 (1988). The Constitution "divide[s] the delegated powers of the . . . federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government . . . confine[s] itself to its assigned responsibility." *Chadha*, 462 U.S. at 951. Article I vests the legislative power in Congress. U.S. Const., art. I, § 1. Article II vests the "executive power" in the President, *id*, art. II, § 1, and requires the President to "take care that the laws be faithfully executed," *id.*, art. II, § 3. Finally, Article III vests the judicial power in the federal courts. *Id.*, art. III, § 1.

The specific words that the Framers chose for the Take Care Clause bear repeating. The Clause requires not only that the President "*shall . . . execute*" duly enacted laws, but also "*take care*" to do so, and furthermore, "take care that the laws be *faithfully* executed." U.S. Const. art. II, § 3 (emphasis added). Along with the vesting clauses, then, the Take Care Clause is a bulwark

of the Constitution's separation of powers. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). "[T]he Constitution is neither silent nor equivocal" on this point, *id.*: "[u]nder our system of government, Congress makes laws and the President, acting at times through agencies . . . , 'faithfully execute[s]' them," *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (quoting U.S. Const., art. II, § 3). "As Madison explained in The Federalist No. 47, under our constitutional system of checks and balances, 'the magistrate in whom the whole executive power resides cannot of himself make a law.'" *Medellín v. Texas*, 552 U.S. 491, 527-28 (2008) (alteration omitted).

Nor unmake a law. "The Constitution does not confer upon" the Executive a suspension power, to suspend "such [laws] as the Congress enacts." *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915) (citing *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838)). Neither does it confer a "dispensing power," as the Supreme Court held in rejecting as "entirely inadmissible" the notion that "the obligation imposed on the President to see the laws faithfully executed[] implies a power to forbid their execution":

> This is a doctrine that cannot receive the sanction of this court. It would be vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution; and is asserting a principle, which, if carried out in its results, to all cases falling within it, would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice.

*Kendall*, 37 U.S. (12 Pet.) at 613; *see Maryland*, 360 F. Supp. at 317.

The pedigree of this principle—that the President cannot refuse to execute laws that he or she dislikes—traces to Magna Carta.[20] "English monarchs had long claimed an extraordinary power to 'dispense with' the law, along with a related but less significant power to 'suspend' the law." Robert J. Delahunty & John C. Yoo, *Dream On: The Obama Administration's*

---

[20]   *See* Andrew Kent, Ethan J. Leib, & Jed Handelsman Shugerman, *Faithful Execution and Article II*, 132 Harv. L. Rev. ___ (June 2019), at 29-30, 32, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3260593; Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa. L. Rev. 1835, 1850 & nn.109-10 (2016).

*Nonenforcement of Immigration Laws, the Dream Act, and the Take Care Clause*, 91 Tex. L.

Rev. 781, 804 (2013). Rebellion against such powers found expression in the first two grievances

of the Declaration of Independence, provisions of early state constitutions, *see id.* at 802-03, the

Federalist Papers, *see id.* at 797, debate at the Constitutional Convention, *see id.* at 802, and,

ultimately, in the Take Care Clause. Powerful expression: "No other constitutional provision

mandates that any branch execute a power in a specific manner. Yet the Constitution mandates

that the president execute the laws in a specific way: *faithfully.*" Josh Blackman, *United States v.*

*Texas (Scalia, J., Concurring)*, 2016 Cato Sup. Ct. Rev. 79, 88 (2015-16).

Faithfulness is key. Even as Article II's vesting clause endows the Executive with "broad

powers" to enforce the laws, *New York Times Co. v. United States*, 403 U.S. 713, 741 (1971)

(Marshall, J., concurring), the Take Care Clause limits the Executive's discretion by mandating

*faithful* execution of those laws, *Util. Air Reg. Grp.*, 573 U.S. at 327; *see* Kent et al., *Faithful*

*Execution* at 7. The debate at the Constitutional Convention confirms the point, where "no one

argue[d] that" the Take Care Clause "empower[ed] the President," and where the Clause was

instead discussed as a "dut[y] or restriction[]." *See id.* at 16. The same is true of the ratification

debates, in which the Take Care Clause did not generate substantial discussion but "tended to be

viewed as [a] real limit[] on presidential power." *Id.* at 17; *see id.* at 17-18 (collecting examples).

In contrast, no evidence from the ratification debates suggests that the Take Care Clause permits

"the President . . . policy-based . . . authority to suspend execution of the laws." *Id.* at 19.

"[T]he best historical understanding of" the references to faithful execution in the Take

Care Clause, and in the presidential oath, *see* U.S. Const., art. II, § 1, "is that they impose *duties*

that we today—and some in the eighteenth century as well—would call fiduciary," Kent et al.,

*Faithful Execution* at 8 (emphasis added). A trove of historical evidence, including dictionary

definitions at the time of the Founding,[21] confirms that the Take Care Clause requires "true,

---

21    *See* Samuel Johnson, *A Dictionary of the English Language* 763 (1755), *available at*
https://johnsonsdictionaryonline.com/page-view/?i =763 (among the definitions of "faithfully,"
including "[w]ith strict adherence to duty and allegiance," "[w]ithout failure of performance;
honestly; exactly," "[s]incerely," and "honestly; without fraud, trick, or ambiguity").

diligent, due, honest, well, skillful, careful, and impartial" execution of the law, "staying within authority and abiding by standing law, following the intent of the lawgiver, and eschewing self-dealing." *Id.* at 56-57 (footnotes omitted). "The reasonable legal implication . . . is that the language of faithful execution is for the most part a language of limitation, subordination, and proscription," *id.* at 71: the Executive's "power and discretion is constrained," and "the President cannot act with a motivation to undermine Congress's laws," *id.* at 72. The Supreme Court confirmed as much in *Youngstown* when, in striking down President Truman's order directing the Secretary of Commerce to seize the nation's steel mills, it observed that "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." 343 U.S. at 588.

