IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CITY OF COLUMBUS, *et al.*,

Plaintiffs,

**v.**

Case No. 1:18-cv-02364-DKC

DONALD J. TRUMP, *et al.*

Defendants.

**BRIEF FOR AMICI CURIAE STATES OF CALIFORNIA,
CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, KENTUCKY, MARYLAND,
MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO,
NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, VIRGINIA,
WASHINGTON, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

INTERESTS OF AMICI CURIAE ................................................................................1

BACKGROUND ........................................................................................................2

ARGUMENT ............................................................................................................5

    I.    The Trump Administration Has Taken Numerous Actions to Discourage and Impede Enrollment in The Markets ..................................................5

    II.    The Trump Administration Has Expanded Health Plans That Do Not Comply with the ACA's Consumer Protections and Which Undermine the ACA's Single Risk Pools ..................................................................7

    III.    The Trump Administration Has Targeted the ACA's Subsidies That Help Low-Income Americans Purchase Health Insurance .........................11

    IV.    There is a Direct Relationship Between The Number of Uninsured Americans and Uncompensated Care Costs Borne By State and Local Governments .......................................................................................14

CONCLUSION ........................................................................................................15

## TABLE OF AUTHORITIES

**Page**

CASES

*Association for Community Affiliated Plans et al. v. U.S. Dep't of Treasury, et al.*
   Case No. 18-2133 (D.D.C. 2018) ...........................................................................8

*King v. Burwell*
   135 S. Ct. 2480 (2015).................................................................................2, 11

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
   132 S. Ct. 2566 (2012)..........................................................................................2

*New York v. Dep't of Labor*
   363 F.Supp.3d 109 (D.D.C. 2019), (D.C. Cir. filed Apr. 30, 2019) ...................8, 10

STATUTES

26 United States Code
   § 36B..................................................................................................................11, 12

42 United States Code
   § 300gg...............................................................................................................8
   § 300gg-1............................................................................................................8
   § 300gg-3............................................................................................................8
   § 300gg-4............................................................................................................8
   § 1396a(a)(10)(A)(i)(VIII)....................................................................................2
   § 1396a(e)(14)(I)(i)..............................................................................................2
   § 18022(d)...........................................................................................................12
   § 18031...............................................................................................................6
   § 18032...............................................................................................................7
   § 18071(b)...........................................................................................................12
   § 18071(c)(2).......................................................................................................12
   § 18071(f)(2).......................................................................................................12

**TABLE OF AUTHORITIES**
(continued)

Page

OTHER AUTHORITIES

83 Fed. Reg. 28,912 ..................................................................................................8

84 Fed. Reg. 308 ....................................................................................................13

84 Fed. Reg. 17,541 ...............................................................................................13

84 Fed. Reg. 17557 .................................................................................................14

84 Fed. Reg. at 17557 .............................................................................................14

Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage
for People Under Age 65: 2016 to 2026* 8 (Mar. 2016)...............................................12

Employee Retirement Income Security Act of 1974 (ERISA)..........................................8

H.R. 1 (Dec. 22, 2017)..............................................................................................2

*Notice of Benefit and Payment Parameters for 2020*, 84 Fed. Reg. 17,541 ...................13

Patient Protection and Affordable Care Act (ACA) ..............................1, 2, 4, 7, 10, 11, 12, 13, 15

## INTERESTS OF AMICI CURIAE

In this lawsuit, five cities and two individuals challenge a series of Executive Branch actions designed to undermine the Patient Protection and Affordable Care Act (ACA), a strategy aptly described as "death by a thousand cuts." The Amici States[1] have experienced firsthand the profound and destabilizing impact of this administration's systematic efforts to impede the proper functioning of the ACA.[2] The Trump Administration's actions have sought to destabilize the ACA's markets by taking numerous steps to dampen consumer enrollment, promote health plans that lack the ACA's consumer protections (including vital protections for 133 million Americans with preexisting health conditions), and undermine the ACA's subsidies that help low and middle-income Americans purchase healthcare.

