## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CITY OF COLUMBUS, *et al.,* <br><br><br> *Plaintiffs,* <br><br><br> v. <br><br><br> DONALD J. TRUMP, *et al.,* <br><br><br> *Defendants.* | Civil Action No. 1:18-cv-02364-DKC |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR
## <u>MOTION TO DISMISS</u>

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................1

II.  ARGUMENT ..............................................................................................................2

     A.   Plaintiffs Fail To Establish Their  Standing To Bring the Instant Claims. ................2

          1.   Plaintiffs' Asserted Injuries Do Not Support Their Standing
               To Raise APA Challenges to Isolated Aspects of the 2019
               Rule ...............................................................................................................2

          2.   Plaintiffs Also Lack Standing To Raise Their Take Care
               Clause Claims.................................................................................................9

     B.   Plaintiffs Fail To Establish That Their Claims Are Ripe. ...........................................10

     C.   The Complaint Fails To State a Claim Upon Which Relief Can Be Granted. .........11

          1.   Plaintiffs' APA Challenge to the 2019 Rule Should Be
               Dismissed. ......................................................................................................11

               a.   CMS's removal of the direct notification requirement for APTC
                    does not violate the Internal Revenue Code and is a reasonable
                    way to alleviate burdens on State Exchanges while protecting
                    taxpayer interests. [Am. Compl. ¶ 282(a), Def. Mem. 35-38,
                    Pl. Opp. 31-34] ......................................................................................12

               b.   CMS's decision to continue its prior qualified health plan
                    certification standards for network adequacy does not violate the
                    ACA and is neither arbitrary nor capricious. [Am. Compl.
                    ¶ 282(b), Def. Mem. 41-43, Pl. Opp. 34-36] ......................................14

               c.   CMS's adoption of new audit standards for entities participating in
                    direct enrollment is not arbitrary or capricious. [Am. Compl.
                    ¶ 282(c), Def. Mem. 33-35, Pl. Opp. 36-37] ......................................17

               d.   CMS's decision to foster innovation by discontinuing
                    standardized plan options is not arbitrary or capricious. [Am.
                    Compl. ¶ 282(d), Def. Mem. 30-32, Pl. Opp. 37-39] ......................18

               e.   CMS's modifications to standards for navigator certification are
                    not contrary to law or arbitrary or capricious. [Am. Compl.
                    ¶ 282(e),  Def. Mem. 32-33, Pl. Opp. 39-41] ...................................20

               f.   CMS's modifications to the Small Business Health Options
                    Program are not arbitrary or capricious. [Am. Compl. ¶ 282(f),
                    Def. Mem. 39-41, Pl. Opp. 41-42] ......................................................21

g.     CMS's revisions to the income verification requirements for
       APTC eligibility are not arbitrary or capricious. [Am. Compl.
       ¶ 282(g), Def. Mem. 38-39, Pl. Opp. 42-44] ...................................22

h.     The 2019 Rule provisions amending CMS's rate review
       requirements are permissible interpretations of the ACA. [Am.
       Compl. ¶ 282(h), Def. Mem. 26-29, Pl. Opp. 44-47] .....................24

i.     The option to allow issuers to report quality improvement activity
       as a single fixed percentage is permissible under the ACA. [Am.
       Compl. ¶ 282(i), Def. Mem. 44-46, Pl. Opp. 47-49] .......................26

2.     Plaintiffs Fail To State a Claim Under the Take Care Clause.......................28

a.     Plaintiffs cannot obtain injunctive or declaratory relief against
       the President ........................................................................................28

b.     The Take Care Clause does not provide a means of
       circumventing the APA ......................................................................30

III.   CONCLUSION ..................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)................................................................10

*Adamski v. McHugh*, 304 F. Supp. 3d 227, 236 (D.D.C. 2015) ................................34

*Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44 (D.C. Cir. 2016), *cert denied*, 137 S. Ct. 1069 (2017)..... 7, 8

*Am. Whitewater v. Tidwell*, 770 F.3d 1108 (4th Cir. 2014) ...........................................26

*Ariz. v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) ...................................33

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................30

*Bennett v. Spear*, 520 U.S. 154, 167 (1997) ..................................................................2

*BNSF Ry. Co. v. U.S. Dep't of Transp.*, 566 F.3d 200 (D.C. Cir. 2009) .......................23

*Bowen v. Am. Hop. Ass'n*, 476 U.S. 610 (1986) ............................................................16

*Carter v. Fleming*, 879 F.3d 132 (4th Cir. 2018) ............................................................8

*CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018) .............. 29, 30

*Clinton v. New York*, 524 U.S. 417 (1998) .....................................................................29

*Dist. of Columbia v. Trump*, 291 F. Supp. 3d 725 (D. Md. 2018),
    *vacated by In re Trump*, 928 F.3d 360 (4th Cir. 2019) ..................................... 29, 32

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).................................14, 18, 19

*Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772 (D. Md. 2010) ............22

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ...........................................................28

*Free Enter. Fund v. Pub. Co. Accounting Bd.*, 561 U.S. 477 (2010) ...............................32

*Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206 (D.D.C. 2016) ...........................23

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) .......................................................33

*In re Trump*, 928 F.3d 360 (4th Cir. 2019) ....................................................2, 7, 29, 32

*Mississippi v. Johnson*, 71 U.S. (4 Wall) 475 (1866).....................................................28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)....................11

*NAACP v. Bureau of the Census*, No. PWG-18-891, 2019 WL 3500934 (D. Md. Aug. 1, 2019) ..........34

*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012) ...........................................22

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003) ..............................................10

*Nat. Res. Def. Council ("NRDC") v. EPA*, 529 F.3d 1077 (D.C. Cir. 2008)...................................16

*Nat'l Tour Brokers Ass'n v. ICC*, 671 F.2d 528 (D.C. Cir. 1982) ...................................................16

*PhRMA v. FTC*, 44 F. Supp. 3d 95 (D.D.C. 2014) ........................................................................16

*Sierra Club v. Dep't of Interior*, 899 F.3d 260, 284 (4th Cir. 2018) ................................................5

*South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018) ..............................................33–34

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996)............................................................................29

*Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017) ..............................................2

*Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301 (D.C. Cir. 2001) ........................7, 8

*United States v. Juarez-Escobar*, 25 F. Supp. 3d 774 (W.D. Pa. 2014) ..........................................33

*United States v. Midwest Oil Co.*, 236 U.S. 459 (1915) ...............................................................31

*United States v. SCRAP*, 412 U.S. 669, 689 & n.14 (1973) .........................................................8

## STATUTES

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 ....................................................1

5 U.S.C. § 704 ...............................................................................................................................10

5 U.S.C. § 706 ......................................................................................................................33, 34

26 U.S.C. § 36B ......................................................................................................................13, 23

42 U.S.C. § 300gg-1 ......................................................................................................................15

42 U.S.C. § 300gg-18 .....................................................................................................................27

42 U.S.C. § 1396a ..........................................................................................................................23

42 U.S.C. § 1396u-1 ......................................................................................................................23

42 U.S.C. § 10139 ..........................................................................................................................33

42 U.S.C. § 18031 ...................................................................................................15, 20, 22

42 U.S.C. § 18118..........................................................................................................25


**REGULATIONS**

45 C.F.R. § 154.103 ..........................................................................................................24

45 C.F.R. § 155.210...........................................................................................................20

45 C.F.R. § 155.221...........................................................................................................17

45 C.F.R. § 155.305 ...................................................................................................... 12, 13

45 C.F.R. § 155.320 ..........................................................................................................23

45 C.F.R. § 156.230...................................................................................................... 14, 15

45 C.F.R. § 158.221...........................................................................................................27

CMS, Health Insurance Market Rules; Rate Review, Final rule,
    78 Fed. Reg. 13406-01 (Feb. 27, 2013) ................................................................25

HHS Notice of Benefit and Payment Parameters for 2018: Amendments to Special Enrollment
    Periods and the Consumer Operated and Oriented Plan Program, Final Rule,
    81 Fed. Reg. 94058-01 (Dec. 22, 2016) ...........................................................12, 18

CMS, ACA Market Stabilization, Final rule, 82 Fed. Reg. 18346, 18371 (Apr. 18, 2017) ..................14

CMS, ACA Notice of Benefit and Payment Parameters for 2019, Proposed rule,
    82 Fed. Reg. 51052-01 (Nov. 2, 2017) .......................................................................*passim*

Centers for Medicare & Medicaid Services ("CMS"), ACA Notice of Benefit and Payment
    Parameters for 2019, Final rule ("2019 Rule"), 83 Fed. Reg. 16930-01 (Apr. 17, 2018) ..........*passim*


**OTHER AUTHORITIES**

Blumberg, Linda J. et al., Urban Institute, *State-by-State Estimates of the Coverage and Funding Consequences
    of Full Repeal of the ACA* 20-21 & tbl.9 (Mar. 2019), https://www.urban.org/sites/
    default/files/publication/100000/repeal_of_the_aca_by_state.pdf ....................................4

CMS,  Press Release, CMS Releases Reports Showing Declining Enrollment for the Unsubsidized
    Population (Aug. 12, 2019), https://www.cms.gov/newsroom/press-releases/cms-releases-
    reports-showing-declining-enrollment-unsubsidized-population ......................................6

Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2018 to 2028* (May 2018) [May 2018 CBO Report], https://www.cbo.gov/system/files?file=2018-06/53826-healthinsurancecoverage.pdf ............................................................... 3, 9

CBO, *How CBO and JCT Analyzed Coverage Effects of New Rules for Association Health Plans and Short-Term Plans* (Jan. 31, 2019), https://www.cbo.gov/publication/54915 .................................................3

CBO, Health Insurance Coverage for *People Under Age 65: Definitions and Estimates for 2015 to 2018* (Apr. 2019), https://www.cbo.gov/system/files/2019-04/55094-CoverageUnder65_0.pdf ...........4

Corlette, Sabrina, *The Effects of Federal Policy: What Early Premium Rate Filings Can Tell Us About the Future of the Affordable Care Act*, CHIRblog, May 21, 2018, http://chirblog.org/what-early-rate-filings-tell-us-about-future-of-aca/ ...........................................................................................5

Fehr, Rachel et al., Insurer Participation on ACA Marketplaces, 2014-2019  (Nov 14, 2018), https://www.kff.org/health-reform/issue-brief/insurer-participation-on-aca-marketplaces-2014-2019/ ...............................................................................................................................4

Hall, Mark, *Stabilizing and Strengthening the Individual Health Insurance Market: A View from Ten States*, USC-Brookings Schaeffer Initiative for Health Policy (July 2018), https://www.brookings.edu/wp-content/uploads/2018/07/Stabilizing-and-Strenghtening-the-Individual-Health-Insurance-Market2.pdf ......................................................................................................... 4, 9

Levey, Noam N., *Health Insurers Plan Big Obamacare Rate Hikes—and They Blame Trump*, Los Angeles Times, May 22, 2017, http://www.latimes.com/politics/la-na-polobamacare-trump-mismanagement-20170518-story.html. ...........................................................................................4

Nat'l Ctr. for Health Stats., *Health Insurance Coverage: Early Release of Estimates from the National Health Interveiw Survey, 2018* 5 (May 2019), https://www.cdc.gov/nchs/data/nhis/earlyrelease/insur201905.pdf .................................................4

## I.    INTRODUCTION

Plaintiffs fail to show that their far-ranging challenge to Defendants' implementation of the Affordable Care Act ("ACA") should proceed beyond the instant Motion to Dismiss. For one thing, Plaintiffs fail to establish their standing to bring claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, or the Take Care Clause of the Constitution. Plaintiffs' standing to pursue their APA claims is particularly weak because their arguments fail to tie their claimed injury to any of the nine relatively minor aspects of the rule that they seek to challenge. *See* Centers for Medicare & Medicaid Services ("CMS"), ACA Notice of Benefit and Payment Parameters for 2019, Final rule ("2019 Rule"), 83 Fed. Reg. 16930-01 (Apr. 17, 2018). Indeed, Plaintiffs' cursory attempt to identify injuries purportedly connected to their APA challenge only confirms that those injuries are no more than speculation. Plaintiffs also fail to show standing to pursue their Take Care Clause claim. In particular, they fail to show that the 2019 Rule caused the drastic changes in premium rates, issuer availability, and enrollments that Plaintiffs hypothesize. Moreover, in light of the fact that independent insurers are the ones to set premiums and decide where they will operate, Plaintiffs fail to meet their obligation to show that the challenged actions were a substantial factor in their alleged injury. Plaintiffs' claims therefore should be dismissed for lack of subject matter jurisdiction.

