IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CITY OF COLUMBUS, et al.        :

                                 :

    v.                           :   Civil Action No. DKC 18-2364

                                 :

DONALD J. TRUMP, in his official
capacity as President of the    :
United States of America, et al.

                                 :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action for declaratory judgment and injunctive relief is the motion to dismiss the amended complaint filed by Defendants Donald J. Trump, Alex M. Azar, II, the United States Department of Health and Human Services, Seema Verma, and the Centers for Medicare and Medicaid Services. (ECF No. 52). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be denied in part and granted in part.

## I. Factual Background[1]

Plaintiffs the City of Columbus, Ohio, the Mayor and City Council of Baltimore, Maryland, the City of Cincinnati, Ohio, the City of Chicago, Illinois, and the City of Philadelphia,

---

[1] Unless otherwise noted, the facts outlined here are set forth in the amended complaint and construed in the light most favorable to Plaintiffs.

Pennsylvania (collectively, the "City Plaintiffs") and Stephen Vondra and Bonnie Morgan (collectively, the "Individual Plaintiffs") filed suit against Defendants Donald J. Trump, in his official capacity as President of the United States of America, the United States Department of Health and Human Services ("HHS"), Alex M. Azar, II, in his official capacity as Secretary of HHS, the Centers for Medicare and Medicaid Services ("CMS"), and Seema Verma, in her official capacity as Administrator of CMS, (collectively, "Defendants"). Plaintiffs assert two claims: violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (Count I) and violation of the Take Care Clause, U.S. Const. art. II, § 3 (Count II).

Central to Plaintiffs' amended complaint is the Patient Protection and Affordable Care Act (the "ACA," the "Act," or the "Affordable Care Act"). Plaintiffs allege that after "fail[ing] to persuade Congress to repeal the Affordable Care Act, President Trump and his Administration are waging a relentless campaign to sabotage and, ultimately, to nullify the law."[2] (ECF No. 44, ¶ 1). Plaintiffs allege that Defendants' strategy is "[to shift deceptively] the blame from their own actions to the Act itself[]" and that Defendants' objective is "to pressure Congress to repeal the Act or, if that fails, to achieve de

---

[2] All citations to court documents in this opinion refer to CM/ECF pagination.

facto repeal through executive action alone." (*Id.*). Plaintiffs allege that Defendants' actions force the City Plaintiffs "to spend more on uncompensated care for their residents[]" and the Individual Plaintiffs "to pay more for the quality health insurance coverage they need[.]" (*Id.*, ¶ 4).

## A.  The ACA

In 2010, Congress passed and President Obama signed into law the Affordable Care Act "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("*NFIB*"). The ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market." *King v. Burwell*, 135 S.Ct. 2480, 2485 (2015). "Individual health insurance is insurance that individuals purchase themselves, in contrast to, for example, joining employer-sponsored group health plans." (ECF No. 44, ¶ 32). "Prior to the enactment of the ACA, individual health insurance markets were dysfunctional." (*Id.*). The ACA "aims to achieve systemic improvements in the individual health insurance market by means of certain key reforms[.]" (*Id.*, ¶ 33). Plaintiffs' amended complaint highlights four such reforms. (*Id.*, ¶¶ 33-34).

First, "Congress addressed the problem of those who cannot obtain insurance coverage because of preexisting conditions or

other health issues . . . through the Act's 'guaranteed-issue' and 'community rating' provisions." *NFIB*, 567 U.S. at 547-48. "These provisions together prohibit insurance companies from denying coverage to those with such conditions or charging unhealthy individuals higher premiums than healthy individuals." *Id.* at 548 (citing 42 U.S.C. §§ 300gg, 300gg-1, 300gg-3, 300gg-4).

Second, recognizing that "[t]he guaranteed-issue and community-rating reforms do not . . . address the issue of healthy individuals who choose not to purchase insurance to cover potential health care needs[,]" *id.*, Congress "required individuals to maintain health insurance coverage [(the individual mandate)] or make a shared responsibility payment to the Internal Revenue Service[,]" (ECF No. 44, ¶ 34).

Third, the ACA requires ACA-compliant plans to cover essential health benefits and limits "so-called 'cost-sharing' – for example, deductibles and copayments – for essential health benefits coverage[.]" (ECF No. 44, ¶ 33b). The ACA also "prohibits plans from imposing annual or lifetime limits" on essential health benefits coverage. (*Id.*).

Fourth, the ACA "seeks to make insurance more affordable by giving refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line [("FPL")]." (ECF No. 44, ¶ 33c (quoting *King*, 135

S.Ct. at 2487)). Qualified individuals receive income-related, premium-based tax credits (advance premium tax credits or "APTCs").[3] (*Id.*). The ACA "also requires health insurance issuers to reduce certain individuals' cost-sharing expenditures and directs HHS to reimburse issuers for such cost-sharing reductions ('CSRs')." (*Id.*).

"To facilitate individuals' ability to learn about and enroll in the health insurance options that are available to them, the ACA 'requires the creation of an "Exchange" in each State where people can shop for insurance, usually online.'" (ECF No. 44, ¶ 35 (quoting *King*, 135 S.Ct. at 2487)). "An exchange may be established by the state in which it operates or, in states that elect not to establish exchanges, by the federal government."[4] (*Id.*, ¶ 38).

The exchanges serve as marketplaces, allowing people not eligible for Medicare or Medicaid to compare and purchase ACA-compliant insurance plans, known as "qualified health plans" or "QHPs" under the Act. (ECF No. 44, ¶ 35). Individuals may

---

[3] "Those with income below 100 percent of FPL generally are not eligible for APTC payments because the ACA contemplated that they would instead be eligible for Medicaid." (ECF No. 92, at 30).

[4] The exchange in Illinois is a hybrid exchange (an exchange that "assume[s] some, but not all, exchange functions[]"), the exchange in Maryland is a state-based exchange ("SBE"), and the exchanges in Ohio and Pennsylvania are federally-facilitated exchanges ("FFEs"). (ECF No. 44, ¶ 38).

enroll during an annual open enrollment period or, after a qualifying life event, during a special enrollment period. The exchanges "help consumers make smart health insurance choices by running call centers and providing in-person assistance." (*Id.*, ¶ 37). Pertinently, "the ACA requires that exchanges award grants to healthcare 'Navigators' to 'carry out . . . duties" that are specified by statute and in HHS implementing regulations[.]" (*Id.* (citations omitted)).

"The ACA requires that exchanges offer only quality health insurance[.]" (ECF No. 44, ¶ 39). Such coverage "improve[s] access to care and overall health[]" and "reduce[s] financial burdens for both individuals and institutions that cover the costs of uncompensated care." (*Id.*). Plaintiffs allege that increasing enrollment in quality health insurance coverage is both the ACA's immediate goal and the key to the ACA's long-term success. Enrollment "must be high enough to reduce random fluctuations in claims from year to year[.]" (*Id.*). Enough healthy individuals must enroll to spread the costs of less-healthy individuals. (*Id.*). To promote increased enrollment, health care costs must be limited. (*Id.*, ¶ 40). Plaintiffs allege that before Defendants' actions, "the ACA's reforms successfully met Congress's goal of enabling more individuals – specifically, 20 million more individuals – to enroll in health insurance coverage." (*Id.*, ¶¶ 41-43).

**B.  Defendants' Challenged Actions**

Plaintiffs dedicate 12 pages of the amended complaint to cataloging the many statements made by the President and members of his Administration that they allege express contempt for the Act.  (ECF No. 44, ¶¶ 44-48).  According to Plaintiffs, these statements evince "the Administration's intent to repeal the ACA, with or without Congress."  (*Id.*, at 22).

Plaintiffs also challenge Defendants' actions.  "At issue here are a final rule and a long list. . . of other executive actions, all undertaken by the Trump Administration to undermine the ACA."  (ECF No. 44, ¶ 9).  "The final rule is [CMS's] Notice of Benefit and Payment Parameters for 2019, 83 Fed. Reg. 16,930 (April 17, 2018), referenced here as the '2019 Rule' [because] it governs many aspects of ACA insurance markets starting in the 2019 plan year."  (*Id.*, ¶ 10).  The challenged executive actions include two executive orders, Executive Order No. 13,765, titled "Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal," 82 Fed. Reg. 8,351 (Jan. 20, 2017) and Executive Order No. 13,813, titled "Promoting Healthcare Choice and Competition Across the United States," 82 Fed. Reg. 48,385 (Oct. 12, 2017).

**1.  The 2019 Rule**

Plaintiffs allege that the 2019 Rule implements changes "that increase the cost of health coverage and impose other

barriers to enrollment." (ECF No. 44, ¶ 10). They allege that the 2019 Rule undermines the Act's safeguards and requirements and that "provisions of the 2019 Rule roll back protections that the Act guarantees, make it more difficult to enroll in ACA-compliant plans, and drive up the cost of ACA-compliant plans." (*Id.*, ¶ 50). They argue that nine particular provisions of the 2019 Rule violate the APA because the "changes lack adequate justification and, in some instances, violate the Affordable Care Act's text[.]" (*Id.* at ¶ 10).

Plaintiffs allege that the first three challenged provisions of the 2019 Rule will eliminate protections guaranteed by the ACA. The first challenged provision of the 2019 Rule relates to APTCs. (ECF No. 44, ¶¶ 52-56). The ACA "required HHS to promulgate regulations further defining APTC eligibility." (*Id.*, ¶ 52). HHS regulations include a "failure to reconcile provision" which directs "exchanges to deny APTCs to an individual if the [IRS] notifies the exchange that the individual or a member of her household did not reconcile the amount of *advance* premium tax credits she received with the amount of the *actual* premium tax credit she should have been allowed on her prior year's tax return." (*Id.* (emphasis added)). In 2016, the failure to reconcile provision was amended "to specify that an exchange may not deny APTC under this provision 'unless *direct notification* is first sent to the tax filer . . .

that his or her eligibility will be discontinued as a result of the tax filer's failure to comply with the requirement.'" (*Id.* (quoting 45 C.F.R. § 155.305(f)(4)(ii)(2016)(effective Jan. 17, 2017 to June 17, 2018))). The 2019 Rule removes the advance direct notification requirement.[5] Plaintiffs allege that this change "will cause eligible individuals to lose the subsidies that the ACA guarantees[]" and that "[t]he unexpected loss of this assistance would likely cause many if not most individuals to drop coverage entirely[.]" (*Id.*, ¶ 56).

