IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| CITY OF COLUMBUS, et al. | : |
|  | : |
| v. | : Civil Action No. DKC 18-2364 |
|  | : |
| NORRIS COCHRAN,[1] in his official capacity as Acting Secretary of the Department of Health and Human Services, et al.: | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action for declaratory judgment and injunctive relief are Plaintiffs' Motion for Summary Judgment (ECF No. 108); Defendants' Cross-Motion for Summary Judgment (ECF No. 118); and two motions for leave to file memoranda as *amici curiae* (ECF Nos. 122 and 123).  The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the cross-motions will be granted in part and denied in part.  The motions for leave to file as *amici curiae* will be granted.

---

[1] The amended complaint named those then in office, namely Donald J. Trump, President, Alex M. Azar, Secretary of HHS, and Seema Verma, Administrator of CMS.  The only claim against the president, in count two, was dismissed.  As of the time of the filing of this opinion, those officials still involved in count one are:  Norris Cochran as Acting HHS Secretary, and Liz Richter as Acting Administrator of CMS.  Pursuant to Fed.R.Civ.P. 25(d), the current officials are automatically substituted.

I.   **Factual Background**

Plaintiffs the City of Columbus, Ohio, the Mayor and City Council of Baltimore, Maryland, the City of Cincinnati, Ohio, the City of Chicago, Illinois, and the City of Philadelphia, Pennsylvania (collectively, the "City Plaintiffs") and Stephen Vondra and Bonnie Morgan (collectively, the "Individual Plaintiffs") filed suit against the President of the United States of America in his official capacity, the United States Department of Health and Human Services ("HHS"), the Secretary of HHS in his official capacity, the Centers for Medicare and Medicaid Services ("CMS"), and the Administrator of CMS in her official capacity, (collectively, "Defendants").   Plaintiffs seek review of agency action under the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706.

A.   **The Affordable Care Act**

In 2010, Congress enacted the Patient Protection and Affordable Care Act (the "ACA," "the Act," or "the Affordable Care Act") "to increase the number of Americans covered by health insurance and decrease the cost of health care."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).  The ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market."  *King v. Burwell*, 576 U.S. 473, 478-79 (2015).  "Individual health insurance is insurance that individuals purchase themselves, in contrast to, for example,

joining employer-sponsored group health plans." *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 778 (D.Md. 2020) (citing ECF No. 44, ¶ 32).   Individual market health plans are referred to as qualified health plans ("QHPs").

"Prior to the enactment of the ACA, individual health insurance markets were dysfunctional." (*Id.*).  The ACA "aims to achieve systemic improvements in the individual health insurance market by means of certain key reforms[.]" (*Id.*).

First, the ACA prohibits insurers from rejecting applicants with preexisting conditions (the "guaranteed issue" requirement) and from charging individuals with serious medical conditions or a history of illness higher premiums (the "community rating" requirement").  *See Sebelius*, 567 U.S. at 548.

Second, recognizing that the failure of healthy individuals to purchase insurance would lead to an economic "death spiral," *King*, 576 U.S. at 480, the Act "require[ed] that individuals maintain health insurance coverage or make a payment to the IRS." *Id.* at 493.

Third, the Act requires all QHPs to cover essential health benefits[2] and limits cost-sharing (in the form of deductibles and

---

[2]   Essential health benefits include hospitalization, prescription drugs, emergency services, ambulatory patient services, maternity and newborn care, mental health and substance use disorder services, preventative and wellness services, and pediatric services.  *See* 42 U.S.C. § 18022(b)(1).

co-pays) by enrollees for essential health benefits.  It also "prohibits plans from imposing annual or lifetime limits" on essential health benefits coverage.  (ECF No. 108-1, at 15) (citing 42 U.S.C. §§ 300gg-6(b), 18022(a)(2), (c).

Fourth, the Act "seeks to make insurance more affordable by giving refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line [("FPL")]." *King*, 576 U.S. at 482.  Such credits are known as advance premium tax credits ("APTCs").  Rather than an enrollee paying the entire insurance premium up front and then later claiming a credit toward that amount on the taxpayer's tax return, HHS may make an advance payment of the premium tax credit amount directly to the enrollee's insurance provider.  In this way, APTCs act as a subsidy for low-income individuals who could not afford to purchase insurance outright.  The amount of the APTC owed ultimately depends on the individual's income at the end of the year.  Thus, individuals must file a federal tax return each year to "reconcile" or pay back any excess APTC received in the previous tax year.

The Act also requires the creation of an Exchange in each State.  Each Exchange serves as "a marketplace that allows people to compare and purchase insurance plans.  The Act gives each State the opportunity to establish its own Exchange but provides that the Federal Government will establish 'such Exchange' if the State

4

does not." *Id.* at 473 (citing 42 U.S.C. §§ 18031, 18041). Some states have chosen to create Exchanges themselves ("state-based Exchanges") while others have created Exchanges that operate on the federal Healthcare.gov platform ("state-based Exchanges on the federal platform"). Some states declined to establish an Exchange at all so the Exchanges in those states are operated by CMS ("federal Exchanges"). Each Exchange must also "provide[] for the establishment of a Small Business Health Options Program [("SHOP Exchange")] . . . that is designed to assist . . . small employers . . . in facilitating the enrollment of their employees in qualified health plans offered in the small group market in the State." 42 U.S.C. § 18031(b)(1)(B).

Individuals generally enroll in qualified health plans for a given benefit year during a specified annual open enrollment period occurring in November and December of the preceding year. *See id.* § 18031(c)(6). To assist individuals in enrolling, the ACA requires that Exchanges award grants to healthcare "Navigators" that conduct public education activities to raise awareness of the availability of QHPs, provide consumers with information to help understand their choices, facilitate consumers' enrollment, and ensure access to consumer protections. *See id.* § 18031(i)(3).

Each year, HHS promulgates rules pursuant to its rulemaking authority under the ACA and the Public Health Service Act ("PHS Act"). Such rules are the mechanisms by which HHS makes ongoing

adjustments to the regulations and processes surrounding ACA insurance markets.

### B.   The 2019 Rule

On April 17, 2018, the U.S. Department of Health and Human Services promulgated its annual Notice of Benefit and Payment Parameters for 2019, 83 Fed. Reg. 16,930 (April 17, 2018) ("the 2019 Rule"), which governs many aspects of ACA insurance markets beginning in the 2019 plan year.  Plaintiffs argue that nine particular provisions of the 2019 Rule violate the Administrative Procedure Act.  Each will be discussed separately.

## II.  Procedural Background

Plaintiffs filed an amended complaint on January 25, 2019 asserting two claims: violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and violation of the Take Care Clause, U.S. Const. art. II, § 3.  (ECF No. 44).  Defendants moved to dismiss both claims. (ECF No. 52).  Defendants' motion to dismiss was granted as to the Take Care Clause challenge but denied as to the APA challenge.  (ECF No. 103).  The parties then agreed to proceed by cross-motions for summary judgment based on the administrative record of the 2019 Rule.[3] (ECF No. 104).  Plaintiffs filed their motion for summary judgment on August 13, 2020.  (ECF No. 108).  Defendants simultaneously filed their opposition and

---

[3] Citations to "AR" refer to the administrative record, (ECF Nos. 114-1 – 114-5).

their cross-motion for summary judgment on September 28, 2020. (ECF No. 118).

Over the course of this litigation, the court has granted five motions for leave to file memoranda as *amici curiae* in support of Plaintiffs.[4]  In addition, nineteen states and the District of Columbia jointly filed an amicus brief in support of Plaintiffs pursuant to United States District Court for the District of Maryland Standing Order 2018-07.[5]  (ECF No. 72).  Currently pending are two additional motions for leave to file memoranda as *amici curiae*.  The first is filed collectively by: The Shriver Center on Poverty Law, Planned Parenthood Federation of America, the National Health Law Program, the Asian & Pacific Islander American Health Forum, the Association of Asian Pacific Community Health

---

[4] Those granted leave include: (1) the United States House of Representatives (ECF No. 65); (2) the City of Berkeley, California, Cook County, Illinois, the City of Dayton, Ohio, the City of Los Angeles, California, the City of Minneapolis, Minnesota, Montgomery County, Maryland, the City of Oakland, California, the City of Saint Paul, Minnesota, the City and County of San Francisco, California, the County of Santa Clara, California, the City of Seattle, Washington, Shelby County, Tennessee, and Travis County, Texas (ECF No. 66); (3) Families USA, Community Catalyst, the National Health Law Program, and Service Employees International Union (ECF No. 67); (4) Henry J. Aaron (ECF No. 71); and (5) Joshua Peck (ECF No. 76).

[5] Under Standing Order 2018-07, a state may file an amicus brief without the consent of the parties or leave of court and any others may file a brief only by submitting a motion to obtain leave of the court.

Organizations, and Families USA.  (ECF No. 122).  The second is filed by Young Invincibles.  (ECF No. 123).

Although this is an administrative review action where Defendants must defend their decisions by offering the actual reasoning behind those decisions, the court will grant both pending motions for leave as each party has demonstrated a special interest in the outcome of the suit and provided helpful information to the court.  *See Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F.Supp. 720, 728 (D.Md. 1996).

## III. Judicial Review of Agency Action

Although the parties filed motions for summary judgment, they recognize that Fed.R.Civ.P. 56 does not govern this action. Plaintiffs seek APA review of agency action and "[r]eviews of agency action in the district courts must be processed *as appeals*." *Olenhouse v. Commodity Credit Corp.*, 42 F3d 1560, 1580 (10th Cir. 1994) (emphasis in original).  "[M]otions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal."  *Id.; see also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256, 281 (D.N.M. 2015). "Accordingly, district courts reviewing agency action do not determine whether a 'genuine dispute as to any material fact' exists, Fed.R.Civ.P. 56, and instead 'engage in a substantive review of the record to determine if the agency considered relevant factors or articulated a reasoned basis for its conclusions[.]'"

8

*New Mexico Health Connections v. United States*, 312 F.Supp.3d 1164, 1171 (D.N.M. 2018) (quoting *Olenhouse*, 42 F.3d at 1580).  "The entire case is a question of law," and the "complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  Therefore, the question is not whether the plaintiff has "raised genuine issues of material fact," but whether, "based on the agency record[,] . . . the agency acted arbitrarily or capriciously." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009).

The "focal point for judicial review" of agency action "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004).  The reviewing court "should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984); *see also Occidental Petroleum Corp. v. Secs. & Exch. Comm'n*, 873 F.2d 325, 338 (D.C. Cir. 1989) ("[I]n order to allow for meaningful judicial review, the agency must produce the administrative record that delineates the path by which it reached its decision.").

### A.    Standing

Defendants challenged Plaintiffs' standing in their motion to dismiss.  After construing the motion as a facial challenge, the court denied the motion, finding that both the Individual Plaintiffs and the City Plaintiffs had alleged sufficient facts. In their motion for summary judgment, Plaintiffs assert that they have corroborated the facts alleged in the Amended Complaint and have established standing.  Defendants do not contest Plaintiffs' standing, even challenging Plaintiffs' right to present and rely on evidence not contained in the administrative record.  Because standing is an element of jurisdiction, it would be appropriate to consider the issue even without a defendant's challenge.  Here, the court finds the Plaintiffs' showing adequate.  *See Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 427 F. Supp. 3d 582, 600 (D.Md. 2019).

> Standing is determined as of the date a plaintiff files suit, *Lujan,* 504 U.S. at 570 n. 5, 112 S.Ct. 2130 (plurality opinion), and each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.*  At the summary judgment stage, however, the nonmovant [] can no longer rest on mere allegations, but rather must cite to "particular parts of materials in the

> record" that, taken as true, show that "a fact
> [relevant to standing] cannot be or is genuinely
> disputed." Fed.R.Civ.P. 56(c)(1). If the movant,
> on the other hand, "shows that there is no genuine
> dispute as to any material fact and the movant is
> entitled to judgment as a matter of law," the court
> "shall grant summary judgment" to the movant [].
> Fed.R.Civ.P. 56(a).

*Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 719
(D.Md. 2011). Plaintiffs have shown that the 2019 Rule predictably
increases the uninsured rate above what it would otherwise be.
There is no reasonable dispute that each of the City Plaintiffs
bears the increased costs of uninsured rate increases because each
operates a local health department that provides free or reduced-
cost health services to uninsured and underinsured residents and
provides emergency medical transport services to their residents,
regardless of their insurance status. (*See* ECF No. 108-1, at 29-
32) (citing ECF Nos. 108-3 – 108-8, 108-10). An order setting
aside the challenged provisions of the 2019 Rule would decrease
the costs that City Plaintiffs pay to provide their residents with
medical services, and consequently, remedy their economic
injuries. Likewise, the Individual Plaintiffs have demonstrated
that the 2019 Rule predictably increases the premiums that they
must pay to purchase health insurance, thereby constituting an
economic injury that could be remedied by vacating the challenged
provisions of the 2019 Rule. (*See* ECF No. 108-1, at 32-33) (citing
ECF No. 108-9, at 1-3). Because both the City Plaintiffs and the

11

Individual Plaintiffs have cited specific facts in the record which indisputably show that they have "suffered an injury in fact, . . . that is fairly traceable to the challenged conduct of the defendant, and . . . that is likely to be redressed by a favorable judicial decision[,]" they have each sufficiently established standing.

**B.    The Administrative Procedure Act**

The APA requires the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).

**1.    Contrary to Law**

> When a challenger asserts that an agency action conflicts with the language of a statute, [a reviewing court] generally appl[ies] the two-step analytical framework set forth in *Chevron, U.S.A., Inc. v Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).  A court first "looks to the 'plain meaning' of the statute to determine if the regulation responds to it." *King v. Burwell*, 759 F.3d 358, 367 (4th Cir. 2014) (quoting *Chevron*, 467 U.S. at 842-43, 104 S.Ct. 2778).  "If it does, that is the end of the inquiry and the regulation stands." *Id.*  If the statute is ambiguous, courts then "move[ ] to *Chevron's* second step and defer[ ] to the agency's interpretation so long as it is based on a permissible construction of the statute." *Id.*

*Sierra Club v. United States Army Corps of Eng'rs*, 909 F.3d 635, 643 (4th Cir. 2018).  "[I]n determining whether Congress has clearly

expressed its intent regarding the issue in question," a reviewing court "should employ all the traditional tools of statutory construction" beginning with "the language of the statute." *King*, 759 F.3d at 367–68.  Reviewing courts employ the traditional rules of statutory construction by "consider[ing] 'the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and . . . other relevant statutes.'" *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 289 (4th Cir. 2013) (citing *Mylan Pharm., Inc. v. FDA*, 454 F.3d 270, 274 (4th Cir. 2006).

At the second stage of the *Chevron* analysis, the reviewing court determines only whether the agency's interpretation of the statute is "reasonable."  *See Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 13 (D.C. Cir. 2011).  This is because:

> *Chevron* is rooted in a background presumption of congressional intent: namely, "that Congress, when it left ambiguity in a statute" administered by an agency, "understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 740–741 (1996). *Chevron* thus provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency.

*City of Arlington, Tex. v. FCC,* 569 U.S. 290, 296 (2013).  At step-two, the court's review is "highly deferential, with a presumption

in favor of finding the agency action valid." *Ohio Vall. Envt'l Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).

### 2.   Arbitrary and Capricious

"Unlike *Chevron* step-two review, which focuses on whether the agency's interpretation was reasonable, 'arbitrary and capricious' review focuses on the reasonableness of the agency's decisionmaking processes." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).

> One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions. *Encino Motorcars, LLC v. Navarro*, --- U.S. ----, 136 S.Ct. 2117, 2125, 195 L.Ed.2d 382 (2016). An agency can satisfy that requirement by providing an explanation with enough clarity that its "path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). So long as the agency "provide[s] an explanation of its decision that includes a rational connection between the facts found and the choice made," we will uphold its decision. *Ohio Valley*, 556 F.3d at 192 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars*, 136 S.Ct. at 2125 (citing *State Farm*, 463 U.S. at 42-43, 103 S.Ct. 2856).

*Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 297-98 (4th Cir. 2018). When reviewing the agency's explanation, the reviewing court "must 'consider whether the decision was based on a consideration of the

relevant factors and whether there has been a clear error of judgment.'" *State Farm*, 463 U.S. at 43, (quoting *Bowman*, 419 U.S. at 285).

> [A]n agency decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [offers an explanation for its decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43).

An agency also violates the APA if it fails to respond to "significant points" and consider "all relevant factors" raised by the public comments. *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977). "An agency is not obliged to respond to every comment, only those that can be thought to challenge a fundamental premise." *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000) (quoting *Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998) ("An agency must . . . demonstrate the rationality of its decisionmaking process by responding to those comments that are relevant and significant.").

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. When an agency changes its existing position, it need not always provide

15

a more detailed justification than would suffice for a new policy created on a blank slate." *Encino Motorcars*, 136 S. Ct. at 2125 (internal citations and quotation marks omitted). However, a more detailed justification *is* required where the agency's "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "In such cases, it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515-516.

Review under the arbitrary and capricious standard is deferential and narrow. "[A] court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Nonetheless, the arbitrary and capricious standard "is not meant to reduce judicial review to a 'rubber-stamp' of agency action." *Ohio Valley*, 556 F.3d at 192. The reviewing court must "engage in a 'searching and careful' inquiry of the record." *Id.* (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

## IV. Analysis

### A. Elimination of Direct Notice Requirement

The first challenged provision of the 2019 Rule concerns APTCs. The ACA required HHS to promulgate regulations further

16

defining APTC eligibility.  HHS regulations include a "failure to reconcile provision" which directs Exchanges to deny APTCs to an individual if the IRS informs the Exchange that the individual or a member of her household failed to reconcile the amount of advance premium tax credit she received with the amount of the actual premium tax credit she should have been allowed on her prior year's tax return.  (*See* ECF No. 44, ¶ 52).  In 2016, the failure to reconcile provision was amended to specify that an Exchange may not deny APTC under this provision "unless direct notification is first sent to the tax filer . . . that his or her eligibility will be discontinued as a result of the tax filer's failure to comply with the requirement."  81 Fed. Reg. 94,058, 94,124 (Dec. 22, 2016) ("2018 Payment Notice").  The 2019 Rule removes the advance direct notification requirement.

Under previous rules, individuals who failed to reconcile a previous year's APTC would receive two notices: a combined notice and a direct notice.  *See generally* 81 Fed. Reg. at 94,124.  Direct notices specifically informed recipients that they had failed to file and reconcile a previous year's APTC and must do so promptly in order to avoid losing their APTC eligibility for the current plan year.  Combined notices, in contrast, are more generalized notices that use "language that is broad enough to apply to all consumers who receive them."  83 Fed. Reg. at 16,983.  They provide

17

recipients with three possible reasons for losing APTC eligibility.

There is a critical difference between combined notices and direct notices. Direct notices are considered to contain sensitive federal tax information ("FTI") under IRS rules while combined notices are not.[6] Because they contain FTI, direct notices require special handling, and thus, are costly and burdensome on state Exchanges that lack the technological infrastructure to protect FTI.[7]

The 2019 Rule removed the requirement that state Exchanges provide individuals with a direct notice before the Exchange discontinued their APTC due to failure to file and reconcile. Federal exchanges, however, would continue to provide direct notices via mail as they had in the past and State Exchanges could

---

[6] FTI includes all information from a tax return, including information as to whether a tax return has been filed with IRS. Also considered FTI is any list that is generated based only on information that is FTI itself. Thus, a list of consumers who have not filed a tax return is considered FTI. Combined notices are not considered to contain FTI because they are not exclusively sent to individuals who fail to reconcile.

[7] Federal Exchanges also lack the infrastructure to protect FTI. Thus, to send direct notices in compliance with IRS privacy rules, federal Exchanges did not send the notices themselves. Instead, federal Exchanges securely sent the relevant data to an FTI-compliant print contractor to print and mail direct notices. To protect FTI, direct notices were never available electronically.

choose to continue sending direct notices "where feasible."   83 Fed. Reg. at 16,984.

Plaintiffs contend that because combined notices do not inform individuals explicitly that their APTC ineligibility is due to a failure to reconcile a previous year's advance credit, such notices will result in widespread loss of advance payments, and by extension, widespread loss of health coverage because many low-income individuals would be unable to afford their insurance premiums without the advance payment.

### 1.   Contrary to Law

Plaintiffs argue that the 2019 Rule is contrary to 26 U.S.C. § 36(B).   (*See* ECF No. 108-1, at 41).   After Defendants pointed out that § 36(B) does not govern eligibility for advance payments, (*see* ECF No. 118-1, at 21), Plaintiffs abandoned that argument and now argue that the 2019 Rule is contrary to 42 U.S.C. § 18082. (*See* ECF No. 121-1, at 9-10).   Defendants contend that the court cannot consider this argument because it was asserted for the first time in Plaintiffs' reply brief and appears nowhere in the amended complaint.   The court agrees.   *See Mylan Labs, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D.Md. 1991); *see also Cape Hatteras Access Pres. All. v. Jewell*, 28 F.Supp.3d 537, 552 (E.D.N.C. 2014) (arguments not in complaint but raised "for the first time in [plaintiff's] motion for summary judgment" are considered waived).

Regardless, Plaintiffs' claim that the 2019 Rule is contrary to § 18082 would fail on the merits because there is no conflict. Section 18082 provides that: "The Secretary [of HHS], in consultation with the Secretary of the Treasury, shall establish a program under which . . . advance determinations are made . . . with respect to the income eligibility of individuals enrolling in a qualified health plan . . . for the premium tax credit allowable under Section 36B[.]"   Plaintiffs argue that, based on this language, whether an individual has reconciled can have no effect on his or her ability to receive an advance payment because income eligibility is the only factor in the determination.

Plaintiffs challenge the wrong regulation.   The 2019 Rule change to allow state Exchanges to send combined notices in lieu of direct notices is unrelated to the effect that a failure to reconcile has on one's eligibility to claim an advance credit.   In reality, it is not the 2019 Rule that Plaintiffs take issue with but 45 C.F.R. § 155.305(f)(4) which expressly makes enrollees ineligible for the advance credit if they fail to reconcile.   This regulation, titled "Eligibility for advance payments of premium tax credits" states in a sub-section titled "Compliance with filing requirement" that:

> The Exchange may not determine a tax filer
> eligible for APTC if HHS notifies the Exchange
> . . . that APTC were made on behalf of the tax
> filer . . . and the tax filer . . . did not
> comply with the requirement to file an income

tax return for that year as required by 26
U.S.C. [§§] 6011, 6012[.]

45 C.F.R. § 155.305(f)(4).  The 2019 Rule only conceivably impacts
the *specificity* of the notice sent to individuals who have failed
to reconcile, not whether an individual is eligible to claim an
APTC.  Nothing in the plain language of the § 18082 unambiguously
forecloses the agency's interpretation of the statute as
permitting the use of combined notices.  Thus, the 2019 Rule is
not contrary to 42 U.S.C. § 18082.

Plaintiffs also argue that the elimination in the 2019 Rule
of the direct notice requirement "raises significant due process
concerns," (ECF No. 108-1, at 42), and "the statute should not be
read to raise such concerns" because of the canon of constitutional
avoidance.  (ECF No. 121, at 11).  As stated above, the court need
not resort to this level of statutory interpretation because the
plain language of the statute makes clear that there is no conflict
with the 2019 Rule.

### 2.  Arbitrary and Capricious

Plaintiffs argue that Defendants' decision to eliminate the
direct notification requirement is arbitrary and capricious for
three reasons.  First, Plaintiffs contend the agency ignored
comments that combined notices would be too confusing to allow
individuals to take corrective action.  Second, Plaintiffs contend
the agency failed to respond to comments questioning why the method

used by federal Exchanges to provide direct notices could not be used by state Exchanges.   Third, Plaintiffs contend the agency changed its position without providing adequate supporting reasons.   Defendants argue, and the court agrees, that the record refutes each of Plaintiffs' arguments.