In sum, the Take Care Clause demarcates the line between the legislative and executive powers, and limits executive discretion, by requiring faithful execution of the laws. "[F]aithful execution requires affirmative effort on the part of the President to pursue diligently and in good faith the interests of the principal or purpose specified by the authorizing instrument or entity." Kent et al., *Faithful Execution* at 75. Justice Story put it this way: in addition to prohibiting "[a] tyrannical President" from "usurp[ing] the functions of other departments of the government," the Take Care Clause *requires* the President "to use all such means as the Constitution and laws have placed at his disposal, to enforce the due execution of the laws." Joseph Story*, A Familiar Exposition of the Constitution of the United States* § 292, at 177-78 (1840). To be sure, "[t]he power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration." *Util. Air Reg. Grp.*, 573 U.S. at 327. But if "it does not include a power to revise clear statutory terms that turn out not to work in practice," *id.*, then it certainly does "not permit the President to refrain from executing laws duly enacted by the Congress," *see Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974); *see also* 38 Op. O.L.C. 1, 6 (2014) ("the Executive cannot, under

the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences"). Yet that is precisely what Defendants have done.

**B.**     **Plaintiffs Have Plausibly Alleged that Defendants Have Failed to Faithfully Execute the ACA**

In seeking the presidency, Mr. Trump campaigned against the ACA, as he was fully entitled to do. AC ¶ 44. Mere hours after being sworn in, however, he began taking unilateral executive action aimed at undermining that law—unlawful action—by signing Executive Order No. 13,765, *Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal*, 82 Fed. Reg. 8,351 (Jan. 20, 2017). *See* AC ¶¶ 100-03. The Order directs executive agencies to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the Act," and to "waive, defer, grant exemptions from, or delay the implementation of any" ACA provision or requirement that, in the Administration's estimation, would impose fiscal or regulatory burdens. *Id.* ¶¶ 100-01. What the President meant by that language was made clear five days later, when he affirmed his agenda to "let [the ACA] explode . .  and let the Democrats come begging us to help them because it's on them." *Id.* ¶ 46(b). The President has returned to this theme repeatedly. *Id.* ¶¶ 46(c)-(f).

Just as the President and others in his Administration have continued to voice their intent to undermine the ACA, *see generally id.* ¶¶ 46-48, they have turned ambition into action. Defendants' actions must be understood as they have been pleaded by Plaintiffs: not as a series of "discretionary political decisions" or isolated "political statements or policy directives," Mot. at 52, but rather on the whole, as a concerted campaign to undermine the Act. It is that systematic attempt to unilaterally dismantle a duly enacted law, separate and apart from the individual actions themselves, that flouts the Executive's duty under the Take Care Clause.

Defendants have made use of many methods but generally have adhered to two strategies. Recall that Congress crafted the ACA to both support, and be supported by, robust enrollment in ACA-compliant plans on ACA exchanges. Key to strong enrollment numbers are competitive exchanges with low premiums that attract a broad range of consumers, not just those with high

medical expenses, and a broad range of insurers, to foster competition. Insurance companies, in turn, strive to minimize risk and uncertainty. When risk and uncertainty increase, issuers raise premiums to compensate, or even exit insurance markets entirely. So, first, given that the ACA's success depends in part on strong enrollment figures, *see* AC ¶¶ 39-40, Defendants have taken actions to make it harder and more expensive to enroll in plans sold on ACA exchanges, pushed bare-bones plans to draw individuals away from ACA plans, and drastically curtailed outreach and education efforts. And second, given that the ACA's success also depends on stable insurance markets, *see id.* ¶ 104, they have deliberately sown uncertainty.

Emblematic of the latter was Defendants' approach to cost-sharing reduction payments. CSR payments reimburse insurers for discounts on cost-sharing that the ACA mandates for certain individuals, as part of the Act's scheme to make coverage more affordable. *See id.* ¶ 33(c). Over the summer and fall of 2017, Defendants exploited questions concerning whether Congress had appropriated funds for CSR payments by repeatedly threatening to end them but, for many months, stopping short of doing so. *See id.* ¶¶ 105-07. The threats caused uncertainty, leading some issuers to leave ACA markets, driving up prices, and decreasing enrollment, thereby increasing adverse selection, further weakening the markets, further raising premiums, and *further* lowering enrollment. *See id.* ¶¶ 106-08. While the Administration's duty to make cost-sharing reduction payments has, as Defendants say, been a subject of litigation, Mot. at 53 n.17, that litigation in no way supports Defendants' persistent attempts to sow uncertainty about whether they would make them. Indeed, one study considering Defendants' approach to CSR payments concluded that "[a]lthough actuarial uncertainty is always present, what has especially bedeviled ACA insurers is the political uncertainty over adverse change in rules." AC ¶ 108.[22]

According to the President, that was the plan: "If you don't make" CSR payments, he said, the Act "fails." *Id.* ¶ 46(g). "Obamacare is dead," he threatened, "if it doesn't get that