The devastating impact of these harmful policies is being felt by state and local governments across the country. Many states have seen rising health insurance premiums, decreasing enrollment in the health insurance marketplaces, and increasing numbers of uninsured residents. Without insurance, individuals turn to safety-net sources of care such as hospital emergency rooms, community healthcare centers, and free clinics to meet their ongoing healthcare needs. But such uncompensated care—a direct result of this administration's policies—is not free. State and local governments pick up part of the tab for those uncompensated care costs, which total tens of billions of dollars each year. The Amici States— as sovereign entities responsible for the health and well-being of their residents—bring a unique perspective on the damage being done by the Trump Administration's relentless efforts to undercut the ACA at every turn. This brief illustrates a few of the myriad ways in which the

---

[1] The District of Columbia, which is treated as a state under the ACA, is included in the term "Amici States."

[2] Pursuant to Standing Order 2018-07, the Amici States file this amicus brief without the consent of the parties or leave of court.

Amici States and their residents have been harmed by this administration's methodical

dismantling of the ACA, one piece at a time.

## BACKGROUND

The ACA is a landmark law that made affordable health coverage available to 20 million

Americans and sharply reduced the number of Americans without health insurance.  It was

designed to create local, state-based markets presenting affordable insurance choices for

consumers in order to "increase the number of Americans covered by health insurance and

decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580

(2012).  The ACA adopted a "series of interlocking reforms" to achieve these goals. *King v.

Burwell*, 135 S. Ct. 2480, 2485 (2015).  The three "closely intertwined" reforms implemented by

the ACA are:  (1) requiring nearly everyone to maintain healthcare coverage or pay a tax penalty

(the minimum coverage requirement); (2) mandating that insurers accept every person seeking

coverage and not charge them higher premiums based on their health (protecting those with

preexisting health conditions); and (3) providing subsidies designed to make insurance coverage

more affordable. *Id*. at 2486-87.[3]  To achieve these goals, the ACA created local health

insurance markets (called exchanges), both state-run and federally-run, "basically, a marketplace

that allows people to compare and purchase insurance plans." [4] *Id.* at 2485.  The ACA also

expanded Medicaid by increasing the number of eligible individuals to include those with

incomes up to 138 percent of the federal poverty line.  42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII),

---

[3] In December 2017, Congress amended the tax code by reducing the shared responsibility payment to zero dollars for individuals failing to maintain health insurance coverage, beginning in 2019. *See* P.L. 115-97, 2017 H.R. 1, at *2092 (Dec. 22, 2017).

[4] Exchanges may be established either by a State or, if a State does not establish an exchange, by the federal government. *King*, 135 S. Ct. at 2485.

1396a(e)(14)(I)(i).  These core principles have made healthcare affordable and accessible for millions of Americans.

As a result of the ACA's reforms, the rate of uninsured non-elderly adults dropped by 41 percent between 2013 and 2016, resulting in 20 million Americans gaining access to health coverage.[5]  To date, almost 13 million Americans have gained health insurance through the ACA's Medicaid expansion,[6] almost 9 million receive ACA-funded tax credits to purchase health insurance through the exchanges,[7] and 133 million Americans (including 17 million children) with preexisting health conditions cannot be discriminated against by insurance companies because of their health history.[8]  Between 2010 and 2014, the share of Americans with preexisting health conditions going without health insurance fell by 22 percent, resulting in 3.6 million individuals with such conditions becoming insured.[9]

These historic gains in coverage have directly benefitted state and local governments because having fewer uninsured individuals reduces uncompensated care costs that are borne by state and local governments.  In 2013, uncompensated care costs were between $74.9 billion and $84.9 billion.[10]  At least 65 percent of those costs were offset by government payments, and 36.5 percent of all governmental payments were made by state and local governments.[11]  In 2013, state and local governments thus spent approximately $19.8 billion on uncompensated care

---

[5] *See* https://www.kff.org/uninsured/fact-sheet/key-facts-about-the-uninsured-population/.
[6] *See* https://www.kff.org/health-reform/state-indicator/medicaid-expansion-enrollment/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.
[7] *See* https://www.kff.org/health-reform/state-indicator/average-monthly-advance-premium-tax-credit-aptc/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.
[8] *See* https://aspe.hhs.gov/system/files/pdf/255396/Pre-ExistingConditions.pdf at 1, 6.
[9] *See* https://aspe.hhs.gov/system/files/pdf/255396/Pre-ExistingConditions.pdf at 1.
[10] *See* https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2013.1068.
[11] *Id.*

costs.[12]  By 2015, nationwide hospital uncompensated care costs fell by about 30 percent on

average, and in Medicaid expansion states that figure was roughly 50 percent.[13]  State and local

government budgets benefitted as a result.[14]