In addition, Plaintiffs offer nothing to save their APA claims from dismissal for failure to state a claim. Each of the nine decisions that they challenge was supported in the Preamble to the 2019 Rule by a reasoned explanation that precludes any conclusion that the decisions were contrary to law or arbitrary and capricious. Plaintiffs object to these decisions because most of them institute changes to the original rules. But CMS adopted these changes out of a reasoned concern with fostering innovation in health plans, removing unnecessary regulatory burdens, and reducing costs, among other things. And in each instance, CMS took care to comply with the ACA's express requirements. Plaintiffs' APA claims thus should be dismissed on this ground as well.

Finally, Plaintiffs' Take Care Clause claim, asserting that the President and other Defendants have improperly failed to faithfully execute the ACA, should also be dismissed as nonjusticiable. Plaintiffs' theory of a Take Care Clause right of action is breathtaking in its scope and brazen in its

invitation to the Court to circumvent the well-established route for challenging the actions of a federal agency in its implementation of a federal program, and to micro-manage everything from the President's tweets, to CMS's recommendations, to the Attorney General's litigation decisions in other cases. No court has allowed a Take Care Clause claim of this kind. In fact, no Court has ever found a Take Care Clause claim justiciable. This Court should not be the first.

## II.   ARGUMENT

### A.   Plaintiffs Fail To Establish Their Standing To Bring the Instant Claims.

Defendants have explained in their opening brief that neither the individual Plaintiffs nor the City Plaintiffs successfully assert facts that support their standing in this case. Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint ("Def. Mem.") [ECF 52-1], at 12–22. A particularly high barrier to standing is posed by Plaintiffs' failure to show that the premium rates in their particular geographic areas have risen, or that any such rise (or, as Plaintiffs would have it, failure to fall even lower) is fairly traceable to the actions challenged in their Amended Complaint. Plaintiffs do not contest the accuracy of the material Defendants cited and attached to the opening brief. Instead, they merely quibble about its significance. However, as discussed in detail below, Plaintiffs' efforts to show standing are unavailing, and their claims therefore should be dismissed for lack of subject matter jurisdiction.

#### 1.   Plaintiffs' Asserted Injuries Do Not Support Their Standing To Raise APA Challenges to Isolated Aspects of the 2019 Rule.

A plaintiff must "demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). A fundamental principle of standing is that a plaintiff's asserted injury, with respect to a particular claim, "must be fairly traceable to the *challenged action* of the defendant." *In re Trump*, 928 F.3d 360, 376 (4th Cir. 2019) (emphasis added) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). Thus, a plaintiff cannot show standing by relying on an injury caused by "the independent action of some third party not before the court." *Id.* (quoting *Bennett*, 520 U.S. at 167). It is equally true that a plaintiff cannot show standing to challenge certain actions of the defendant by relying on injuries that, even under the

plaintiff's theory, were caused by entirely different actions that are not within the scope of that particular challenge.

With respect to their APA claims, Plaintiffs' theory of standing relies on just such a disconnect. Plaintiffs purport to describe "Defendants' actions" at length. Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Pl. Opp.") [ECF 61], at 11–15, 18–28. But those actions that are the focus of Plaintiffs' lengthy descriptions are not the decisions—all of which are relatively minor and none of which went into effect before June 18, 2018, little more than six months before the date of the Amended Complaint—that Plaintiffs identify as the subject of their APA challenge to the 2019 Rule. Indeed, it is striking that Plaintiffs rely so heavily on estimated premium increases between 2017 and 2018—which, according to Plaintiffs, averaged 37 percent, Amended Complaint ("Am. Compl.") [ECF 44] ¶ 184[1]—because increases during that time period could not possibly have been caused by the challenged decisions in the 2019 Rule. Indeed, the Congressional Budget Office ("CBO") report on which Plaintiffs rely for that figure was issued in May 2018, before any provision of the 2019 Rule went into effect. *See id.* (citing May 2018 CBO Report). And the May 2018 CBO Report itself does not identify the 2019 Rule as a factor in its projections. Rather, that report identifies the anticipated lack of enforcement of the individual mandate, as well as the lack of direct cost-sharing reduction payments and an increase in areas with only one insurance issuer, as the primary reasons for the increase. May 2018 CBO Report, at 2.[2] The May 2017 article in the *Los Angeles*

---

[1] The CBO report cited by Plaintiffs actually puts the figure at "about 34 percent." CBO, *Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2018 to 2028* 2 (May 2018) [hereinafter May 2018 CBO Report].

[2] In their opposition brief, Plaintiffs cite reports that were issued since the Amended Complaint was filed. Pl. Opp. at 15-16 n.6. However, those reports do nothing to bolster Plaintiffs' standing. The January 2019 CBO report, based on an analysis conducted in August 2018, sought to analyze the impact of rules regarding association health plans ("AHPs") and short-term, limited-duration insurance ("STLDI") that Plaintiffs have not challenged under the APA. CBO, *How CBO and JCT Analyzed Coverage Effects of New Rules for Association Health Plans and Short-Term Plans* 1 (Jan. 31, 2019), https://www.cbo.gov/publication/54915. Plaintiffs also cite a Kaiser Family Foundation issue brief that included a statement regarding the impact of AHP and STLDI rules (again, not relevant for Plaintiffs' challenge to the 2019 Rule), and otherwise confirmed that premium rates had held steady

*Times*, upon which Plaintiffs rely, *see* Am. Compl. ¶ 184 n.222, likewise did not cite the 2019 Rule as contributing to rises in premiums, nor could it have, since the 2019 Rule had not even been proposed at that point.[3] Plaintiffs also cite a July 2018 article[4] that attributed the increases to "political and regulatory factors that arose in 2017," Am. Compl. ¶ 184—thus, not to the 2019 Rule.[5]

---

or decreased in 2019. Rachel Fehr et al., Kaiser Family Found., *How Affordable Are 2019 ACA Premiums for Middle-Income People?* (Mar. 5, 2019), https://www.kff.org/health-reform/issue-brief/how-affordable-are-2019-aca-premiums-for-middle-income-people/. The April 2019 CBO report indicates estimates, based on survey responses, that the number of uninsured rose by 1.1 million from 2017 to 2018. CBO, Health Insurance Coverage for *People Under Age 65: Definitions and Estimates for 2015 to 2018* 7 tbl.1 (Apr. 2019), https://www.cbo.gov/system/files/2019-04/55094-CoverageUnder65_0.pdf. Again, that time period is before the 2019 Rule went into effect, and the report does not attempt to attribute the decrease to any particular cause. *See id.* The May 2019 report from the National Center for Health Statistics indicates that there was a statistically significant increase in the percentage of uninsured between 2017 and 2018 in only one age group, adults aged 45-64. Nat'l Ctr. for Health Stats., *Health Insurance Coverage: Early Release of Estimates from the National Health Interveiw Survey, 2018* 5 (May 2019), https://www.cdc.gov/nchs/data/nhis/earlyrelease/insur201905.pdf. At any rate, the time period again makes these figures irrelevant for purposes of Plaintiffs' APA challenge to the 2019 Rule. Plaintiffs also cite figures published in an Urban Institute report, showing that marketplace plan enrollment rose in some states and fell in others, but the report does not identify causes for these changes. Indeed, the report concludes that, in 2019, "even without the individual mandate but with the ACA private nongroup insurance reforms in place, the individual market continues to operate effectively when compared with 2018, when the mandate penalties were still in place. Though several factors and sources of uncertainty may have affected insurers' decisions about premiums and participation in 2018, the 2019 figures indicate that a stable market exists under current law." Linda J. Blumberg et al., Urban Institute, *State-by-State Estimates of the Coverage and Funding Consequences of Full Repeal of the ACA* 20-21 & tbl.9 (Mar. 2019), https://www.urban.org/sites/default/files/publication/100000/repeal_of_the_aca_by_state.pdf.

[3] *See* Noam N. Levey, *Health Insurers Plan Big Obamacare Rate Hikes—and They Blame Trump*, Los Angeles Times, May 22, 2017, http://www.latimes.com/politics/la-na-polobamacare-trump-mismanagement-20170518-story.html.

[4] Mark Hall, *Stabilizing and Strengthening the Individual Health Insurance Market: A View from Ten States* 4, USC-Brookings Schaeffer Initiative for Health Policy (July 2018) [hereinafter Hall], https://www.brookings.edu/wp-content/uploads/2018/07/Stabilizing-and-Strenghtening-the-Individual-Health-Insurance-Market2.pdf.

[5] The Hall article discussed the likely causes of the 2018 rate increases at length but did not mention any of the challenged aspects of the 2019 Rule. *See* Hall, at 22-26. Indeed, the article suggested that "the specifics of any particular regulatory change are often not as important as simply the uncertainty created by ongoing regulatory changes." *Id.* at 26. On that theory, the substance of the challenged

To the extent Plaintiffs address premium rates in 2019, they fare no better. Again, none of the factors that they identify as allegedly contributing to premiums "higher than they otherwise would be in 2019" have anything to do with the challenged aspects of the 2019 Rule. *See* Am. Compl. ¶ 188. Indeed, Plaintiffs identify budgetary issues as the problem rather than regulatory changes. *See id.* Their cited sources also fail to identify the challenged aspects of the 2019 Rule as contributing to premium increases. *See* Am. Compl. ¶¶ 186–89 & nn.228–41. To the contrary, one source suggested that the 2018 Final Rule (which is not at issue here) served to counteract upward pressure on premiums from other sources by increasing plan flexibility.[6]

Plaintiffs' allegations regarding uninsured rates similarly focus either on time periods that predate the 2019 Rule, *see* Am. Compl. ¶¶ 190–93, or on factors other than the challenged aspects of the 2019 Rule, *see id.* ¶ 195; Pl. Opp. at 15 (citing Am. Compl. §§ 133–72, which have nothing to do with the challenged aspects of the 2019 Rule). Thus, far from supporting Plaintiffs' standing to challenge the discrete aspects of the 2019 Rule that they identify, the factual assertions in Plaintiffs' Amended Complaint undermine their standing to assert their APA challenge by making clear that the injuries they seek to rely on were not, and could not have been, caused by the 2019 Rule. This is not a situation where Plaintiffs have merely failed to show that the 2019 Rule is the "sole or . . . immediate cause" of their asserted injury, *see* Pl. Opp. at 10 (quoting *Sierra Club v. Dep't of Interior*, 899 F.3d 260, 284 (4th Cir. 2018)). Rather, they have failed to show that it is even a contributing factor. That is, they do not meet the traceability requirement of the standing doctrine.