The second challenged provision of the 2019 Rule relates to the compliance review of insurance plans to be offered on federal exchanges. (ECF No. 44, ¶¶ 57-63). The ACA requires the Secretary of HHS to establish, by regulation, "'criteria for the certification of health plans as [QHPs],' including criteria that 'ensure a sufficient choice of providers,' – *i.e.*, criteria that ensure network adequacy." (*Id.*, ¶ 57 (quoting 42 U.S.C. § 18031(c)) (internal citations omitted)). The criteria require an exchange to "implement procedures for the certification, recertification, and decertification . . . of health plans as [QHPs]." (*Id.* (quoting 42 U.S.C. § 18031(d)(4)(A))). Previously, "CMS, acting as the exchange in states with [FFEs] . . . review[ed] network adequacy and accreditation status plans

---

[5] The 2019 Rule "indicates that FFEs will continue to provide direct notification[.]" (ECF No. 44, ¶ 55).

that insurers proposed to offer[.]" (*Id.*, ¶ 58). The 2019 Rule allows CMS to "'rely on the [s]tates' reviews' of network adequacy and other critical requirements in certain [FFEs]."[6] (*Id.*, ¶ 59 (quoting 83 Fed. Reg. at 17,024-26)). Plaintiffs allege that "[o]utsourcing federal plan review to states will permit insurers to market plans with overly restrictive networks of providers – networks that could thereby limit patient access to care." (*Id.*, ¶ 63). As a result, the rate of the underinsured will increase because "[m]ore consumers will end up purchasing inadequate plans[.]" (*Id.*).

The third challenged provision of the 2019 Rule relates to federal oversight of insurance brokers participating in direct enrollment. (ECF No. 44, ¶¶ 64-68). "Direct enrollment is a process under which a consumer enrolls in an ACA-compliant health insurance plan through a third-party website instead of through the governmental platform[.]" (*Id.*, ¶ 65). Previous rules "provided a strong oversight structure" and required third-party audits by HHS-approved auditors because "direct enrollment entities were committing fraud, signing up individuals without their knowledge or consent, and using inaccurate calculators for APTC eligibility[.]" (*Id.*). The 2019 Rule eliminates this protection and allows direct enrollment

---

[6] This represents an extension of a "policy first adopted in the 2018 Market Stabilization Rule, 82 Fed. Reg. 18,346, 18371-72 (April 18, 2017)[.]" (ECF No. 44, ¶ 59).

entities to select their own third-party auditors without HHS's initial review and approval. (*Id.*, ¶ 66). Plaintiffs allege that the reduced oversight "will increase the likelihood that consumers receive inaccurate information, thus decreasing overall enrollment and leading to a rise in the rate of the uninsured [and underinsured]." (*Id.*, ¶ 68).

Plaintiffs allege that the next four challenged provisions of the 2019 Rule will deter Americans from enrolling in QHPs. The fourth challenged provision of the 2019 Rule relates to standardized options. (ECF No. 44, ¶¶ 70-74). Previous "rules supported 'standardized options,' which are qualified health plans at different levels of coverage with a cost-sharing structured specified by HHS[.]" (*Id.*, ¶ 70). HHS previously supported standardized options because "an excessive number of health plan options makes consumers less likely to make any plan selection, more likely to make a selection that does not match their health needs, and more likely to make a selection that leaves them less satisfied." (*Id.*, ¶ 71 (quoting CMS, Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2017, 81 Fed. Reg. 12,204, 12,205, 12,289-293 (Mar. 8, 2016))). The 2019 Rule discontinues support for standardized options. (*Id.*, ¶ 72). Plaintiffs allege that eliminating support for standardized options "makes it more difficult for consumers to select appropriate health coverage,

and also increases the risk that they will go without coverage entirely." (*Id.*, ¶ 73). They also allege "eliminating support for standardized options will limit the degree to which health plans will compete on price; instead, some plans will choose to compete on benefit design in a gambit to discourage high-risk enrollees." (*Id.*, ¶ 74). "Without standardized options, it will be harder for individuals to select coverage, prices will rise, and the rate of the uninsured and underinsured will increase." (*Id.*).

The fifth challenged provision of the 2019 Rule relates to the Navigator program. (ECF No. 44, ¶¶ 75-79). Previous rules required each exchange "to have two Navigators, one of those Navigators was required to be a community- and consumer-focused nonprofit, and Navigators were required to have physical presences in the areas they served." (*Id.*, ¶ 75). The 2019 Rule eliminates these requirements. (*Id.*). Plaintiffs allege that the elimination of these requirements "will decrease individuals' and families' in-person access to complete, impartial information[]" and "dampen overall enrollment, especially among vulnerable populations[.]" (*Id.*, ¶ 79). Plaintiffs emphasize the importance of in-person assistance for minority populations and young people and the statistic that "[p]eople who receive in-person assistance are nearly 40 percent more likely to enroll in coverage than people who are forced to

go it alone." (*Id.*). They conclude that the elimination of these Navigator requirements will "increase the rate of the uninsured [and underinsured]." (*Id.*).

The sixth challenged provision of the 2019 Rule relates to small business exchanges. (ECF No. 44, ¶¶ 80-82). Under the ACA, exchanges must provide for the establishment of a Small Business Health Options Program (a "SHOP Exchange") to assist certain "small employers in facilitating the enrollment of their employees in [QHPs] offered in the small group market." (*Id.*, ¶ 80 (quoting 42 U.S.C. § 18031(b)(1)(B))). The ACA also "requires SHOP exchanges to 'make available [QHPs] to . . . qualified employers,' to protect employers' and employees' choice among certain [QHPs], and to protect employees' ability to enroll even after their employer no longer qualifies as a small employer under the Act." (*Id.* (internal citations omitted)). "Under prior rules, CMS interpreted the ACA as 'requiring that all SHOPs provide for employer eligibility, employee eligibility, and certain enrollment functions, including premium aggregation functions." (*Id.*, ¶ 81 (citing 83 Fed. Reg. at 16,996)). The 2019 Rule "purport[s] to reinterpret the ACA and remove these requirements." (*Id.*). Plaintiffs allege that "[b]y eliminating the requirement that SHOP exchanges allow employers to determine employee eligibility, aggregate premiums, and enroll employees online, the 2019 Rule

makes it more difficult for small businesses to offer workers and their dependents affordable coverage, and thereby will increase the size of the uninsured population." (*Id.*, ¶ 82). Additionally, Plaintiffs allege that "[t]hese changes will . . . push small businesses to use a broker or buy directly from an insurance company, limiting their ability to make plan comparisons and shop by price for appropriate coverage, potentially raising their premiums." (*Id.*).

The seventh challenged provision of the 2019 Rule relates to income verification requirements imposed on individuals seeking APTCs. (ECF No. 44, ¶¶ 83-86). The 2019 Rule imposes "income verification requirements 'where electronic data sources reflect income under 100 percent FPL and a consumer attests to income between 100 percent FPL and 400 percent FPL.'" (*Id.*, ¶ 83 (citing 83 Fed. Reg. at 16,985)). The income verification requirement originated "[o]ut of purported concern that individuals inflate their income above the FPL to gain APTCs, resulting in the payment of APTCs to those not entitled to receive them[.]" (*Id.*). Plaintiffs allege that "making it harder for consumers to obtain insurance tax credits . . . will likely mean that more consumers will choose to go without coverage entirely – *i.e.*, that the rate of the uninsured will increase." (*Id.*, ¶ 85). Significantly, "paperwork burdens have historically deterred enrollment of people with relatively low

need for health care; those with high health care needs will work harder to get coverage." (*Id.*). Thus, Plaintiffs also allege that the income verification requirement "will worsen the risk pool and raise premiums, causing coverage to become less affordable." (*Id.*).

Plaintiffs allege that the final two challenged provisions of the 2019 Rule will drive up costs. The eighth challenged provision curtails review of insurance rate increases. (ECF No. 44, ¶¶ 88-93). "Under the ACA, '[t]he Secretary, in conjunction with States, shall establish a process for the annual review . . . of unreasonable increases in premiums for health insurance coverage.'" (*Id.*, ¶ 88 (quoting 42 U.S.C. § 300gg-94(a)(1))). CMS "promulgated regulations that require insurers to justify annual rate increases above a given threshold." (*Id.*). The 2019 Rule changes this scheme by (1) exempting student health plans from rate review and (2) raising the threshold for rate review from rate increases of 10% to rate increases of 15%. (*Id.*, ¶ 89). Plaintiffs allege that "the 2019 Rule's . . . changes to rate review will make it easier for insurers to increase rates without adequate justification; the purpose of rate review is for insurance commissioners and the public to examine the proposed reasons for health insurance premium increases in the individual and small-group market and adjust them as appropriate to improve affordability for consumers."

(*Id.*, ¶ 93).  Plaintiffs point to statistical data from 2011 and 2015 to demonstrate the effectiveness of rate review.[7]  They allege that "if prices are permitted to increase without the significant check provided by rate review, individuals will increasingly decide to go without appropriate coverage or any coverage at all – driving up the rate of uninsured and underinsured individuals." (*Id.*).

The ninth, and final, challenged provision of the 2019 Rule relates to rebates for poor insurer performance. (ECF No. 44, ¶¶ 94-98).  This provision involves the "medical loss ratio" or "MLR."  The MLR is "the percentage of each premium that [insurers] spend on paying claims and improving their services[.]" (*Id.*, ¶ 94).  Under the ACA, insurers must pay rebates if the MLR "drops below 85 percent (for large group insurance plans) or 80 percent (for small group and individual insurance plans)." (*Id.*, (citing 42 U.S.C. § 300gg-18(b)(1)(A)).  "These minimum MLR standards are intended to help ensure that individuals covered under private health insurance plans (enrollees) receive adequate value for their premiums and to create incentives for insurers to become more

---

[7] "In 2011, one in five proposed premium increases was reduced through rate review, with rates that went into effect approximately one-fifth lower than those initially requested by the insurer." (ECF No. 44, ¶ 93).  "In 2015, rate review lowered premiums in the individual and small group markets by $1.5 billion." (*Id.*).

efficient in their operations." (*Id.*). The 2019 Rule "alters the method by which rebates are awarded[]" by "allow[ing] insurers to claim a flat 0.8 percent of premium credit for quality improvement activities ("QIA") – *i.e.*, 'activities that promote health care quality,' when calculating medical loss ratio, rather than a percent based on the amount actually spent on such activities. (*Id.*, ¶ 95 (internal citations omitted)). "In other words, the 2019 Rule allows insurers to take credit for improving their services whether or not they actually did so." (*Id.*). Plaintiffs allege that since the beginning of ACA's medical loss ratio policy in 2012, enrollees "have received nearly $4 billion in rebates." (*Id.*, ¶ 98). In 2018, insurers paid "nearly $707 million in rebates[.]" (*Id.*). Plaintiffs allege that "[b]y allowing insurers [increasingly to avoid] paying these rebates, the 2019 Rule will effectively cause consumers to pay more for worse insurance, leading to an increase in the number of consumers that lack appropriate coverage." (*Id.*).