The record shows that Defendants acknowledged concerns that combined notices may be insufficient to alert individuals to the reason for their ineligibility and thus, insufficient to allow them to take appropriate action to resolve the issue before losing eligibility.   *See* 83 Fed. Reg. at 16,983.   The agency responded that it believed its decision was justified despite these concerns because it foresaw consumers becoming more familiar with the annual requirement to file and reconcile over time, thus decreasing the number of individuals who would lose eligibility due to confusion over why they were ineligible or over how to remedy ineligibility. *See id.*   The agency also stated its belief that this concern would be mitigated by the fact that federal Exchanges would continue sending direct notices that more explicitly spelled out the requirement to file and reconcile and that state Exchanges could continue providing direct notices if feasible.   *See id*. at 16,983- 84.

The record also shows that the agency was responsive to comments questioning why state Exchanges could not become FTI compliant or simply use the same method used by the federal

government to send direct notices in an FTI compliant manner.  The
agency stated that "[f]or a number of SBEs, upgrading their systems
to be FTI compliant represents an undertaking that may be
infeasible to implement in the short term."  *Id.* at 16,984.  In
addition, it stated that the method used by the federal Exchanges
may be infeasible for some state Exchanges because of limited print
contracting options.  *See id.* at 16,983 ("While some [state
Exchanges] may be able to contract with the [federal Exchange's]
print contractor or another FTI-compliant contractor, we have
heard that some are required to use only in-State contractors,
which can create a significant barrier if there are not FTI-
compliant contractors in the State.").  The record supports that
at least one state Exchange stated that extensive operational
changes would be necessary for it to be able to send direct notices
in an FTI-compliant manner.  *See* AR2838.  Thus, Defendants argue
that their decision to reduce the burden on states by making direct
notices optional rather than mandatory was rational and,
therefore, in compliance with the APA.  Plaintiffs argue that the
agency cannot rely on a single comment noting operational
difficulty in order to support its decision when two other states
submitted comments supporting retaining the direct notice
requirement.  However, the court cannot conclude that the agency's
decision was irrational simply because Plaintiffs disagree with
it.  Because the record supports that requiring direct notices was

burdensome on at least *some* state Exchanges, the agency's decision to remove the requirement was rational and is sufficient to withstand APA review.

**B.   Eliminating Federal Review of Network Adequacy**

The second challenged provision of the 2019 Rule relates to the compliance review of insurance plans to be offered on federal Exchanges.  The ACA requires the Secretary of HHS to establish, by regulation, "criteria for the certification of health plans as qualified health plans."  42 U.S.C. § 18031(c)(1).  To receive certification, a plan must "ensure a sufficient choice of providers."  *Id.* § 18031(c)(1)(B).  This requirement, also known as network adequacy, means that plans must offer consumers reasonable access to a sufficient number of providers and to providers that cover conditions that the consumer may have.  Prior to 2018, CMS conducted reviews of insurance plans offered on federal Exchanges to certify that they were qualified health plans.  Beginning in 2018, CMS ceased conducting such reviews and instead began relying on review of network adequacy by the states.  The 2019 Rule continues to allow CMS to rely on review by the states of network adequacy for plans offered on federal Exchanges.

The 2019 Rule outsources compliance review of plans operating on federal Exchanges to the states, "provided the State has a sufficient network adequacy review process."  83 Fed. Reg. at 17,025.  In states "that do not have the authority and means to

conduct sufficient network adequacy review processes[,]" the 2019 Rule proposes relying on an issuer's accreditation of compliance. *Id.* Issuers may receive accreditation either from one of the three HHS-recognized accrediting entities[8] or from an unaccredited issuer. Unaccredited issuers may deem themselves in compliance so long as they "have standards and procedures in place" to maintain a provider network "consistent with the National Association of Insurance Commissioners' Health Benefit Plan Network Access and Adequacy Model Act." *Id.*

### 1. Contrary to Law

Plaintiffs contend that Defendants' decision to outsource network adequacy review is contrary to 42 U.S.C. § 18031(c)(1) and (d)(4)(A). Section 18031(c)(1) provides that HHS:

> shall, by regulation, *establish criteria* for the certification of health plans as qualified health plans. Such criteria shall require that, to be certified, a plan shall, at a minimum . . . ensure a sufficient choice of providers (in a manner consistent with applicable network adequacy provisions under section 2702(c) of the Public Health Service Act [42 U.S.C. 300gg-1(c)])[.]

42 U.S.C. § 18031(c)(1). Section 18031(d)(4)(A) provides that, "[a]n Exchange shall, at a minimum . . . implement procedures for the certification, recertification, and decertification,

---

[8] The HHS-recognized accrediting entities include the National Committee for Quality Assurance, the Utilization Review Accreditation Commission ("URAC"), and the Accreditation Association for Ambulatory Health Care.

consistent with guidelines developed by the Secretary under subsection (c), of health plans as qualified health plans[.]" *Id.* § 18031(d)(4)(A).   First, Plaintiffs argue that § 18031(c)(1) requires CMS to "carry out" plan certification in states with federal Exchanges.   Next, Plaintiffs point to the dictionary definition of the word "implement" as meaning "to put into effect" and argue that Defendants have not met their burden under § 18031(d)(4)(A) to "implement procedures for . . . certification" of health plans because they have delegated certification decisions to the states.   (*See* ECF No. 121, at 9) (citing *Implement*, Oxford U. Press, https://www.lexico.com/en/ definition).

These arguments fail at *Chevron* step-one because the language of § 18031 is not ambiguous.   Section 18031(c)(1) merely requires HHS to establish *criteria* for the certification of plans as qualified health plans.   It does *not* require HHS itself to take the additional step of actually applying that criteria and certifying compliance.   HHS fulfilled its obligation to "*establish criteria* for the certification of qualified health plans" in 2012 when it promulgated 45 C.F.R. § 156.230.   This regulation, titled "Network adequacy standards," lays out the criteria that each QHP issuer must meet in order to become certified as network adequate. The regulation requires, among other things, that each QHP issuer ensure that its provider network "[i]ncludes essential community

providers in accordance with § 156.235," "[m]aintains a network that is sufficient in number and types of providers, including providers that specialize in mental health and substance abuse services, to assure that all services will be accessible without unreasonable delay," and "is consistent with the network adequacy provisions of section 2702(c) of the PHS Act." 45 C.F.R. § 156.230. For the 2019 Rule to be contrary to § 18031(c), it would had to have allowed HHS to outsource the task of coming up with the network certification criteria. That is not what the 2019 Rule does. Rather, the 2019 Rule simply permits states to apply the criteria for network adequacy that HHS established in 45 C.F.R. § 156.230 and to make a determination of whether or not issuers are compliant with such criteria.

Contrary to Plaintiffs' assertion, the instant case is distinguishable from *U.S. Telecom Association v. FCC*, 359 F.3d 554, 564 (D.C. Cir. 2004). There, the FCC "adopted a provisional nationwide rule . . . to be created by state regulatory commissions under a purported delegation of the [FCC's] own authority." *Id*. at 563. The court held that the FCC's action constituted an improper sub-delegation of agency authority because it entrusted state entities with the authority to make decisions that Congress entrusted to the FCC itself. Here, no such sub-delegation occurred because, as stated above, the 2019 Rule did

not delegate to states the authority to declare the criteria for network adequacy, it merely allowed states to apply those criteria.

Likewise, § 18031(d)(4)(A) merely requires Exchanges to put in place procedures for the certification of qualified health plans in accordance with the criteria established by HHS pursuant to § 18031(c). Nothing in the plain text of § 18031(d)(4)(A) suggests that Congress intended for federal Exchanges to *conduct* their own network adequacy determinations. Federal Exchanges complied with the requirement to "implement procedures" for plan certification in 2017 when they adopted the process articulated in 82 Fed. Reg. 18,346, 18,371 (Apr. 18, 2017), whereby federal Exchanges rely on state determinations of network adequacy provided that the state's network review process is adequate. In instances where the state lacks an adequate review process, the Exchange must either conduct its own evaluation or rely on a determination by an accrediting entity. The 2019 Rule "reaffirmed" continued use of this procedure by federal Exchanges for plan certification moving forward. 83 Fed. Reg. at 17,025. In short, HHS was required to, and did, put in place *procedures* for plan certification. It was not, however, required directly to execute each step of the procedure itself. For these reasons, the second challenged provision of the 2019 Rule is not contrary to law.

## 2.   Arbitrary and Capricious

Plaintiffs argue that the agency's decision to eliminate federal review of network adequacy is arbitrary and capricious because the agency did not meaningfully respond to extensive comments and evidence in the record, thereby undercutting its conclusion that state and issuer accreditation processes could sufficiently assess network adequacy.

HHS received numerous comments opposing the proposal and warning that the review processes of states and accrediting entities do not do enough to ensure enrollees have adequate access to necessary care.  *See* AR740, 938, 986, 1002, 1065-66, 1175, 1412, 1581, 1587, 1611, 1811, 2275-76, 2980-83, 2997.  In response, HHS dismissed such concerns, stating that it believed state and issuer accreditation would preserve adequate access to care because "[m]any states already address issuer network adequacy in State-specific regulation"  and because "[t]he National Committee for Quality Assurance requires accredited plans to create standards for the number and geographic distribution of providers and establish standards regarding the ability of consumers to access care" and the URAC "requires that plans have proper methods in place to build, manage, and evaluate their networks."  83 Fed. Reg. at 17,025.

This response is both vague and conclusory.  It declares that states' review procedures are adequate because states have "state-

29

specific regulations" in place but fails to explain what such regulations entail or why they are comparable to federal review. This response is especially insufficient considering the evidence put forward by commenters that state review procedures are *not* adequate. For example, one commenter emphasized state review procedures are inadequate because nearly half the states and the District of Columbia have no quantitative standards[9] for assessing network adequacy in place. Moreover, in contrast to federal review, which was preemptive, state oversight is primarily complaint-driven and nearly eighty percent of state regulators had reported taking only one enforcement action in response to network adequacy concerns in the previous year. *See* AR906-907. The American Medical Association and the American College of Physicians also submitted comments urging HHS to reconsider its decision in light of the recent "proliferation" of narrower provider networks as a method to reduce premiums. *See* AR1086, 1092. Another commenter plainly stated that the fact that states had adopted *some* sort of regulatory framework for network adequacy was no indication that their processes are adequate because "oversight is uneven across and within states and state network

---

[9] For example, standards concerning the time it takes for a consumer to reach a provider, the distance a consumer must travel to reach a provider, and the minimum number of providers that must be included in a network.

adequacy requirements often only apply to certain types of network designs, such as HMOs but not PPOs." AR3226.

Commenters also provided compelling reasons for why accrediting entities' review procedures would be inadequate to protect against poor networks. *See* AR1087 ("Accreditation standards are not available to the public, accreditors do not have regulatory authority over plans [as HHS does], and these organizations are not in a position to monitor network adequacy via consumer complaints or other such commonly used means."). *See also* AR2744 ("[M]ost plans have been accredited for years but network adequacy problems persist."). Similarly, another commenter undermined the agency's theory that unaccredited issuers would provide sufficient review because the issuers are required to create standards consistent with the National Association of Insurance Commissioners' Health Benefit Plan Network Access and Adequacy Model Act. *See* AR2513 (stating that the model act does not provide for the metrics of network adequacy needed to ensure sufficient consumer access to a broad range of providers, such as time and distance).

Because these comments challenged a fundamental premise of the agency's decision, it was obligated to respond. *See Grand Canyon*, 154 F.3d at 468 ("An agency must . . . demonstrate the rationality of its decisionmaking process by responding to those comments that are relevant and significant."). The agency,

31

however, made no attempt to refute, mitigate, or explain away any of these significant concerns. Instead, it summarily concluded without explanation or evidence that the alternative procedures were adequate. The agency's failure to consider or respond meaningfully to the significant points raised is not indicative of reasoned decision-making. For this reason, the agency's decision was arbitrary and capricious.