---

[22]   Defendants also created confusion concerning their enforcement, or lack thereof, of the ACA's individual mandate. AC ¶¶ 116-21. Preliminary analyses estimate that this uncertainty accounted for up to a 20 percent increase in 2018 individual market premiums. *Id.* ¶ 121.

money. . . . What I think should happen and will happen is the Democrats will start calling me and negotiating." *Id.* ¶ 46(h). "I predicted it a long time ago. I said, [the ACA] is failing. And now, it's obvious that it's failing. It's dead. It's essentially dead. If we don't pay lots of ransom money over to the insurance companies it would die immediately." *Id.* ¶ 46(k). The day after stopping the payments, the President explained, "We're taking a little different route than we had hoped, because getting Congress—they forgot what their pledges were. . . . So we're going a little different route. But you know what? In the end, it's going to be just as effective, and maybe it'll even be better." *Id.* ¶ 47(d). Shortly thereafter, the President declared that the Act was indeed "dead" and "gone," and that "[t]here is no such thing as Obamacare anymore." *Id.* ¶ 107.

Of course, that was not true at the time and it has not proven true since. Not for Defendants' lack of trying, however. For example, six days after the President took office, and in the final days of 2017's open enrollment period, Defendants abruptly pulled the plug on all federally-funded ACA advertising campaigns, even though HHS regulations require them. *See id.* ¶¶ 143-46; *see also id.* ¶ 147 (describing another advertising cut); *id.* ¶ 171 (describing cuts to other outreach efforts).[23] And even though—or because—Defendants knew from years of evidence that television advertising was the most effective, television advertising is what they targeted. *See id.* ¶¶ 147-51. When Defendants did spend on television advertising, they went so far as to use federal dollars designated to support the ACA to produce ads that denigrated it and aimed to weaken public confidence in it. *See id.* ¶ 152; *see also id.* ¶¶ 129-31 (detailing other similar efforts by Defendants to undermine confidence in the ACA's exchanges).

Defendants likewise have drastically reduced funding for Navigators, deliberately hampering their efforts to help individuals and families enroll in ACA plans. *See id.* ¶¶ 155-67.

---

[23] Since Plaintiffs filed their Amended Complaint, Defendants' efforts in these regards have continued unabated: a recent report concludes that executive "agencies have censored their websites to reduce public access to information about the Affordable Care Act . . . , actions that may undercut the aim of the law to increase rates of healthcare coverage among Americans." Sunlight Found. *Erasing the Affordable Care Act: Using Government Web Censorship to Undermine the Law* 5, Web Integrity Project (May 2019), http://sunlightfoundation.com/wp-content/uploads/2019/05/Erasing-the-ACA-Using-Web-Censorship.pdf.

The GAO criticized Defendants' purported rationale for the cuts. *See id.* ¶ 164. Accordingly, these are not "discretionary budgetary decisions made by the agency based on its experience and expertise," Mot. at 54; these are decisions to *ignore* the agency's experience and expertise in service of an unlawful agenda. Yet not content to merely strip Navigators of their funding, making it nearly impossible for them to comply with the ACA's requirements, Defendants went so far as to require Navigators to compete for what little funding is available in part by pledging to push bare-bones plans as alternatives to ACA plans. *See* AC ¶ 166.

Such plans comprise a substantial part of Defendants' sabotage agenda. By Executive Order No. 13,813, which posits that the ACA "has severely limited the choice of healthcare options available to many Americans and has produced large premium increases in many State individual markets for health insurance," the President has directed his agencies to take steps to promote association health plans, short-term, limited-duration insurance plans, and health reimbursement arrangements instead. *Id.* ¶ 109. All three can provide bare-bones coverage that need not comply with the ACA's requirements, or can provide broader coverage while turning a profit by cherry-picking for healthy individuals. *Id.* For example, short-term, limited-duration insurance can refuse to offer coverage at all, or exclude coverage, for preexisting conditions; charge a higher rate based on an individual's health history and health status; exclude benefits such as prescription drugs, maternity care, mental health services, and substance use disorder services; can include a dollar cap on services and stop paying medical bills after that cap is reached; and are not required to limit consumer out-of-pocket costs. *Id.*

By promoting such plans, Defendants aim to draw healthy individuals away from ACA exchanges, increasing adverse selection and, with it, premiums, thereby further decreasing enrollment. *See id.* ¶¶ 110-12. Whether "[i]t is eminently *reasonable* for the Executive Branch to make [AHPs, STLDI, and HRAs] more readily available," Mot. at 57 (emphasis added), is beside the point where doing so does not *faithfully* implement the ACA. There can be no ambiguity on that latter point: in advance of issuing Executive Order No. 13,813, the President announced that "[s]ince Congress can't get its act together on HealthCare, I will be using the

power of the pen." AC ¶ 47(c). And in signing the order, the President confirmed its intent, saying, "I just keep hearing repeal-replace, repeal replace. Well, we're starting that process." *Id.* ¶ 113. Except, of course, the President cannot repeal the ACA and Congress has not done so. These are neither the words nor, crucially, the actions of faithful execution. As regards the AHPs rule that emerged from the executive order, *see id.* ¶ 114 & n.126; Mot. at 24, a court has agreed, concluding not only that it is not reasonable under the APA, but also that it "undermines the market structure that Congress so carefully crafted," and that it was "intended and designed to end run the requirements of the ACA," *New York v. Dep't of Labor*, 363 F. Supp. 3d 109, 141 (D.D.C. 2019), *appeal pending*, No. 19-5125 (D.C. Cir. filed Apr. 30, 2019).