California, for instance, witnessed a sharp decline in uncompensated care costs attributable

to the ACA.  California hospitals incurred uncompensated care costs of more than $3 billion

dollars in 2013, before the ACA was fully implemented.[15]  By 2016, California's uncompensated

care costs dropped to $1.44 billion, a decline of more than 50 percent in just three years.[16]  And

California's uninsured rate decreased from 17 percent in 2013 to 6.8 percent by 2017.[17]  New

York likewise experienced a 23 percent reduction in self-pay hospital emergency room visits,

and a 40 percent reduction in self-pay inpatient services.  In Maryland, total uncompensated care

dropped 36% in Maryland hospitals, from $1.1 billion dollars in 2013 to $700 million in 2017.[18]

And Maryland's uninsured rate decreased from 11.3 percent in 2010 to 6.1 percent by 2016.[19]

Uncompensated care in Oregon hospitals fell from $1.28 billion in 2013 to $476 million in

2015.[20]  Other states have experienced similar declines.

---

[12] *Id*; *see also* https://www.kff.org/uninsured/report/uncompensated-care-for-the-uninsured-in-2013-a-detailed-examination/view/print/.

[13] *See* https://www.cbpp.org/research/health/uncompensated-care-costs-fell-in-nearly-every-state-as-acas-major-coverage.

[14] *Id.*

[15] *See* https://www.chcf.org/blog/uncompensated-hospital-care-costs-in-california-continued-to-decline-in-2016/.

[16] *See* https://www.chcf.org/blog/uncompensated-hospital-care-costs-in-california-continued-to-decline-in-2016/.

[17] *See* https://www.coveredca.com/newsroom/news-releases/2017/11/20/New-CDC-Report-Shows-Number-of-Uninsured-Continued-to-Decline-in-2017-for-States-That-Created-State-Based-Marketplaces-Including-California/.

[18] *See* https://www.marylandhbe.com/wp-content/uploads/2018/11/MHC_AnnualReport_2018.pdf at 6.

[19] *Id.*

[20] https://docs.house.gov/meetings/WM/WM00/20190129/108918/HHRG-116-WM00-Wstate-StolfiA-20190129.pdf at 4.

4

Against this backdrop of historic healthcare gains, the Trump Administration has taken aim at many of the ACA's core principles, including by: (1) discouraging and impeding enrollment through the exchanges; (2) expanding health plans that do not include the ACA's consumer protections and which undermine the ACA's single risk pools; and (3) targeting the ACA's subsidies which make insurance coverage more affordable for low-income Americans.

## ARGUMENT

### I. THE TRUMP ADMINISTRATION HAS TAKEN NUMEROUS ACTIONS TO DISCOURAGE AND IMPEDE ENROLLMENT IN THE MARKETS

The Trump Administration has taken numerous steps to discourage and impede individuals from enrolling in health coverage.  HHS cut the open enrollment period in half (making it just 6 weeks long) and stated that they were shutting down *HealthCare.gov*—the website that individuals in most states use to enroll in health insurance offered through the ACA's Exchanges—for 12 hours every Sunday during that already-truncated open enrollment period. *See* Docket No. 44 at 74.  HHS also scaled back its efforts to encourage individuals to purchase health insurance through *HealthCare.gov*:  for the 2018 plan year, it cut its advertising budget by 90% and nearly halved the amount of money spent on organizations that help individuals purchase insurance through the exchanges (known as navigators).[21]  For 2019, HHS cut navigator funding by another 41%, leaving just $10 million dollars to assist enrollment in the 34 states in which individuals enroll in plans offered through the exchanges using *HealthCare.gov*.[22] Further, HHS eliminated the requirement that each exchange have at least two navigators, and that those navigators have a physical presence in the communities that they serve.  *See* Docket No. 44 at 41.  That change further eviscerated the statutorily-mandated navigator program. *See*

---

[21] *See* https://www.healthaffairs.org/do/10.1377/hblog20180824.152907/full/.
[22] *See* https://www.cbpp.org/blog/navigator-funding-cuts-will-leave-many-marketplace-consumers-on-their-own.