In their opposition brief, Plaintiffs offer a cursory list of the nine aspects of the 2019 Rule that they seek to challenge and argue that this list suffices to "tie[] each and every one of the challenged provisions" to their asserted injuries. Pl. Opp. at 16–17. Not so. Instead of establishing a causal link, this list makes clear that Plaintiffs are only speculating regarding the possible impacts of the challenged

---

aspects of the 2019 Rule would be irrelevant, and Plaintiffs' claimed injuries would not be redressable since, after all, any decision setting aside the 2019 Rule would simply be yet another regulatory change.

[6] Sabrina Corlette, *The Effects of Federal Policy: What Early Premium Rate Filings Can Tell Us About the Future of the Affordable Care Act*, CHIRblog, May 21, 2018, http://chirblog.org/what-early-rate-filings-tell-us-about-future-of-aca/; *see* Am. Compl. ¶ 186 n.230.

provisions, and that their speculation is fueled by exaggerated descriptions of the provisions themselves. Thus, for example, Plaintiffs assert that the 2019 Rule "[e]liminat[es] the direct notification requirement" regarding the potential loss of advance premium tax credits ("APTC") due to the taxpayer's failure to reconcile such payments on the prior year's tax return. Pl. Opp. at 16. The impact of this regulatory change, however, is likely to be minimal because as CMS made clear, the Federal Exchanges will still send the direct notices, and CMS encouraged State Exchanges to do so as well if they are able to. 83 Fed. Reg. at 16983–84. The change was simply intended to alleviate a significant burden on some State Exchanges that lack the ability to hire contractors to handle the particular tax privacy concerns implicated by the direct notices; and even those Exchanges will continue to send notices that do not raise the same concerns. *See id.* Moreover, those whose APTC payments are stopped will also receive termination notices explaining their right to appeal, and their APTC payments will continue while any appeal is underway. *See id.* at 16983.

Similarly, Plaintiffs baldly assert that "eliminat[ing] support for standardized options limits price competition," *see* Pl. Opp. at 16, but they provide no factual support whatsoever for this contention, while failing to acknowledge that the change is designed to stimulate innovation, which could just as easily enhance competition. Plaintiffs also assert that the 2019 Rule's provision allowing issuers to claim a fixed .8 percent expenditure on quality improvements "make[s] it easier [for insurance issuers] to avoid paying rebates," which they assert will "increas[e] the cost of health care," Pl. Opp. at 16, but this assertion is simply implausible when the provision will affect issuers' total reported costs (which determines whether they must pay rebates) by, at most, less than one percent, and more likely not at all, since CMS based the fixed amount on the average of actual reported quality improvement costs in prior years. *See* 83 Fed. Reg. at 17032. [7]

---

[7] In addition, nothing in the most recent data issued by CMS ties changes in premiums or uninsured rates in 2019 to the challenged aspects of the 2019 Rule. The data shows "consistent enrollment through the Exchanges" while "the average total monthly premium for Exhcnage enrollees in February 2019 decreased by one percent from the prior year." CMS, Press Release, *CMS Releases Reports Showing Declining Enrollment for the Unsubsidized Population* (Aug. 12, 2019), *available at* https://www.cms.gov/newsroom/press-releases/cms-releases-reports-showing-declining-

In regard to the individual Plaintiffs, Plaintiffs acknowledge that their 2019 premiums are actually lower than their 2018 premiums, but they assert that the premiums are still higher than they otherwise *would have been* in the absence of "Defendants' actions," taken as a whole. Pl. Opp. at 19.[8] But again, the 2019 Rule could not have affected the individual Plaintiffs' premiums at all prior to 2019 (since premiums for the new plan year would not have taken effect until January 2019). And the notion that, in the absence of the 2019 Rule, premiums in 2019 would have been lower than they were (which, as noted, was already lower than they were in 2018) is pure speculation on Plaintiffs' part. Indeed, Plaintiffs rely on third parties, including the Governor of Virginia, who attribute premium increases prior to 2019 to factors *other* than the 2019 Rule. *See* Pl. Opp at 20 (citing Am. Compl. ¶¶ 267, 270–72).

Moreover, as explained in Defendants' opening brief, premium rates are set by issuers, not by Defendants, so "the independent action of some third party not before the court," *In re Trump*, 928 F.3d at 376, breaks any chain of causation there might be (which, for the reasons discussed above, is already tenuous when it comes to Plaintiffs' APA claims). *See Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) (recognizing that issuers stand as independent third parties between plaintiffs' asserted injuries and the challenged ACA-related claims). In this situation, courts have required plaintiffs to show that the challenged action was "at least a substantial factor motivating the third parties' actions." *Tozzi v. U.S. Dep't of Health & Human Servs.,* 271 F.3d 301, 308–09 (D.C. Cir. 2001); *see* Pl. Opp. at 10–11 (conceding that *Tozzi*'s "substantial factor" standard applies); *cf. In re Trump*, 928 F.3d at 375 ("speculation into the subjective motives of independent actors who are not before the court [ ] undermin[e] a finding of causation"). Although Plaintiffs attempt to distinguish *Am. Freedom*

---

enrollment-unsubsidized-population. Although the data shows a decrease in enrollment by those who do not receive advance premium tax credits, *see id.*, none of the challenged aspects of the 2019 Rule has a discernible connection to such a result.

[8] Plaintiffs argue that the rate for the plan that the individual Plaintiffs purchased in 2019, the Anthem bronze plan, rose by 1.6 percent from 2018 to 2019. *See* Pl. Opp. at 19-20. However, the individual Plaintiffs did not choose that plan in 2018, and thus did not themselves experience the 1.6 percent increase, *see id.* at 19, rendering the increase irrelevant to the individual Plaintiffs' claim of injury.

*Law Ctr.*, that case is directly on point; as there, Plaintiffs here have failed to "separate out" the challenged aspects of the 2019 Rule as direct causes of their alleged injuries. *Cf. Am. Freedom Law Ctr.*, 821 F.3d at 51. Indeed, as discussed, Plaintiffs fail to show that any of the challenged aspects of the 2019 Rule are factors contributing to their injuries, much less "substantial" ones. Given the lack of causation, Plaintiffs also fail to show that their claimed injuries would be redressed by a decision setting aside the challenged aspects of the 2019 Rule. *See Carter v. Fleming*, 879 F.3d 132, 138 (4th Cir. 2018).

The City Plaintiffs' standing argument is even more attenuated than that of the individual Plaintiffs. The City Plaintiffs would have to show not only that each challenged aspect of the 2019 Rule will be a substantial factor in the increased premiums and decreased enrollments that they predict, but also that those increased premiums and decreased enrollments will "shift[] costs" onto the City Plaintiffs. Pl. Opp. at 24. They clearly have failed to make those required showings. In regard to their allegations of increased premiums, Plaintiffs rely in part on the notion that Defendants' actions have caused an "exodus of carriers" in their States. Am. Compl. ¶ 276. But, as discussed in Defendants' opening brief, the number of issuers in each of the States at issue, including the State in which the individual Plaintiffs reside, actually increased from 2018 to 2019. Def. Mem. at 19 & n.8. Plaintiffs do not contest that point but rely on asserted decreases in prior years, from 2016 to 2018. *See* Pl. Opp. at 25. For the same reasons explained above, changes that occurred before the 2019 Rule went into effect cannot be attributed to the challenged aspects of the 2019 Rule. Plaintiffs' insistence that they need to show only an "identifiable trifle" of injury, *id.* at 26 (quoting *United States v. SCRAP*, 412 U.S. 669, 689 & n.14 (1973)), falls flat because, however small the injury might be, the involvement of independent third parties—issuers who are the ones responsible for setting rates—means that Plaintiffs still must show that the actions they seek to challenge were a "substantial factor" in that injury in order to satisfy the causation prong of standing. *See Tozzi*, 271 F.3d at 308–09. This Plaintiffs fail to do for purposes of their APA claims.

2.      **Plaintiffs Also Lack Standing To Raise Their Take Care Clause Claims.**

The range of challenges that Plaintiffs attempt to assert under the Constitution's Take Care Clause is far more disparate than those identified in their APA claim, but Plaintiffs likewise fail to show that any of the challenged conduct was a "substantial factor" in producing the harms that they allege, or that their asserted injuries would be redressable by the relief they seek for these claims. Given the breadth of the Take Care Clause claims—which seek to challenge Executive Orders, "announcements," "letters," "guidance," "discussion papers," a proposed rule before it went into effect, website and social media content, advertising funding, and statements and tweets by the President, *see* Def. Mem. at 47 (citing Am. Compl. ¶¶ 68, 100–03, 105, 109, 116–17, 118, 119, 124, 127, 129, 130–31, 138, 147 173–76)—the notion that any of the challenged actions could conceivably qualify as a "substantial factor" in issuer decisions to set rates, or in consumer decisions to enroll in health plans, is far-fetched.

The notion becomes particularly incredible in the face of the common theme that emerges from the sources on which Plaintiffs purport to rely: if anything could be identified with certainty as a cause of reduced enrollments, it is *Congress's* decision to set the penalty for failure to comply with the individual mandate at zero. *See* May 2018 CBO Report, at 5 ("Between 2018 and 2019, the number of people enrolled in health insurance through the nongroup market is projected to fall by 3 million, *mainly because the penalty associated with the individual mandate will be eliminated* and premiums faced by people who are ineligible for subsidies in the nongroup market will be higher [as a result]." (emphasis added)); Hall article, at 5 ("Most rigorous analytic studies conclude that repeal of the individual mandate penalty will adversely affect premiums and enrollment" although "this adverse effect will be less than many people originally thought"), 32 (concluding that repeal of the mandate would likely affect rates by five to ten percent in 2019 and that the impact may be a one-time correction); *see also* Kaiser May 2019 report, at 1–2 (indicating that the elimination of the individual mandate penalty prevented 2019 premium rates from falling more than they did from 2018). Moreover, these publications, as well as the material cited in Defendants' opening brief, make clear that because issuers must make decisions regarding the next year's rates in advance, it is difficult to attribute a rate increase to a particular

government action, much less to identify any particular action as a substantial factor. Indeed, highlighting the independent nature of their decisions, issuers may overreact to circumstances, or they may anticipate events that never actually take place. Plaintiffs thus fail to meet their burden to establish their standing with respect to their Take Care Clause claims.