## 2. Defendants' Executive Actions

Plaintiffs allege that, in addition to the 2019 Rule, Defendants "have taken many other actions with the intent and effect of sabotaging the Act generally and its private insurance reforms and exchanges in particular." (ECF No. 44, ¶ 99). They allege that these actions "establish Defendants' pattern and

practice of taking executive action to undermine the Act[.]" (*Id.*) They divide the actions into five categories: (1) directing agencies to sabotage the Act; (2) attempting to destabilize the exchanges; (3) working to decrease enrollment; (4) arbitrarily driving up premiums; and (5) refusing to defend the Act.

Plaintiffs first outline Defendants' actions directing agencies to sabotage the ACA. (ECF No. 44, ¶¶ 100-103). They highlight Executive Order No. 13,765 ("EO 13,765"). EO 13,765 announced the policy of the Trump Administration "to seek the prompt repeal of the [ACA]" and directed Administration officials to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the Act." (ECF No. 44, ¶ 100 (quoting 82 Fed. Reg. 8,351 (Jan. 20, 2017)). EO 13,765 signaled that the Trump Administration might not enforce the individual mandate. One estimate, from Joshua Peck, the Chief Marketing Officer for the federal government's ACA exchange until 2016 and an amicus curiae presently, forecasted that such signaling "resulted in 130,000 fewer individuals enrolling in health insurance during the open enrollment period for 2017 plan year insurance[.]" (*Id.*, ¶ 102). Indeed, EO 17,365 "resulted in reduced enforcement of the individual mandate[.]" (*Id.*).

Plaintiffs next outline Defendants' actions to destabilize the exchanges. Plaintiffs allege that Defendants' strategy was to sow uncertainty in insurance markets. Defendants' challenged actions include: (1) threatening to discontinue, and ultimately discontinuing, reimbursing insurers for cost-sharing reductions (ECF No. 44, ¶¶ 105-108); (2) issuing Executive Order No. 13,813 ("EO 13,813") and thereby promoting non-ACA compliant plans to try to weaken ACA exchanges (*id.*, ¶¶ 109-115); (3) undermining the individual mandate (*id.*, ¶¶ 116-122); (4) delaying or denying state waiver requests under Section 1332 of the Act that would further the Act's goals (*id.*, ¶¶ 123-126);[8] (5) enabling and encouraging states to seek Section 1332 waivers that would undercut the Act's goals (*id.*, ¶¶ 127-128); and (6) attempting to weaken public confidence in ACA exchanges (*id.*, ¶¶ 129-132).

Plaintiffs also outline Defendants' actions to decrease enrollment. These actions include: (1) halving the open enrollment period and increasing planned downtime for the federal health insurance exchange website (ECF No. 44, ¶¶ 135-

---

[8] "Section 1332 of the ACA, 42 U.S.C. § 18052, permits states to apply for waivers of some of the law's requirements in order to promote innovative policies that satisfy certain statutorily-prescribed guardrails[.]" (ECF No. 44, ¶ 123). "Crucially, for example, states may only seek waivers that would 'provide coverage that is at least as comprehensive as' ACA-compliant coverage." (*Id.* (citing 42 U.S.C. § 18052 (b)(1)(A))). "In keeping with these guardrails, only certain ACA provisions are subject to waiver under Section 1332." (*Id.*).

142); (2) drastically reducing funding twice (in January 2017 and in August 2017) for advertising and refusing to publicize open enrollment (*id.*, ¶¶ 143-154); (3) drastically cutting funding twice (in 2017 and 2018) for Navigators working in federally-facilitated exchanges and encouraging them to undermine the Act by "requiring them to compete for funding according to how enthusiastically they plan to advertise the availability of *non*-ACA compliant coverage" (*id.*, ¶¶ 155-167); (4) failing to set numeric enrollment targets for 2018 and 2019 despite explicit findings from the Government Accountability Office ("GAO") that "failing to set enrollment targets . . . hamper[s] HHS's ability to measure its performance and make critical decisions about how to use resources to facilitate enrollment[]" (*id.*, ¶¶ 168-170); and (5) refusing to participate in enrollment events and other outreach (*id.*, ¶¶ 171-172). Plaintiffs allege "two of the decisions at issue here – shortening open enrollment and reducing outreach – may result in as much as a [nine] percent increase in premiums." (*Id.*, ¶ 134).

Finally, Plaintiffs outline Defendants' efforts to drive up premiums and Defendants' refusal to defend the ACA. (ECF No. 44, ¶¶ 173-180). Plaintiffs' allegations regarding Defendants' efforts to drive up premiums focus on a proposed rule, *see* CMS, Proposed Rule, Notice of Benefit and Payment Parameters for

2020, -- Fed. Reg. 00 (Jan. 17, 2019) (the "2020 Proposed Rule"). (ECF No. 44, ¶ 173). Plaintiffs allege that Defendants' refusal to defend the ACA in the ongoing litigation over the individual mandate "is a dramatic example of how Defendants are eager to invalidate, rather than to implement, core ACA provisions." (*Id.*, ¶ 179).

Plaintiffs' allegations regarding the 2019 Rule support their APA claim in Count I. Plaintiffs' allegations regarding both the 2019 Rule and Defendants' other executive actions support their Take Care Clause claim in Count II.

## II. Procedural Background

On January 25, 2019, Plaintiffs filed the amended complaint. (ECF No. 44). On March 8, 2019, Defendants filed the presently pending motion to dismiss. (ECF No. 52). Plaintiffs responded, (ECF No. 61), and Defendants replied (ECF No. 92). Defendants move to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) and for failure to state a claim under Fed.R.Civ.P. 12(b)(6).

Also pending are five motions for leave to file memoranda as amici curiae in support of Plaintiffs.[9] (ECF Nos. 65; 66; 67;

---

[9] The potential amici include: (1) the United States House of Representatives (ECF No. 65); (2) the City of Berkeley, California, Cook County, Illinois, the City of Dayton, Ohio, the City of Los Angeles, California, the City of Minneapolis, Minnesota, Montgomery County, Maryland, the City of Oakland, California, the City of Saint Paul, Minnesota, the City and

71; 76). In addition, the District of Columbia, along with the States of California, Connecticut, Delaware, Hawaii, Illinois, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington, jointly filed an amicus brief in support of Plaintiffs pursuant to United States District Court for the District of Maryland Standing Order 2018-07. (ECF No. 72).

Under Standing Order 2018-07, a state may file an amicus brief without the consent of the parties or leave of court and any other amicus curiae may file a brief only by submitting a motion to obtain leave of the court. There is no Federal Rule of Civil Procedure that applies to motions for leave to appear as amicus curiae in a federal district court. District courts therefore have discretion to deny or grant such leave and often look for guidance to Rule 29 of the Federal Rules of Appellate Procedure, which applies to amicus briefs at the federal appeals level. *See, e.g.*, *Wheelabrator Balt., L.P. v. Mayor of Balt.*, --- F.Supp.3d ---, No. 19-1264-GLR, 2020 WL 1491409, at *1 n.1

---

County of San Francisco, California, the County of Santa Clara, California, the City of Seattle, Washington, Shelby County, Tennessee, and Travis County, Texas (ECF No. 66); (3) Families USA, Community Catalyst, the National Health Law Program, and Service Employees International Union (ECF No. 67); (4) Henry J. Aaron (ECF No. 71); and (5) Joshua Peck (ECF No. 76). Defendants and Plaintiffs consented to the filing of each proposed amicus brief.

(D.Md. Mar. 27, 2020); *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F.Supp. 720, 728 (D.Md. 1996); *Wash. Gas Light Co. v. Prince George's Cty. Council*, No. 08-0967-DKC, 2012 WL 832756, at *3 (D.Md. Mar. 9, 2012). Rule 29 indicates that *amici* should state "the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case." Fed.R.App.P. 29(a)(3). As noted by Judge Davis in *Bryant*, "[t]he aid of *amici curiae* has been allowed at the trial level where they provide helpful analysis of the law, they have a special interest in the subject matter of the suit, or existing counsel is in need of assistance." *Bryant*, 923 F.Supp. at 728 (citations omitted). Here, the motions will be granted. Each demonstrated a special interest in the outcome of the suit and provided helpful information to the court.

## III. Justiciability

Defendants contend that the complaint should be dismissed for lack of subject matter jurisdiction because Plaintiffs lack standing and because their claims are not ripe. (ECF No. 52-1, at 23-38; ECF No. 92, at 9-17). Plaintiffs disagree. (ECF No. 61, at 23-45).

"A challenge to subject matter jurisdiction under [Fed.R.Civ.P. 12(b)(1)] may proceed 'in one of two ways': either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter

jurisdiction, or a factual challenge, asserting "'that the jurisdictional allegations of the complaint [are] not true.'" *Mayor of Balt. v. Trump*, 416 F.Supp.3d 452, 479 (D.Md. 2019) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192. In a factual challenge, "the district court is entitled to decide disputed issues of fact" and may "'go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations.'" *Id.* (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). "The burden of establishing subject matter jurisdiction rests with the plaintiff." *Demetres v. East West Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).

### A. Standing

"Article III standing is 'part and parcel of the constitutional mandate that the judicial power of the United States extend only to cases and controversies.'" *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly

traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). These three elements are "the irreducible constitutional minimum of standing[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Defendants appear to mount a facial challenge to standing, although they rely on declarations of Jeff Wu, Deputy Director for Policy for the Center for Consumer Information and Insurance Oversight, for some of their arguments, and use language indicative of a factual challenge at times. Plaintiffs' response to the challenge reflects their understanding that the challenge is facial. The issue will be resolved based on the allegations in the amended complaint.