### C. Eliminating Federal Oversight of Direct Enrollment

The third challenged provision of the 2019 Rule relates to federal oversight of insurance brokers participating in direct enrollment. Direct enrollment is a process through which a consumer enrolls in an ACA-compliant health insurance plan through a third-party website operated by an agent, broker, or issuer instead of through the official Healthcare.gov website. Previous rules "provided a strong oversight structure" and required third-party audits of direct enrollment entities by HHS-approved auditors because such "entities were committing fraud, signing up individuals without their knowledge or consent, and using inaccurate calculators for APTC eligibility[.]" (ECF No. 44, ¶¶ 64-68). The 2019 Rule eliminates this safeguard and allows direct enrollment entities to select their own third-party auditors without HHS's initial review and approval. (*Id*. ¶ 66). Plaintiffs contend that this decision was arbitrary and capricious because the agency ignored important aspects of the problem and failed to

provide an adequate justification for its change of course.  (*See* ECF No. 108-1, at 48-49).

The record does not support Plaintiffs' argument that the agency ignored important aspects of the problem raised by commenters.  Indeed, the record shows that the agency acknowledged concerns of commenters that reduced oversight would increase the likelihood that consumers would enroll in non-ACA compliant plans, would receive inadequate information about their rights, or would expose their personal information to brokers that lack stringent compliance with privacy and security standards.  The agency responded that it "agree[d] that it is important that consumers enrolling using direct enrollment be able to make informed decisions about coverage" and that it believed the standards established for third-party auditors would sufficiently mitigate such concerns.  83 Fed. Reg. at 16,982.  The agency did not specifically reiterate the standards in its "Response" paragraph, but such standards were detailed in the preceding three paragraphs and include: (i) a requirement that auditing entities have experience conducting audits or similar services, including specific experience with relevant privacy and security standards such as demonstrated experience with the HIPAA Security Rule Standards and the ability to conduct penetration testing on all interfaces that collect personally identifiable information or connect with HHS; (ii) a requirement that auditing entities

collect, store, and share with HHS all data related to their audits in a manner, format, and frequency specified by HHS for ten years from the date of creation; (iii) a requirement that auditing entities comply with the privacy and security standards HHS adopts for agents, brokers, and issuers; (iv) a conflict of interest requirement that auditing entities disclose financial relationships between itself and the agent, broker, or issuer; (v) a requirement that appropriate staff of the auditing entity complete training as established by HHS prior to conducting audits; and (vi) a requirement that auditing entities permit the Secretary and the Office of the Inspector General, or their designees, access to its books, contracts, computers, or other electronic systems for ten years from the date of creation. *Id.* at 16,981-82 (citing 45 C.F.R. § 155.221(b)(1)-(7)). The agency also stated that it believed the "requirement [set forth in 45 C.F.R. § 155.220] that agents and brokers engaged in direct enrollment [must] display all QHP data provided by the Exchange, w[ould] help promote informed consumer choice about all available QHPs, not just those with which the agent or broker has an existing relationship." *Id.* at 16,981. Finally, the agency stated it "anticipate[d] continuing to monitor enrollments through the direct enrollment pathway for evidence of fraud or abuse." *Id.*

Plaintiffs' next argument, that the agency's decision is arbitrary and capricious because it provided an inadequate

justification for its policy change, also fails.  "[T]he mere fact that an agency interpretation contradicts a prior agency position is not fatal." *Smiley*, 517 U.S. at 742.  "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars*, 136 S.Ct. at 2125 (citing *Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 981-982 and *Chevron*, 467 U.S. at 863-64).  The agency provided a sufficiently reasoned explanation for its decision to replace a system requiring advance HHS approval of auditors with a system of regulatory standards for third-party auditors: to "reduce the regulatory burden for agents, brokers, and issuers, and reduce duplicative HHS oversight" as well as to "reduce the burden on third-party entity reviewers." 83 Fed. Reg. at 16,981. The agency "need not demonstrate to [the] court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox*, 556 U.S. at 515.  Here, the agency's desire to reduce regulatory burdens is a sufficiently "good reason" for its policy change and, thus, is neither arbitrary nor capricious.

D.   **Elimination of Standardized Options**

The fourth challenged provision of the 2019 Rule concerns "standardized options." Standardized options are "qualified health plans offering different levels of coverage and price, but with a standard cost-sharing structure specified by HHS that makes it easier for consumers to compare plans[.]" (ECF No. 108-1, at 29). The Standardized Options were provided preferential display on HealthCare.gov. The 2019 Rule discontinues designation of standardized options beginning for the 2019 year as well as their differential display on Healthcare.gov.

Plaintiffs argue that this decision was arbitrary and capricious because the agency ignored important aspects of the problem and failed to provide an adequate justification for its change in position. (*See* ECF No. 108-1, at 49-50). The court agrees.

HHS fails to articulate a rational basis in the record for why it suddenly, and in contradiction to its previous position, believes standardized options hamper innovation. The rationale HHS relies on in the record for eliminating standardized options is its stated belief that "providing differential display for [standardized options] may limit enrollment in coverage with plan designs that do not match the standardized options, [thereby] removing incentives for issuers to offer coverage with innovative plan designs." 83 Fed. Reg. at 16,974. Yet, in previous rules,

the agency expressly stated that it did *not* believe standardized options hampered innovation or limited choice. *See* 81 Fed. Reg. 12,204, 12,292 (Mar. 8. 2016) ("We are not requiring issuers to offer standardized options, nor limiting the ability to offer other QHPs, and as a result, we do *not* believe that standardized options will hamper innovation or limit choice.") (emphasis added). CMS provides no such explanation whatsoever for abandoning its prior conclusion. It simply concludes in a single sentence that it "believe[s] that not specifying standardized options . . . will remove disincentives for issuers to offer coverage with innovative plans designs." 83 Fed. Reg. at 16,975. Such an "unexplained inconsistency" is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act." *Nat'l Cable*, 545 U.S. at 981. This is particularly true considering the many comments submitted explaining that standardized options could not stifle innovation because they were voluntary – i.e., there was no requirement that issuers offer them, and issuers were permitted to offer other plans as well. *See* AR1135, 3574, 2701, 1803.

A significant number of commenters also raised concerns that eliminating standardized options would cause consumers to face choice paralysis and lead to a reduction in overall enrollment in QHPs, thereby undermining the ACA's mandate of allowing people to compare and purchase QHPs. *See generally* AR1857, 1949, 3530. CMS

37

abruptly dismissed these comments in the record concluding that "other tools are sufficient to enable most consumers to make plans selection," 83 Fed. Reg. at 16,975, despite its previous findings contradicting this theory.  HHS had concluded in previous rules that "an excessive number of health plan options make consumers less likely to make any plan selection, more likely to make a selection that does not match their health needs, and more likely to make a selection that leaves them less satisfied." 80 Fed. Reg. 75,488, 75,542 (Dec. 2, 2015).  This finding rested on studies of consumer behavior and the agency's own experiences:

> Our experience in the first two open enrollment periods suggests that many consumers, particularly those with a high number of health plan options, find the large variety of cost-sharing structures available on the Exchanges difficult to navigate.  We believe that standardized options will provide these consumers the opportunity to make simpler comparisons of plans offered by different issuers within a metal level. Consumers will be able to focus their decision making on the providers in the plan networks, premiums, benefits, and quality, and will not be required to make complex tradeoffs among costsharing differences among a large number of plans.  Taken together, standardized options, EHB, AV, and QHP certification standards can significantly simplify consumers' ability to compare plans and make informed choices.

*Id*.  There is no indication in the record that the agency's previous findings were incorrect or outdated.  There is also no indication that consumers now face a choice of fewer plan options.

38

In this way, the agency's new policy disregards the factual finding underlying its prior policy.  While HHS is "not required to refute the factual underpinnings of its prior policy with new factual data[,]" it must "provide a reasoned explanation for discounting the importance of the facts that it had previously relied upon." *U.S. Sugar Corp. v. Env't Prot. Agency*, 830 F.3d 579, 626 (D.C. Cir. 2016).  HHS's vague assertion that "other tools" would be sufficient to allow consumers to select an adequate plan when such tools were not sufficient in the past is not a reasoned explanation.  *Cf. U.S. Sugar Corp.*, 830 F.3d at 626 (finding that the EPA provided a reasoned explanation for disregarding its prior factual findings because it explained that its prior findings were limited due to the fact that little research had been on the subject at the time and that the agency lacked data).  For the reasons stated above, the court concludes that HHS's decision to eliminate standardized options was arbitrary and capricious.

### E.  Modification of Navigator Selection Standards

The fifth challenged provision of the 2019 Rule relates to the Navigator program.  Previous rules required: (1) that each Exchange have two Navigators, (2) that one of those Navigators be a community- and consumer-focused nonprofit, and (3) that Navigators have a physical presence in the areas they serve. ("Navigator Selection Standards").  *See* 83 Fed. Reg. at 16,979

(citing 45 C.F.R. § 155.210(c)(2) and (e)(7)).   The 2019 Rule
eliminates these requirements.  *See* 83 Fed. Reg. at 16,979-81.

### 1.   Contrary to Law

Plaintiffs argue that modification of Navigator Selection
Standards is contrary to law because the changes allow entities to
qualify as Navigators without satisfying the statutorily imposed
duties set forth in 42 U.S.C. § 18031(i)(2)(A) and (4)(A).

Section 18031(i)(2)(A) requires Navigators to demonstrate
that they have "existing relationships, or could readily establish
relationships, with employers and employees, consumers (including
uninsured and underinsured consumers), or self-employed
individuals likely to be qualified to enroll."  The 2019 Rule does
not run afoul of this statutory provision because the Rule does
not relieve Navigators of this obligation.   To the contrary,
Navigators remain bound by this requirement under the amended
regulation.   The final rulemaking notice expressly states that an
"Exchange's Navigator grantee selection process [must continue to
be] consistent with . . . § 155.210(c)(1)(ii)."  83 Fed. Reg. at
16,980.    45  C.F.R.  § 155.210(c)(1)(ii)  incorporates  the
requirements in § 18031(i)(2)(A) by stating that, in order to
receive a Navigator grant, an entity must "demonstrate to the
Exchange that [it] has existing relationships or could readily
establish  such  relationships  with  employers  and  employees,
consumers (including uninsured and underinsured consumers), or

40

self-employed individuals likely to be eligible for enrollment in a QHP[.]"

Plaintiffs also argue that the modification of Navigator Selection Standards in the 2019 Rule is contrary to 42 U.S.C. § 18031(i)(4)(A).  Section 18031(i)(4)(A) provides that "[t]he Secretary shall establish standards for Navigators . . . including provisions to ensure that any private or public entity that is selected as a navigator is qualified, and licensed if appropriate, to engage in the navigator activities described in [§ 18031(i)(3)(A)-(E)] and to avoid conflicts of interest." Section 18031(i)(3)(A)-(E) titled "Duties," requires Navigators to conduct public education activities to raise awareness of the availability of QHPs; to distribute fair and impartial information concerning enrollment in a QHP; to facilitate enrollment in QHPs; to provide enrollees with grievances or complaints referrals to specified entities; and to provide information in a manner that is culturally and linguistically appropriate to the needs of the population.  HHS incorporated these duties into the amended regulation.  *See* 45 C.F.R. § 155.210(e)(1)-(5).

Plaintiffs contend that the language of § 18031(i)(4)(A), specifically the use of the words "shall" and "ensure," prohibits HHS's removal of the Navigator Selection standards in § 155.210. Plaintiffs' line of reasoning is this: "shall" implies a mandatory duty, *Holland v. Pardee Coal Co.,* 269 F.3d 424, 431 (4th Cir. 2001),

and "ensure" means to "[m]ake certain that (something) shall occur or be the case."   Thus, HHS was required to establish Navigator standards that went beyond "simply reiterat[ing] the statutory criteria in their regulations and hop[ing] that others take action to ensure that the statutory requirements are met[.]"   (ECF No. 121, at 24).