Indeed, Plaintiffs have plausibly alleged that *all* of Defendants' actions addressed here "undermine[] the market structure that Congress so carefully crafted" and are "intended and designed to end run" the ACA. Of course, the President retains ample discretion to direct the faithful implementation of the laws. Here, however, Defendants have strayed far beyond their discretion in their avowed efforts to undermine the law. Their actions are outliers even within established separation of powers doctrine.

Additional examples abound. The provisions of the 2019 Rule addressed above aim not to faithfully execute the ACA but rather to sabotage it. AC ¶ 99. Defendants have refused to grant waiver applications by states that sought to further the ACA's goals, *see id.* ¶¶ 123-25, and have encouraged states to request waivers that seek the opposite end, *see id.* ¶ 127. Defendants have shortened the annual open enrollment period, making it harder for individuals and families to adequately compare and purchase ACA coverage. *See id.* ¶¶ 135-41; *see also id.* ¶¶ 168-70 (detailing how Defendants' decision not to set enrollment targets is another feature of their campaign to decrease enrollment, one that has also been criticized by the GAO). Again, these are not mere matters of "preferences and disagreements." Mot. at 55. They are conscious decisions to eschew techniques and policies proven to increase enrollment—the ACA's core objective. As demonstrated above, Defendants' actions have caused consumers' costs to rise generally; one

recent change, in the recently finalized 2020 Rule, will do so specifically, for no reason related to faithfully implementing the Act. *See* AC ¶¶ 173-75.

Finally, Defendants have refused to defend the ACA's constitutionality, and backed its wholesale invalidation, in litigation pending before the Fifth Circuit. *Id.* ¶¶ 177-80. In doing so, Defendants have not only abdicated their duty to present reasonable arguments in favor of a statute's constitutionality, *see id.* ¶¶ 177-78, they have pressed arguments *against* the Act so tenuous that even the Attorney General has suggested they are unlikely to succeed.[24] And while the plaintiffs there and Plaintiffs here press remarkably similar theories of injury, Defendants concede standing *only* in the case that seeks to invalidate the ACA, and protest here, where Plaintiffs' aim is to protect Congress's law against Executive overreach. Defendants say that the Executive has long declined to defend laws it deems unconstitutional, Mot. at 52-53, but so too has the Executive long been expected to present reasonable arguments in a law's defense.

Tellingly, in seeking dismissal, Defendants decline the opportunity to explain why their actions faithfully execute the ACA by promoting Congress's goals in the Act. As noted above, Defendants labor to recharacterize their actions as "discretionary political decisions," and they reject Plaintiffs' allegations as "no more than political disagreements with the President's policy decisions." *Id.* at 52; *see id.* at 52-61. That does not carry Defendants' burden. As summarized above, the Amended Complaint details, with ample factual support, how all of Defendants' actions have been undertaken not with the good faith that the Take Care Clause requires—not to "execute[]" a "congressional policy . . . in a manner prescribed by Congress"—but rather to "execute[]" a "presidential policy" of undermining the ACA. *Youngstown*, 343 U.S. at 588.[25]

---

[24] *See* Aaron Rupar, *Barr's Confusing Testimony about Trump's Latest Push to Overturn the ACA, Decoded*, Vox (Apr. 9, 2019), https://www.vox.com/policy-and-politics/2019/4/9/18302270/bill-barr-testimony-obamacare-house-lawsuit.

[25] *See, e.g.*, AC ¶¶ 108 (CSR payments), 115 (promoting bare-bones plans), 122 (undermining the individual mandate), 126 (denying faithful state waiver requests), 128 (encouraging unfaithful state waiver requests), 132 (working to weaken public confidence in the ACA and its exchanges), 142 (shortening open enrollment), 154 (curtailing, and misdirecting, advertising efforts), 167 (slashing funding for Navigators and encouraging them to advertise non-ACA

Or, in the terms the President has used to describe his Administration's actions, Plaintiffs plausibly allege that Defendants' aim is to "get[] rid of Obamacare," AC ¶ 47(j) ("[s]ome people would say, essentially, we have gotten rid of it"), in the face of Congress's decision not to, *id.* ¶ 47; *see id.* ¶¶ 47(k) ("Could have had it done a little bit easier, but somebody decided not to vote for it . . . ."), 47(m) ("it doesn't matter[,] [w]e gutted it anyway"). The point is worth emphasizing. Plaintiffs' Amended Complaint makes it "plausible[,] and not merely possible," *McLean v. United States*, 566 F.3d 391, 399 (4th Cir. 2009), that Defendants' actions undermine the ACA; that having failed to carry the day with Congress, their intent now is to achieve effective repeal by unilateral executive action. Once again, the President's words speak for themselves, and for all of the actions by Defendants that the Amended Complaint thoroughly describes: "We had Obamacare repealed and replaced, and a [senator] . . . at 2 o'clock in the morning went thumbs down . . . . But still, I have just about ended Obamacare. . . . [W]e're doing it a different way. We have to go a different route." *Id.* ¶ 47(o) (emphasis omitted).