42 U.S.C. § 18031.  These severe cutbacks came despite ample evidence that marketplace

advertising and enrollment assistance are essential to maintaining and increasing enrollment.[23]

The near-complete elimination of federal marketing, outreach, and navigator programs has

forced states to fill the void.  Overall, the federal government is spending just $0.51 per

uninsured person on advertising and the same amount on navigator grants, while the state-based

marketplaces have budgeted, on average, $13.23 per uninsured person on advertising and $13.37

per uninsured person on their navigator programs.[24]  The five states using the federal platform

averaged $6.46 per uninsured person on advertising and $8.21 per uninsured person on their

navigator programs.[25]  The states have invested heavily in marketplace advertising and assistance

to compensate for these deep cuts at the federal level.[26]

Collectively, the Trump Administration's actions have depressed enrollment in many states

that run their own exchanges as well as those that rely on *Healthcare.gov* (the latter are known as

federally-facilitated marketplace (FFM) States).  New enrollment in FFM states dropped 16

percent in 2019, on top of the already large drop of 40 percent over the prior two

years.[27]  California's state-based exchange, Covered California, experienced a 24 percent decline

in the number of new enrollees signing up for coverage this year as compared with 2018.[28]  In

Washington, the decline was over 46 percent.[29]  In Rhode Island, the decline was 22%.  In

---

[23] *See* https://www.commonwealthfund.org/blog/2018/states-lean-federal-government-cuts-back-navigator-and-advertising-funding.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *See* https://www.coveredca.com/newsroom/news-releases/2019/05/07/new-analysis-finds-record-number-of-renewals-for-leading-state-based-marketplaces-but-lack-of-penalty-is-putting-consumers-at-risk/.
[28] *Id.*
[29] *See* https://www.wahbexchange.org/wp-content/uploads/2019/05/HBE_AE_190522_Spring-2019-Enrollment-Report_190521_FINAL.pdf at 16.

Maryland, the decline was over 10 percent.[30]  In California, premiums rose by 8.7% (on average)

for existing consumers who renewed coverage in their same plan for 2019.[31]  Non-subsidized

consumers in Washington experienced an average premium increase of 11.6% in 2019.[32]

Premiums rose in other states as well.

## II.   THE TRUMP ADMINISTRATION HAS EXPANDED HEALTH PLANS THAT DO NOT COMPLY WITH THE ACA'S CONSUMER PROTECTIONS AND WHICH UNDERMINE THE ACA'S SINGLE RISK POOLS

The Trump Administration has also expanded health plans that do not include the ACA's

consumer protections and which undermine one of the key ways in which the ACA expanded

affordable healthcare:  the creation of unified risk pools for the individual and small group health

insurance markets.  Most Americans who receive commercial healthcare coverage do so through

one of three different markets for health insurance: the individual market, the small group market

(which provides health insurance to individuals who work for businesses with 50 or fewer

employees), and the large group market (which provides health insurance to individuals who

work for businesses with 50 or more employees).  *See* 42 U.S.C. § 18032.  Many of the ACA's

health insurance reforms apply only in the individual and small groups markets.  Historically, the

individual and small groups markets experienced volatile premiums, variable levels of benefits,

and widespread discrimination on the basis of preexisting health conditions.

To combat these problems, Congress sought to pool risk by requiring insurers to treat all

enrollees in the individual and in the small group markets as "members of a single risk pool."  *Id.*

at 18032(c)(1) & (2).  That allows premiums to reflect the average risk level of the entire market,

---

[30] *See* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/.

[31] *See* https://www.coveredca.com/newsroom/PDFs/CoveredCA_2019_Plans_and_Rates.pdf at 4.

[32] *See* https://www.wahbexchange.org/wp-content/uploads/2019/05/HBE_AE_190522_Spring-2019-Enrollment-Report_190521_FINAL.pdf at 9.

rather than the cost of enrollees in a particular plan. Congress also mandated that all individual and small group plans include ten essential health benefits, limited the factors that could be used to vary premiums (ruling out factors other than age, tobacco use, family size, and geography), and prohibited insurers from denying coverage or charging higher premiums on the basis of preexisting health conditions. *Id.* at § 18022; 42 U.S.C. §§ 300gg, 300gg-1, 300gg-3, 300gg-4.