## B.    Plaintiffs Fail To Establish That Their Claims Are Ripe.

Defendants have also explained that Plaintiffs' claims are unripe. Indeed, Defendants pointed out that, at the time Plaintiffs filed their Amended Complaint, a number of agency actions that Plaintiffs attempt to roll into a single Take Care Clause claim had not been finalized. Some of these actions consisted of proposed rules, for which CMS was still engaged in a notice and comment rulemaking process. *See* Def. Mem. at 24–25. Plaintiffs' only response is that they have not raised challenges to these rules under the APA. Pl. Opp. at 29. But that is precisely the point. To allow Plaintiffs to turn an unripe APA claim, where no "final agency action" has been taken, *see* 5 U.S.C. § 704, into a constitutional claim under the Take Care Clause would subvert well-established limitations on judicial review of agency decisions under the APA.

Plaintiffs also argue that it does not matter that, as Defendants have explained and Plaintiffs concede, the impact of many actions they identify cannot yet be known. They make that surprising assertion because, they explain, they do not mean to challenge any specific action or decision at all. Instead, they seek to use those claims "as evidence of Defendants' intent." Pl. Opp. at 29. However, nebulous arguments regarding Defendants' intent cannot possibly identify a "case or controversy" sufficient to confer Article III jurisdiction. Plaintiffs have not shown that their claims are fit for judicial review. Their Take Care Clause claim, in particular, reflects nothing more than an "abstract disagreement[] over administrative polices" and, as such, is unripe. *See Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003)( quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).

C.     **The Complaint Fails To State a Claim Upon Which Relief Can Be Granted.**

1.     **Plaintiffs' APA Challenge to the 2019 Rule Should Be Dismissed.**

Plaintiffs do not challenge the 2019 Rule in its entirety. Indeed, the 2019 Rule left unchanged many major aspects of CMS's prior implementation of the ACA, including the general contours of federal health insurance exchanges ("Federal Exchanges"), which CMS operates in States that have not established their own exchanges, as well as the federal platform used by some State Exchanges; the provision of premium tax credits for individuals and families with income between 100 and 400 percent of the federal poverty level ("FPL"); CMS's guidance to States on Medicaid expansion for individuals below 133 percent of the FPL; and its prohibition on health insurance issuers' refusing to cover, or charging higher premiums to, individuals with pre-existing medical conditions. Rather than taking issue with the broader, general contours of CMS's ongoing implementation efforts, Plaintiffs attempt to nitpick at the smaller details, singling out nine specific decisions in the 2019 Rule as supposedly contrary to law or unreasonable.  However, as discussed below, CMS examined "the relevant data" and articulated "a satisfactory explanation" for each of these aspects of the 2019 Rule, "including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 45 (1983) (internal quotation omitted). It therefore has satisfied its obligations under the APA.[9]

---

[9] Plaintiffs argue that dismissal of their APA claims is inappropriate because the administrative record for the 2019 Rule has not been submitted on the docket. *See* Pl. Opp. at 31 & n.15. However, the Notice of Proposed Rulemaking ("NPRM") and the Preamble to the Rule, which contain the complete record of CMS's reasoning, are published in the Federal Register and are publicly available. *See* CMS, ACA Notice of Benefit and Payment Parameters for 2019, Proposed rule, 82 Fed. Reg. 51052-01 (Nov. 2, 2017) (NPRM); 2019 Rule (Preamble and final rule). Moreover, the comments received in response to the NPRM are also publicly available on the regulations.gov website. *See* https://www.regulations.gov/docket?D=CMS-2017-0141. Indeed, Plaintiffs' opposition brief cites some of those comments. *E.g.*, Pl. Opp at 39 n.17. There is therefore no barrier to the Court's dismissal of Plaintiffs' APA claims.

   **a.  CMS's removal of the direct notification requirement for APTC does not violate the Internal Revenue Code and is a reasonable way to alleviate burdens on State Exchanges while protecting taxpayer interests. [Am. Compl. ¶ 282(a), Def. Mem. 35–38, Pl. Opp. 31–34]** [10]

Plaintiffs fail to show that the 2019 Rule is arbitrary or capricious in its amendment of the APTC notification requirements. As described in Defendants' opening brief (Def. Mem. at 35), Exchanges provide advance payments of premium tax credits to qualified health plans to offset premiums on behalf of eligible enrollees meeting certain requirements. 45 C.F.R. § 155.305(f)(3). However, after the end of each plan year, the applicable taxpayer for an eligible enrollee must file a tax return "reconcil[ing] the advance payments" with the actual premium tax credit that can be claimed on behalf of the enrollee, which depends on taxable income for the year. *See id.* § 155.305(f)(4). If the taxpayer failed to do so for the previous year, the Exchange cannot deem him eligible for the APTC payment in the current year. *Id.*

In 2016, CMS had recognized "ongoing challenges for consumers and Exchanges" in implementing the reconciliation requirement. HHS Notice of Benefit and Payment Parameters for 2018: Amendments to Special Enrollment Periods and the Consumer Operated and Oriented Plan Program, Final Rule, 81 Fed. Reg. 94058-01, 94124 (Dec. 22, 2016). To address the issue, CMS required direct notification to the applicable tax filer, on behalf of the enrollee, identifying the tax filer's failure to file an income tax return that reconciled APTC paid on their behalf. *See id.* The 2019 Rule, however, removed that requirement because the direct notices contained protected taxpayer information, which required special handling, and thus increased the burden on the Exchanges. 83 Fed. Reg. at 16982–84.

Plaintiffs seek to challenge CMS's decision to remove the direct notice requirement, but they fail to plausibly assert that the decision is arbitrary or capricious, or contrary to law.  Plaintiffs first

---

[10] Defendants' opening brief addressed the challenged aspects of the 2019 Rule identified in Am. Compl. ¶ 282(a), (c), and (d)-(g) in a single section, III.B.1.b. of the brief, because those aspects all related to certain Exchange functions and the direct enrollment and eligibility verification process. The APA challenges therefore were not addressed in the same order listed in the Amended Complaint. Because Plaintiffs addressed the challenges in the order listed in the Amended Complaint, Defendants now do so as well in the Reply, in order to facilitate the Court's review.

argue that the change violates a provision of the Internal Revenue Code ("IRC"), 26 U.S.C. § 36B(a), which identifies the income eligibility requirements for ACA tax credits. *See* Pl. Opp. at 32. However, as explained in Defendants' opening brief, the regulation that CMS revised in the 2019 Rule, 45 C.F.R. § 155.305(f)(4), does not address taxpayers' eligibility to claim tax credits on their tax returns. Instead, it governs when an Exchange will make *advance payments* of those tax credits directly to a health plan on behalf of an Exchange enrollee. A taxpayer's eligibility to claim the tax credit in tax filings under the Internal Revenue Code remains unaffected. Thus, there is no conflict between the IRC provision and the CMS regulation.

In addition, the Preamble to the 2019 Rule shows that CMS had good reason to reach its decision. In particular, CMS came to understand that, given current technological limitations faced by both Federal and State Exchanges, the Exchanges had to hire outside contractors in order to prepare direct notices that would comply with taxpayer privacy requirements. *See* 83 Fed. Reg. at 16983 (explaining that, to comply with taxpayer privacy requirements, the direct notices were not generated by the Federal Exchange but instead by a contractor); *id.* at 16984 (reporting comment from State Exchange highlighting the burdens imposed by the direct notice requirement). CMS explained that, due to the burdens involved in hiring such contractors, not all State Exchanges were able to use this option. *See id.*

At the same time, CMS did not take lightly its decision to eliminate *required* direct notices. Responding to comments, CMS recognized the concern with providing enrollees with sufficiently explicit notice such that they are able to take action to continue their eligibility for APTC payments. *See id.* CMS pointed out that the Federal Exchanges had and would continue to provide direct notices to the taxpayers, and it encouraged State Exchanges to do the same "where feasible." *See id.* at 16983–84. CMS explained that it would continue to evaluate whether further improvements to the notification process could be made. *See id.* at 16985.

CMS also recognized that, either instead of or in addition to direct notices, Exchanges would continue prior notification practices, whereby notifications were sent to the individual that the enrollee had identified as the household contact—which in many cases would be the tax filer—identifying the

— 13 —

failure to satisfy the reconciliation requirement as only one of three possible reasons that the Exchange had determined it could not make the APTC payment. *Id.* at 16983; *see also* 82 Fed. Reg. at 51086. These "combined notices" avoided disclosing private tax information. 83 Fed. Reg. at 16983. And enrollees who were identified as not having met the reconciliation requirement would receive, in addition to a combined notice, a termination notice providing a full explanation of appeal rights. *Id.* During any appeal, enrollees may continue receiving the APTC payments, *id.*, and the applicable taxpayer may amend or belatedly file his tax return in order to comply with the reconciliation requirement. Plaintiffs fail to explain why those procedures would be insufficient to protect any applicable procedural due process rights, and none of the Plaintiffs claim a violation of such rights.[11]

Because CMS adequately explained its rationale for this change and addressed commenters' concerns, its decision cannot be deemed arbitrary or capricious. Indeed, the Supreme Court has explained that, when an agency changes its policy, "it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). That standard is met here, and this challenge therefore should be dismissed.

### b. CMS's decision to continue its prior qualified health plan certification standards for network adequacy does not violate the ACA and is neither arbitrary nor capricious. [Am. Compl. ¶ 282(b), Def. Mem. 41–43, Pl. Opp. 34–36]

Plaintiffs fare no better in their second APA claim. As explained in Defendants' opening brief, the decision at issue here extended a policy, first adopted in the ACA Market Stabilization final rule, 82 Fed. Reg. 18346, 18371 (Apr. 18, 2017), of relying on States and accrediting entitites to evaluate health plans' compliance with the network adequacy requirement set forth in 45 C.F.R. § 156.230 for

---

[11] While Plaintiffs purport to raise "due process concerns," they do not actually claim a procedural due process violation, nor could they, since none of the Plaintiffs assert that they have been deprived of APTC payments without due process. Indeed, it should be noted that the individual Plaintiffs are not eligible for APTC. Am. Compl. ¶ 276.

purposes of the qualified health plan ("QHP") certification process. 82 Fed. Reg. at 51109; 83 Fed. Reg. at 17025. This decision was intended to eliminate duplicative evaluations by both the Federal Exchange and States of the same network adequacy criteria, which remain unchanged. *See id.* The Federal Exchange will now rely on State determinations of network adequacy, so long as it determines that the State's network adequacy review process is adequate. *See id.* Otherwise, the Federal Exchange will conduct its own evaluation based on an issuer's Qualified Health Plan application or rely on determinations by accrediting entities, which typically also require plans to meet network adequacy standards. *See id.* CMS indicated that it would continue coordinating with States to monitor network adequacy. *See id.*

Plaintiffs first challenge this decision as contrary to the ACA provisions set forth in 42 U.S.C. § 18031(c)(1) and (d)(4)(A). But as explained in Defendants' opening brief (Def. Mem. at 42–43), nothing in these provisions requires CMS to conduct the QHP certification process or assess network adequacy itself. Rather, § 18031(c)(1) requires that HHS promulgate a regulation establishing criteria for the certification of "qualified" health plans. *See* 42 U.S.C. § 18031(c)(1). Those criteria must include the requirement that a plan ensure "network adequacy," defined as a sufficient choice of providers, consistent with the rules set forth for network plans in the Public Health Service Act,  42 U.S.C. § 300gg-1(c). 42 U.S.C. § 18031(c)(1)(B). HHS has done so by promulgating 45 C.F.R. § 156.230, which the 2019 Rule did not change. Moreover, CMS has explained that it will not rely on a State's determination of network adequacy unless it determines that the State's review process is adequate— in other words, that the State's process reasonably ensures compliance with the criteria established by CMS. 83 Fed. Reg. at 17025. Plaintiffs' contention that CMS has violated § 18031(c)(1) is therefore baseless.