### 1. Injury in Fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560).

Defendants contend that the Individual Plaintiffs lack standing because "even assuming that rising premiums alone could constitute an injury in fact . . . the Individual Plaintiffs' prediction about continued rising individual market insurance premiums has been proven to be incorrect." (ECF No. 52-1, at

25).  Defendants elaborate that "the 2019 premiums for such insurance in [the county where the Individual Plaintiffs live] has seen dramatic decreases[]" and that "a new insurer, HealthKeepers, Inc. (affiliated with Anthem, Inc.), entered the . . . market in 2019."  (*Id.*).

Plaintiffs respond that the Individual Plaintiffs "have standing because Defendants' actions have caused issuers . . . to charge them . . . higher premiums."  (ECF No. 61, at 33). They elaborate:

> Defendants' actions led to significant premium increases nationwide from 2017 to 2019.  Charlottesville, Virginia, where the Individual Plaintiffs reside, is no exception.  Overall, premiums tripled in Charlottesville in 2018, becoming the highest in the nation.  In 2017, the Individual Plaintiffs paid a monthly premium of $1,270 for an Optima silver plan; in 2018, they paid $3,300 a month for their Optima bronze plan, *261 percent higher* than their 2017 premium, and with a significantly higher deductible of $14,400.  Now, in 2019, they pay $1,899 a month for their Anthem bronze plan – still *50 percent higher* than what they paid for the Optima silver plan in 2017 – with a deductible of $13,000.  Anthem also raised its statewide rates from 2018 to 2019 by 3.2 percent.  Indeed, the price of the plan purchased by the Individual Plaintiffs itself rose by 1.6 percent from 2018 to 2019.

(*Id.*, at 34-35 (citations omitted and emphasis in original)).

Plaintiffs' allegations, reduced to the minimum, recite that they were insured by Optima in 2017 and 2018 and switched

to Anthem in 2019. While their actual premium with Anthem in 2019 is lower than their actual premium with Optima in 2018, the Anthem premium in 2019 was higher than the Anthem premium in 2018 was for the same plan.

Plaintiffs allege that their increased premiums constitute concrete injury and cite several cases in support of their contention. (*Id.*, at 33 (citing *Stewart v. Azar*, 313 F.Supp.3d 237, 252 (D.D.C. 2018) ("Plaintiffs would be required to pay increased premiums and thus would suffer a concrete injury[.]"); *AARP v. EEOC*, 226 F.Supp.3d 7, 18 (D.D.C. 2016) ("An increase in premiums would certainly constitute an injury.").[10] Defendants do not address these cases, instead noting that the Individual Plaintiffs "acknowledge that their 2019 premiums are actually lower than their 2018 premiums," (ECF No. 92, at 14), and focusing on traceability, (*id.*, at 10-15). The increase in premiums constitutes economic harm and is therefore "a classic and paradigmatic form of injury in fact[.]" *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018). The Individual Plaintiffs satisfy the first element of constitutional standing.

---

[10] Plaintiffs also emphasize that "Defendants themselves recently endorsed a similar theory of standing in *Texas v. United States*," explaining that "in *Texas*, Defendants say that higher premiums constitute 'concrete financial and practical injuries.'" (ECF No. 61, at 33-34 (quoting Brief for the Federal Defendants at 24, *Texas*, No. 19-10011)). Defendants do not address this contention in their reply.

Defendants similarly contend that the City Plaintiffs lack standing because their alleged injury – harm to "the City Plaintiffs' budgets, including the budgets for their public health departments, free or reduced-cost clinics, and ambulance services" – "is premised on an even greater number of uncertain links in the causal chain, which are either premised on invalid assumptions or are attributable to the City Plaintiffs themselves."  (ECF No. 52-1, at 31–32 (quoting ECF No. 44, ¶ 197)).  Plaintiffs correctly note that this challenge does not dispute that budgetary outlays constitute injury in fact but rather focuses on traceability.  (ECF No. 61, at 24).  Plaintiffs argue that "[a] city has standing 'when a harm to the city itself has been alleged[,]'" (*id.*, at 38 (quoting *City of Olmstead Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002), and elaborates that a city may sue to protect its proprietary interests, including "'management, public safety, [and] economic' harms[,]" (*id.* (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197-99 (9th Cir. 2004).  Plaintiffs also highlight four cases that have found standing where policies have shifted costs onto governments to provide uncompensated health care: (1) *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 923 F.3d 209 (1st Cir. 2019); (2) *California v. Azar*, 911 F.3d 558 (9th Cir. 2018); (3) *Pennsylvania v. Trump*, 351 F.Supp.3d 791 (E.D.Pa. 2019); and (4) *U.S. House of*

*Representatives v. Price*, No. 16-5202, 2017 WL 3271445, at *1
(D.C. Cir. 2017) (per curiam). Defendants again do not address
Plaintiffs' argument but focus on traceability. The City
Plaintiffs satisfy the first element of constitutional standing.

## 2. Traceability and Redressability[11]

"For an injury to be traceable, 'there must be a causal
connection between the injury and the conduct complained of' by
the plaintiff." *Air Evac EMS, Inc.*, 910 F.3d at 760 (quoting
*Lujan*, 504 U.S. at 560). "While the defendant's conduct need
not be the last link in the causal chain, the plaintiff must be
able to demonstrate that the alleged harm was caused by the
defendant, as opposed to the 'independent action of some third
party not before the court.'" *Id.* (quoting *Frank Krasner
Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234 (4th Cir.
2005). Although a plaintiff's theory of standing may "not rest
on mere speculation about the decisions of third parties[,]" it
may "rel[y] instead on the predictable effect of Government

_____

[11] The parties conflate their arguments regarding the second
and third elements of constitutional standing: traceability and
redressability. (ECF No. 52-1, at 31 ("For similar reasons, nor
would the Individual Plaintiffs' asserted injury be redressed by
striking down the challenged actions.") (alteration and
quotation marks omitted); ECF No. 61, at 38 ("By the same token,
the Individual Plaintiffs' injuries would be redressed by a
decision invalidating Defendants' actions."); ECF No. 92, at 15
("Given the lack of causation, Plaintiffs also fail to show that
their claimed injuries would be redressed by a decision setting
aside the challenged aspects of the 2019 Rule.")).

action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2566 (2019).

Defendants contend that "Plaintiffs have not established that Defendants' actions are the cause of Plaintiffs' purported harms, nor can they make this showing." (ECF No. 52-1, at 25). Defendants primarily advance two arguments in support of this contention. The first asserts that "the Individual Plaintiffs have not shown that there is a causal link. . . because Defendants do not set individual health insurance premiums; rather, issuers set them by taking into account a wide range of factors that are in turn dependent on a whole host of other third party actors." (*Id.*, at 26). Relatedly, Defendants argue that the City Plaintiffs' "standing allegations are even weaker[]" because "[t]heir alleged injury is premised on an even greater number of uncertain links in the causal chain[.]" (*Id.*, at 31). This first argument focuses on third party actors. Defendant's second argument emphasizes that Plaintiffs must demonstrate standing for each claim individually and argues that Plaintiffs fail to demonstrate that any of Defendants' actions are a substantial factor in their injury. (ECF No. 92, at 9-17).

Defendants highlight two cases, *Frank Krasner Enterprises, Ltd. v. Montgomery County*, 401 F.3d 230 (4th Cir. 2005), and *American Freedom Law Center v. Obama*, 821 F.3d 44 (D.C. Cir.

30

2016), to support their first argument that third party actors break the chain of causation between their challenged actions and Plaintiffs' injury. (ECF No. 52-1, at 26–31). Crucially, "the *Frank Krasner* [c]ourt did not establish that courts could never find standing when the 'asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else,' only that doing so will be 'substantially more difficult.'" *Mayor of Balt.*, 416 F.Supp.3d at 489 (quoting *Frank Krasner*, 401 F.3d at 235). Judge Hollander aptly summarized *Frank Krasner's* limits:

> In the recent case of *Department of Commerce v. New York*, ––– U.S. ––––, 139 S. Ct. 2551, 204 L.Ed.2d 978 (2019), the Supreme Court confronted the standing arguments the government raises here. That case involved the Department of Commerce's plan to ask about citizenship on the 2020 United States Census. Several states, counties, cities, and other entities challenged the change as arbitrary and capricious under the Administrative Procedure Act. *Id.* at 2564. The respondent challengers maintained that the question would result in residents declining to complete the Census, and that this underreporting would, in turn, lead to a host of injuries, including a loss of federal funds for states with a disproportionate share of noncitizen households. *Id.* at 2565.
>
> The Department of Commerce contested respondents' Article III standing on the ground that the alleged harms were not traceable to the Department's actions but to the independent actions of third parties. *Id.* at 2565-66. Indeed, the

Department contended that the chain of
causation was further attenuated by the fact
that the intervening, third party-actions
were unlawful and driven by "unfounded
fears." *Id.* The Supreme Court rejected the
Department's argument, concluding that
respondents "met their burden of showing
that third parties will likely react
in *predictable* ways to the citizenship
question, even if they do so unlawfully and
despite the requirement that the Government
keep individual answers confidential."
*Id.* at 2566 (emphasis added). As a result,
the respondents' theory of standing "d[id]
not rest on mere speculation about the
decisions of third parties" but "instead on
the predictable effect of Government action
on the decisions of third parties." *Id.*

*Id.*, 416 F.Supp.3d at 489. Plaintiffs contend that "independent
analyses and issuers' explanations confirm Plaintiffs'
allegations that Defendants' actions have caused price
increases." (ECF No. 61, at 37). Plaintiffs have sufficiently
alleged that insureds and issuers reacted in "predictable ways"
to Defendants' actions.