Plaintiffs' focus is misplaced.   Plaintiffs focus on the meaning of the words "shall" and "ensure" but their argument actually depends on the meaning of the word "qualified."   The focus of the § 18031(i)(4) standards is to ensure that Navigators are "qualified" in the sense that they avoid conflicts of interest with health insurance issuers.   The statute's focus is not, as Plaintiffs claim, to require that HHS create an additional set of selection standards aimed at guaranteeing fulfillment of the Navigator duties listed in § 18031(i)(3)(A)-(E).   The statutory context of Section 18031(i)(4)(A) makes this clear.   The statute explicitly states that:

> Under [the standards established to ensure
> that a navigator is qualified] a navigator
> shall not-
> (i)     be a health insurance issuer; or
> (ii)    receive any consideration directly or
>         indirectly from any health insurance
>         issuer   in   connection   with   the
>         enrollment   of   any   qualified
>         individuals   or   employees   of   a

> qualified employer in a qualified
> health plan.

§ 18031(i)(4)(A)(i)-(ii). These provisions unambiguously demonstrate that the command of § 18031(i)(4)(A) that the Secretary establish standards to ensure that Navigators are "qualified" refers narrowly to ensuring that Navigators lack conflicts of interest. In other words, the standards that the Secretary must establish pursuant to § 18031(i)(4)(A) are independent of the statutory duties of Navigators under § 18031(i)(3)(A)-(E). Put simply, § 18031(i)(4)(A) in no way forecloses the agency's decision to dispense with the Navigator Selection Standards that it previously imposed. Because Plaintiffs have not shown that HHS has violated any unambiguous statutory requirement, their contrary to law challenge fails at *Chevron* step-one.

### 2. Arbitrary and Capricious

Plaintiffs also challenge the modification of Navigator selection standards in the 2019 Rule as arbitrary and capricious. Plaintiffs argue that the agency dismissed concerns expressed by commenters that the Navigator selection standards in place were necessary "to ensure that Navigator programs fulfill their statutory purposes." (ECF No. 121, at 26). Plaintiffs assert that the only reasonable conclusion that could be drawn from the comments was that eliminating the Navigator selection standards would make it impossible for Navigators to perform their statutory

43

duties.[10]   Defendants argue that HHS did, in fact, consider and respond to these comments even though it was not required to because they were speculative.

### a.   Two Navigator Requirement

HHS acknowledged that "[m]any commenters . . . expressed concern about reducing the number of Navigator entities per Exchange, conveying that removing this requirement could potentially negatively affect consumer access to in-person assistance, and therefore make it harder for consumers to understand the coverage options and enroll in health coverage." 83 Fed. Reg. at 16,980.   In response, the agency expressly acknowledged "the importance of consumer access to experienced, in-person assistance" but stated that it believed that the change would *not* "have a detrimental effect on the availability of professional, unbiased, in-person consumer assistance" given that the proposal did not *require* an Exchange to have a single Navigator but simply provided Exchanges with that option.   *Id*.   The agency reiterated its view that the change would "allow each Exchange [to use optimally] available funding amounts" and that, for some

---

[10] Plaintiffs do not specify whether it is the elimination of any single navigator selection requirement or the elimination of all three requirements simultaneously that makes compliance impossible.

Exchanges, optimal allocation would be achieved by selecting a single, high performing grantee.[11]  *Id.*

### b. Physical Presence Requirement

HHS also considered concerns that removing the physical presence requirement would negatively impact low-income and other at-risk populations.  *Id.*  In response, HHS emphasized that nothing in the final rule prevents an Exchange from selecting a grantee that is physically present in its service area.  It also agreed that "in some situations" in-person assistance may be more helpful than remote services.  *Id.* at 16,981.  In other situations, however, the agency believed that Exchanges may wish to weigh criteria other than physical presence more heavily and should be allowed the flexibility to do so.  It stressed its belief that individual Exchanges are best suited to determine which entities will be able to serve the unique needs of its consumers and that no one-size-fits-all policy will do.  Finally, it pointed out that

---

[11] Plaintiffs also argue that the agency must provide a more detailed justification for its decision to eliminate the physical presence requirement because the new policy rests upon factual findings that contradict those underlying the previous policy. Defendants argue, and the court agrees, that the agency's previous finding that "entities with a physical presence *tend* to deliver the most effective outreach" is not contradicted by its current position that Exchanges are best-suited to decide what entities best serve their population and that in some circumstances, this may be achieved by selecting an entity that lacks a physical presence.  Even assuming the agency *was* subject to the heightened standard articulated in *Fox*, it has satisfied the standard because it has "show[n] that there are good reasons for the new policy." 556 U.S. at 515.

entities seeking to become Navigators would still be required to comply with 45 C.F.R. § 155.210(c)(1)(ii), which requires that Navigators demonstrate to the Exchange that they either have or could readily establish relationships with consumers, employers and employees, and self-employed individuals likely to be eligible for enrollment in a QHP.  The agency also noted that it received several comments supporting the change as a means of enabling them to expand options for consumer support.

      **c.**    **Community and Consumer-Focused Non-profit Requirement**

HHS also adequately considered concerns that removing the requirement that at least one Navigator be a community and consumer-focused nonprofit may harm hard-to-reach populations because such entities typically have expertise with hard-to-reach populations and have gained the trust of many community members. *See* 83 Fed. Reg. at 16,980.  It responded by explaining that in some instances, an entity other than a non-profit may be the strongest applicant.  Thus, the change would allow Exchanges to tailor their Navigator Program to target grants to the highest scoring and performing entity, regardless of organization type. *Id*.  Exchanges were free to continue selecting a non-profit entity as a Navigator if it determined this type of entity would best serve its population.

In sum, the record reflects that, contrary to Plaintiffs' assertions, HHS considered and meaningfully responded to the

comments submitted.  It simply found such comments unpersuasive and concluded that the change would, overall, be beneficial.  The court may not supplant the agency's view that the new policy is better than the old one simply because Plaintiffs prefer the old policy.  Because the record plainly shows that there is a "rational connection between the facts found and the choice made," *Ohio Valley*, 556 F.3d at 192, the agency did not act in an arbitrary or capricious way with respect to its elimination of select Navigator standards.

**F.  Modifying Small Business Exchange SHOP Requirements**

The sixth challenged provision of the 2019 Rule involves SHOP Exchanges.  According to the amended complaint, the ACA requires SHOP Exchanges to "make available qualified health plans to . . . qualified employers," to protect the ability of employers and employees to choose between certain qualified health plans, and to protect the ability of employees to enroll even after their employer no longer qualifies as a small employer under the Act.  (ECF No. 44, ¶¶ 80-82).  The ACA provides that each Exchange shall provide for the establishment of a SHOP Exchange "that is designed to assist" small businesses "in facilitating enrollment of their employees in [QHPs] offered in the small group market[.]"  42 U.S.C. § 18031(b)(1)(B).  It also directs the Secretary to "issue regulations setting standards" for SHOP operations.  *Id.* § 18041(a)(1)(A).  Pursuant to that authority, HHS previously

47

promulgated regulations establishing standards for SHOP Exchange operations that required SHOP Exchanges, among other things, to (1) verify employee eligibility, (2) aggregate premiums, and (3) provide online enrollment functionality. *See* 83 Fed. Reg. at 16,996.  The 2019 Rule dispenses with these requirements and instead makes it optional for SHOP Exchanges to provide them.

## 1. Contrary to Law

Plaintiffs argue that it is impossible for SHOP Exchanges to fulfill their statutory duty to "assist" in facilitating enrollment in QHPs unless such Exchanges are *required* to provide the employee verification, premium aggregation, and online enrollment features.  Thus, Plaintiffs argue the 2019 decision to make such features optional conflicts with § 18031(b)(1)(B)'s mandate that SHOP Exchanges "assist" in facilitating enrollment in QHPs.  In other words, Plaintiffs construe the statute as requiring retention of the employee verification, premium aggregation, and online enrollment features.

HHS, on the other hand, interprets § 18031(b)(1)(B)'s requirement that SHOP Exchanges "assist" in facilitating QHP enrollment as imposing an obligation only to provide basic SHOP Exchange functionalities.  *See* 83 Fed. Reg. at 16,997.  In its view, SHOP Exchanges that opted not to offer the features "w[ould] still assist [small businesses] in facilitating [] enrollment . . . because the basic functionalities of an Exchange w[ould]

48

still be provided." The basic functionalities that remain
mandatory include: an internet website that displays and provides
QHP information, a premium calculator that generates estimated
prices of the available QHPs, and a call center to answer questions
related to the SHOP. Further, small employers would still be able
to obtain an eligibility determination from the SHOP website
although they would be required to work with a SHOP-registered
agent or broker, or with a QHP issuer in order to complete the
enrollment process. *Id.* In the eyes of the Secretary, SHOP
Exchanges are only required to offer the aforementioned basic
functionalities in order to meet their statutory obligation to
"assist" small businesses in facilitating employee enrollment in
QHPs.

In addressing this claim, the court applies the familiar
*Chevron* framework. First is the question of whether Congress has
directly spoken to the precise question at issue. Here, the
"precise question at issue" is whether the ACA's mandate that SHOP
Exchanges be "designed to assist" small businesses "in
facilitating enrollment of their employees in QHPs" unambiguously
forecloses HHS's understanding that it was free to make certain
SHOP Exchange functions optional. "If that statute does not
directly foreclose HHS's understanding" the court must "defer to
the agency's reasonable interpretation." *Am. Hosp. Ass'n v. Azar*,
967 F.3d 818, 828 (D.C. Cir. 2020).

49

As always, the court begins with the statutory text. The dictionary definition of "assist" is "to give support or aid."[12] Merriam-Websters Dictionary, available at https://www.merriam-webster.com/dictionary/assist (last visited Jan. 11, 2021). The broad provision that SHOP Exchanges be "designed to assist" in facilitating enrollment in QHPs, by its plain terms, does not unambiguously require retention of the SHOP Exchange functions removed by the 2019 Rule. Moreover, when viewing the language in light of the section as whole, it is clear that Congress intended to delegate authority to HHS to establish the particular standards governing SHOP Exchange operations. *See* § 18041(a)(1)(A) ("The Secretary shall . . . issue regulations setting standards for meeting the requirements under this title . . . with respect to . . . the establishment and operation of Exchanges []including SHOP Exchanges[.]"). The court concludes that the statute is not ambiguous with respect to the precise question at issue. The statute, as written, lends itself clearly to the Defendants' interpretation. "Under *Chevron*, if a statute is unambiguous regarding the question presented, the statute's plain meaning controls." *Morgan v. Sebelius*, 694 F.3d 535, 537 (4th Cir. 2012). Thus, the court does not proceed to step-two of the *Chevron*

---

[12] The Supreme Court of the United States has stated that undefined statutory terms be accorded their ordinary meaning. *See Russello v. United States*, 464 U.S. 16, 21 (1983).

analysis but instead asks whether the agency's interpretation conflicts with the plain language of the statute. It does not. Thus, Plaintiffs' contrary to law challenge fails.[13]

### 2. Arbitrary and Capricious

Plaintiffs argue that Defendants' decision to discontinue the selected SHOP features was arbitrary and capricious because it ignored important aspects of the problem including the reason SHOP Exchanges saw decreased enrollment and how the decision to eliminate such features would negatively affect the interests of small businesses by "either driv[ing] small businesses and their employees off the Exchanges entirely or impos[ing] significant additional costs on employers who seek to use SHOPs to find insurance." (ECF No. 108-1, at 57). HHS asserts that it did not ignore this point but rather decided against it after careful consideration.