The Constitution, of course, does not "give the President an 'I'm-frustrated-with-democracy' exception to Bicameralism and Presentment." *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 416 (D.C. Cir. 2017) (Brown, J., dissenting from denial of rehearing en banc). Plaintiffs have plausibly alleged that, by their actions, Defendants have violated the command of the Take Care Clause and the separation of powers that they faithfully execute the Affordable Care Act. At this stage of the litigation, Defendants' attempts to recharacterize the nature and purpose of their actions—to paint them as purely discretionary policy choices—must be rejected. Even Defendants appear to admit that their efforts amount, at least in part, to a request that the Court "reject[]" Plaintiffs' claim "as a matter of . . . *fact*." Mot. at 53 (emphasis added). Such a request has no place under Rule 12(b)(6), which requires this Court to accept Plaintiffs' well-pleaded factual allegations as true. *Wikimedia Found.*, 857 F.3d at 208. In any event, contrary to Defendants' assertions, Plaintiffs are not seeking "to advance [their] own political and policy

---

compliant plans), 170 (failing to set enrollment targets), 172 (cutting back on enrollment events), 175 (arbitrarily increasing premiums), 179 (refusing to defend the Act's constitutionality).

views," Mot. at 54, no matter how often Defendants repeat the charge, *see id.* at 55, 57, 61. Rather, Plaintiffs ask only that the Court hold Defendants to the view of the Executive that the Constitution requires: a co-equal branch that faithfully executes Congress's laws.

### C.      Defendants' Threshold Objections Lack Merit

Defendants' primary response to Plaintiffs' claim is to question the Court's authority to hear it. Their myriad threshold objections, taken in turn below, boil down to the argument that the Take Care Clause's obligation to faithfully execute the laws begins and ends with the President but is nonetheless unenforceable as to him. This asserted double-bind cannot hold. It is as dangerous as it is unfounded, running contrary to our nation's long history of holding the Executive Branch accountable for separation of powers violations. *See, e.g.*, *Util. Air Reg. Grp.*, 573 U.S. at 327-28; *Youngstown*, 343 U.S. at 587; *Kendall*, 37 U.S. (12 Pet.) at 612-13.

### 1.      *The Court has the authority to hear Plaintiffs' claim*

Defendants first question whether the Court may adjudicate claims under the Take Care Clause at all. Mot. at 47-48. To that end, Defendants appeal to limitations *in the APA* that "preclude[] . . . broad programmatic attack[s]," *Norton v. SUWA*, 542 U.S. 55, 64 (2004), but never explain their relevance to Plaintiffs' claim under *the Constitution's* separation of powers principles and Take Care Clause. Mot. at 47-48, 57. There is no connection; Plaintiffs are not attempting "to circumvent the limitations of the APA," *id.* at 47, but rather are asking this Court to proceed to adjudicate whether, in failing to faithfully execute the ACA, the Executive Branch has usurped the lawmaking function the Constitution assigns to Congress.[26]

---

[26]   Defendants argue that Plaintiffs must "challenge [Defendants' actions], if at all, under the APA." Mot. at 57; *accord id.* at 54. Defendants, in effect, "claim that Plaintiffs cannot invoke this Court's inherent authority because the APA governs suits challenging government actions," but "Congress [has not] designate[d] the APA as the exclusive mechanism to challenge executive action." *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 289 n.10 (4th Cir. 2018) (Gregory, C.J., concurring), *vacated*, 138 S. Ct. 2710 (2018); *see Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (while "the President's actions . . . are not reviewable for abuse of discretion under the APA," they "may still be reviewed for constitutionality" (collecting cases)).

Specifically, Plaintiffs invoke this Court's authority "to enjoin unconstitutional actions by . . . federal officers," a "creation of courts of equity . . . reflect[ing] a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). "The courts, when a case or controversy arises, can always 'ascertain whether the will of Congress has been obeyed.'" *Chadha*, 462 U.S. at 953 n.16 (quoting *Yakus v. United States*, 321 U.S. 414, 425 (1944)). More than a capability, this is a core judicial function—a responsibility with long roots:

> In *Marbury*, the Supreme Court established that if the legislative branch has acted in contravention of the Constitution, it is the courts that make that determination. In *Youngstown* . . . , the Supreme Court made clear that the courts *must make the same determination* if the executive has acted contrary to the Constitution.

*NLRB v. Enter. Leasing Co. Se.*, 722 F.3d 609, 639 (4th Cir. 2013) (emphasis added, quotation and citations omitted). It remains "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cr.) 137, 177 (1803).

For these reasons, the Court cannot accept Defendants' argument that the Take Care Clause "does not provide a cause of action against the President or any other Defendant," and contention that "no court has ever held that the Clause can be used as a mechanism to obtain affirmative relief against the Executive." Mot. at 48. Faced with the strikingly similar "assert[ion] that [the plaintiffs] have not pointed to any case in which this Court has recognized an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles," the Supreme Court rejected it, reaffirming that "equitable relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (quotation omitted); *see District of Columbia*, 291 F. Supp. 3d at 755 ("Precedent makes clear that a plaintiff may bring claims to enjoin unconstitutional actions by federal officials and that they may do so to prevent violation of a structural provision of the Constitution." (collecting cases)). What the Court observed in *Free Enterprise Fund* applies with equal force here: "If the Government's point is that a[] . . . separation-of-powers claim should be

treated differently than every other constitutional claim, it offers no reason and cites no authority why that might be so." 561 U.S. at 491 n.2