The ACA's unified risk pools have contributed to the unprecedented healthcare gains outlined above. But they require a mix of healthy and sick individuals to function properly. The Trump Administration, however, has expanded health plans which are exempt from the ACA's consumer protections and which distort those carefully constructed single risk pools by siphoning away healthy individuals. The two most prominent examples are the expansion of Association Health Plans (AHPs) and short-term, limited duration insurance (STLDIs).[33]

AHPs are group health plans offered through an association of employers, such as an industry group. The federal government has always permitted some AHPs meeting stringent criteria to qualify as a single employee benefit plan under the Employee Retirement Income Security Act of 1974 (ERISA). But the Department of Labor (DOL) recently promulgated a final rule that loosens the requirements for qualifying as a single ERISA plan, allowing virtually any association of disparate employers connected by geography or industry to qualify as a single ERISA plan. 83 Fed. Reg. 28,912 (June 21, 2018). The final rule also brings sole proprietors without any employees within ERISA's scope by (double) counting them as both "employers" and "employees." *Id.* AHPs have a decades-long history of fraud and abuse.[34]

---

[33] Both rules have been challenged in court. In the STLDI lawsuit, cross-dispositive motions are currently pending. *See Association for Community Affiliated Plans et al. v. U.S. Dep't of Treasury, et al.*, Case No. 18-2133 (D.D.C. 2018). A district court judge has vacated the final AHP rule, although that ruling is being appealed. *See New York v. Dep't of Labor,* 363 F.Supp.3d 109 (D.D.C. 2019), *appeal pending*, No. 19-5125 (D.C. Cir. filed Apr. 30, 2019).
[34] *See* https://www.healthaffairs.org/doi/full/10.1377/hlthaff.25.6.1591.

The AHP rule encourages healthy individuals and small employers with healthy employees to leave the traditional health insurance markets (thereby increasing overall risk and costs within those markets) and purchase cheaper plans with fewer benefits. Many of those employees and their dependents (including children)—healthy at the time of enrollment in an AHP—will get sick, some seriously, and require healthcare that their AHP does not cover because it does not need to meet the ACA's requirements for the individual and small group markets. And the most vulnerable employees and dependents—such as those with serious preexisting conditions—will be left in the ACA-compliant market to purchase now more-expensive comprehensive coverage from the start, or possibly lose their coverage entirely.[35]

In August 2018, in separate rulemaking, HHS finalized a rule to expand the use of short-term insurance that does not need to comply with the ACA's consumer protections.[36] Designed to fill temporary gaps in coverage when an individual is transitioning between plans, STLDIs can now last up to 36 months with renewals.[37] STLDIs do not need to cover all ten essential health benefits or abide by prohibitions on annual and lifetime benefit limits.[38] One recent analysis found that 43 percent of STLDIs did not cover mental health services, 62 percent did not cover substance abuse treatment, 71 percent did not cover outpatient prescription drugs, and 100 percent did not cover maternity care.[39] For the same reasons that AHPs will undermine the ACA's risk pools, so will STLDIs. Indeed, according to one estimate, in 2019 alone STLDIs

---

[35] *See* https://familiesusa.org/product/association-health-plan-rule-would-make-it-easier-sell-junk-insurance.

[36] *See* https://www.cms.gov/CCIIO/Resources/Files/Downloads/dwnlds/CMS-9924-F-STLDI-Final-Rule.pdf.

[37] *Id*. at 12.

[38] *See* https://www.urban.org/sites/default/files/updated_estimates_of_the_potential_impact_of_stld_policies_final.pdf.

[39] *See* https://www.kff.org/health-reform/press-release/analysis-most-short-term-health-plans-dont-cover-drug-treatment-or-prescription-drugs-and-none-cover-maternity-care/.

will increase the number of Americans without ACA-compliant insurance by 2.6 million, and

raise ACA-compliant nongroup insurance premiums by 18.3 percent (on average) in the 43 states

that do not prohibit or limit such plans.[40]

The Trump Administration's expansion of AHPs and STLDIs will directly harm state and

local governments in numerous ways.  With respect to AHPs, a district court judge recently held

that several states' economic injuries from the final rule conferred standing to challenge it

because: (1) the expansion of self-funded AHPs will decrease state tax revenues because the

affected States will not collect premium taxes when individuals select coverage through a self-

insured AHP; and (2) states will face an increased regulatory burden from fraudulent AHPs

because the rule expressly "depends on state insurance regulators for oversight and enforcement

to, among other things, prevent fraud, abuse, incompetence and mismanagement, and avoid

unpaid health claims."[41]  Decreased tax revenue and increased regulatory enforcement are fiscal

injuries to the states that flow directly from the implementation of the final AHP rule.[42]