Section 18031(d)(4)(A) requires Exchanges to "implement procedures for the certification" of qualified health plans that, among other things, are consistent with the criteria for certification, including those related to network adequacy, promulgated by CMS. *See* 42 U.S.C. § 18031(d)(4)(A). Plaintiffs argue that this provision, by using the term "implement," requires CMS, on behalf of the Federal Exchange, to conduct its own evaluation of a plan's network adequacy, independent of any

duplicate evaluation conducted by States. However, nothing in the statute prevents CMS from implementing a procedure that relies on evaluations by States and accrediting entities, which is exactly what CMS has done here. This statutory argument is thus also baseless.

Nor do Plaintiffs state a plausible claim that CMS's decision is arbitrary or capricious. Plaintiffs' opposition brief merely repeats the same assertions set forth in their Amended Complaint without responding to Defendant's opening brief, which addressed those assertions in detail. *See* Def. Mem. at 41–43. In particular, Plaintiffs cite nothing to support the notion that CMS could not rely on its experience with State and accrediting entity determinations over the past year, or that CMS had an additional obligation to "provide evidence" that State review procedures "guarantee network adequacy," or other wise "point . . . to any data." *See* Pl. Opp. at 35–36. Courts have rejected arguments that an agency must "undergo an independent investigation in search of evidence to support its rationale" when it sets forth a reasoned explanation based on its experience. *PhRMA v. FTC*, 44 F. Supp. 3d 95, 130–31 (D.D.C. 2014) (citing *Nat'l Tour Brokers Ass'n v. ICC*, 671 F.2d 528, 533 (D.C. Cir. 1982)). Indeed, nothing in the APA's deferential standard allows the plaintiff to dictate the evidentiary showing that CMS must make, or to insist that CMS prove that its decision will "guarantee" that its adopted policy will work as intended. *See* ). The "sole question" for the court is "whether [the agency] has acted reasonably, not whether it has acted flawlessly." *Nat. Res. Def. Council* ("NRDC") *v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008).

Plaintiffs cite *Bowen v. Am. Hop. Ass'n*, 476 U.S. 610, 627 (1986), but that case merely held that the agency must explain its decision rather than relying on an unarticulated rationale. *See id.* Here, in contrast, CMS explained its decision. Plaintiffs also suggest that CMS failed to address contrary evidence in the record that purportedly showed that State standards of network adequacy were insufficient. Pl. Opp. at 35–36 & n.16. But the only such evidence that Plaintiffs cite consists of a single article containing "[d]ata from 2015." *See id.* n.16. There is no reason to believe such data would have continued relevance three years later, particularly in the face of CMS's own more recent experience. Again, the 2019 Rule explains that CMS will defer to States' determinations only if States have a sufficient network adequacy review process. 83 Fed. Reg. at 17025. And CMS will continue to

monitor network adequacy in cooperation with States. *See id.* In the face of those assurances, Plaintiffs' assertions that CMS's policy will undermine network adequacy is baseless speculation. CMS's approach is a reasonable way to continue efforts to ensure that plans have adequate networks while reducing administrative burdens caused by duplicative efforts on the Federal and State levels.

> **c. CMS's adoption of new audit standards for entities participating in direct enrollment is not arbitrary or capricious. [Am. Compl. ¶ 282(c), Def. Mem. 33–35, Pl. Opp. 36–37]**

Plaintiffs' third APA challenge also fails to state a claim upon which relief can be granted. As explained in Defendants' opening brief, the decision at issue eliminated a prior requirement that CMS approve third-party auditors before such auditors can conduct operational readiness reviews of entities that allow beneficiaries to directly enroll in a health plan through their platform rather than through an Exchange. 83 Fed. Reg. at 16981 (revising 45 C.F.R. § 155.221); *see also* 82 Fed. Reg. at 51084. Instead of this requirement, CMS determined that all agents, brokers, web-brokers, and health plan issuers that participate in direct enrollment may select their own third-party auditors for the purpose of conducting the required operational readiness review, provided that the selected auditors adhere to a set of standards set forth in a new § 155.221(b). 83 Fed. Reg. at 16981. CMS considered and responded to concerns that the revision may harm the integrity of the auditing process but ultimately concluded that the standards set forth in § 155.221(b), together with existing oversight processes and CMS's commitment to ongoing monitoring, sufficiently addressed those concerns, while the adopted revision would reduce regulatory burdens and eliminate duplicative HHS oversight. *See* 83 Fed. Reg. at 16981–82.

Plaintiffs' opposition brief baldly asserts that CMS has ignored the problems that had led it to impose an advance approval requirement for third-party auditors in the first place. *See* Pl. Opp. at 37. But CMS directly addressed such concerns in the Preamble to the 2019 Rule and, in any event, did not simply eliminate all oversight of third-party auditors. Rather, CMS replaced a system requiring advance HHS approval of auditors with one that retained robust standards for third-party auditors, set forth in a new subsection (b) within the regulation itself. *See* 83 Fed. Reg. at 16981–82. CMS's

desire to reduce regulatory burdens while maintaining the role that third-party auditors play is sufficient "good reason" to meet APA requirements. *See FCC*, 556 U.S. at 515. Plaintiffs' disagreement with CMS's policy choice does not render CMS's decision arbitrary or capricious.

> **d. CMS's decision to foster innovation by discontinuing standardized plan options is not arbitrary or capricious. [Am. Compl. ¶ 282(d), Def. Mem. 30–32, Pl. Opp. 37–39]**

Plaintiffs' fourth APA challenge also fails. As explained in Defendants' opening brief, this challenge involves CMS's decision to remove the option of so-called Simple Choice plans, which existed during the 2017 and 2018 benefit years. 83 Fed. Reg. at 16974; *see also* 82 Fed. Reg. at 51081. Such plans used a single, standardized cost-sharing structure set forth by CMS in rulemaking (with an alternative designed for high deductible health plans), *see, e.g.*, 81 Fed. Reg. at 94110–12, and were highlighted on the HealthCare.gov website. In removing the option, CMS explained its concern that this approach has overly promoted enrollment in standardized plans and discouraged issuers from designing and offering more innovative plans to consumers. 83 Fed. Reg. at 16974. CMS acknowledged comments that made the very point that Plaintiffs assert was ignored, *see* Pl. Opp. at 38–39 & n.17—the contention that standardized options also encourage innovation on the plan features that are not standardized. *See* 83 Fed. Reg. at 16975. And contrary to Plaintiffs' assertion, Pl. Opp. at 39, CMS offered a reasoned explanation for rejecting these comments, explaining its belief that the removal of standardized options would better encourage issuers to offer coverage with innovative plan designs, and that issuers are in the best position to decide which areas are most appropriate for innovation. *See* 83 Fed. Reg. at 16975.[12] CMS noted that issuers would still have market

---

[12] Plaintiffs cite specific comments in support of their argument. *See* Pl. Opp. at 38-39 & n.17. However, those comments merely stated the commenters' beliefs regarding innovation; they did not contain any data that warranted an evidentiary response from CMS. *See* Justice in Aging comment, at 2 (asserting that standardized options lead insurers to compete in the generosity of other plan design elements, but failing to suggest that this would involve innovation), *available at* https://www.regulations.gov/document?D=CMS-2017-0141-0299; DC-Leukemia & Lymphoma Soc'y comment, at 3 (stating nothing more than a "question" about the effect of standardized options on innovation), *available at* https://www.regulations.gov/document?D=CMS-2017-0141-0139; DC – Soc'y for Pub. Health Education, at 2 (asserting disagreement with CMS's suggestion that standardized plans may stifle innovation but offering no evidence to support its position), *available at*

incentives to offer certain features that were popular in plans offered on the Federal Exchange but that consumers would not be encouraged to choose a plan simply because it was labeled as a "Simple Choice" plan, when another plan might provide better coverage for an individual's specific situation. *See id.*.

In their opposition, Plaintiffs argue that the 2019 Rule failed to point to any concrete data showing that CMS's prior conclusions when establishing Simple Choice plans for the 2017 benefit year were flawed. Pl. Opp. at 37. Essentially, Plaintiffs argue that CMS cannot change its prior policy because the prior policy was reasonable. However, that is not the law. *See FCC*, 556 U.S. at 515 (emphasizing that an agency need not show that its reasons for a new policy "are *better* than the reasons for the old one"). CMS has explained that its new approach reflects its greater concern with encouraging plan innovation, together with its conclusion that HealthCare.gov will still provide adequate tools that allow consumers to compare plan features. 83 Fed. Reg. at 16974–75.

Plaintiffs are also wrong in suggesting that CMS's decision in the 2019 Rule contradicts prior factual findings. *See* Pl. Opp. at 38. CMS's suggestion in 2015 that standardized options might help consumers make a choice is not inconsistent with its concern, expressed in the 2019 Rule, that the standardized options might unduly influence consumers for the very reason that such plans are labeled as a "Simple Choice" plan. See 83 Fed. Reg. at 16974–75. Moreover, CMS's decision was supported by its own ever-growing experience with administering the Federal Exchanges as well as by many commenters who agreed that eliminating Simple Choice plans would encourage innovation. *See id.* Again, Plaintiffs apparently disagree with CMS's policy priorities, but they fail to support the notion that CMS's policy choice is arbitrary or capricious. This claim therefore should be dismissed.

---

https://www.regulations.gov/document?D=CMS-2017-0141-0136. Plaintiffs' suggestion that such comments show that dismissal is unwarranted without a filed administrative record is therefore baseless.

e. **CMS's modifications to standards for navigator certification are not contrary to law or arbitrary or capricious. [Am. Compl. ¶ 282(e), Def. Mem. 32–33, Pl. Opp. 39–41]**

Plaintiffs' fifth APA challenge should also be dismissed. As described in Defendants' opening brief, this claim challenges CMS's decision to give Exchanges more flexibility in how to spend Navigator funding. 83 Fed. Reg. at 16979–80 (amending 45 C.F.R. § 155.210(c)(2) by removing requirements that each Exchange must have two Navigator entities and that one of those entities must be a community and consumer-focused nonprofit group, and amending § 155.210(e)(7) by removing the requirement that Navigators maintain a physical presence in an Exchange's service area); *see also* 82 Fed. Reg. at 51083–84. When adopting this change, CMS explained that Exchanges could still award grants to two entities, and to a community and consumer-focused nonprofit group, if they wished, but could also award a single grant to a different entity that is deemed the strongest candidate even if it is not a community or consumer-focused nonprofit. 83 Fed. Reg. at 16980. CMS also explained that the elimination of the physical presence requirement would allow Exchanges to determine what weight to give an entity's physical presence in the service area, as opposed to other considerations such as relationships with the community, when awarding Navigator funding. *See id.* CMS indicated that this proposal would provide Exchanges with improved flexibility to use Navigators in the manner that would be most effective for the Exchanges' particular needs. *See id.* at 16981.