Defendants' discussion of *American Freedom Law Center* is
also unpersuasive. Defendants emphasize the language: "[M]any
factors determine the cost of health care, including
administrative costs, drug costs, and the health and age of the
national populace. Changes in any of these factors could cause
costs to increase or decrease, and it is difficult to separate
out which factors actually cause any specific price adjustment."
*Am. Freedom Law Ctr.*, 821 F.3d at 51. However, *American Freedom*

32

*Law Center* does not conclude that a plaintiff can never establish a causal link between increased premiums and challenged policies. Contrary to Defendants' assertion, Plaintiffs provide more than "unadorned speculation as to the existence of a relationship between the challenged government action and the third-party conduct[.]" (ECF No. 52-1, at 29 (quoting *Am. Freedom Law Ctr.*, 821 F.3d at 49)). Plaintiffs correctly note that Defendants criticize and emphasize one allegation, "Healthkeepers' statement that 'the elimination of the individual mandate penalty for lack of minimum essential coverage and potential movement into other markets' are factors that the issuer considered in setting its 2019 health insurance rate[,]" (ECF No. 52-1, at 29 (quoting ECF No. 44, ¶ 277)), and ignore "page upon page of independent studies and analyses, statements from issuers, and statistics [detailing] how Defendants' actions have harmed health insurance markets."[12]

---

[12] Defendants also argue that "Congress's reduction of the individual mandate tax penalty to zero . . . is not attributable to Defendants (nor do Plaintiffs allege otherwise)[.]" (ECF No. 52-1, at 29). Plaintiffs counter that "Defendants' actions need not be the sole cause" and regardless, the elimination of the individual mandate and its resultant encouragement of individuals to purchase non-ACA compliant plans "confirms, rather than defeats, Plaintiffs' allegations concerning causation; the availability and desirability of those alternatives . . . is *itself* a result of Defendants' own decisions to expand access to them." (ECF No. 61, at 42-43). Plaintiffs' counterargument is persuasive. Indeed, their allegations regarding EO 13,813, which directed the Administration to expand access non-ACA compliant plans, state:

(ECF No. 61, at 26, 35-38). Plaintiffs also fairly distinguish their complaint from "the 19-page complaint in [*American Freedom Law Center*]" and emphasize that the only evidence offered to support causation in *American Freedom Law Center* was a single rate filing (that may not have applied to the plaintiffs' plan at all and was contradicted by subsequent filings). (*Id.*, at 37–38).

Defendants' second argument is more compelling but still unavailing. Here, Defendants distinguish between standing to assert the APA claim and standing to assert the Take Care Clause claim. Defendants contend that Plaintiffs' factual allegations regarding the APA claim predate the 2019 Rule. (ECF No. 92, at 10–15 ("[C]hanges that occurred before the 2019 Rule went into effect cannot be attributed to the challenged aspects of the 2019 Rule.")). For the Individual Plaintiffs, Defendants contend that "the 2019 Rule could not have affected the

> "Executive Order No. 13,813 will open doors for young and healthy people to flee the ACA-compliant market, *i.e.*, the exchanges, and find lower premiums off of the exchanges. Because on-exchange purchasers will as a group be older and sicker than they have been in prior years, premiums for on-exchange purchasers will increase. This will lead to decreased enrollments in ACA-compliant plans, particularly among the young and healthy. The Order will thereby increase costs and decrease coverage[.]"

(ECF No. 44, ¶ 110 (alterations and quotation marks omitted).

[I]ndividual Plaintiffs' premiums at all prior to 2019 (since premiums for the new plan year would not have taken effect until January 2019)." (*Id.*, at 14). For the City Plaintiffs, Defendants contend that they failed to show "that each challenged aspect of the 2019 Rule will be a substantial factor in the increased premiums and decreased enrollments that they predict, [and] also that those increased premiums and decreased enrollments will shift costs onto the City Plaintiffs." (*Id.*, at 15 (citations and quotation marks omitted). Contrary to Defendants' assertions, Plaintiffs do "tie[]. . . the challenged provisions of the 2019 Rule to increased costs, inaccessibility of quality coverage, and rises in the uninsured and underinsured rates." (ECF No. 61, at 31). Plaintiffs' opposition details the amended complaint's allegations and explains that:

> eliminating the direct notification requirement causes individuals to lose their premium tax credits and drop insurance coverage, [ECF No. 44, ¶ 56];
>
> outsourcing plan review to states allows restrictive networks to flourish, meaning that more individuals purchase inadequate insurance; *id.* ¶ 63;
>
> scaling back oversight of agents, brokers, and issuers makes it harder for consumers to receive accurate information and enroll in the right plan; *id.* ¶ 68;
>
> eliminating support for standardized options limits price competition, thereby raising premiums, cost-sharing payments, and deductibles; *id.* ¶ 74;

> decreased access to impartial, in-person Navigators deprives individuals of the assistant they need to enroll; *id.* ¶ 79;
>
> making exchanges for small businesses less functional impedes employers from enrolling their employees and inhibits price competition among issuers; *id.* ¶ 82;
>
> requiring enrollees to verify their income will deter enrollment, particularly among healthy individuals, which will thereby increase premiums; *id.* ¶¶ 85-86;
>
> scaling back rate review will make it easier for insurers to raise premiums, causing more individuals to forgo insurance; *id.* ¶ 93; and
>
> allowing issuers to claim a set figure for quality improvement activities will make it easier to avoid paying rebates, increasing the cost of health care without increasing quality, *id.* ¶ 98.

(ECF No. 61, at 31-32). These allegations outline the predictable results of the 2019 Rule.

Defendants contend that Plaintiffs' factual allegations regarding the Take Care Clause claim "fail to show that any of the challenged conduct was a 'substantial factor' in producing the harms" and "the notion that any of the challenged actions could conceivably qualify as a 'substantial factor' in issuer decisions to set rates, or in consumer decisions to enroll in health plans, is far-fetched." (ECF No. 92, at 16-17). Defendants try to bolster their Take Care Clause argument by pointing to "*Congress's* decision to set the penalty for failure

to comply with the individual mandate at zero[]" as the cause of reduced enrollments." (*Id.*, at 16). Plaintiffs outline the amended complaint's allegations "that Defendants have engaged in a campaign to undermine the ACA comprising many discrete actions that, both individually and in combination, make ACA-compliant health insurance more expensive, less effective, and less accessible." (ECF No. 61, at 32). Plaintiffs' allegations regarding cost-sharing reduction payments provide a useful example. They allege:

> Exemplifying the Trump Administration's strategy is the way in which the Administration, over the course of the summer and the fall in 2017, repeatedly threatened to discontinue reimbursing insurers for cost-sharing reductions – to stop paying insurers back for the reductions in copayments, coinsurance, and so on, that the Act requires them to provide to consumers . . . [T]he Administration's actions, aimed toward provoking a legislative repeal, were deliberately designed to introduce uncertainty into the exchanges through *threats* that the CSR payments would cease. As the President himself asserted . . . "If you don't make them, [the ACA exchange] fails."

> The threats served their purpose. Throughout the country, some insurers that had previously sold health insurance through the exchanges for the 2017 plan year exited them entirely, refusing to offer coverage for the 2018 plan year because of the Administration's refusal to guarantee that CSR payments would continue. That left some counties with decreased competition among issuers, which (again) drives up prices and decreases overall enrollment. Indeed, at

> the time, the Congressional Budget Office
> warned that terminating CSR payments could
> increase the percentage of people living in
> areas not served by a single insurer between
> 2018 and 2020. Other insurers raised
> premiums by as much as 23 percent for 2018
> to guard against the risk that they would
> not receive the payments . . .
>
> Tellingly, the Trump Administration
> ultimately stopped making CSR payments on
> October 12, 2017, shortly after the
> reconciliation instruction for legislation
> to repeal and replace the ACA expired . . .
> Some insurers and insurance commissioners
> adjusted to the Administration's action by
> raising premiums rather than pulling out of
> the exchanges entirely.

(ECF No. 44, ¶¶ 105-107). Plaintiffs fairly tie Defendants'

actions to the harm alleged in their Take Care Clause claim.

Moreover, while Defendants attempt to blame decreased enrollment

on Congress's reduction of the individual mandate to zero,

Plaintiffs allege that "promoting and expanding access to non-

ACA compliant plans causes individuals, particularly healthy

individuals, to leave the marketplace[]" and that "threatening

[not to] enforce the individual mandate and expanding exemptions

similarly caused individuals, particularly healthy individuals,

to leave the marketplace, driving up premiums for those that

remained." (ECF No. 61, at 32 (citing ECF No. 44, ¶¶ 110-22).

Defendants' actions need not be "the sole or even immediate

cause of the injury." *Sierra Club v. U.S. Dep't of the*

*Interior*, 899 F.3d 260, 284 (4th Cir. 2018). Plaintiffs

sufficiently allege that Defendants' actions underlying the Take Care Clause claim caused their asserted harm.

For an injury to be redressable, "it must be likely, and not merely speculative, that a favorable decision will remedy the injury." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000). The parties largely rely on their traceability arguments to advance their redressability positions. *See supra* n.11. Defendants elaborate that the court "cannot compel a health plan issuer to maintain a certain premium rate level[]" and that invalidating the challenged actions would not "necessarily lead to any rate decreases . . . because a health plan issuer has the discretion to establish premium rates in a manner deemed appropriate by the issuer within the broad parameters set by federal and state laws." (ECF No. 52-1, at 31). Plaintiffs counter that the court "need not compel issuers to set rates at a particular level; a favorable decision would abate Defendants' ongoing attempts to undermine the ACA, curbing actions that issuers have cited as reasons for their high premiums, and thereby redressing the Individual Plaintiffs' injuries." (ECF No. 61, at 38). Defendants' argument that Plaintiffs' injury cannot be redressed because it is dependent on third party actions and speculative, like Defendants' traceability argument, fails. The relief

sought here would redress Plaintiffs injuries by ameliorating the predictable results of Defendants' challenged actions.

**B.  Ripeness**

"The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form." *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006) (internal quotation marks omitted).  The ripeness inquiry requires courts to "'balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.'" *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (quoting *Miller*, 462 F.3d at 319).  "[A] case is 'fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties.'" *Id.* (quoting *Miller*, 462 F.3d at 319).  "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiff]." *Id.* at 199 (quoting *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208–09 (4th Cir. 1992).

Defendants contend that, for many of the same reasons Plaintiffs lack standing, the claims are not ripe for review. Plaintiffs, too, acknowledge that standing and ripeness are often congruent issues.  Because many of the claims are

primarily legal, and the alleged hardships are already occurring, the claims are ripe.