HHS noted that it received comments expressing concerns that its proposal did "not address the reasons the SHOP Exchanges have been unattractive to small employers" and that "SHOPs saw low enrollment for reasons other than a poor enrollment system." 83 Fed. Reg. at 16,998; AR1631. For example, some comments stated

---

[13] Even if the court construed the statute as ambiguous and proceeded to analyze it under *Chevron* step-two, Plaintiffs' challenge would still fail because the agency's interpretation is based on a permissible construction of the statute.

that decreased enrollment was likely due to technical and operational issues and thus, was likely to be temporary. HHS did not directly respond to these comments. This is not a fatal flaw in the agency's decision-making process, however, as such comments were only speculative and lacked evidence that enrollment numbers would in fact increase in the future. Thus, the agency was not required to respond. *See Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("[I]t is settled that the agency [is not required] to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking. The agency need only state the main reasons for its decision and indicate it has considered the most important objections.") (internal citations and quotations omitted).

Plaintiffs also argue HHS ignored comments about the negative impact of the change on small business stakeholders. (*See* ECF No. 108-1, at 57). Plaintiffs emphasize a comment submitted by the Center on Budget and Policy Priorities which stated that "small firms that have been utilizing the SHOP could find it difficult, or even impossible, to obtain fair and impartial information about their coverage options, offer workers a choice of small-group health plans, or meet minimum participation requirements outside of open enrollment." (ECF No. 108-1, at 57) (citing AR1631).

A "searching" review of the record reveals that, contrary to Plaintiffs' assertions, the agency addressed the concerns raised

about the 2019 Rule's impact on small business stakeholders, albeit in various scattered paragraphs over several pages rather than in a single response paragraph as is customary.  For example, HHS refuted the commenters' theory the change would prevent small employers from accessing free and impartial information on the basis that employers would have continued access to free and impartial information through other features that would remain available under the new rule, such as a premium calculator where employers could view a complete listing of all QHPs available in a given area.  *See* 83 Fed. Reg. at 16,998.  HHS further stated that employers would still "be able to see the SHOP plans available, by coverage level and issuers, in their area using the plan comparison tool available on a SHOP website." *Id.* at 16,997. In response to concerns that the change could make it difficult to offer workers a choice of plans or to meet minimum participation rates, HHS stated that SHOPs "would still be required to provide an opportunity for employers to offer employees a choice of plans," and that the calculation of minimum participation rates would be adjusted to help employers provide such choices.  *Id.* at 16,999-17,000.   In short, HHS considered the harms to small business stakeholders but explained its belief that such harms would be minimal given the relatively small number of employers that had used SHOPs in the past and the alternative features that remained available.  *See id.* at 16,996 ("[I]n light of decreases in issuer

participation and lower enrollments in SHOP plans in 2018, it [was] not cost effective for the Federal Government to continue to maintain certain [Federal] SHOP functionalities, collect significantly reduced user fees on a monthly basis, maintain the technologies required to maintain a[] [Federal SHOP website and payment platform, generate enrollment and payment transaction files, and perform enrollment reconciliation.")].   Accordingly, there was "a rational connection between the facts found and the choice made." *Ohio Valley*, 556 F.3d at 192.   That is all that the APA requires.   For these reasons, the agency's decision to dispense with certain SHOP Exchange requirements was not arbitrary or capricious.

### G.   Imposing Income Verification Requirements

The seventh challenged provision of the 2019 Rule relates to new income verification requirements imposed on certain individuals seeking an APTC.   The 2019 Rule requires that "where electronic [government] data sources reflect income under 100 percent FPL and a consumer attests to income between 100 percent FPL and 400 percent FPL," additional income verification must be submitted.   83 Fed. Reg. at 16,985.   The stated rationale for this change is "to protect against overpayment of APTC," because

individuals with an income below 100 percent FPL are generally not eligible to receive APTCs.[14]   *Id.*

Plaintiffs contend that HHS's decision to impose income verification requirements is arbitrary and capricious because it failed to support its decision with anything more than unsubstantiated conclusions and failed to acknowledge the impracticability of low-income applicants being able to meet this requirement.

Plaintiffs assert, and the record confirms, that Defendant's stated rationale for imposing income verification requirements-to prevent fraud in states that did not expand Medicaid-is unfounded. Defendants failed to point to any actual or anecdotal evidence indicating fraud in the record.   HHS essentially admits as much with its statement that, "HHS acknowledges that it does not have firm data on the number of applicants that might be inflating their income to gain APTC, but believes that it is reasonable to design an appropriate program integrity check, particularly when incentives may exist for applicants to do so."   83 Fed. Reg. at 16,986.   Moreover, the agency failed to provide any reason why such data could not readily be obtained.   While the APA does not demand that an agency "obtain the unobtainable," a court may set

---

[14] This is because the ACA contemplated that individuals with an income below 100 percent FPL would instead be eligible for Medicaid.   (*See* ECF No. 92, at 30).

aside agency action "because of failure to adduce empirical data that can readily be obtained[.]" *Huntco Pawn Holdings, LLC v. U.S. Dep't of Def*., 240 F. Supp. 3d 206, 225 (D.D.C. 2016) (quoting *Fox*, 556 U.S. at 519). HHS improperly elevated the objective of fraud prevention, for which it had no evidence, above the ACA's primary purpose of providing health insurance. *See King*, 759 F.3d at 373-374 ("The Supreme Court has recognized [that] the broad policy goals of the Act [are] 'to increase the number of Americans covered by health insurance and decrease the cost of health care.'"). Such "[a]n unjustified leap of logic or unwarranted assumption, however, can erode any pillar underpinning an agency action, whether constructed from the what-is or the what-may-be." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012).

The agency received a large volume of comments spelling out exactly why providing additional income verification would be so onerous for low-income individuals. "Many commenters were concerned that this new verification process would disadvantage house-holds with lower household incomes" because low-income consumers are more likely to experience variance in their income levels and would also have difficulty in providing documentation to resolve their income data matching issues. 83 Fed. Reg. at 16,986. This is because many "work in part-time or in hourly positions," "rely on multiple part-time or part-year jobs," or

"work in cash industries, such as food service, where tip-income makes up the largest portion of their earnings" and "[i]n all these cases, documentation from an employer may be hard to obtain." AR1657. The record is replete with similar comments. *See* AR909, 934-36, 1340-41, 1449, 1458, 1824, 1943-44, 2063, 2682-83, 2720, 2738, 3122-23, 3486, 3529. Despite the overwhelming number of comments describing this problem, Defendants tersely responded that the problem of fluctuating income could be solved by imposing a "threshold" for income inconsistencies, and that they would continue to publish a consumer guide to help households "provide the correct documentation to verify their income in the event of an inconsistency." 83 Fed. Reg. at 16,986. Defendants do not state the threshold level or why it would be effective in solving the problem. Moreover, even if the threshold was effective in reducing the number of individuals who must provide supplemental verification documents, it does nothing to address the concern raised that many low-income individuals would be unable to obtain verifying documentation at all given the nature of their work. Such "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decision-making." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). HHS's decision to prioritize a hypothetical risk of fraud over the substantiated risk that its decision result in immense

administrative burdens at best, and a loss of coverage for eligible individuals at worst, defies logic.

## H.   Curtailing Insurance Rate Review

The eighth challenged provision of the 2019 Rule limits review of insurance rate increases.  The PHS Act directs the Secretary, in conjunction with States, to "monitor premium increases of health insurance offered through an Exchange and outside of an Exchange." 42 U.S.C. § 300gg-94(b)(2)(A).  The Secretary is delegated authority to promulgate "such regulations as may be necessary or appropriate to carry out" such review.  *Id.* § 300gg-92. Accordingly, CMS promulgated regulations that required insurers to submit written justifications for proposed annual rate increases above a given threshold.  Such justifications then had to be reviewed by HHS or state regulators before the plan could issue. Previously, student health insurance plans were subject to this review and the threshold triggering review was ten percent.  The 2019 Rule exempts student health plans from this automatic review process known as "pre-issuance rate review" and raises the threshold triggering such review from rate increases of 10% or more to rate increases of 15% or more.

### 1.   Contrary to Law

Plaintiffs challenge Defendants' decision to exempt student health plans from the pre-issuance rate review as contrary to law.

Plaintiffs' challenge fails because they focus on the wrong statutory provisions and ignore the relevant ones.

The fatal flaw in Plaintiffs' argument is this: they fail to distinguish properly between pre-issuance rate review of premium increases generally, governed by 42 U.S.C. § 300gg-92 and 42 U.S.C. § 300gg-94(b)(2)(A), and pre-issuance rate review of *unreasonable* premium increases, governed by 42 U.S.C. § 300gg-94(a)(1)-(2).

Plaintiffs argue that the decision to exempt student health plans from pre-issuance review is contrary to § 300gg-94(a)(1) which requires Defendants to review "unreasonable increases in premiums for health insurance coverage" and § 300gg-94(a)(2) which requires "health insurance issuers to submit to the Secretary . . . a justification for an *unreasonable* premium increase *prior* to the implementation of the increase." Plaintiffs contend that because student health coverage is included in the definition of health insurance coverage, it follows that student health issuers must submit written justification for an unreasonable premium increase before a plan may be issued. This statement is accurate; however, it overlooks that the 2019 Rule does *not* exempt student health plan issuers from their obligations in § 300gg-94(a)(1)-(2) to submit a justification for *unreasonable* rate increases.

The 2019 Rule merely exempts student health plan issuers from having to submit for automatic pre-issuance review *all* proposed rate increases above a specified threshold. This requirement arose

*not* from § 300gg-94(a)(1)-(2), but from a set of regulatory rules[15] promulgated in 2011 pursuant to the Secretary's grant of discretion in § 300gg-92 to creates rules as may be necessary to monitor premium increases *generally* under § 300gg-94(b)(2)(A).   The critical point Plaintiffs overlook is that only *after* a rate increase is deemed "unreasonable" does it become subject to § 300gg-94(a)(2).   In other words, not all rate increases are "unreasonable rate increases." "Unreasonable rate increases" are specifically defined in 45 C.F.R. § 154.102.   The requirement that student health plans submit written justifications for "unreasonable rate increases" remains intact and there are processes for determining whether a rate increase is unreasonable other than the pre-issuance review process.   Thus, the 2019 Rule's exemption of student health plans from pre-issuance rate review does not violate the plain language of the § 300gg-94(a)(1) which directs the Secretary only to establish a process for the annual review of *unreasonable* increases in premiums.   Nor is the 2019 Rule contrary to the language of § 300gg-94(a)(2) which directs the Secretary to "monitor premium increases" because the statute does not specify a particular method for monitoring rate increases or require the Secretary to apply uniform rate review requirements to all health insurance coverage.   The statute vests discretion in

---

[15] *See* 45 C.F.R. § 154.103, 200, 205, 210, 215, 225, and 230.

the Secretary as to *how* to review and monitor premium increases generally.   Because the Secretary's interpretation does not conflict with the plain language of the statute, it is not contrary to law.

### 2.   Arbitrary and Capricious

### a.   Exempting Student Health Plans from Pre-Issuance Review

Plaintiffs also contend that HHS's decision to exempt student health plans from automatic pre-issuance review is arbitrary and capricious because it failed to provide "adequate reasons for its decision[.]"   (ECF No. 108-1, at 62) (quoting *Encino Motorcars*, 136 S. Ct. at 2125).   Defendants counter that the record contains their precise reasoning and that such reasoning is adequate.

The agency offers only a brief recitation of its reasoning in the final rule.   It states that "student health insurance coverage is generally rated and administered differently from other forms of individual health insurance coverage" but does not expand on what the differences are in any detail.   83 Fed. Reg. at 16,972. What Plaintiffs overlook, however, is that this short statement is followed by a citation to footnote 37.   Footnote 37 cites to the preamble discussion in Health Insurance Market Rules; Rate Review, 78 Fed. Reg. 13,406, 13,424 (Feb. 27, 2013) (the "February 2013 Rule").   There, HHS goes into detail about the unique nature of student health insurance plans.   It states that:

> student health insurance coverage generally is
> rated and administered differently than other
> forms of individual health insurance coverage
> [because] [i]ssuers of student health
> insurance coverage typically contract with a
> college or university to issue a "blanket"
> health insurance policy, from which students
> can buy coverage, and the policy is generally
> rated on a group basis based on the total
> expected claims experience of the college's or
> university's students enrolled in the plan.