Regardless, Defendants are simply incorrect in asserting that courts have not given effect to the Take Care Clause. In *United States v. Juarez-Escobar*, the court held the prior Administration's Deferred Action for Childhood Arrivals policy "unconstitutional because it violates the separation of powers and the Take Care Clause of the Constitution." 25 F. Supp. 3d 774, 797 (W.D. Pa. 2014); *see id.* at 785-88. And particularly compellingly, in *In re Aiken County*, the D.C. Circuit (in an opinion by then-Judge Kavanaugh) described its "modest task" as "ensur[ing], in justiciable cases, that agencies comply with the law as it has been set by Congress," 725 F.3d 255, 257 (D.C. Cir. 2013); carefully assessed the executive agency's compliance with the law under the Take Care Clause, *see id.* at 259-66; found the agency's actions wanting and, notwithstanding that "[m]andamus is an extraordinary remedy," *id.* at 258, issued the writ, *see id.* at 267. In any event, Plaintiffs' claim sounds in the Constitution's separation of powers, which courts can, do, and must enforce. *Abatement of Aircraft Noise, Inc.*, 501 U.S. at 272-73; *see Enter. Leasing Co. Se.*, 722 F.3d at 656-57 (collecting cases).

Finally, as noted above, Defendants argue that many of the actions Plaintiffs challenge escape review under the Take Care Clause because they are the President's "discretionary, political acts." Mot. at 51; *see id.* 51-53. Defendants' acts are certainly political in one sense: they comprise the core of the President's scheme to force Congress to do what it has repeatedly refused to do—to repeal the ACA. "I've been saying for years," the President has boasted, "that the best thing is to let Obamacare explode and then go make a deal with the Democrats." AC ¶ 46(e). "It's in for some rough, rough days. I'll fix it as it explodes. They're going to come to ask for help. They're going to have to." *Id.*; *see id.* ¶ 46(j) ("And I've said from day one, the best thing I could do is let ObamaCare die and then come in with a plan."). The President has promised—and delivered, by the actions described above—not passive but rather *affirmative* neglect: "we'll *let* Obamacare fail," he has pledged. *Id.* ¶ 46(q) (emphasis added). "We're not going to own it. I'm not going to own it. I can tell you the Republicans are not going to own it.

We'll let Obamacare fail and then the Democrats are going to come to us." *Id.* Although a President may certainly use powers of persuasion to move Congress to act, the Constitution does not countenance unilateral executive action aimed at sabotaging a duly enacted law. As the *Juarez-Escobar* court put it, "Presidential action may not serve as . . . a bargaining chip to be used against the legislative branch." 25 F. Supp. 3d at 786. Rather than insulating Defendants' actions from this Court's inquiry, their particular political nature requires judicial review.[27]

    2.    *Defendants provide no grounds for dismissing the President at this early stage*

Defendants next argue that Plaintiffs' claim cannot proceed, and seek immediate dismissal of the President, because (according to them) the same separation of powers principles that courts of equity have long enforced prevent this Court from issuing injunctive or declaratory relief against the President. *See* Mot. at 48-51. To reach this conclusion, Defendants principally rely on an overreading of *Franklin*, 505 U.S. 788, and *Mississippi v. Johnson*, 71 U.S. (4 Wall) 475 (1866). But neither of those cases, nor any of the others Defendants cite, foreclose the relief Plaintiffs seek or require the President's dismissal. To the contrary, the plurality opinion in *Franklin* expressly left open "whether injunctive relief against the President was available," even though it characterized such relief as "extraordinary." 505 U.S. at 802-03.[28]

Defendants then stretch *Franklin* and *Johnson* to the breaking point, arguing that they foreclose declaratory relief as well. Mot. at 49-50 & n.14. While, as Defendants point out, the

---

[27]  As Defendants appear to recognize by only gesturing at the political question doctrine, Mot. at 51-52, there is no "textually demonstrable constitutional commitment of" the issue whether the Executive is complying with the Take Care Clause "to a coordinate political department," *Baker v. Carr*, 369 U.S. 186, 217 (1962). Indeed, if Take Care claims were categorically non-justiciable, it would have made little sense for the Supreme Court to "*sua sponte* direct[] the litigants in *United States v. Texas* to address whether the Obama Administration's Deferred Action for Parents of Americans . . . policy violated the Take Care Clause." *CREW v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018) (citing 136 S. Ct. 906 (2016)).

[28]  Defendants (Mot. at 49-50) lean on the Fourth Circuit's decision in *International Refugee Assistance Project v. Trump*, but it merely echoes the Supreme Court in acknowledging that injunctive relief should be ordered against the President "only in the rarest of circumstances." 857 F.3d 554, 605 (4th Cir. 2017) (en banc), *vacated as moot*, 138 S. Ct. 353 (2017).

D.C. Circuit has suggested that *Johnson*'s statements regarding injunctive relief extend to declaratory relief, *see Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996), the D.C. Circuit nonetheless "*has* issued a declaratory judgment directly against the President," *CREW*, 302 F. Supp. 3d at 139 (citing *Nat'l Treasury*, 492 F.2d 587).[29] Moreover, in arguing against declaratory relief, Defendants rely on the "statement of Justice Scalia in *Franklin*," but as this Court has observed, "[l]anguage from later Supreme Court cases runs directly contrary to" that statement, *see District of Columbia*, 291 F. Supp. 3d at 751-52.