AHPs and STLDIs will negatively impact the ACA's markets and consumers too.  The

Congressional Budget Office (CBO) estimates that AHPs and STLDIs will increase premiums

for ACA-compliant plans by 3 percent, and that 5 million people will enroll in such plans (80

percent of whom would otherwise have remained in the ACA's markets).[43]  This proliferation of

plans with less comprehensive coverage for the young and healthy will inevitably make

comprehensive coverage for older Americans (between the ages of 50-64) and those with

preexisting conditions more expensive.  Even young and healthy individuals may wind up

---

[40] *Id.* at 1-2.
[41] *See New York*, 363 F.Supp.3d at 125, 127; *see also id.* at 141 ("The Final Rule was intended and designed to end run the requirements of the ACA . . .")
[42] *Id.*
[43] *See* https://www.cbo.gov/system/files/2019-01/54915-New_Rules_for_AHPs_STPs.pdf at 1.

needing unexpected care that is not covered by these threadbare plans.  Studies have also shown that consumers are confused about whether STLDIs offer the comprehensive benefits and consumer protections of ACA-compliant plans.[44]  These skimpier plans will cause uncompensated care costs to rise, and those costs will be borne in part by healthcare systems funded by the states and their political subdivisions.

## III.   THE TRUMP ADMINISTRATION HAS TARGETED THE ACA'S SUBSIDIES THAT HELP LOW-INCOME AMERICANS PURCHASE HEALTH INSURANCE

The Trump Administration has also taken aim at yet another vital ACA reform:  the subsidies which help low- and middle-income Americans purchase health insurance.  The ACA provides two forms of interrelated subsidies that reduce the cost of obtaining and utilizing healthcare coverage for lower income individuals and their families.  First, section 1401 provides tax credits that reduce monthly insurance premiums for eligible individuals.  26 U.S.C. § 36B.  Qualified individuals are those with household incomes between 100 and 400 percent of the federal poverty level.  *King*, 135 S. Ct. at 2487.  Such individuals may purchase insurance with the tax credits—which the Treasury Secretary pays in advance directly to the individual's health insurer.  *King*, 135 S. Ct. at 2487.

Second, to offset individuals' out-of-pocket costs when using their health insurance, section 1402 requires insurers to provide cost-sharing reductions (CSRs) to qualifying individuals.  Cost-sharing refers to copayments (for medical visits and prescription drugs, among other things), coinsurance, and deductibles—the out-of-pocket costs consumers face when seeking care.  Under the ACA, insurers must reduce cost-sharing for all individuals:  (1) who are

---

[44] *See* https://www.fiercehealthcare.com/payer/consumers-don-t-understand-short-term-plans and http://chirblog.org/new-study-consumers-dont-understand-that-short-term-plans-lack-protections/.

eligible to receive tax credits under Section 1401 and 26 U.S.C. § 36B; (2) whose household

income is below 250 percent of the federal poverty level; and (3) who are enrolled in a "silver"

plan on one of the exchanges.  42 U.S.C. § 18071(b), (c)(2), (f)(2).[45]  But while the upfront cost

is borne by the insurers, *id.* § 18071(a)-(c), the ACA requires the government to reimburse

insurers for these CSRs by "mak[ing] periodic and timely payments to the [insurer] equal to the

value of the reductions," *id.* § 18071(c)(3)(A).  CSRs are a major federal subsidy:  in 2017 they

were expected to cost $9 billion.[46]

On October 12, 2017, however, the Trump Administration abruptly ceased making the

CSR reimbursement payments required by section 18071.[47]  That caused chaos and uncertainty

in the markets, prompted insurers to increase premiums for 2018, and harmed consumers who

were not shielded from those increased premiums because they do not qualify for premium tax

credits.[48]  Insurers, moreover, suffered huge losses for the last quarter of 2017 when the federal

government reneged on its obligation to reimburse them for CSR payments.  For example, it was

estimated that California insurers would suffer a loss of $700 million for the 2017 plan year

because of the termination of CSR reimbursement payments.[49]  For 2018 and beyond, the harm

from terminating CSRs was largely mitigated by an innovative response from the states (known

---

[45] The Act classifies plans offered on the exchanges into one of four "metal levels" based on their cost-sharing requirements.  42 U.S.C. § 18022(d).  A "silver" plan is structured so that the insurer pays 70 percent of the average enrollee's health care costs, leaving the enrollee responsible for the remaining 30 percent through cost sharing.  *Id.*  "Gold" and "platinum" plans cover a greater portion of the insured's average health care costs, while a "bronze" plan covers a smaller portion.  *Id.*  Insurers on the exchanges must offer at least one "silver" and one "gold" level plan.  *Id.* § 18021(a)(1)(C)(ii).