In response to this reasoned explanation, Plaintiffs contend that eliminating the physical presence requirement, as well as the requirement that each Exchange have two Navigators, makes it impossible for Navigators to serve their statutory functions. Pl. Opp. at 39–40. However, as explained in Defendants' opening brief, the ACA does not require Navigators to have a physical presence in the Exchange's service area, nor mandate a two-Navigator minimum for every Exchange. *See* 42 U.S.C. § 18031(i)(2)(A). Rather, the ACA sets forth broader requirements for Navigators, *see id.*, and CMS has determined that the amendments to § 155.210 will give Exchanges greater flexibility in selecting Navigators, while complying with those statutory requirements. In their opposition brief, Plaintiffs also suggest that CMS has inappropriately decided to rely on entities other than Navigators to carry

out Navigators' statutory functions. Pl. Opp. at 41. But that is not the case. Rather, CMS responded to comments by agreeing that collaborations with other entities could be helpful in reaching marginalized communities. 83 Fed. Reg. at 16980–81. Nowhere did CMS suggest that such entities would take over functions that the ACA assigns to Navigators. Plaintiffs fail to plausibly claim that CMS's decision to give Exchanges more flexibility in selecting Navigators is arbitrary or capricious.

> **f.    CMS's modifications to the Small Business Health Options Program are not arbitrary or capricious. [Am. Compl. ¶ 282(f), Def. Mem. 39–41, Pl. Opp. 41–42]**

Plaintiffs' sixth claim also fails. Here, the challenge concerns changes to Small Business Health Options Programs ("SHOPs")—programs run by Exchanges that are intended to facilitate access to health plans by small business employees. 83 Fed. Reg. at 16997; *see also* 82 Fed. Reg. at 51092–93. As explained in Defendants' opening brief, the changes that CMS adopted in the 2019 Rule were a practical response to significant decreases in SHOP qualified health plan issuer participation and enrollments. 83 Fed. Reg. at 16996. CMS noted that 2018 enrollments in SHOPs had been even lower than anticipated and that many SHOPs continued to face challenges in managing all the original regulatory requirements. *See id.* The adopted changes removed certain requirements that, though not mandated by the ACA, CMS had previously imposed on SHOPs, including the requirement that SHOPs provide employee eligibility, premium aggregation, and online enrollment functionality. *Id.* CMS determined that these changes would allow SHOPs to continue to provide the basic functions that the ACA requires, as well as any other functions that Exchanges deemed appropriate, but would grant Exchanges greater flexibility to reduce operational costs. *See id.* Among other things, SHOPs would continue to certify available plans, provide plan information and premium calculators on their websites, and maintain call centers to answer questions. *Id.* at 16997.

Although Plaintiffs' Amended Complaint asserts that these changes violate the ACA, *see* Am. Compl. ¶¶ 80–81, Plaintiffs have now abandoned that point. Specifically, Defendants explained in their opening brief that no ACA provision requires SHOPs to perform the functions removed by the new rule, Def. Mem. at 40–41, and Plaintiffs failed to contest that point in their opposition brief. They

therefore have abandoned any claim that these changes are contrary to law. *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to this argument, the plaintiff abandons [the] claim.").

Plaintiffs also fail to support their claims that these changes are arbitrary or capricious. Plaintiffs attempt to analogize the SHOP changes to the rule at issue in *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012), where the agency conducted an economic analysis of whether "the benefits of the amended rule outweigh its costs," even though no such analysis was required by the governing statute. *See id.* at 1039. As in that case, the ACA does not require CMS to engage in an economic analysis of the costs of regulatory changes relative to their benefit. But here, unlike in *Nat'l Ass'n of Home Builders*, CMS has not attempted to conduct such an economic analysis, so Plaintiffs' suggestion that they have identified a "serious flaw" in CMS's purported economic analysis is misplaced. Rather than an economic cost-benefit analysis, CMS simply explained that, in light of decreases in issuer participation as well as lower enrollments in SHOP plans in 2018, it would not be cost effective to continue to impose certain obligations that were not expressly required by the ACA. 83 Fed. Reg. at 16996. By removing those obligations, CMS sought to ensure that SHOPs would be able to continue performing functions that the ACA does require. *See id.* CMS pointed out that a few State Exchanges had already adopted, on a temporary basis, certain such changes that the 2019 Rule was finalizing, and they reported that these changes had helped to reduce programmatic expenses, which was critical for State Exchanges "to maintain financial sustainability" as required under 42 U.S.C. § 18031(d)(5)(A). *See* 83 Fed. Reg. at 16996–97. As Defendants previously explained, CMS's removal of costly and underutilized functionality requirements was a reasoned response to decreased utilization of SHOPs. Plaintiffs fail to present any plausible claim to the contrary.

g.    **CMS's revisions to the income verification requirements for APTC eligibility are not arbitrary or capricious. [Am. Compl. ¶ 282(g), Def. Mem. 38–39, Pl. Opp. 42–44]**

Plaintiffs' seventh APA claim is similarly flawed. As discussed above, the ACA and its implementing regulations provide that Exchanges make APTC payments to plans on behalf of eligible

enrollees. Taxpayers enrolled in qualifed health plans through an Exchange may be eligible for such APTC payments if their expected household income for the year falls between 100 and 400 percent of FPL. (Those with income below 100 percent of FPL generally are not eligible for APTC payments because the ACA contemplated that they would instead be eligible for Medicaid. *See, e.g.*, 42 U.S.C. §§ 1396a(a)(10)(A)(i)(III), (IV), (VI), (VII) and (VIII), 1396u-1(b), (d); 26 U.S.C. § 36B(c)(1)(B)). In the 2019 Rule, CMS revised 45 C.F.R. § 155.320(c)(3)(iii) by directing Exchanges to request verifying documentation from applicants asserting elibility for APTC payments if they attest to projected annual income between 100 and 400 percent of FPL, but information from the IRS or Social Security Administration indicates that their income is actually below 100 percent of FPL. 83 Fed. Reg. at 16985; *see also* 82 Fed. Reg. at 51086. Previously, CMS had directed Exchanges to rely on applicants' attestations, without verification, but CMS explained that such an approach could lead to enrollees receiving APTC payments  when they are not, in fact, eligible for such payments. *See* 83 Fed. Reg. at 16985. In response to comments, CMS explained that it regarded this change as a "critical program integrity measure" that would also help limit tax filers' potential liability to repay excesses when reconciling the advance payments on their tax returns. *See id.* CMS also pointed out that the income verification could help identify individuals who were inaccurately determined not to be eligible for Medicaid. *See id.* at 16986.

In their Amended Complaint, Plaintiffs claim that this revision is arbitrary and capricious because CMS did not put forward data showing that individuals intentionally inflate their income to gain APTC. As explained in Defendants' opening brief, however, courts have rejected the notion that an agency needs to defend every regulatory change with technical data, particularly where such data cannot be "readily obtained." *Huntco Pawn Holdings, LLC v. U.S. Dep't of Defense*, 240 F. Supp. 3d 206, 225 (D.D.C. 2016). Indeed, in *Huntco*, the court pointed out that those involved in submitting false information "are not likely to report" it, making it difficult to collect data regarding such falsification. *See id.*; *see also BNSF Ry. Co. v. U.S. Dep't of Transp.*, 566 F.3d 200, 203 (D.C. Cir. 2009) (concluding it was "illogical" to require stastistical evidence of cheating on drug tests). Plaintiffs fail to respond to this authority in any meaningful way in their opposition brief, merely calling it "inapposite." Pl. Opp.

at 43. But Plaintiffs cannot dispute that the reasoning of *Huntco* and similar cases applies here: It is "illogical" that CMS would have data showing how many enrollees have submitted inaccurate income information and thus have obtained APTC payments for which they were ineligible. Such information would only be revealed to the IRS if these individuals ultimately file tax returns and reconcile the discrepancy based on their actual income.

Plaintiffs also argue that the revision is arbitrary because those with lower incomes have a greater likelihood of income fluctuation, making it difficult to submit accurate projected income information, and also may have difficulty providing income documentation. Pl. Opp. at 43. However, CMS addressed similar comments in the 2019 Rule, and explained that its policy "recognizes the need to have a reasonable threshold for income discrepancies to allow for normal variations in income, which may include a dollar threshold amount." 83 Fed. Reg. at 16986. CMS also explained that it had taken steps to make it easier for enrollees to document their income. *See id.* It is entirely reasonable for CMS to look at ways to improve documentation rather than simply forgoing any effort to ensure program integrity in the first place. Plaintiffs thus fail to plausibly assert that this revision was arbitrary or capricious.

### h. The 2019 Rule provisions amending CMS's rate review requirements are permissible interpretations of the ACA. [Am. Compl. ¶ 282(h), Def. Mem. 26–29, Pl. Opp. 44–47]

Plaintiffs' eighth APA claim is also subject to dismissal. This claim first challenges CMS's revision of 45 C.F.R. § 154.103(b) to exempt student health insurance coverage from ACA rate review, which generally requires issuers to submit justifications for proposed rate increases in plans in the individual and small group markets. 83 Fed. Reg. at 16972; *see also* 82 Fed. Reg. at 51078. Most commenters supported this change. *See* 83 Fed. Reg. at 16972. As explained in Defendants' opening brief (Def. Mem. at 26–27), the exclusion of student health insurance coverage from rate review is consistent with the treatment accorded student health insurance in many areas, in recognition of the fact that, although student health insurance is considered to be a type of individual market coverage, it is in many respects more like large group coverage because of the involvement of institutions of

higher education, which are "well informed, with significant purchasing power." 82 Fed. Reg. at 51078–79.

Plaintiffs argue that CMS's decision to exclude student health insurance coverage from rate review reflects an impermissible interpretation of 42 U.S.C. § 18118(c), which requires the ACA to be construed so as not to prohibit institutions of higher education from offering student health insurance. *See* Pl. Opp. at 45. According to Plaintiffs, § 18118(c) only allows student health insurance coverage to be exempt from an ACA requirement if the requirement would make student coverage "economically infeasible" or "impossible." Pl. Opp. at 45.

Plaintiffs' interpretation, based on a single district court decision that has now been vacated. should be rejected. *See id.* at 45 & n.18. Notably, the interpretation advanced in the 2019 Rule is not new. Rather, the 2019 Rule relies on an interpretation of § 18118(c) discussed in a 2013 final rule, Health Insurance Market Rules; Rate Review, Final rule, 78 Fed. Reg. 13406-01, 13424 (Feb. 27, 2013). There, CMS explained that the provision allows it to exempt student health insurance coverage from the ACA's single risk pool requirement due to the reality that student health insurance policies are "generally rated on a group basis," based on the college's or university's students enrolled in the plan. *See* 78 Fed. Reg. at 13424.