## IV. Fed.R.Civ.P. 12(b)(6).

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

It is axiomatic that, "[g]enerally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited

to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). Courts are, however, permitted to consider facts and documents subject to judicial notice because, under Federal Rule of Evidence 201, courts "at any stage of a proceeding" may "judicially notice a fact that is not subject to reasonable dispute." *Id*. at 607. Importantly, "[n]evertheless, when a court considers relevant facts from the public record at the pleading stage, the court must construe such facts in the light most favorable to the plaintiffs." *Id.*

## A. APA Claim

The first claim in the amended complaint is for violation of the APA, 5 U.S.C. § 706. Under the APA, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Plaintiffs contend that all of the 2019 Rule's challenged provisions are arbitrary and capricious and that several of the 2019 Rule's challenged provisions are contrary to

law.   Defendants  disagree.[13]   As  will  be  discussed  *infra*,
Defendants' arbitrary and capricious challenge is premature and
although the contrary to law challenge is not necessarily
premature, it is underdeveloped.   The parties combined their
arguments regarding these challenges.   The court endeavored to
disentangle the arguments below to allow consideration of each
under the appropriate framework.

### 1.   Arbitrary and Capricious

The arbitrary and capricious standard requires the agency
to "examine the relevant data and articulate a satisfactory
explanation for its action including a 'rational connection
between the facts found and the choice made.'"   *Motor Vehicle
Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43
(1983) (quoting *Burlington Truck Lines v. United States*, 371

---

[13] Defendants argue "[a]s an initial matter, the President
is not subject to the APA, *Franklin v. Massachusetts*, 505 U.S.
788, 828, 796 (1992), and thus, this claim can only proceed as
against the other defendants."   (ECF No. 52-1, at 38).
Plaintiffs do not challenge this argument in the APA section of
their opposition, (ECF No. 61, at 45-64), and subsequently note
that "while 'the President's actions. . . are not reviewable for
abuse of discretion under the APA,' they 'may still be reviewed
for constitutionality" (*id.*, at 76 n.26 (quoting *Franklin*, 505
U.S. at 801)).   This observation comports with the amended
complaint, which did not identify the President in Count I.
(*See* ECF No. 44, ¶ 282 ("As detailed above, Defendants HHS,
Secretary Azar, CMS, and Administrator Verma have failed to
provide adequate reasons, and failed to [respond adequately] to
comments for many provisions of the 2019 Rule, such that they
are 'arbitrary' and 'capricious.'   In addition, as also detailed
above, many provisions of the 2019 Rule violate the [ACA] and
therefore are 'not in accordance with law.'")).

U.S. 156, 168 (1962)).  When reviewing the agency's explanation, the reviewing court "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974).  "[A]n agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Sierra Club*, 899 F.3d at 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43).

Review under the arbitrary and capricious standard is deferential and narrow.  *Dep't of Commerce*, 139 S.Ct. at 2569. "[A] court is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  Nonetheless, the arbitrary and capricious standard "is not meant to reduce judicial review to a 'rubber-stamp' of agency action."  *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).  The reviewing court must "engage in a 'searching and careful' inquiry of the record."  *Id.* (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

44

Plaintiffs allege that all of the challenged provisions of the 2019 Rule are arbitrary and capricious. As may be expected, many of these allegations overlap. Plaintiffs contend that Defendants failed to cite data or offer evidence in support of the challenged provisions, failed to respond adequately to commenters' concerns about the challenged provisions, failed to explain sufficiently the challenged provisions that involved policy changes, and deferred to insufficient state processes. (ECF No. 44, ¶¶ 55, 62, 67, 72, 78, 81, 84, 91, 92, 97). Defendants provide CMS's reasons for implementing the challenged provisions to demonstrate that they are not arbitrary and capricious. (ECF No. 52-1, at 38-59). Defendants also emphasize CMS's substantial expertise and the deferential nature of review under the arbitrary and capricious standard.

These arguments are premature at the motion to dismiss stage in this case. Plaintiffs argue: "[A]t this early stage of the litigation, Defendants have yet to produce the administrative record, so the [2019 Rule] itself is all that Plaintiffs and the [c]ourt have to go by. That posture alone counsels in favor of permitting Plaintiffs' claims to proceed, as 'the [c]ourt cannot properly evaluate' whether Defendants 'acted arbitrarily and capriciously' where 'the [c]ourt does not have a complete administrative record.'" (ECF No. 61, at 46 (quoting *Farrell v. Tillerson*, 315 F.Supp.3d 47, 69 (D.D.C.

2018)).  Defendants respond that the Notice of Proposed Rulemaking ("NPRM"), the comments responding to the NPRM, and the Preamble to the Rule are all publicly available and therefore there is no barrier to dismissal.  (ECF No. 92, at 18 n.9).

Because of the sheer number of administrative appeals arising in the District of Columbia, courts in that circuit have the most complete description of the procedures for analysis. In *Banner Health v. Sebelius*, 797 F.Supp.2d 97, 112-13 (D.D.C. 2011) (footnote omitted), the district judge outlined the overall approach to an APA challenge in the District of Columbia Circuit:

> "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  "The entire case is a question of law," and the "complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  Therefore, the question is not whether the plaintiff has "raised genuine issues of material fact," but whether, "based on the agency record[,] . . . the agency acted arbitrarily or capriciously." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (citing 5 U.S.C. § 706), *cert. denied sub nom. Rempfer v. Hamburg*, --- U.S. ----, 130 S.Ct. 1707, 176 L.Ed.2d 183 (2010).

When presented with a motion to dismiss for failure to state a claim, the district court may, in appropriate circumstances, reach the merits even in the absence of the administrative record, as when the parties' arguments can be resolved with reference to nothing more than the relevant statute and its legislative history. [*See Dist. Hosp. Partners, L.P. v. Sebelius*, 794 F.Supp.2d 162, 169–72 (D.D.C. 2011)]. Moreover, a court may generally take judicial notice of materials published in the Federal Register without converting the motion to one for summary judgment. See 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed.").

Nevertheless, in recognition of the dangers associated with proceeding with judicial review "on the basis of a partial and truncated record" without the consent of the parties, *Nat. Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291–92 (D.C. Cir. 1975), when the arguments raised go to the question of whether the agency has adhered to the standards of decisionmaking required by the APA, the United States Court of Appeals for the District of Columbia Circuit has advised that the "better practice" is to test the parties' arguments in the context of a motion for summary judgment and with reference to the full administrative record. *Marshall Cty.*, 988 F.2d at 1226 n.5. "If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984); *see also Occidental Petroleum Corp. v. Secs. & Exch. Comm'n*, 873 F.2d 325, 338 (D.C. Cir. 1989) ("[I]n order to allow for meaningful judicial review, the agency must produce an administrative record that delineates the path by which it reached its decision.").

Consistent with this guidance, courts routinely exercise their discretion to decline to reach the ultimate question of whether the agency's decisionmaking process was arbitrary or capricious in the absence of the full administrative record. *See, e.g., Ravulapalli v. Napolitano*, 773 F.Supp.2d 41, 53–54 (D.D.C. 2011); *Int'l Longshoremen's Ass'n, AFL–CIO v. Nat'l Mediation Bd.*, No. 04 Civ. 824(RBW), 2005 WL850358, at *4 (D.D.C. Mar. 30, 2005).

In a similar case where a defendant, in reference to material in the Federal Register, argued that the decisionmaking was explained sufficiently, the court concluded that such analysis would be premature:

Even though the Court may refer to the Federal Register, it concludes that dismissal based solely on its contents would be premature here because a review of the administrative record is necessary to a determination of whether the Secretary's methodology was arbitrary and capricious.

*Dist. Hosp. Partners*, 794 F.Supp.2d at 171. The situation is the same here. The court declines to examine a truncated record in evaluating this claim.

### 2. Contrary to Law

"When a challenger asserts that an agency action conflicts with the language of a statute, [the reviewing court] generally appl[ies] the two-step analytical framework set forth in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)." *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 643 (4th Cir. 2018). The *Chevron* framework

"operates as a tool of statutory construction whereby [the reviewing court] give[s] plain and unambiguous statutes their full effect; but, where a statute is either silent or ambiguous, [the reviewing court] afford[s] deference 'to the reasonable judgments of agencies with regard to the meaning of ambiguous terms or silence in statutes that they are charged with administering.'" *People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture*, 861 F.3d 502, 506 (4th Cir. 2017) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 739 (1996) (alteration omitted)).

Plaintiffs allege that the first challenged provision of the 2019 Rule, relating to the elimination of the direct notification requirement before denying APTC for failure to reconcile, "conflicts with express statutory language requiring that any eligible individual be allowed to claim APTC." (ECF No. 44, ¶ 54). The Internal Revenue Code ("IRC") provides the express statutory language on which Plaintiffs rely: "In the case of an applicable taxpayer, there shall be allowed as a credit against the tax imposed . . . for any taxable year an amount equal to the premium assistance credit amount of the taxpayer for the taxpayer year." 26 U.S.C. § 36B(a). "The term 'applicable taxpayer' means, with respect to any taxable year, a taxpayer whose household income for the taxable year equals or exceeds 100 percent but does not exceed 400 percent of an amount

equal to the poverty line for a family of the size involved." 26 U.S.C. § 36B(c)(1)(A). Plaintiffs contend: "Whether an individual has reconciled her APTC has no bearing on whether she is an 'applicable taxpayer' under the statute. Therefore, depriving an 'applicable taxpayer' of the credit that the statute says 'shall be allowed' based on a failure to reconcile . . . violates the plain language of the statute." (ECF No. 44, ¶ 54). Defendants argue that the IRC provision "is not under the jurisdiction of CMS," and regardless, "there is no conflict between the challenged provision and § 36B of the IRC because nothing in the challenged provision deprives an individual from receiving APTC as long as she or he complies with the statutory and regulatory eligibility requirements." (ECF No. 52-1, at 49-50). In other words, the challenged provision "does not address taxpayers' eligibility" but instead "governs when an Exchange will make *advance payments* of those tax credits directly to a health plan on behalf of an Exchange enrollee." (ECF No. 92, at 20). Plaintiffs respond by highlighting Defendants' lack of "authority for the . . . proposition that agency regulations must only comply with statutes that the agency administers," and by emphasizing that "where there is a conflict between a regulation and a statute . . . the statute controls regardless of where it is codified[.]"[14] (ECF No. 61, at 48).