*Id*. Thus, contrary to Plaintiffs' assertion, HHS did provide adequate reasoning for its decision to exempt student health plans from automatic review: its belief that student health plans are structurally more similar to large group plans than individual plans and therefore, should be treated more like large group plans which were already exempt from automatic review.

Plaintiffs also argue that the agency's conclusion that student health insurance plans should be treated like large-group plans constitutes a change in agency position requiring a heightened justification under *Fox,* 556 U.S. at 515 (stating that an agency must provide a more detailed justification where its "new policy rests upon factual findings that contradict those which underlay its prior policy."). In support, they point to two previous statements by the agency that "student health insurance plans are not employment-based, [therefore] they do not meet the definition of a group health plan," 76 Fed. Reg. 7,767, 7,769 (Feb. 11, 2011), and that student health insurance is "a type of individual health insurance coverage." 79 Fed. Reg. 13,744, 13,752

(Mar. 11, 2014). Defendants counter that the prior policy of treating student health plans as individual plans did not rest upon any "factual findings" but was merely a "default until HHS considered the question in greater detail and determined that student health insurance coverage should be treated like large group coverage for purposes of pre-issuance federal rate review." (ECF No. 132, at 39). Thus, they argue, the 2019 Rule does not contradict any prior factual findings and is not subject to a heightened justification. They also argue that the decision to treat student health plans as group plans does not constitute a reversal in agency policy, but rather reflects the agency's "incremental" realization over several years that student health insurance coverage resembles large group coverage more than it does individual coverage. *See* 77 Fed Reg. 16,453, 16,457 (Mar. 21, 2012); 78 Fed. Reg. 13,406, 13,424 (Feb. 27, 2013); 79 Fed. Reg. 13,744, 13,752 (Mar. 11, 2014) (exempting student health plans from other ACA requirements because they share similarities with large group plans). They argue this evolving view has been articulated in previous rules and thus, is another reason why no heightened standard is applicable to the agency's decision to exempt student health plans in the 2019 Rule.

The court agrees that the agency's decision does not rest upon new factual findings which contradict previous ones, but rather on the agency's reexamination of existing facts. However,

even if the agency is held to the heightened standard in *Fox*, the agency's explanation for its decision is sufficient.  The agency stated that student health plans are a unique form of individual health insurance coverage and that because of this, such plans were already exempt from certain individual health insurance coverage requirements like the guaranteed availability and renewability requirement and the single risk pool requirement. The agency's citation to the February 2013 Rule further explained why it views student health plans as more analogous to large group plans than individual group plans.  *See* 78 Fed. Reg. at 13,424. Thus, the agency's decision to exempt student health insurance coverage from federal pre-issuance review was a logical extension of the agency's belief that student health plans are structurally more similar to large group plans than individual plans.  When viewed in its entirety, the record shows that HHS provided a good reason for exempting student health coverage from federal pre-issuance review.  That is all the heightened standard requires.

**b.  Modifying Threshold for Rate Review**

Plaintiffs advance three arguments as to why Defendants' decision to raise the threshold triggering rate review from ten to fifteen percent was arbitrary and capricious.

First, Plaintiffs contend the agency ignored concerns that the reduced review resulting from a higher threshold would "normalize excessive increases."  (*See* ECF No. 108-1, at 63)

64

(citing AR1104, 1313, 1339, 1623, 1696). This assertion is unsupported. HHS explained on the record that it disagreed that raising the threshold from ten to fifteen percent would normalize excessive increases. The agency explained that since the inception of the rate review threshold, only one increase that fell between ten and fifteen percent was deemed an "unreasonable" increase after a complete review. *See* 83 Fed. Reg. at 16,973. Thus, the agency found it unlikely that increasing the threshold from ten to fifteen percent would have any significant effect at all, let alone normalize excessive increases. *Id.* The record therefore reflects that the agency did not ignore concerns that raising the threshold would normalize increases, it merely disagreed.

Plaintiffs' second argument is that, in narrowly focusing on the number of rates deemed unreasonable at the end of the rate review process, Defendants ignored that that the process itself was valuable. Plaintiffs contend that requiring issuers to submit written justifications for their rate increases created transparency in the rate-setting process and that it was the very existence of the process itself that protected consumers against rate increases. *See* AR2005-06, 2138, 2734 (explaining that requiring issuers to undergo mandatory review can act as a forcing mechanism, and that rates have been reduced during the course of the review prior).

The record reveals that HHS did not ignore this concern either.  HHS specifically acknowledged that the change would result in 125 fewer written justifications from the prior year but stated that it "expected the change to have a minimal impact on transparency" because issuers must continue to submit other documentation explaining rate increases.  *See* 83 Fed. Reg. at 16,973 ("All issuers must continue to submit a Uniform Rate Review Template (URRT) (Part I of the Rate Filing Justification) for all single risk pool plan submissions.  Issuers offering a QHP or any single risk pool submission containing a rate increase of any size must continue to submit an actuarial memorandum (Part III of the Rate Filing Justification).").  The agency simply disagreed that raising the threshold would significantly reduce transparency given that the other Rate Filing Justifications remained in place. The agency's response adequately addressed all comments received on the subject.

Finally, Plaintiffs argue that Defendants' decision to increase the threshold for rate review was arbitrary because it based its decision on the significant rate increases seen in the past few years but ignored the reasons behind those rising premiums.  Specifically, Plaintiffs contend that the agency dismissed comments suggesting that premium increases exceeding fifteen percent seen in recent years were based on "extraordinary circumstances" and therefore could be expected to slow in the

future.  (*See* ECF No. 121, at 39) (citing AR1623).  *See also* AR2734 ("National Health Expenditure data shows a 6.5% increase in marketplace plans for 2017 due to various temporary factors but slower spending growth in private insurance overall.").  HHS responds that it was not required to respond to such comments because they merely speculated about the possibility of a change in market conditions in the future.  (*See* ECF No. 132, at 40). The court agrees that because of the speculative nature of such comments, the agency was not required to respond in any more detail than it did.  For example, the agency acknowledged that some commenters suggested that a "6 percent threshold would be appropriate because that would be in line with health expenditures but still above the general rate of inflation."  83 Fed. Reg. at 16,973.  However, it explained that it did not agree that this threshold rate would be appropriate because it "may increase the burden on issuers and States."  *Id*.  The agency's choice to base its decision off the current market conditions occurring before it, rather than suppositions posed by commenters about what the market might do in the future, was entirely appropriate.

## I.   Reducing Medical Loss Ratio Rebates

The ninth, and final, challenged provision of the 2019 Rule relates to consumer rebates for poor insurer performance.  The ACA requires that health insurance companies spend eighty percent of each premium received on actual health care rather than

67

administrative costs like marketing, overhead, and executive salaries. This requirement is known as the medical loss ratio ("MLR"). The numerator consists of the amount spent paying out claims plus the amount spent on activities that improve quality of health care ("QIA expenditures"). The denominator consists of the total annual premium paid by the enrollee. *See* 42 U.S.C. § 300gg-18(a). "MLR standards . . . are intended to help ensure policyholders receive value for their premium dollars," and "to create incentives for issuers to become more efficient in their operations." 75 Fed. Reg. 74,864, 74,865 (Dec. 1, 2010). Thus, insurers must pay rebates to enrollees if the MLR drops below 80 percent for small group plans or 85 percent for large group plans.

Previous HHS regulations identified categories of eligible QIA expenditures for purposes of reporting and calculating MLR, as well as excluded certain activities from inclusion in the total QIA expenditure amount. *See* 45 C.F.R. § 158.150(b), (c). Prior to the 2019 Rule, issuers were required to report QIA expenditures in alignment with the categories identified in § 158.150(b)(2)(i)-(v) and "to use and disclose specific allocation methods to report expenses, including QIA expenditures." 83 Fed. Reg. at 17,032. The 2019 Rule provides issuers with the option to report a fixed amount equal to 0.8 percent of earned premium in lieu of reporting their actual expenditures on activities that improve health care quality. *See id.*; 45 C.F.R. § 158.221(b)(8).

An issuer's reported MLR determines whether or not it must provide an annual rebate to enrollees. *See id.* § 300gg-18(b)(1)(A) ("[A] health insurance issuer . . . shall . . . provide an annual rebate to each enrollee . . . [based on] the amount of premium revenue *expended* by the issuer[.]"). Generally, rebates are required if the issuer's MLR is less than "85 percent in the large group market and 80 percent in the small group or individual market." *Id.* The rebate provision is designed to "encourage use of premium income to provide benefits to insureds and discourage its use to offset administrative costs, thus serving the primary goal of expanding affordable care." *Morris v. Cal. Physicians Serv.*, 918 F.3d 1011, 1014 (9th Cir. 2019).

The ACA does not specify what activities and expenditures do or do not qualify as QIA expenditures. Thus, pursuant to the Secretary's grant of authority in § 300gg-18(b)(3) to promulgate regulations to enforce the MLR requirements, HHS promulgated regulations in 2011 identifying five categories of eligible QIA activities expenditures, *see* 45 C.F.R. § 158.150(b)(2)(i)-(v), as well as categories for exclusion, *see* 45 C.F.R. § 158.150(c)(1)-(14). These regulations required issuers to track expenditures, identify whether they are appropriately categorized as belonging to one of the five QIA expenditure eligible categories, and if so, to report such QIA expenditures in alignment with the five categories specified. Issuers were also required to "use and

disclose specific allocation methods" to report QIA expenditures. 45 C.F.R. § 158.170.  HHS observed that, between 2011 and 2015 issuers reported spending, on average, 0.8 percent of premium of total QIA.  Thus, beginning with the 2019 Rule, HHS removed the requirement that issuers track and report their actual QIA expenditures, and allowed them simply to report spending a fixed 0.8 percent figure on QIA expenditures.

### 1.   Contrary to Law

In their final APA challenge, Plaintiffs contend that the 2019 Rule is contrary to § 300gg-18(a)(2) which provides that: "A health insurance issuer . . . shall . . . submit to the Secretary . . . a report . . . [that] include[s] the percentage of total premium revenue . . . that such coverage *expends* . . . for activities that improve health care quality."  As with all contrary to law challenges, the court begins by asking if Congress has spoken directly to precise question at issue.

The precise question at issue here is whether term "expends" requires issuers to report the actual amount spent on QIA activities.  The agency interprets the term "expends" as permitting issuers to report a fixed percentage for QIA expenditures.  It argues that this interpretation comports with the statutory text because the statute does not require issuers to "detail" each individual QIA expenditure and the itemized list method was imposed only by regulation.  (*See* ECF No. 118-1, at 61).  Plaintiffs, on

70

the other hand, interpret the term "expend" as requiring "insurers to report the *actual* amount they expended, even if does not require them to do so in a particular manner." (ECF No. 121, at 40). "To allow insurers to instead claim a flat 0.8% rate for [QIA] amounts to a de facto adjustment of the [MLR] from 80% to 79.2% without complying with the statutory procedures for making such an adjustment." (*Id.*) (citing 42 U.S.C. § 300gg-18(b)(1)(A)(ii), (d)).

"Because we presume Congress expresses its intent through the ordinary meaning of the words it uses, an exercise of statutory interpretation must begin by examining the plain and literal language of the statute." *Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Human Servs.*, 794 F.3d 383, 391 (3d Cir. 2015). The dictionary defines "expend" as "to pay out." Merriam-Websters Dictionary, available at https://www.merriam-webster.com/dictionary/expend?src=search-dict-hed (last visited Dec. 30, 2020). The court thus agrees with Plaintiffs that the plain and ordinary meaning of "expend" requires insurers to report the amount *actually spent* and not a pre-determined fixed amount reflecting an average spent by insurers in years past. If Congress intended to allow for reporting of an estimate based on data from years past, it could and would have said so. "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."

*City of Arlington,* 569 U.S. at 296.   The Supreme Court "ha[s] stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."   *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

Viewing the statute within its broader context further affirms that HHS's understanding of "expend" is foreclosed.   First, § 300gg-18(a) is entitled "Clear Accounting for Costs" which further implies that the statute intends for the reporting of actual amounts spent.   Second, § 300gg-18(d) provides that: "The Secretary may adjust the rates [triggering a rebate] if the Secretary determines appropriate on account of the volatility of the individual market due to the established of State Exchanges." The fact that this section allows for the Secretary to adjust the rate triggering rebates "on account of market volatility" implies that the Secretary may not adjust the rate purely to ease the administrative burden on issuers as is the consequence of permitting the reporting of pre-determined fixed rate.   Third, the agency's interpretation of "expend" is contrary to the legislative history.   Congress's purpose in promulgating the MLR requirement was to decrease healthcare costs by "incentivizing issuers to maximize spending on health care and activities that improve healthcare quality."   By allowing insurers to take credit for spending on activities that improve healthcare quality without

actually proving that they have done so, the 2019 Rule undermines the very purpose of the statute.  In sum, the statute's plain meaning, context, and legislative history all yield the conclusion that HHS's interpretation of "expend" as allowing for a reporting of a fixed amount on QIA expenditures is directly foreclosed. Plaintiffs prevail at step-one and the court's analysis need not proceed any further.

### 2. Arbitrary and Capricious

Finally, Plaintiffs argue that Defendants' decision to allow standardized QIA reporting, even if not contrary to law, nevertheless was arbitrary and capricious for three reasons. First, Plaintiffs state that HHS failed to provide any evidence corroborating its rationale for the change.  Second, the agency failed to consider alternatives to standardization.  Third, the agency failed to meaningfully address comments explaining that standardization would disincentivize issuer investment in activities that improve healthcare quality thereby harming consumers.  The court addresses each of these arguments in turn.

### a.   Failure to Provide Adequate Reasoning

HHS states in the record that the change was prompted by its:

> observ[ation] that the current MLR regulations require a substantial effort by issuers to accurately identify, track and report QIA expenses . . . [and] that, between 2011 and 2015, issuers that did report QIA expenses have reported spending, on average, a consistent percentage of premium on total QIA:

73

> approximately 0.7 percent in 2011, and 0.8
> percent in 2012 through 2015. Given issuers'
> relatively low and consistent reported
> expenditures on QIA and the significant burden
> associated with identifying, tracking, and
> reporting these expenditures, we proposed
> [allowing] issuers an option to report . . .
> a single QIA amount equal to 0.8 percent[.]

83 Fed. Reg. at 17,032. Plaintiffs argue that HHS failed to provide any evidence to corroborate its assertion that issuers faced a "significant burden" in reporting quality improvement activity. (ECF No. 108-1, at 66). HHS responds that its assertion *was* supported, 83 Fed. Reg. at 17,033, but that its decision was justified in any event, because such decision did not rely solely on the rationale that reporting was burdensome. HHS contends the record shows that its decision was *also* based on its conclusion that detailed reporting was unnecessary given that its audit data showed "very low and consistent average expenditures made on QIA [] year [after] year." (ECF No. 118-1, at 63) (citing 83 Fed. Reg. at 17,032).

The record supports HHS's position. HHS did not solely rely on the premise that tracking expenditures was burdensome for its decision. Rather, it expressly stated that, in addition to the burden imposed, it also believed detailed reporting was unnecessary because reported expenditures remained low and relatively unchanged year over year. The agency adequately corroborated this assertion with data from its audit history. *See*

83 Fed. Reg. at 17,032.  Thus, HHS's decision is not arbitrary and capricious due to a failure to support its reasoning.

### b.   Failure to Consider Alternatives

Plaintiffs next argue HHS's decision was arbitrary and capricious because it failed to consider a significant alternative to its policy choice presented by the American Academy of Actuaries.  (*See* ECF No. 121, at 42).  The organization proposed removing the requirement that issuers split QIA into five categories but retaining the requirement to report actual QIA expenses.  This alternative would reduce some of the administrative burden on issuers without resorting to fixed reporting which would ultimately harm consumers by leading to reduced rebates.  (*See* AR1797).  Defendants argue that HHS was not required to address the alternative proposal because it would "still impose some level of unnecessary burden [in tracking QIA expenditures]" and require "revising the entire framework for reporting [] expenditures." Therefore, Defendants argue, the proposal was "insignificant" and merited no response whatsoever.

The court disagrees.  While an agency is not required to consider "every alternative device and thought conceivable by the mind of man[,]" *State Farm*, 463 U.S. at 51, "it is well established that an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives."  *Am. Radio Relay League, Inc. v.*

*FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) (citing *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987).

Regardless of whether or not HHS would have ultimately rejected the Academy's proposal, it was nonetheless a "significant and viable alternative" that "was neither frivolous nor out of bounds." This is especially true in light of the fact that HHS itself noted that fixed reporting would reduce rebates to consumers by approximately twenty-three million dollars. *See* 83 Fed. Reg. at 17,046, 17,054. Thus, the alternative merited consideration and HHS's failure to "give a reasoned explanation for its rejection" of the alternative was fatal. This flaw in the agency's decision-making process constitutes a violation of the APA.

c. **Failure Meaningfully to Consider Comments**

Plaintiffs also contend that HHS's decision was arbitrary and capricious because it failed meaningfully to consider comments explaining that standardized reporting would disincentivize issuer investment in QIA, thereby harming consumers, and comments noting that standardized reporting was unlikely meaningfully to decrease the administrative burden on issuers that actually do make quality improvement expenditures. (*See* ECF No. 121, at 43).

A review of the record confirms that numerous commenters voiced concerns that standardized reporting would "be a loophole for insurance companies to get away with charging more for coverage without having to rebate excess premiums to consumers" and would

76

"give[] a competitive advantage to insurers that do not invest in quality improvement activities, since they could claim this credit toward their MLR without having to go [through] any of the hard work and expense of improving the quality of health care for consumers." (AR2290). (*See also* AR741, 914-15, 1088-89, 1598, 1782-83, 1946-47, 2004-05, 2143-44, 2157-58, 2712-13, 2730, 2748-49, 2842, 2935-36, 3016, 3227-28, 3444). HHS acknowledged the existence of these concerns in the record, stating:

> [W]e considered retaining the current quality improvement activity reporting requirements, since giving issuers the option to report a standardized rate for QIA expenditures may inhibit HHS from being able to analyze trends in issuers' investments in improving the quality of healthcare in the future, and may also reduce rebates to consumers by allowing issuers to effectively increase their MLRs by 0.8 percent even if those issuers engaged in and spent only trivial amounts on QIA. However, this change will also potentially level the playing field among issuers to a certain extent and lead to more accurate rebate payments, since many issuers likely do engage in QIA but forego reporting that spending because the burden of . . . reporting QIA expenses exceeds the benefits for MLR purposes. Because the finalized approach of giving issuers the option to report a minimal, standardized rate will reduce unwarranted regulatory and economic burdens for issuers that do not want to track and report the exact QIA amounts for their MLR calculation, we believe that the finalized approach will be more effective and represented a better balance than the current requirements.

83 Fed. Reg. at 17,056. Thus, while HHS did not *ignore* comments explaining the dangers of standardization, it did not meaningfully

consider them either.   Essentially, HHS shrugged these comments off by quickly concluding that the benefit of fixed percentage reporting (the *possibility* that more issuers would report QIA since the burden of doing so would be reduced) outweighed the harms (tens of millions of dollars in reduced rebates to consumers, premium increases, and a decreased ability to track trends in issuer investment in QIA in the future).   *See* 83 Fed. Reg. at 17,046 and 17,054.   *See also* AR1636 and 270.   To begin, this conclusion is difficult to square with the ACA's mandate of improving access to quality, affordable healthcare.   Apart from that, HHS provided no evidence for its assertion that more issuers would report QIA expenditures under a standardized reporting system.   Nor did the agency acknowledge comments undercutting that conclusion by pointing out that the reason many issuers may not have been reporting expenditures, was not because of any administrative burden, but simply because they were not making such investments at all.   (*See* AR1636) (noting that "many issuers do not currently report undertaking [QIA investments].").

HHS also stated that it did not believe standardized reporting would actually lead to reduced issuer spending on QIA as commenters suggested because issuers would still "have financial incentives to improve the health of their enrollees because healthier populations incur lower medical costs, and reducing the administrative burden associated with tracking QIA will free up

funds that issuers can invest in QIA." 83 Fed. Reg. at 17,033. This response ignores the fact that the MLR system was established precisely for the purpose of incentivizing issuers to spend on activities that improve healthcare quality. *See Morris*, 918 F.3d at 1016 (citing 77 Fed. Reg. 28,790, 28,791-28,793 (May 16, 2012) ("The MLR is thus intended to further the ACA's goal of decreasing health care costs by providing greater transparency on how consumers' premium dollars are used and incentivizing issuers to maximize spending on health care and activities that improve health care quality, thereby promoting greater efficiency in health insurance markets."). Clearly then, Congress did not believe such external incentives adequate. Thus, HHS failed to respond to "significant points" and to consider "all relevant factors" raised by the public comments, *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977), rendering its decision arbitrary and capricious.

## V.   The Appropriate Remedy

In light of the court's findings that the agency's decision to standardize QIA reporting was contrary to law and that several decisions were arbitrary and capricious, the only question remaining is the appropriate remedy for Plaintiffs. Where agency action is found contrary to law, it is clear that vacatur is required. "The Supreme Court has recognized that Section 706(2)(A) 'requires federal courts to set aside federal agency action' that

is 'not in accordance with law.'"   *Sierra Club v. United States Army Corps of Engineers*, 909 F.3d 635, 655 (4th Cir. 2018) (citing *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003)).   However, in instances where agency action is deemed arbitrary and capricious rather than contrary to law, courts will, at times, remand the agency's decision without vacating it.   *See A*llied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993).   "The decision whether to vacate depends on [1] 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed.'"   *Id*. at 150-51 (quoting *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)).

Defendants argue that the court should apply the *Allied-Signal* approach here and find that vacatur is inappropriate because HHS "may well be able to justify its decision[s]" on remand and because vacatur would have disruptive consequences on the agency as well as other members of the health insurance community.   (ECF No. 132, at 44).   Defendants instead request that the court "either remand to HHS without vacatur or provide an opportunity for the parties [to address briefly] appropriate remedies."   (*Id*.). Plaintiffs, on the other hand, contend that this court should reject the *Allied-Signal* remand-without-vacatur approach because

the United States Court of Appeals for the Fourth Circuit "has never formally embraced [this] approach." *Sierra Club*, 909 F.3d at 655.

The court concludes that, even under the *Allied-Signal* approach, vacatur is warranted as to Plaintiffs' arbitrary and capricious claims because, given the seriousness of the deficiencies in the agency's explanations, it is unlikely that the agency will be able to substantiate its decisions on remand. "[T]he court must vacate a decision that 'entirely failed to consider an important aspect of the problem.'" *SecurityPoint Holdings, Inc. v. TSA*, 867 F.3d 180, 185 (D.C. Cir. 2017) (quoting *State Farm*, 463 U.S. at 43); *see also Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) ("In the past [courts] have not hesitated to vacate a rule when the agency has not responded to empirical data or to an argument inconsistent with its conclusion."). Where, as here, "there is substantial doubt whether the [agency] chose correctly . . . [,] [t]hat makes vacatur appropriate." *Humane Soc'y v. Zinke*, 865 F.3d 585, 614-15 (D.C. Cir. 2017) (citation omitted). The court concludes that, for each of the agency decisions found arbitrary and capricious, there is not a serious possibility that the agency will be able to rehabilitate its reasoning on remand. Moreover, the second *Allied-Signal* factor also leans toward vacatur because, as Plaintiffs point out, any disruptive consequences caused by vacatur may be

81

mitigated by the agency's exercise of its power to issue interim rules during the transition period.  Accordingly, the court will vacate and remand the portions of the 2019 Rule found arbitrary-and-capricious.  The court will also vacate the ninth challenged provision found contrary to law.

## VI.  Conclusion

For the foregoing reasons, the cross motions for summary judgment will be granted in part and denied in part.  The motions for leave to file as *amici curiae* will be granted.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