More fundamentally, the Supreme Court has affirmed that "[w]hen judicial action is needed to serve broad public interests[,] as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance[,] . . . the exercise of jurisdiction been held warranted," even as to the President. *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982); *see id.* at 753-54 & n.36 (collecting cases). Accordingly, many courts, including in this judicial district, have declined to dismiss the President as a defendant in challenges to federal action. *See, e.g.*, *District of Columbia*, 291 F. Supp. 3d at 752 ("The Court sees no barrier to its authority to grant either injunctive or declaratory relief."); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 329 (D. Md. 2018) ("[N]one of the authority cited by Defendants requires that the President be dismissed at this early stage.").[30] On motions to dismiss, these courts have not been constrained by the distinction Defendants emphasize, between the President's exercise of ministerial duties—where even Defendants concede equitable relief is available—and his discretionary authority. *See* Mot. at 48 n.13. For example, the *District of Columbia* court considered the very argument Defendants make here but declined to dismiss the President,

---

[29]   *National Treasury*, in turn, noted that the "*Youngstown* majority[] made it clear that the Court understood its [decision] effectively to restrain the president. There is not the slightest hint in any of the *Youngstown* opinions that the case would have been viewed differently if President Truman rather than Secretary Sawyer had been the named party." 492 F.2d at 611.

[30]   *Accord Blumenthal v. Trump*, No. 17-cv-1154, 2019 WL 1923398, at *14-15 (D.D.C. Apr. 30, 2019); *Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 419 (D. Mass. 2018).

finding instead that it was "entirely plausible . . . that an appropriate injunction of some sort could be fashioned, were Plaintiffs to succeed on the merits." 291 F. Supp. 3d at 751-52.

In reprising their bid to reframe the Amended Complaint as seeking to require "the President to exercise his discretion according to [Plaintiffs'] own policy preferences," Defendants assert that Plaintiffs "have identified no ministerial duty at issue." Mot. at 49 n.13. Again, Plaintiffs' policy views are irrelevant—they play no role—and Plaintiffs do not challenge the President's discretion to choose among "[t]he ways to *faithfully* execute [the ACA]," which are "uncountable in number." *Cf. Knight First Amendment Inst. v. Trump*, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018) (emphasis added), *appeal pending*, No. 18-1691 (2d Cir. argued Mar. 26, 2019). Rather, the discretion the Executive unquestionably lacks is the precise power it has claimed here: a lawmaking power, to take actions to undermine the Act and unilaterally effectuate its repeal. Accordingly, the relief Plaintiffs request can hardly be said to cut into "the heart of the President's authority as Chief Executive." Mot. at 49 n.13. "No government official, after all, possesses the discretion to act unconstitutionally." *Knight*, 302 F. Supp. 3d at 579.

Finally, while Defendants are correct that Plaintiffs may ultimately be able to obtain complete relief through injunctions against subordinate officials, *see* Mot. at 51, there is no need for the Court to resolve that fact-bound question now. Indeed, on Defendants' motion to dismiss, with no "record . . . regarding . . . what relief would be appropriate if Plaintiffs prevailed on their claim or whether an injunction against lower officials or declaratory relief would be sufficient[,] [i]t is . . . premature to determine whether this case has the potential to be the rare case in which" equitable relief against the President "might be justified." *Centro Presente*, 332 F. Supp. 3d at 419; *see CASA de Maryland*, 355 F. Supp. 3d at 329 (declining to dismiss the President at the early motion to dismiss phase, even where it was "extraordinarily unlikely" that the Court would ultimately grant relief against the President). In any event, because Plaintiffs seek "judicial action . . . not in derogation of the separation of powers, but to maintain their proper balance," *Fitzgerald*, 457 U.S. at 754, permitting this case to move forward with the President as a

defendant would not "interfere with his ability to ensure that the laws be faithfully executed," but rather advance it, *see Blumenthal*, 2019 WL 1923398, at *15 (denying motion to dismiss).

3.   *The Take Care Clause requires the President's subordinates to faithfully execute the law*

In a remarkable turn, Defendants finally argue that the Take Care Clause restrains *only* the President (who, they say, is not subject to the Court's equitable powers), leaving the vast remainder of the Executive Branch unrestricted. *See* Mot. at 54. Not so. Whether the Take Care Clause imposes a duty on the President to supervise the actions of her subordinates or whether those subordinates are understood to be themselves bound by the Take Care Clause is immaterial; the Executive must faithfully execute the law.

That the Take Care Clause extends to the actions of the President's subordinates is apparent from its text: the President must not only take care that *he* faithfully executes the law, but that "the laws *be* faithfully executed." U.S. Const., art. II, § 3 (emphasis added). As "indicated by the Clause's use of the passive voice and the sheer practical impossibility of any other result, . . . the actual execution of the laws will be done by others." Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 Yale L.J. 1836, 1876 (2015). Thus, "[t]he President must act in good faith in executing the law," but "also must ensure that other executive officials do so, by demanding their fidelity to law." Patricia L. Bellia, *Faithful Execution and Enforcement Discretion*, 164 U. Pa. L. Rev. 1753, 1788 (2016). Indeed, the Supreme Court has "repeatedly affirmed" that while "[t]he vesting of the executive power in the President [is] essentially a grant of the power to execute the laws," the President cannot do so "alone and unaided" and rather "must execute them by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926) (discussing the Take Care Clause).[31]

---

[31]   *See, e.g.*, *Util. Air Reg. Grp.*, 573 U.S. at 327 (the President "act[s] at times through agencies" to "faithfully execute[] [the laws]"); *Free Enter. Fund*, 561 U.S. at 484 ("The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them."); *see also al-Marri v. Pucciarelli*, 534 F.3d 213, 288 (4th Cir. 2008) (an executive officer is "the President's agent in implementing the Take Care Clause"), *vacated and remanded sub nom. al-Marri v. Spagone*, 555 U.S. 1220 (2009).