[46] Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage for People Under Age 65:  2016 to 2026* 8 (Mar. 2016) (CBO *Federal Subsidies*), https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51385-healthinsurancebaseline.pdf.

[47] *See* https://www.hhs.gov/about/news/2017/10/12/trump-administration-takes-action-abide-law-constitution-discontinue-csr-payments.html.

[48] *See* https://www.businessinsider.com/trump-obamacare-csr-payments-premiums-2017-10.

[49] *See* https://oag.ca.gov/sites/all/files/agweb/pdfs/press/cost-sharing-subsidies.pdf.

as "silver-loading") which increased the ACA's tax credits in a manner that shielded most consumers from the premium increases caused by the termination of CSRs.[50]

The administration has also sought to curb the ACA's premium tax credits. On April 25, 2019, the Centers for Medicare & Medicaid Services (CMS) (a branch of HHS) finalized a rule that, among other changes, implemented a premium adjustment percentage change of approximately 1.29 percent for 2020. *See Patient Protection and Affordable Care Act*; *Notice of Benefit and Payment Parameters for 2020*, 84 Fed. Reg. 17,541, 17,454 (CMS-9926-P). This technical change—according to HHS and as discussed below—will significantly increase consumers' out-of-pocket costs, reduce premium tax credits that help working Americans purchase health coverage by $1 billion per year, and increase the ranks of uninsured Americans by 70,000 people per year. 84 Fed. Reg. 17,541.

CMS determines an annual premium adjustment percentage which is used to set the rate of increase for: (1) the maximum annual limitation on cost sharing; (2) the required contribution percentage used to determine certain exemptions under section 5000A; and (3) the employer shared responsibility payment amounts. 84 Fed. Reg. 308. For 2020, HHS finalized an alternative measure that is an adjusted private individual and group market health insurance premium measure. *Id.* The Final Rule estimates that—as a direct result of HHS's premium adjustment change—federal premium tax credit spending will decrease by approximately $980 million in 2020, $1.04 billion in 2021, $1.09 billion in 2022, and $1.15 billion in 2023. *Id.* The Center for Budget and Policy Priorities estimates that 7.3 million marketplace consumers will pay higher premiums in 2020 because of these reduced tax credits.[51] The Final Rule also

---

[50] See https://www.healthaffairs.org/do/10.1377/hblog20180613.293356/full/.
[51] *See* https://www.cbpp.org/research/health/change-to-insurance-payment-formulas-would-raise-costs-for-millions-with-marketplace.

estimates that 70,000 fewer Americans will enroll in health coverage on the exchanges in 2020

and in every year thereafter because of this percentage modification.  84 Fed. Reg. 17557.

By targeting the ACA's subsidies, which provide a financial lifeline for millions of

Americans to purchase health insurance, the Trump Administration is actively making it harder

for ordinary Americans to obtain, and to maintain, comprehensive healthcare coverage.  By

design, these actions will swell the ranks of the uninsured, resulting in downstream costs to state

and local government social safety nets.

## IV.  THERE IS A DIRECT RELATIONSHIP BETWEEN THE NUMBER OF UNINSURED AMERICANS AND UNCOMPENSATED CARE COSTS BORNE BY STATE AND LOCAL GOVERNMENTS

Through these concerted efforts, many Americans are newly uninsured—and under-

insured—since President Trump took office two and a half years ago.  In 2017 alone, the number

of uninsured Americans increased by nearly 700,000.[52]  Beginning in 2020, another 70,000 are

projected to lose insurance each year because of HHS's premium adjustment percentage change.

*See* 84 Fed. Reg. at 17557.  And countless others will sign up for AHPs and STLDIs which are

not required to cover the care that they may need when they get sick.[53]  Collectively, state and

local governments can expect to grapple with hundreds of thousands of newly uninsured

residents, and millions of additional under-insured residents, over the next few years.