Plaintiffs' assertions fail to undermine CMS's interpretation of § 18118(c) in this instance. The provision by its own terms leaves it to CMS, on behalf of HHS, to identify instances where the application of the ACA market reforms would harm and interfere with the offering of student health insurance. Defendants provided a number of examples in their opening brief, illustrating that CMS applies this standard broadly to allow different treatment where appropriate based on the practical realities of student health insurance—for example, its different plan year, to match the typical academic calendar, and its different enrollment and renewal restrictions, excluding those who are not students or dependents of students. Def. Mem. at 27. And CMS had already exempted student health insurance coverage from the ACA's single risk pool requirement based on its recognition that student health insurance policies are "generally rated on a group basis," 78 Fed. Reg. at 13424, similar to its rationale here that student health insurance coverage is "generally rated and administered differently,"

in a way that is "more in line with large group pricing." 83 Fed. Reg. at 16972. This is because colleges and universities typically contract with an issuer to issue a blanket health insurance policy based on total expected student claims. *See* 45 C.F.R. § 147.145(b)(3). The decision in the 2019 Rule to exempt student health insurance coverage from federal rate review thus simply parallels its earlier decision, upon which it expressly relied. 83 Fed. Reg. at 16972 & n.37. Plaintiffs also ignore the fact that States are free to continue to review student health rates, and many do.[13] CMS's policy is therefore neither contrary to law nor arbitrary and capricious.

Plaintiffs also fail to mount a plausible challenge to CMS's decision to raise the threshold for rate review from 10 to 15 percent. As Plaintiffs acknowledge, the ACA does not set an explicit threshold for rate review. Plaintiffs cannot plausibly dispute the conclusion that the ACA leaves it to CMS, on behalf of HHS, to set this threshold. Plaintiffs' disagreement with CMS's decision does not suffice to deem it arbitrary. Rather, as Defendants have already explained in their opening brief (Def. Mem. at 28), CMS has provided a reasonable rationale for its decision based on its experience conducting rate reviews. *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1116 (4th Cir. 2014) ("so long as the agency 'provides an explanation of its decision that includes a rational connection between the facts found and the choice made,' its decision should be sustained") (citation omitted).

      **i.** **The option to allow issuers to report quality improvement activity as a single fixed percentage is permissible under the ACA. [Am. Compl. ¶ 282(i), Def. Mem. 44–46, Pl. Opp. 47–49]**

In their final APA challenge, Plaintiffs argue that CMS impermissibly adopted an optional fixed 0.8 percent of earned premiums figure for the amount that issuers could report as having been

---

[13] *See, e.g.*, Ill. Dep't of Insurance, Student Blanket Rate Review Checklist, *available at* https://insurance.illinois.gov/LAH_HMO_IS3_Checklists/LAH-Checklist.html; Md. Insurance Admin., Bulletin 18-26 (Dec. 19, 2018) (requiring rate review if issuer plans to use different forms or to revise its rates), *available at* https://insurance.maryland.gov/Insurer/Documents/bulletins/18-26-Student-Health-Plan-Form.pdf; Ohio Dep't of Insurance, ACA Compliant Student Blanket Health Plans, *available at* https://www.insurance.ohio.gov/Company/Pages/StudentHealthPlans.aspx; Penn. Insurance Dep't, 2019-2020 Student Health Insurance Rate Filing Guidance (Jan. 2019), *available at* https://www.insurance.pa.gov/Companies/ProductAndRateRequire/Documents/Rate%20-%202019-2020%20PA%20Student%20Health%20Insurance%20Rate%20Filing%20Guidance%201.9.19.pdf;

spent on activities that improve health care quality ("QIA expenditures").  The figure is submitted as part of issuers' annual reports of, essentially, how much they paid out in claims and QIA expenditures versus how much they collected in earned premiums, pursuant to 42 U.S.C. § 300gg-18. CMS made this option available by adding a new provision at 45 C.F.R. § 158.221(b)(8). 83 Fed. Reg. at 17032; *see also* 82 Fed. Reg. at 51114. In doing so, CMS explained that, during the years since it began conducting audits of issuers' medical loss ratio reports, it observed that it required "a substantial effort" by issuers to "accurately identify, track and report" every QIA expenditure, but the resulting amounts were consistently low, ranging from 0.7 percent in 2011 and 0.8 percent in 2012 through 2015. *See* 83 Fed. Reg. at 17032. The minor change in the 2019 Rule, therefore, was intended to simplify the medical loss ratio reporting and calculations, as well as to reduce a burden that, in CMS's experience, served no useful purpose in assessing issuer expenditures. *See id.*

As explained in Defendants' opening brief, Plaintiffs are simply wrong in their contention that the ACA, in 42 U.S.C. § 300gg-18, requires issuers to base their calculations only on actual expenditures for QIA, and prohibits CMS from authorizing the simplified reporting option that it approved in the 2019 Rule. The statute contains no such express requirement. Moreover, Plaintiffs fail to show that CMS's decision is arbitrary or capricious. CMS reasonably weighed the burdens and benefits of the previous requirement and determined that offering a fixed percentage option was warranted, particularly given the consistently low amounts of such expenditures from year to year. *See* 83 Fed. Reg. at 17032. CMS also considered and responded to comments that raise the same concerns that Plaintiffs raise here, explaining that those concerns do not justify maintaining the prior rule. *See, e.g., id.* at 17033 ("While we acknowledge commenters' concerns that the standardized QIA reporting option may in some cases give issuers credit for activities that they do not perform, we note that issuers also have financial incentives to improve the health of their enrollees because healthier populations incur lower medical costs, and reducing the administrative burden associated with tracking QIA will free up funds that issuers can invest in QIA.").

As for Plaintiffs' arguement that CMS did not cite evidence to "corroborate" its statement that tracking QIA expenses was burdensome for issuers, *see* Pl. Opp. at 48, CMS actually noted that "[m]ost

commenters who supported the proposal stated that the current process for identifying, tracking and reporting QIA expenses is burdensome, time consuming and costly." *See* 83 Fed. Reg. at 17033. CMS's decision was neither arbitrary nor capricious.

### 2.    Plaintiffs Fail To State a Claim Under the Take Care Clause.

Aside from their APA challenge in Count One to the 2019 Rule, discussed above, Plaintiffs threw everything that could not possibly be challenged under the APA—such as a proposed tri-agency regulation on health reimbursement arrangements, which was not yet final, as well as funding and calendaring decisions, and oral and social media statements by the President—into a grab bag and called it a Take Care Clause claim. Plaintiffs allege that these statements and issuances, as a whole, exemplify Defendants' failure to faithfully execute the ACA. But the Take Care Clause has never been understood to provide an enforceable private right of action, and Plaintiffs' attempt to invoke it amply demonstrates why no such right is appropriate. Their broad claim also impermissibly asserts a right to seek relief against the President. And in any event, the claim would swallow the traditional limitations on judicial review of government action, allowing any alleged statutory violation by the Executive Branch to be transformed into a constitutional challenge.

### a.    Plaintiffs cannot obtain injunctive or declaratory relief against the President.

As discussed in Defendants' opening brief, the weight of authority makes clear that courts should not issue injunctive or declaratory relief against the President concerning his performance of official duties, due to the extraordinary separation of powers concerns that such an order would raise. *See Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992). Plaintiffs do not contest that such relief is at least highly disfavored, but they contend that the question of whether it is barred entirely is unsettled. Pl. Opp. at 64–65. But the Supreme Court's decision in *Mississippi* clearly prohibits a court from compelling the President to perform a discretionary act. *See Mississippi*, 71 U.S. at 499, 501 (holding that "judicial interference with the exercise of Executive discretion" was forbidden). The President's duties under the ACA clearly are discretionary duties because they involve the "exercise of judgement." *Id.* at 499. And even if they could be considered

ministerial duties—*i.e.* duties in "which nothing is left to discretion," *id.* at 498—which they cannot, no court has ever issued an injunction compelling the President to perform a ministerial duty, even though the Supreme Court left open the question whether such an injunction may be permitted.

Plaintiffs rely heavily on the district court opinion in *District of Columbia v. Trump*, 291 F. Supp. 3d 725 (D. Md. 2018), but that decision has now been vacated by the Fourth Circuit. *In re Trump*, 928 F.3d 360, 373–74 (4th Cir. 2019). Moreover, its analysis was not sound, relying primarily on a footnote and a dissenting opinion in two Supreme Court cases, neither of which ordered any relief against the President. *Dist. of Columbia*, 291 F. Supp. 3d at 752. Indeed, the footnote, in *Clinton v. New York*, 524 U.S. 417 (1998), nowhere suggested that injunctive or declaratory relief might be awarded *against the President. See id.* at 433 n.22. It simply suggested that the President's use of the line item veto, pursuant to the challenged law, to cancel certain budgetary allocations might be declared invalid. *See id.*

In a last ditch effort to avoid dismissal of the President as a defendant, Plaintiffs cite *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018), which declined to dismiss the plaintiffs' claims against the President at the  motion to dismiss stage even while recognizing that, "ultimately, relief against the President himself is extraordinarily unlikely." *Id.* at 329. Here, it is even more "extraordinarily unlikely" that any relief against the President would be appropriate. After all, although Plaintiffs challenge two Executive Orders, those Orders merely issued broad policy-based directions to the Secretary of Health and Human Services and other federal agencies. Indeed, Plaintiffs do not seek declarations that the Orders are invalid; rather, they seek to enjoin implementation of the Orders by "Defendants" in a manner that undermines the ACA. Am. Compl. at 141 (seeking to enjoin implementation of E.O. 13765), 142 (seeking to enjoin implememtation of E.O. No. 13813). And the only Defendants charged with implementing the Orders are the agency defendants, not the President. *See* E.O. 13765 §§ 2–5; E.O. 13813 §§ 3–4. Plaintiffs otherwise identify no reason that the relief they request would have to be issued against the President. *Cf. Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) (concluding that the plaintiff had standing because the claimed injury—his removal by the President from the Board of the National Credit Union Administration—could be redressed by ordering subordinate officials to treat the plaintiff as a board member). They do not, for example,

expressly ask the Court to order the President to stop expressing his views on the ACA in public statements, nor request any other relief that only the President could provide. Am. Compl. at 140–42. Plaintiffs therefore fail to state a claim against the President that "raise[s] a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Because the standard for dismissal is satisfied, it is irrelevant that the case is at an "early stage," *CASA de Maryland, Inc.*, 355 F. Supp. 3d at 329.

### b. The Take Care Clause does not provide a means of circumventing the APA

By all accounts, Plaintiffs intend their Take Care Clause claim as a "broad programmatic attack" on Defendants' implementation of the ACA, which is the very type of challenge precluded under the APA. *Norton v. SUWA*, 542 U.S. 55, 64 (2004) (APA's "limitations rule out several kinds of challenges," including . . . "broad programmatic attack[s]"). In their opposition brief, Plaintiffs do not deny the programmatic nature of their challenge, nor its breadth. Instead, they urge the Court to discount the breadth of their claim because they have not raised it under the APA, but instead have invoked the Constitution's Take Care Clause. Pl. Opp. at 61. However, to allow Plaintiffs' claim under the Take Care Clause would effectively nullify Congress's limitations on APA review because, by the same reasoning, any broad programmatic attack on an agency's implementation of a statute could be rewritten as a Take Care Clause claim. Plaintiffs identify no case where a court has allowed a broad programmatic attack of this kind against an agency, under the Take Care Clause or otherwise. To the contrary, judicial review of federal agency conduct has traditionally been highly constrained, not only by the APA, but also by the limitations on mandamus review.