_____

[14] Plaintiffs also note that the challenged provision raises

Plaintiffs allege that the second challenged provision of the 2019 Rule, relating to outsourcing to the states compliance review of federal plans, "conflicts with express statutory language . . . that requires the federal government, as the administrator of federally-facilitated exchanges, to certify plans proffered by insurers as [QHPs.]" (ECF No. 44, ¶ 60). Plaintiffs contend that "[i]nterpreting the statute to prohibit CMS's decision to rubber-stamp states' review of network adequacy for federally-facilitated exchanges is also consistent with the Act's purpose." (*Id.*, ¶ 61). Plaintiffs rely on the ACA's language that HHS "shall, by regulation, establish criteria for the certification of health plans as [QHPs,]" 42 U.S.C. § 18031(c)(1), including criteria that ensure network adequacy, and that, pursuant to those criteria, "[a]n Exchange shall, at a minimum[,] implement procedures for the certification, recertification, and decertification . . . of health plans as [QHPs,]" 42 U.S.C. § 18031(d)(4)(A). Defendants contend that the challenged provision "falls well within CMS's authority to promulgate regulations" under § 18031(c)(1). (ECF No. 52-1, at 56). Defendants argue that § 18031(d)(4) "does not require CMS . . . to conduct the QHP certification process or

"significant due process concerns." (ECF No. 61, at 47; *see also* ECF No. 44, ¶ 55 ("[T]he direct notice requirement was added to the failure to reconcile provision in 2016 in response to concerns that denying APTCs without direct notice would violate due process.")).

assess network adequacy itself[]" and "the challenged provision does what § 18031(d)(4) requires: implementing a procedure for FFE QHP certification – one that relies on [s]tates' processes[.]" (*Id.*, at 55-56). Plaintiffs respond that the ACA's "repeated use of the term 'shall' makes plain that these are mandatory duties[]" and that "CMS does not 'implement procedures for . . . certification' by leaving certification to others." (ECF No. 61, at 50).

Plaintiffs allege that the fifth challenged provision, relating to changes to the Navigator program, "is contrary to law because it permits entities to qualify as Navigators that cannot satisfy the relevant statutory criteria." (ECF No. 44, ¶ 76). Plaintiffs identify those criteria as: (1) conducting "public education activities to raise awareness of the availability of [QHPs]," 42 U.S.C. 18031(i)(3)(A); (2) distributing "fair and impartial information concerning enrollment in [QHPs], and the availability of premium tax credits . . . and cost-sharing reductions," *id.* 18031(i)(3)(B); (3) facilitating "enrollment in [QHPs]," *id.* 18031(i)(3)(C); (4) providing "enrollees with grievances, complaints, or questions about their health plans with referrals to specified entities," *id.* 18031(i)(3)(D); and (5) providing "information in a manner that is culturally and linguistically appropriate to the needs of the population being served by the Exchange or Exchanges,"

*id.* 18031(i)(3)(E). (ECF No. 44, ¶ 76). Defendants argue that "the ACA does not require Navigators to have a physical presence in the Exchange's service area, nor mandate a two-Navigator minimum for every Exchange[]" but rather "sets forth broader requirements for Navigators." (ECF No. 92, at 27). Defendants conclude that absent any statutory directive, "the same statutory authority that allowed CMS to establish the prior standards for Navigator certification now allows CMS to modify those standards."[15] (ECF No. 52-1, at 46 (citation omitted)).

Plaintiffs allege that the sixth challenged provision, regarding the removal of certain requirements for SHOP exchanges, is contrary to law because "the removal of these requirements permits SHOPs that cannot fulfill their statutory duties . . . which violates the ACA's text." (ECF No. 44, ¶ 81). This argument is similar to Plaintiffs' argument regarding the Navigator program. Defendants argue that the ACA does not require SHOPs "to perform the functions removed by the new rule." (ECF No. 52-1, at 53). In their reply, Defendants contend that Plaintiffs failed to contest this argument in their opposition and therefore have abandoned any claim that the SHOP changes are contrary to law. (ECF No. 92, at 28-29). Despite

---

[15] Defendants also argue the 2019 Rule improves flexibility for Exchanges because despite eliminating the requirements, Exchanges could nonetheless choose Navigators that comply with them. (ECF No. 92, at 27).

Defendants' characterization, Plaintiffs' opposition argues that the changes "permit SHOPS to operate even where they cannot possibly meet the ACA's command that they 'make available [QHPs] to qualified individuals and qualified employers'" and therefore "undercuts the ACA's purpose." (ECF No. 61, at 56).

Plaintiffs allege that part of the eighth challenged provision, regarding the exemption of student health plans from rate review, is contrary to the text of the ACA. (ECF No. 44, ¶ 90). Plaintiffs explain that "the ACA requires review of 'unreasonable increases in premiums for health insurance coverage,' 42 U.S.C. § 300gg-94(a)(1), which are defined as 'benefits consisting of medical care,' *id.* § 300gg-91(b)(1) – a term that encompasses student health plans, which . . . provide medical care benefits like any other health insurance plan." (ECF No. 44, ¶ 90). "[T]he only exceptions to rate review are for 'excepted benefits' and 'grandfathered health plan' coverage, both of which are mandated by statute, *see* 42 U.S.C. §§ 300gg-91(c), 18011, and for large group plan rates, which are negotiated on a group-by-group basis and therefore cannot be effectively reviewed." (ECF No. 44, ¶ 90). Defendants discuss 42 U.S.C. § 18118(c), and argue that "CMS has long interpreted the ACA to exclude student health insurance plans from ACA requirements that 'would have, as a practical matter, the effect of prohibiting an institution of higher education from offering

a student health plan otherwise permitted under federal, state, or local law." (ECF No. 52-1, at 39). Defendants offer three examples of exemptions for student health plans under § 18118(c): (1) student health plans are exempt "from the ACA's guaranteed availability and renewability requirements to the extent that such requirements would require a student health insurance plan to accept enrollment or renew coverage of individuals who are not students or dependents of students[;]" (2) student health plans may offer coverage based on the academic year, rather than the calendar year; and (3) "student health insurance coverage is not included in the ACA's individual market single risk pool in a State because issuers of student health insurance coverage typically contract with colleges and universities to issue a blanket health insurance policy[.]" (*Id.*, at 40). Plaintiffs question Defendants' invocation of § 18118(c) and proffer of these three examples: "CMS did not invoke § 18118 in the 2019 Rule itself – let alone articulate this novel rationale – and Defendants cannot do so now." (ECF No. 61, at 60).

Finally, Plaintiffs allege that the ninth challenged provision, "allowing insurers to claim a flat credit for quality improvement activities [when calculating MLR], is contrary to the text of the ACA." (ECF No. 44, ¶ 96). Plaintiffs contend that the ACA "requires insurers to report the amount *actually*

spent on QIA[.]" (*Id.* (discussing 42 U.S.C. § 300gg-18(a)(1)). They argue that the ACA "does not permit CMS to . . . throw up its hands and give every insurer the same credit [for QIA], whether or not the funds are actually expended." (*Id.*). Defendants argue that § 300gg-18(a)(2) "directs insurers to report 'the percentage of total premium revenue, after accounting for collections or receipts for risk adjustments and risk corridors and payments of reinsurance, that such coverage expends . . . for [QIA].'" (ECF No. 52-1, at 58). Defendants conclude that "[b]y its express terms, the statute does not require issuers to provide an itemized list of each QIA expenditure that contributes to the calculation of the MLR; the itemized method was imposed only by regulation." (*Id.*).

Pure matters of law may be resolved on a motion to dismiss and, at times, determining whether an agency's actions are contrary to law presents such a question of law. *See, e.g. King v. Burwell*, 759 F.3d. 358, 367-376 (4th Cir. 2014), *aff'g King v. Sebelius*, 997 F.Supp.2d 415 (E.D.Va. 2014), *aff'd*, 135 S.Ct. 2480 (2015). Of course, the issue can also be resolved on a motion for summary judgment. Defendants' arguments are insufficiently developed to demonstrate that Plaintiffs' claims would fail under the *Chevron* standard. *See Farrell*, 315 F.Supp.3d at 65-68. Defendants appear to raise both *Chevron* step one and *Chevron* step two arguments but do not clearly apply

the Chevron analysis. The United States Court of Appeals for the Fourth Circuit explained the framework:

> At *Chevron*'s first step, a court looks to the "plain meaning" of the statute to determine if the regulation responds to it. *Chevron*, 467 U.S. at 842-43, 104 S.Ct. 2778. If it does, that is the end of the inquiry and the regulation stands. *Id.* However, if the statute is susceptible to multiple interpretations, the court then moves to *Chevron*'s second step and defers to the agency's interpretation so long as it is based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. 2778.

*King*, 759 F.3d at 367. "The objective of *Chevron* step one is not to interpret and apply the statute to resolve a claim, but to determine whether Congress's intent in enacting it was so clear as to foreclose any other interpretation." *Id.* "Courts should employ all the traditional tools of statutory construction in determining whether Congress has clearly expressed its intent regarding the issue in question." *Id.* Defendants here attempt "to interpret and apply" the ACA but they fail to grapple with Congress's intent.

Moreover, the parties combined their arbitrary and capricious arguments with their contrary to law arguments. Because all of the provisions challenged as contrary to law are also challenged as arbitrary and capricious, the court will not resolve the contrary to law arguments separately now.

**B.    Take Care Clause Claim**

The second claim in the amended complaint is for violation of the "Take Care Clause," U.S. Const. art II, § 3.  Plaintiffs assert that the court "has authority to issue 'equitable relief [to] prevent[] entities from acting unconstitutionally.'"  (ECF No. 44, ¶ 14) (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)).

The viability of the "Take Care Clause" as a stand-alone cause of action is, to put it lightly, uncertain.  No court in this circuit, or any other circuit, has definitively found that the "Take Care Clause" provides a private cause of action which a plaintiff may bring against the President of the United States or his administration.  Arguably the closest any court has come to doing so is the D.C. Circuit in *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974).  In that case, the D.C. Circuit issued broad dicta about the constitutional implications of the Take Care Clause, specifically noting that the constitutional duty arising from the Take Care Clause "does not permit the President to refrain from executing laws duly enacted by the Congress[.]"  *Nixon*, 492 F.2d at 604.