"The Constitution does not leave to speculation who is to administer the laws enacted by Congress; the President, it says, 'shall take Care that the Laws be faithfully executed,' . . . personally *and through officers whom he appoints*." *Printz v. United States*, 521 U.S. 898, 922 (1997) (emphasis added) (quoting U.S. Const., art. II, § 3). Put differently, when the President's officers exercise his Article II power to execute the laws, they are also bound by the Article II duty to execute them faithfully, and the President is bound by *his* Article II duty to ensure that they do. In turn, courts' "constitutional duty of requiring the executive branch to remain within the limits stated by the legislative branch," *Nat'l Treasury*, 492 F.2d at 604, "exists whether the President or a subordinate executive officer is the defendant," *id.* at 613. *See In re Border Infra. Envtl. Litig.*, 284 F. Supp. 3d 1092, 1137-38 (S.D. Cal. 2018) (rejecting the "argument that the Take Care Clause applies only to the President, and not his cabinet members"), *aff'd*, 915 F.3d 1213 (9th Cir. 2019). Any other interpretation would undermine the Take Care Clause's most fundamental purpose.

* * *

Ultimately, Defendants rest most of their objections to judicial review on the Constitution's separation of powers. But a decision by this Court permitting Plaintiffs' claim to proceed would not violate those principles; it would vindicate them. As the D.C. Circuit stated in granting relief on the merits—and the extraordinary relief of mandamus at that—of a claim sounding in the Take Care Clause, such a decision would "rest[] on the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress." *In re Aiken Cty.*, 725 F.3d at 267. Or, in the words of the Supreme Court, it is the "responsibility" of this Court "to enforce the principle" of the separation of powers here. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. at 272. Contrary to Defendants' argument, therefore, the Constitution's separation of powers does not prevent, but rather requires, that Plaintiffs' claim be heard on the merits.

## CONCLUSION

Defendants' motion to dismiss should be denied.

Dated: May 31, 2019

Respectfully submitted,

**City of Columbus**
Zach Klein (OH Bar No. 0078222)
City Attorney

Lara N. Baker-Morrish (OH Bar No. 0063721)
City Solicitor General

Charles P. Campisano (OH Bar No. 0095201)
Jennifer L. Shea (OH Bar No. 0085239)
Assistant City Attorneys

Columbus City Attorney's Office
77 N. Front St., 4th Floor
Columbus, OH 43215
(614) 645-7385
zmklein@columbus.gov
lnbaker-morrish@columbus.gov
cpcampisano@columbus.gov
jlshea@columbus.gov

**Mayor and City Council of Baltimore**
Andre M. Davis #00362
City Solicitor

Suzanne Sangree #26130
Senior Public Safety Counsel & Director of
   Affirmative Litigation

City of Baltimore Department of Law
City Hall, Room 109
100 N. Holliday St.
Baltimore, MD 21202
(443) 388-2190
amd2107@gmail.com
suzanne.sangree2@gmail.com

**City of Cincinnati**
Paula Boggs Muething (OH Bar No. 0080018)
City Solicitor

Emily Woerner (OH Bar No. 089349)
Senior Assistant City Solicitor

Office of the City Solicitor, Cincinnati

Javier M. Guzman (D.C. Bar No. 462679)
   (*pro hac vice*)
Legal Director

/s/ *Adam Grogg*
Adam Grogg (D.C. Bar No. 1552438)
   (*pro hac vice*)
Senior Counsel

John Lewis (D.C. Bar No. 1033826)
   (*pro hac vice*)
Counsel

Democracy Forward Foundation
1333 H St. NW
Washington, DC 20005
(202) 448-9090
jguzman@democracyforward.org
agrogg@democracyforward.org
jlewis@democracyforward.org

Sara E. Kropf (D. Md. Bar No. 26818)
Law Office of Sara Kropf, PLLC
701 8th St. NW, Suite 300
Washington, DC 20001
(202) 627-6900
sara@kropf-law.com

***Counsel for Plaintiffs***

City Hall, Room 214
801 Plum St.
Cincinnati, OH 45202

**City of Chicago**
Mark A. Flessner (IL Bar No. 6194599)
Acting Corporation Counsel

Stephen J. Kane (IL Bar No. 6272490)
Acting Deputy Corporation Counsel
Affirmative Litigation Division

City of Chicago Department of Law
121 N. LaSalle St., Room 600
Chicago, IL 60602
mark.flessner@cityofchicago.org

**City of Philadelphia**
Marcel S. Pratt
Solicitor of the City of Philadelphia

Diana P. Cortes (PA Bar No. 204274)
Chair, Litigation Group

Eleanor N. Ewing (PA Bar No. 28226)
Chief Deputy Solicitor, Affirmative & Special
    Litigation Unit
Benjamin H. Field (PA Bar No. 204569)
Divisional Deputy City Solicitor, Affirmative
    & Special Litigation Unit

City of Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
diana.cortes@phila.gov
eleanor.ewing@phila.gov
benjamin.field@phila.gov
(215) 683-5000