It is axiomatic that when the number of uninsured individuals rise, uncompensated care

costs rise as well.  Each newly uninsured individual is associated with a $900 increase in

uncompensated care annually.[54]  And that directly increases the amount of uncompensated care

---

[52] *See* https://www.kff.org/uninsured/fact-sheet/key-facts-about-the-uninsured-population/.
[53] *See* https://www.cbpp.org/research/health/key-flaws-of-short-term-health-plans-pose-risks-to-consumers and https://www.healthaffairs.org/do/10.1377/hblog20180104.347494/full/.
[54] *See* https://www.healthaffairs.org/do/10.1377/hblog20180503.138516/full/; *see also* https://www.nber.org/papers/w21290.pdf.

costs borne by state and local governments. Approximately 65 percent of uncompensated care costs are offset by government funds.[55] Of those government funded uncompensated care costs, 36.5 percent comes from state and local governments.[56] Therefore, state and local governments will collectively spend around $214 more annually for each newly uninsured individual. Even an additional 100,000 uninsured Americans caused by the Trump Administration's actions— surely an undercount in light of the numerous actions outlined above—will therefore cost state and local governments over $21 million dollars each year. Collectively, large numbers of newly uninsured and underinsured individuals will impose a serious financial strain on state and local government coffers. The Amici States, and their residents, are paying a steep price because of the Trump Administration's concerted efforts to bring about the ACA's demise.

## CONCLUSION

Through these and other efforts, the Trump Administration has made its intentions clear: it wants the ACA to fail, no matter how many millions of Americans stand to lose access to healthcare benefits and services as a result. The harm being inflicted is not conjecture; much of it reflects the stated goals and express predictions of the Trump Administration itself. We are responsible for the health and well-being of our residents. Our hospital emergency rooms and public health departments are the front lines serving our communities, regardless of insurance status. When our residents become uninsured because of the actions described above, the financial burden of their uncompensated care strains our limited public resources. The Trump Administration's unremitting efforts to dismantle the ACA should be halted.

---

[55] *See* https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2013.1068 at 812-13.
[56] *Id.*

Dated: June 7, 2019

KARL A. RACINE
Attorney General for the
District of Columbia

*/s/ Valerie M. Nannery*
VALERIE M. NANNERY
Assistant Attorney General
Bar No. 20441
441 4th Street NW,
Suite 630 South
Washington, D.C.  20001
(202) 442-9596 (phone)
(202) 730-1465 (fax)
valerie.nannery@dc.gov

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General

*/s/ Nimrod Pitsker Elias*
NIMROD PITSKER ELIAS
Deputy Attorney General
California Bar No. 251634
(*admitted pro hac vice*)
State of California, Department of Justice
Office of the Attorney General
1515 Clay Street, Suite 2000
Oakland, CA  94612-1413
(510) 879-0012 (phone)
(510) 622-2270 (fax)
nimrod.elias@doj.ca.gov

*(Additional Counsel Listed on Next Page)*

WILLIAM TONG
*Attorney General*
*State of Connecticut*

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*

CLARE E. CONNORS
*Attorney General*
*State of Hawai'i*

KWAME RAOUL
*Attorney General*
*State of Illinois*

ANDY BESHEAR
*Attorney General*
*Commonwealth of Kentucky*

BRIAN E. FROSH
*Attorney General*
*State of Maryland*

MAURA HEALEY
*Attorney General*
*Commonwealth of Massachusetts*

DANA NESSEL
*Attorney General*
*State of Michigan*

KEITH ELLISON
*Attorney General*
*State of Minnesota*

AARON D. FORD
*Attorney General*
*State of Nevada*

HECTOR BALDERAS
*Attorney General*
*State of New Mexico*

LETITIA JAMES
*Attorney General*
*State of New York*

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*

JOSH SHAPIRO
*Attorney General*
*State of Pennsylvania*

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*

THOMAS J. DONOVAN, JR.
*Attorney General*
*State of Vermont*

MARK R. HERRING
*Attorney General*
*Commonwealth of Virginia*

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*

## **CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on June 7, 2019, a true and correct copy of the foregoing was electronically filed with the CM/ECF system, which will send a Notice of Electronic Filing to all parties of record in this matter.


*/s/ Nimrod Pitsker Elias*
Deputy Attorney General