Although Plaintiffs dispute that they are attempting to circumvent the APA, the fact that their claim challenges a federal agency's implementation of a federal program belies their denial. Plaintiffs would have the Court review myriad statements and decisions in regard to disparate aspects of the implementation of a federal program and discern an overall unconstitutional intent or motive on the part of Defendants. *See* Am. Compl. ¶ 8 ("The executive actions challenged here have been undertaken to thwart the ACA's goals and try to make the law fail."), ¶ 99 (asserting that the Administration's "many other actions" have "the intent and effect of sabotaging the [ACA] generally"), ¶ 176 (asserting

that a proposed rule "corroborates Defendants' intent to unlawfully sabotage the [ACA]"). Then, Plaintiffs would have the Court issue declaratory and injunctive relief that would result in the Court's oversight of virtually every facet of CMS's implementation of the ACA, *see id.* at 140 (seeking broad declaratory and injunctive relief based on goals to "expand . . . the number of individuals and families obtaining health insurance through ACA exchanges" and "reduce . . . premiums").

Plaintiffs attempt to downplay the novelty of their claim by suggesting that many other cases have recognized the availability of judicial review under the Take Care Clause. But none of the cases Plaintiffs cite were at all similar to this one. Indeed, while other courts have mentoned the Take Care Clause when addressing claims or defenses raised under other available legal frameworks, such as requests for mandamus relief, Plaintiffs identify no case where a claim was brought directly under the Take Care Clause, as Plaintiffs seek to do here, nor any case where a court invoked the Take Care Clause in a manner that expanded a claim beyond the limitations imposed by the APA or the requirements for mandamus jurisdiction.

Strikingly, Plaintiffs rely on a dissenting opinion (though they do not identify it as such) in *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915) (Day, J., dissenting), as supporting their position. Pl. Opp. at 51. However, the Supreme Court in *Midwest Oil* actually upheld the President's authority to withdraw federal land from public acquisition without express statutory authority. *See Midwest Oil Co.*, 236 U.S. at 483 (opinion of the Court). Thus, nothing in that case suggests that this Court may overturn a President's action under the Take Care Clause.

The Court's decision in *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524 (1838), likewise provides no support for Plaintiffs' Take Care Clause claim. The opinion noted that the President could not invoke the Clause as a basis for his authority to forbid the execution of a law, but it also recognized that the President had claimed no such power, nor had he forbidden a lower-level Executive Branch official— the postmaster general—to abstain from executing the law. *Id.* at 613. Ultimately, the discussion had no bearing on the Court's holding, which was merely that a court could, in an appropriate case, grant mandamus relief against a lower-level employee to perform a ministerial duty. *See id.* at 626. Nothing in that case suggested that a court could go beyond the limitations of mandamus relief—which requires

a clear right to relief and a clear duty to act, in addition to a showing that alternative avenues of relief were unavailable—by ordering the far more nebulous relief that an Executive Branch official, or even the President, must take various discretionary actions in order to "take care" that a law is "faithfully executed."

None of the other cases upon which Plaintiffs seek to rely support the availability of a Take Care Clause right of action. Plaintiffs cite *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010), but that decision does not establish that courts can consider free-standing Take Care Clause claims. Rather, the relevant section of the Court's opinion cited by Plaintiffs merely held that a particular statute did not strip the district court of jurisdiction to consider the plaintiffs' claim. *See id.* at 491. The Court then considered whether an Act of Congress impermissibly infringed on the President's removal power by including a good cause condition for removal of certain executive officers. *See id.* at 492. The Court's consideration of that discrete issue, based on its review of a single statutory provision, did not require it to consider broad discretionary matters such as how the President should properly implement a federal program. *Free Enterprise* is thus far from what Plaintiffs are seeking here.

Plaintiffs also can draw no support for their claim from any suggestion in the  now-vacated decision in *District of Columbia* that a plaintiff may seek to enjoin the violation of "a structural provision of the Constitution," *see Dist. of Columbia*, 291 F. Supp. 3d at 755. Not only does this case not involve a structural constitutional challenge, but in ordering dismissal of the case on standing grounds, the Fourth Circuit expressed considerable skepticism regarding the notion that a plaintiff could seek to judicially enforce the constitutional provisions at issue in that case given the lack of a history of judicial review by courts in equity of such claims. *In re Trump*, 928 F.3d at 373–74. Here as well, the Court should be skeptical of Plaintiffs' attempt to raise a Take Care Clause claim, particularly one that essentially asks the Court to order Defendants to implement an Act of Congress in the manner that Plaintiffs desire, when no court has ever recognized a Take Care Clause cause of action against the President in the first place.

Plaintiffs also cite *United States v. Juarez-Escobar*, 25 F. Supp. 3d 774 (W.D. Pa. 2014), but that was a criminal case, so it provides no support for Plaintiffs' right to bring a civil claim based solely on an alleged Take Care Clause violation. *See id.* Moreover, the court in that case did not address a claim that the President had failed to "faithfully execute" a federal program created by Congress. Rather, the issue there was whether an Executive Order was an impermissible exercise of legislative rather than executive power. *See id.* at 786. The court cited the Take Care Clause simply to illustrate the unremarkable principle that the Constitution confers executive rather than legislative powers on the President. *See id.* ("The President may only 'take Care that the Laws be faithfully executed . . .'; he may not take any Executive Action that creates laws.").

Finally, Plaintiffs cite *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013), but that case was exactly what this one is not—a request for mandamus relief to compel an agency to take a discrete agency action it was required to take by statute. *See* Pet'n for Writ of Mandamus, *In re Aiken County*, No. 11-1271, at 1, 20–21 (D.C. Cir. filed July 29, 2011). The D.C. Circuit granted a writ of mandamus requiring the U.S. Nuclear Regulatory Commission to comply with a statutory duty to consider and issue a decision on the Energy Department's license application to store nuclear waste at Yucca Mountain. The court recognized that the claim at issue was equivalent to an APA claim pursuant to 5 U.S.C. § 706(1). *See In re Aiken County*, 725 F.3d at 258 (citing *Ariz. v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 20 (2013), as supporting issuance of mandamus relief under § 706(1)). However, original jurisdiction was vested by statute in the Court of Appeals, rather than a district court. *See* 42 U.S.C. § 10139. Thus, although the opinion cited the Take Care Clause as a source of prosecutorial discretion, the claim at issue was not brought pursuant to the Take Care Clause, nor did the court analyze whether the Take Care Clause was violated. Rather, the court applied the traditional mandamus framework and concluded that the Commission had a clear duty, pursuant to a federal statute, to take a discrete action—deciding whether to issue a license. *See In re Aiken County*, 725 F.3d at 266.

Here, in contrast, Plaintiffs are not seeking to compel a discrete agency action that the agency is required to take. They point to no clear statutory duty that has been violated. They do not assert mandamus jurisdiction, *see* Am. Compl. ¶ 14, nor could they possibly meet its requirements. *Cf. South*

*Carolina v. United States*, 907 F.3d 742, 754–55 (4th Cir. 2018) (availability of mandamus requires plaintiff to show "a clear and indisputable right to the relief sought" and "a clear duty [by the defendant] to do the specific act requested" (internal quotation omitted)). Rather, Plaintiffs seek to compel the President and the other Defendants, not to take specific statutorily-required actions, but to generally act in furtherance of the statutory objectives of the ACA in the manner preferred by Plaintiffs. The Take Care Clause does not permit such a claim.

Nor can Plaintiffs save their Take Care Clause claim by their alternative suggestion, made for the first time in their opposition brief, that they are raising a "separation of powers" claim. Pl. Opp. at 63. This notion apparently relies on the theory that Defendants' actions "have usurped Congress's lawmaking function." Am. Compl. ¶ 12. However, the only supposed "usurpation" that Plaintiffs allege in their Amended Complaint is the President's issuance of Executive Order 13813. That Order merely directs the agency Defendants to consider proposing certain regulations "to the extent permitted by law" or "consistent with law." E.O. 13813 §§ 2–4. The Order thus provides no basis for a separation of powers claim. *Id.* And to the extent any regulations were promulgated as a result, they would qualify as a final agency action under the APA, subject to review only under the APA, 5 U.S.C. § 706(2)(A), (C). *See Adamski v. McHugh*, 304 F. Supp. 3d 227, 236 (D.D.C. 2015).  Plaintiffs thus have not identified a separation of powers claim that warrants circumvention of traditional modes of judicial review of agency actions.

Indeed, the very separation of powers principles that Plaintiffs now invoke disfavor judicial review of their Take Care Clause claim. As a member of this Court recently recognized, courts "are woefully ill-suited . . . to adjudicate generalized grievances asking [them] to improve an agency's performance or operations." *NAACP v. Bureau of the Census*, No. PWG-18-891, 2019 WL 3500934, at *8 (D. Md. Aug. 1, 2019). The Court therefore should dismiss Plaintiffs' Take Care Clause claim.[14]

---

[14] In their opening brief, Defendants also explained why none of the specific subjects of Plaintiffs' Take Care Clause challenge supports their argument that Defendants have failed to faithfully execute the ACA. Def. Mem. at 54-61. Plaintiffs do not respond to these arguments, relying instead on their theory that, even though none of the specific decisions or statements that they identify could be held invalid, as a whole they demonstrate an "intent" to undermine the ACA and thus warrant the broad

## III.   CONCLUSION

For the foregoing reasons and those set forth in Defendants' opening brief, this Court should grant Defendants' motion and dismiss this action with prejudice.

Dated: August 21, 2019                         Respectfully submitted,

                                               JOSEPH H. HUNT
                                               *Assistant Attorney General*

                                               JAMES M. BURNHAM
                                               *Deputy Assistant Attorney General*

                                               JEAN LIN
                                               *Special Counsel*

                                                /s/
                                               KATHRYN L. WYER
                                               Senior Trial Counsel
                                               U.S. Department of Justice
                                               Civil Division, Federal Programs Branch
                                               1100 L Street, NW
                                               Washington, DC 20005
                                               (202) 616-8475
                                               (202) 616-8470 (fax)
                                               kathryn.wyer@usdoj.gov
                                               *Counsel for the Defendants*


## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on August 21, 2019, a true and accurate copy of the foregoing was electronically filed with the CM / ECF system, which will send a Notice of Electronic Filing to all counsel of record in this matter.

                                                */s/ Kathryn L. Wyer*
                                               KATHRYN L. WYER

---

programmatic relief that they seek. *See* Pl. Opp. at 54 (asserting that it is the "systematic attempt to unilaterally dismantle" the ACA, "separate and apart from the individual actions themselves," that Plaintiffs seek to challenge under the Take Care Clause). For the same reasons explained above, such a theory does not give rise to a claim upon which relief may be granted.