Critically, though, *Nixon* did not involve a freestanding cause of action brought under the Take Care Clause.  Rather, Plaintiffs in that case asserted claims for mandamus pursuant to 28 U.S.C. § 1361 and declaratory relief pursuant to the Federal

Declaratory Judgment Act, 28 U.S.C. § 2201. The court in *Nixon* held that it had subject matter jurisdiction under the former, and the alternative power to issue declaratory relief pursuant to the latter. Section 1361 grants district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. The court ultimately issued a declaratory judgment against President Nixon declaring that "that the President has a constitutional duty forthwith to grant, effective as of October, 1972, the federal pay increase mandated by the Congress and sought by NTEU herein so that the members of NTEU can collect what has been due them for many months." *Nixon*, 492 F.2d at 616.

While the D.C. Circuit *did* find that the President's "constitutional duty" to implement a federal pay increase arose from the Take Care Clause, it did not find that the Take Care Clause creates a federal cause of action. Indeed, even though the existence of such a cause of action was not directly before the court, the D.C. Circuit was still careful to limit itself to a declaratory judgment only, refusing to issue an injunction or writ of mandamus. The court stated that "[w]e so restrict ourselves at this time in order to show the utmost respect to the office of the Presidency and to avoid, if at all possible,

59

*direct involvement by the Courts in the President's constitutional duty faithfully to execute the laws* and any clash between the judicial and executive branches of the Government." *Id.* (emphasis added).

To understand the D.C. Circuit's reluctance to so involve itself, the court must look back to *Mississippi v. Johnson*, 71 U.S. 475 (1866), the clearest statement the Supreme Court of the United States has given on the Take Care Clause. There, the state of Mississippi sought to force President Andrew Johnson, by writ of mandamus, to "faithfully execute" portions of a series of Reconstruction Acts. The Supreme Court refused, contrasting a series of earlier cases where courts had issued writs of mandamus to lower executive branch officials:

> A ministerial duty, the performance of which may, in proper cases, be required of the head of a department, by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law.
>
> The case of *Marbury v. Madison, Secretary of State*, furnishes an illustration. A citizen had been nominated, confirmed, and appointed a justice of the peace for the District of Columbia, and his commission had been made out, signed, and sealed. Nothing remained to be done except delivery, and the duty of delivery was imposed by law on the Secretary of State. It was held that the performance of this duty might be enforced by *mandamus* issuing from a court having jurisdiction.

So, in the case of *Kendall, Postmaster-General, v. Stockton & Stokes*, an act of Congress had directed the Postmaster-General to credit Stockton & Stokes with such sums as the Solicitor of the Treasury should find due to them; and that officer refused to credit them with certain sums, so found due. It was held that the crediting of this money was a mere ministerial duty, the performance of which might be judicially enforced.

In each of these cases nothing was left to discretion. There was no room for the exercise of judgment. The law required the performance of a single specific act; and that performance, it was held, might be required by *mandamus*.

Very different is the duty of the President in the exercise of the power to see that the laws are faithfully executed, and among these laws the acts named in the bill. By the first of these acts he is required to assign generals to command in the several military districts, and to detail sufficient military force to enable such officers to discharge their duties under the law. By the supplementary act, other duties are imposed on the several commanding generals, and these duties must necessarily be performed under the supervision of the President as commander-in-chief. The duty thus imposed on the President is in no just sense ministerial. It is purely executive and political.

*Johnson*, 71 U.S. at 498-99.

The distinction which the Court in *Johnson* created was between "ministerial" duties and "executive and political" duties. The former could be enforced, by mandamus, on executive branch officials – and perhaps, though not clearly so, even on

the President – while the latter were beyond the purview of the courts. The D.C. Circuit in *Nixon* explained this distinction as one that turns on the amount of discretion afforded to the executive branch: "'If the law direct him to perform an act in regard to which no discretion is committed to him, and which, upon the facts existing, he is bound to perform, then that act is ministerial[.]'" *Nixon*, 492 F.2d at 602 (quoting *Roberts v. United States ex rel. Valentine*, 176 U.S. 219, 231 (1900), and citing to *Wilbur v. United States ex rel. Krushnic*, 280 U.S. 306, 318-19 (1930)). The court in *Nixon* went on to hold that it "possesses the authority to mandamus the President to perform the ministerial duty involved herein[.]" *Id*. at 616. That duty was the putting into effect of a Congressionally mandated pay raise for the plaintiffs. *Id*. at 595. Critically, the court found that issuing a declaratory judgment on the President's obligation to effect the pay raise would "not require any court supervision over the performance of duty by the executive branch." *Id*. at 605.

Despite this cautious history, Plaintiffs blithely assert that this court has jurisdiction and they enjoy a right to sue directly under the Take Care Clause. Plaintiffs argue that:

> Faced with the strikingly similar "assert[ion] that [the plaintiffs] have not pointed to any case in which this Court has recognized an implied private right of action directly under the Constitution to

> challenge governmental action under . . . separation-of-powers principles," the Supreme Court rejected it, reaffirming that "equitable relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."

(ECF No. 61, at 77 (quoting *Free Enter. Fund*, 561 U.S. at 491 n.2)). Reliance on *Free Enterprise Fund*, however, is misplaced. The Court there held that "the dual for-cause limitations on the removal of [certain executive branch officials] contravene the Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 492.

That holding *did* stem in part from the Take Care Clause: the Court noted that "[i]t is [the President's] responsibility to take care that the laws be faithfully executed. The buck stops with the President, in Harry Truman's famous phrase . . . [T]he President therefore must have some 'power of removing those for whom he can not continue to be responsible.'" *Id*. at 493. In other words, the Court found unconstitutional an act of Congress which purported to tie the president's hands regarding his duties under the Take Care Clause. Under those circumstances, the court agreed with the plaintiffs that equitable relief was a proper remedy. That equitable relief was to take the form of "declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject will be enforced only by a constitutional

agency accountable to the Executive." *Id*. at 513. In other words, the court rightly held that it could issue equitable relief in the form of a declaration that certain aspects of an Act of Congress were unconstitutional, in part because of separation of powers issues stemming from the Take Care Clause.

The Court in *Free Enterprise Fund* was, of course, right to uphold the bedrock Constitutional Law principle that courts may utilize equitable relief to declare Acts of Congress unconstitutional. *Id*. at 491 n.2 ("[E]quitable relief 'has long been recognized as the proper means for preventing entities from acting unconstitutionally' . . . If the Government's point is that an Appointments Clause or separation-of-powers claim should be treated differently than every other constitutional claim, it offers no reason and cites no authority why that might be so.") In this instant case, Plaintiffs are not asking the court to 1) exercise its traditional powers of judicial review over an Act of Congress, and 2) grant equitable relief sufficient to remedy the constitutional issue. Rather, Plaintiffs are asking the court to appropriate a degree of the discretion left to the President in *how* to take care that the ACA is faithfully executed. Here, there is ample reason and authority why Plaintiffs' claims *should* be treated differently from the type of claim brought in *Free Enterprise Fund*.

Much of the authority distinguishing this case from the circumstances of *Free Enterprise Fund* is recent. In *Citizens for Responsibility and Ethics in Washington v. Trump*, 302 F.Supp.3d 127 (D.D.C. 2018) (hereinafter *CREW*), the court tentatively concluded that "while *Johnson* may prevent a court from issuing an injunction to the President concerning a discretionary duty, that case does not so clearly foreclose the declaratory judgment claim at issue here." *Id*. at 140. The Fourth Circuit has been even less circumspect in its reading of *Johnson*, taking that case and its progeny to mean that "'in general, "this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."'" *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017)(en banc)(*vacated as moot*, 138 S. Ct. 353 (2017)) (quoting *Franklin*, 505 U.S. at 802-03).

Based on this guidance from the Fourth Circuit, the D.C. Circuit, and the Supreme Court, Plaintiffs' claims for injunctive relief pursuant to the Take Care Clause will be dismissed. The only remaining question, then, is whether Plaintiffs have stated a claim for a declaratory judgment pursuant to the Take Care Clause. Assuming, *arguendo*, that a valid Take Care Clause cause of action exists in some form, and that a district court may, as it did in *Nixon*, issue a declaratory judgment against the President – neither of which

appears firmly grounded in precedent or sound constitutional principles – Plaintiffs have nonetheless failed to state a claim. For this conclusion, the court need not look further than the exact declaratory relief Plaintiffs seek; they have asked this court to:

> declare that Defendants are violating the Take Care Clause by taking executive action to: [(a)] suppress the number of individuals and families obtaining health insurance through ACA exchanges; [(b)] increase premiums for health insurance in the ACA exchanges; [(c)] diminish the availability of comprehensive, reasonably-priced health insurance for individuals and families with preexisting conditions; [(d)] discourage individuals and families from obtaining health insurance that provides the coverage that Congress, in the ACA, determined is necessary to protect American families against the physical and economic devastation that results from lesser insurance, with limits on coverage that leaves them unable to cover the costs of an accident or unexpected illness[.]

(ECF No. 44, at 144).

Plainly, none of the President's complained-of actions are "ministerial" in the sense developed in *Johnson* and *Nixon*. That is, there is no "peremptory, and plainly defined[,]" *Nixon*, 492 F.2d at 602, course of action the President could take to rectify the flaws that Plaintiffs perceive in his execution of the ACA. Any judgment to the contrary by this court would "require . . . court supervision over the performance of duty by the executive branch." *Id*. at 605. Plaintiffs' Take Care

Clause cause of action fails for the same reason stated by the district court in its recent decision in *CREW*: because judicial intervention here would impinge on the *discretion* that Congress has afforded to the President and entrust to the courts the "executive and political" duties of determining how to "faithfully execute" the APA. *CREW*, 302 F.Supp.3d at 140 ("The Supreme Court has advised that "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [the courts'] review") (quoting *Dalton v. Specter*, 511 U.S. 462, 476 (1994)); *see also*, *In re Border Infrastructure Envtl. Litig.*, 284 F.Supp.3d 1092, 1139 (S.D.Cal. 2018) ("[A] Take Care challenge in this case would essentially open the doors to an undisciplined and unguided review process for all decisions made by the Executive Department."). Count II will be dismissed in its entirety.

## V.    Conclusion

For the foregoing reasons, the motion to dismiss filed by Defendants will be denied in part and granted in part. A separate order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge
